Edward Swanson (SBN 159859)
ed@smllp.law
Carly Bittman (SBN 305513)
carly@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94101
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for Defendant Lewis Wallach

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>LEWIS WALLACH,<br><br>　　　　Defendant | Case No. 20-CR-00365-MMC<br><br>**NOTICE OF MOTION AND MOTION FOR COMPASSIONATE RELEASE** |

TO: THE UNITED STATES THROUGH ASSISTANT UNITED STATES ATTORNEY LLOYD FARNHAM

PLEASE TAKE NOTICE that on a date and time to be set by the Court, before the Honorable Maxine M. Chesney, Lewis Wallach will and hereby does move the Court for an order releasing him from the custody of the Bureau of Prisons and imposing home detention as a condition of supervised release. This motion is based on 18 U.S.C. section 3582, the files and records in this action, the attached memorandum of points and authorities, the concurrently filed declaration of counsel and Carole Santos, and on such argument as may be made at the hearing.

Dated: December 1, 2023              Respectfully submitted,

                                                    /s/ Edward Swanson
                                                 Edward Swanson
                                                 Carly Bittman
                                                 SWANSON & McNAMARA LLP
                                                 Attorneys for Lewis Wallach

2

**Motion for Compassionate Release**
*United States v. Wallach*, 20-CR-00365 MMC

**TABLES OF CONTENTS**

I. INTRODUCTION .................................................................................................................1

II. RELEVANT BACKGROUND .............................................................................................2

   A) Trial Court Proceedings and Incarceration History .......................................................2

   B) The Events Leading to Mr. Wallach's Traumatic Brain Injury ......................................2

   C) Mr. Wallach's Ongoing Need for Comprehensive Care and Assistance with Activities of Daily Living ..................................................................................................5

   D) Mr. Wallach's Medical Records Reveal Concerning Discrepancies in Documentation and Gaps in Care .....................................................................................6

   E) A Staffing Shortage Prevents the BOP from Providing Adequate Care to Inmates with Complex Health Concerns Like Mr. Wallach .......................................................8

   F) Mr. Wallach's Release Plan .............................................................................................9

   G) Exhaustion of Administrative Remedies .........................................................................9

III. LEGAL STANDARD .........................................................................................................10

IV. ARGUMENT .......................................................................................................................10

   A) Mr. Wallach Has Established Extraordinary and Compelling Circumstances Warranting a Sentence Reduction ..................................................................................10

   B) The Section 3553(a) Factors Weigh in Favor of Reducing Mr. Wallach's Sentence .........................................................................................................................12

V. CONCLUSION ....................................................................................................................13

# TABLE OF AUTHORITIES

## FEDERAL CASES

*United States v. Asaro*, 2020 WL 1899221 (E.D.N.Y. Apr. 17, 2020) .......................................... 11

*United States v. Bardell*, 634 F. Supp. 3d 1083 (M.D. Fla. 2022) ................................................ 12

*United States v. Beck*, 425 F. Supp. 3d 573 (M.D.N.C. 2019) ..................................................... 12

*United States v. Bellamy*, 2019 WL 3340699 (D. Minn. July 25, 2019) ....................................... 11

*United States v. Gray*, 416 F.Supp.3d 784 (S.D. Ind. Sept. 20, 2019) ......................................... 11

*United States v. McCall*, 465 F. Supp. 3d 1201 (M.D. Ala. 2020) ............................................... 12

*United States v. Nieves-Feliciano*, 2021 WL 1170317 (D. Conn. Mar. 29, 2021) ....................... 12

*United States v. Verasawmi*, 2022 WL 2763518 (D.N.J. July 15, 2022) ..................................... 12

## FEDERAL STATUTES

18 U.S.C. § 3582(c) .................................................................................................................. 9, 10

28 U.S.C. § 994(a) ......................................................................................................................... 10

## REGULATIONS

U.S.S.G. § 1B1.13 ................................................................................................................. passim

## I.     INTRODUCTION

In January 2023, as a direct result of the Bureau of Prison's negligent medical treatment, Mr. Wallach fell and suffered a traumatic brain injury that will impair his ability to think, chew, swallow, walk, and otherwise take care of himself, likely for the rest of his life. This horrific injury makes clear that the BOP is unable to care for Mr. Wallach or keep him safe. At the time of his fall, Mr. Wallach's was already housed in a medical facility that provides the highest level of care in the BOP system. But even in a facility designed to provide 24-hour nursing care, the BOP failed to prevent a completely foreseeable accident. The resulting harm cannot be undone, but things could certainly get worse.

Mr. Wallach remains unable to care for himself and is at heightened risk of further injury and illness. It is not hyperbole to say that Mr. Wallach's life is in danger. This danger is multifaceted. He requires a wheelchair and, because he can forget his own limitations, continues to be a fall risk. Indeed, he has fallen multiple times since returning from his month-long stay in the hospital. He is also at risk of silent aspiration (the accidental inhaling of foods or liquids) because his brain injury prevents him from properly chewing and swallowing. This in turn could lead to a dangerous infection in his lungs. His neurological damage also causes confusion, impairs his memory and judgment, and hampers his ability to communicate, all significant dangers in a prison environment.

A review of Mr. Wallach's medical records reveals a pattern of inconsistent documentation, overlooked symptoms, and delayed interventions, all of which suggest systemic issues in the coordination and quality of Mr. Wallach's care. Unfortunately, these problems are not unique to Mr. Wallach, although they are especially dangerous in Mr. Wallach's case given his complex set of medical issues. The BOP's inability to hire enough medical professionals to adequately care for inmates with complex needs such as Mr. Wallach has been documented in the many reports, news articles, and court cases described in this motion. Mr. Wallach requests that he be released from BOP custody so that he can obtain the therapies he needs to best recover from his brain injury and ensure that his many chronic conditions do not result in an unnecessarily early death.

## II.  RELEVANT BACKGROUND

### A)  Trial Court Proceedings and Incarceration History

The Court sentenced Mr. Wallach to 144 months in custody following his guilty plea to wire fraud and conspiracy to commit wire fraud.  Dkt. 63.  Mr. Wallach self-surrendered to FCI Terminal Island in January 2022.  He remains incarcerated at MCFP Springfield, a medical facility, with a projected release date of August 2031.  *See* https://www.bop.gov/inmateloc/.

### B)  The Events Leading to Mr. Wallach's Traumatic Brain Injury

Mr. Wallach is 67 years old.  As reported to the Court at sentencing, Mr. Wallach has long suffered from several significant and chronic health conditions.  Dkt. 37 (Letter from Dr. Michael Farzam, filed under seal).  Mr. Wallach's diagnoses at the time of sentencing included sarcoidosis (a chronic inflammatory disease), stage 3 cirrhosis of his liver, chronic kidney disease, atrial fibrillation, type 2 diabetes, hypertension, asthma, and bronchiectasis.  *Id.*; *see also* Dkt. 32 (Presentence Investigation Report, ¶¶ 60-61).

Soon after entering FCI Terminal Island at the beginning of 2022, Mr. Wallach's health quickly declined.  He sought medical attention for back pain.  He was given Tylenol.  He later lost consciousness, fell, and was taken to the hospital.  He was found to be bleeding internally and suffering from severe blood loss.  He required several blood transfusions and 13 days in the hospital.  Exhibit A to the Declaration of Carly Bittman, pgs. 1-13.

In May 2022, Mr. Wallach was transferred from FCI Terminal Island to MCFP Springfield, a federal medical center, due to his poor medical condition and the assistance he needed with activities of daily living.  *Id.* at 14-16.  Staff correctly determined that Mr. Wallach was a fall risk.  They noted that he could not walk without an assistive device and that he had a history of falls, weakness, and dizziness.  *Id.* at 17.  Staff also noted that Mr. Wallach diagnosis of Parkinson's disease created a fall risk.  *Id.* at 18.

On December 21, 2022, Mr. Wallach fainted.  BOP staff remarked that the episode may have been caused by low blood sugar.  *Id.* at 20.  Indeed, in the days leading up to and following

2

this episode, Mr. Wallach's blood glucose levels were alarmingly below the normal range. *Id.* at 21-22 (listing blood glucose levels on December 17, 2023, December 21, 2023, and December 30, 2023). Mr. Wallach is diabetic. Normally, a blood sugar this low is considered hypoglycemic and, at a minimum, would require close monitoring in the form of blood sugar checks three or four times a day until the problem was resolved. Declaration of Carole Santos, ¶5. This was not done. *Id.* Mr. Wallach was not treated, and no changes were made to his medications or plan of care. *Id.*

On January 5, 2023, Mr. Wallach reported that a medication he received to manage his diabetes was making him "shaky and dizzy." Exhibit A at 21. Medical staff temporarily discontinued the medication but otherwise did not provide Mr. Wallach with any treatment. *Id.* They did not institute additional precautionary measures to prevent another fall. *Id.* Nor did they institute additional, frequent checks of Mr. Wallach's blood glucose level or vitals to monitor his progress after they paused the medication. Santos Declaration, ¶6.

Just three days later, on January 8, Mr. Wallach fell and suffered a catastrophic brain injury. *Id.* Nobody knows how long Mr. Wallach lay there unresponsive before he was found. He was intubated and placed on a ventilator. A feeding tube was inserted. During emergency triage at the hospital, Mr. Wallach tested positive for M. catarrhalis, a bacterial pathogen associated with respiratory infections, and was simultaneously diagnosed with coronavirus, acute respiratory failure, influenza, and pneumonia. He spent the next 25 days in the hospital. Exhibit A at 23-35. His wife was told that he might not survive. Miraculously, he did survive, albeit with several physical and mental deficits that are likely permanent, as described below.

Mr. Wallach's fall was wholly preventable. Santos Declaration, ¶¶8-9. Someone this sick on January 8 would have had observable symptoms on January 5, the date on which Mr. Wallach sought medical care for feeling "shaky and dizzy." *Id.* Yet BOP staff failed to recognize (or simply ignored) how sick Mr. Wallach was. *Id.* In addition to stopping the medication that medical staff believed caused the low blood sugar, they should have monitored

him closely for several days to confirm the intervention resolved the problem. *Id.* This monitoring would not have only caught any ongoing issues with his diabetes, it would have caught that Mr. Wallach had been infected with multiple different pathogens and required treatment. *Id.* Mr. Wallach's fall and brain injury were the direct result of this failure to properly monitor, assess, and treat Mr. Wallach after his prior fainting spells, complaints of dizziness, dangerously unstable glucose levels, and infection by multiple pathogens. *Id.*

When Mr. Wallach returned to MCFP Springfield, he had lost 40 pounds. His condition was described as follows: "Slow recovery of Alertness and speech, and mobility due to severe 4 extremity weakness obtundation. Unable to care for self, high fall risk, aspiration risk, risk for skin breakdown. ++ mobility deficits. Needs PT/OT/SLP." He still had a feeding tube, and his hands had to be restrained because he did not understand that he could not pull at the tube. The BOP recognized he needed "full supportive care." An assessment of his mental status put him in the category of someone suffering from dementia. Exhibit A at 36-37.

On February 5, 2023, just a few days after his return from the hospital, Mr. Wallach again fell and hit his head. He was found on the floor next to his bed, unable to explain why he had tried to get up. *Id.* at 38-39. Mr. Wallach was confused and had difficulty understanding medical staff's questions. *Id.* He sustained bruising on his forehead and a skin tear to his right forearm. *Id.* at 25. Mr. Wallach fell again in June 2023, although this more recent fall was not documented in Mr. Wallach's medical records. Santos Declaration, ¶11.

Mr. Wallach's falls in February and June 2023 were again the direct result of the BOP's negligence in failing to institute basic fall precautions for someone with Mr. Wallach's condition. Santos Declaration, ¶¶10-12. With a patient experiencing confusion and other mental deficits, it is unreasonable to rely on the patient's using a call light to prevent a fall, but that is precisely what the BOP did here. *Id.* Expecting a patient with a traumatic brain injury, poor memory, and impaired thinking to use a call light shows neglect, disregard for safety standards, and poor critical judgment on the part of medical staff. *Id.* At a minimum, medical staff should

have used a bed and chair alarm to ensure that Mr. Wallach did not attempt to stand or ambulate without their knowing.  *Id.*

These precautions are still not in place.  *Id.*  As a result, Mr. Wallach remains at risk for future falls and fall-related head injuries and fractures.  For someone whose health is as fragile as Mr. Wallach's, one more fall-related injury could result in serious complications, even death.  *Id.*

### C) Mr. Wallach's Ongoing Need for Comprehensive Care and Assistance with Activities of Daily Living

Individuals with traumatic brain injuries need ongoing comprehensive care, including physical therapy, occupational therapy, and mental health services.  Santos Declaration, ¶15.  Unfortunately, Mr. Wallach's medical records demonstrate that the complexities of his injury have not been fully integrated into his care.  *Id.*  BOP staff have failed to recognize the extensive and interconnected effects of Mr. Wallach's injury, leading to an oversimplified approach to his multifaceted symptoms and problems.  *Id.*

Nearly a month passed after Mr. Wallach's hospital stay before he had a follow-up appointment with a neurologist.  Exhibit A at 40-45.  He initially received speech therapy to help with swallowing, speech, and memory deficits, but those sessions were discontinued after only two months.  Exhibit A at 52.  Although Mr. Wallach improved with this therapy, he still struggles with swallowing.  Choking while eating or drinking has become a regular occurrence.  Santos Declaration, ¶13.  This puts Mr. Wallach at risk of silent aspiration, which occurs when someone inadvertently inhales foods or liquids.  *Id.*  Aspiration can lead to pneumonia, an extreme danger for someone with fragile health such as Mr. Wallach.  *Id.*  More recently, Mr. Wallach has also experienced increased saliva output, further increasing the risk of silent aspiration.  Exhibit A at 61; Santos Declaration, ¶13.

In terms of physical therapy, Mr. Wallach received an initial consultation in March 2023 (over a month after his return from the hospital) and some sessions after that, but those sessions were stopped the following month.  The provider stated that he was terminating the therapy

because of the vision deficits and cognitive impairments resulting from Mr. Wallach's brain injury. Exhibit A at 46-48, 53-55. While Mr. Wallach later received some additional physical therapy to help him walk again, those sessions were again discontinued. He remains confined to a wheelchair, still unable to walk.

Mr. Wallach never received occupational therapy. Because he is in a wheelchair and has limited use of his arm and hands, he still needs assistance with activities of daily living. *Id.* at 62-64. Mr. Wallach also continues to suffer from cognitive deficits. He has trouble remembering, cannot focus, and experiences severe depression, anger, and mood swings. *Id.* at 56-60. These symptoms are commonly associated with traumatic brain injuries. Santos Declaration, ¶14. Mr. Wallach's mental condition makes it difficult for him to comprehend and follow the instructions of officers and staff, increasing the risk of injury to Mr. Wallach and the burden to BOP staff in caring for him. *Id.* These symptoms also impede Mr. Wallach's ability to absorb and retain information, which in turn prevents him from participating in the BOP's rehabilitative programs. *Id.*

### D) Mr. Wallach's Medical Records Reveal Concerning Discrepancies in Documentation and Gaps in Care

Mr. Wallach's medical records reveal concerning discrepancies in the BOP's documentation of Mr. Wallach's condition. For example, a monthly nursing assessment from March 2023 indicated that Mr. Wallach received thickened liquids, which is a means of protecting against aspiration and choking, but the report also indicated that Mr. Wallach had no difficulties chewing and swallowing. Santos Declaration, ¶16. That same assessment states that Mr. Wallach's memory is impaired yet contains a contrary indication that he has no barriers to education. *Id.* As another example, an interdisciplinary team assessment in September 2023 reported that Mr. Wallach had an "appropriate" affect, yet multiple providers had recently documented that Mr. Wallach was experiencing increased emotional outbursts. *Id.* More

generally, Mr. Wallach's self-care deficit and mobility issues are recognized but not consistently addressed or documented.  *Id.*

Mr. Wallach's medical records also indicate alarming gaps in care.  *Id.*, ¶17.  For example, in April 2023, a speech therapist recommended that Mr. Wallach be given thin liquids with certain parameters to prevent aspiration.  *Id.*  But to be safely implemented, this recommendation requires daily monitoring to ensure compliance with the imposed parameters.  *Id*.  It is unlikely this monitoring occurred, both because it was not documented and because it is unlikely that the BOP staff can provide sufficient monitoring in light of ongoing staffing shortages (which are discussed below).  *Id.*

As another example, in October 2023, Mr. Wallach complained of congestion, persistent cough, and nasal drainage for two weeks.  *Id.*  He was prescribed Flonase.  *Id.*  The provider noted that Mr. Wallach had no symptoms of systemic illness but failed to assess breath sounds.  *Id.*  Listening to lungs would be expected as part of an assessment of a patient with a history of respiratory failure, a high aspiration risk, and a history of influenza, COVID, and pneumonia.  *Id.*  One week later, Mr. Wallach returned to medical with worsening symptoms.  *Id.*  Mr. Wallach was still not tested for coronavirus or influenza, despite his symptoms and the onset of flu season.  *Id.*  The provider diagnosed a sinus infection and prescribed antibiotics but did not discontinue the Flonase.  *Id.*  This is part of a pattern of delayed adjustments to medication and a disconnect between various healthcare providers' assessments and the actual interventions provided.  *Id.*

These patterns of inconsistent documentation, overlooked symptoms, and delayed interventions suggest systemic issues in care coordination and quality.  *Id.*  These problems are in turn symptomatic of MCFP Springfield's poor care management practices and the BOP's system-wide inability to obtain adequate staff as documented in several court orders and published reports.  In sum, the BOP is currently capable of providing Mr. Wallach with appropriate care.  *Id.*  He will suffer if he remains in a custodial setting.  *Id.*

### E) A Staffing Shortage Prevents the BOP from Providing Adequate Care to Inmates with Complex Health Concerns Like Mr. Wallach

In correctional healthcare settings, multiple factors contribute to the systemic problem of inadequate care. Santos Declaration, ¶3. High patient-to-nurse ratio, staffing shortages, and high workload stress increase the likelihood of errors. *Id.* These problems are longstanding and well-documented in the BOP. *Id.* For years, staffing shortages have prevented the federal prison system from effectively addressing the medical needs of its inmate population.

In 2016, the Office of the Inspector General found that the "recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care[.]" Exhibit B to the Bittman Declaration at pg. i. This problem was exacerbated by the COVID-19 pandemic and continues to undercut the BOP's ability to provide timely and appropriate care to its wards. Exhibit C to the Bittman Declaration at pgs. 44-54 (Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic); Exhibit D to the Bittman Declaration at pgs. 38-50 (Review of Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic); Exhibit E to the Bittman Declaration at pgs. 34-36 (OIG report describing effects of staffing shortages on health care at FCI Tallahassee); Exhibit F to the Bittman Declaration at pgs. 26-28 (report concluding that staff shortages in FCI Waseca caused delays in treatment and more serious health issues for inmates).

A recent investigation by NPR into FMC Butner, one of seven medical centers in the BOP system, revealed how a lack of appropriately trained medical staff can lead to serious, life-threatening, or deadly consequences. Exhibit G to the Bittman Declaration. Speaking to reporters, a correctional officer explained that "staff shortages are the primary reason inmates go without essential care." *Id.* at 16-17. Because more than 20 percent of the nurse and paramedic positions at the facility were vacant as of September 2023, two nurses could be responsible for up to 30 inmate-patients. *Id.* at 17. In a letter to her regional director, the correctional officer wrote that "[d]eath is becoming the price paid for doing more with less at FCC Butner." *Id.* at

18. "The quality of care proves to be deadly," the officer wrote. *Id.* at 19. She explained that medical conditions and loss of life could have been prevented if adequate medical staff had been available. *Id.*

There is reason to believe that these staffing shortages and resulting problems extend to MCFP Springfield. The facility is currently recruiting medical staff for several different positions, including a psychiatric physician, psychologist, dentist, nurse, advance practice nurse, medical officer, clinical director, physician assistant, and nursing assistant. Exhibit H to the Bittman Declaration. This staffing shortage is more important in Mr. Wallach's case than it is for most incarcerated people. His needs are complicated, he needs personnel who can help train him to walk and swallow, and failure to adequately monitor and support him could result in another fall, with potentially fatal consequences. In his case, these deficiencies can mean the difference between life and death.

### F) Mr. Wallach's Release Plan

Should the Court release Mr. Wallach, he would live with his sister in her home in the Northern District. Mr. Wallach's sister understands the significant medical care Mr. Wallach requires and has agreed to assist him in setting up in-home nursing care. Mr. Wallach has maintained supplemental medical insurance which will help with the cost of in-home care. His wife will also assist with Mr. Wallach's care. If it becomes necessary for Mr. Wallach to transfer to a fulltime care facility, his family will work to find a suitable nursing home and communicate fully with Probation to ensure Mr. Wallach is at all times in compliance with the terms of his supervision.

### G) Exhaustion of Administrative Remedies

The warden of MCFP Springfield denied Mr. Wallach's most recent request for compassionate release on May 10, 2023. Exhibit I to the Bittman Declaration. This motion is accordingly ripe for the Court's consideration under 18 U.S.C. section 3582(c)(1)(A).

III.     **LEGAL STANDARD**

Under the First Step Act, courts may reduce a previously imposed sentence where "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3852(c). In determining whether release is warranted, courts are to consider "the factors set forth in section 3553(a) to the extent that they are applicable." *Id*. Sentence modification must be "consistent with applicable policy statements issued by the Sentencing Commission." *Id*. Pursuant to 28 U.S.C. § 994(a), the Sentencing Commission recently promulgated Amendments to the Sentencing Guidelines, providing the first guidance for the term "extraordinary and compelling reasons" since the First Step Act was passed. U.S.S.G. § 1B1.13.

With respect to a defendant's medical condition, Section 1B1.13 lists circumstances where a defendant may demonstrate an extraordinary and compelling reason for a sentence modification. Two are relevant here. First, the defendant may demonstrate that they suffer from "a serious physical or medical condition" or "a serious functional or cognitive impairment" that "substantially diminishes" their ability "to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(b)(1)(B). Second, the defendant may demonstrate that they suffer from a "medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." *Id*. § 1B1.13(b)(1)(C).

More generally, under Section 1B1.13's "residual exception," a defendant can also establish an extraordinary and compelling reason if he presents "any other" circumstances or combination of circumstances that are "similar in gravity" to the other extraordinary and compelling reasons listed in paragraphs (1)–(4) of § 1B1.13. U.S.S.G § 1B1.13(b)(5).

IV.     **ARGUMENT**

> A)     **Mr. Wallach Has Established Extraordinary and Compelling Circumstances Warranting a Sentence Reduction**

As detailed above, Mr. Wallach suffers from "a serious physical or medical condition" and a "functional or cognitive impairment" that "substantially diminishes" his ability "to provide

10

self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(b)(1)(B).  In addition to his traumatic brain injury, Mr. Wallach suffers from a host of chronic illnesses, including anemia, sarcoidosis, Parkinson's, diabetes, hyperlipidemia, hypertension, gastroesophageal reflux disease, and chronic kidney disease.  Mr. Wallach is confined to a wheelchair and has limited use of his arm and hands.  He also has cognitive deficits that impair his memory and emotional stability.  He needs BOP staff to help him with activities of daily living.  While physical and occupational therapy may improve Mr. Wallach's condition to some extent, he will need help for the rest of his life.  Exhibit A at 62-64.

In cases involving defendants with a similar inability to care for themselves, compassionate release has been granted.  *See*, *e.g.*, *United States v. Asaro*, No. 17-CR-127 (ARR), 2020 WL 1899221, at *5 (E.D.N.Y. Apr. 17, 2020) (granting compassionate release to defendant who was a high fall risk, occasionally needed assistance with feeding, and had an extensive medical history); *United States v. Bellamy*, No. 15-CV-1658-JRT-LIB, 2019 WL 3340699, at *3 (D. Minn. July 25, 2019) (granting compassionate release to wheelchair-bound defendant who had heart problems and suffered from diabetic kidney disease, among other conditions); *United States v. Gray*, No. 2:02-CR-00018-JMS-CMM-13, 416 F.Supp.3d 784, 789–91 (S.D. Ind. Sept. 20, 2019) (granting compassionate release to 64-year old defendant who had been hospitalized for multiple procedures, including chemoembolization of a liver tumor).

Release is also warranted under Section 1B1.13(b)(1)(C).  Mr. Wallach's traumatic brain injury, whether considered alone or in combination with the long list of his other chronic illnesses and conditions, requires both long term and specialized care.  The BOP has not provided this care, and it appears incapable of providing this care.  Mr. Wallach needs therapies to address his ongoing difficulty swallowing, inability to walk without a wheelchair, vision deficits, emotional instability, and other mental deficits.  Without that support, Mr. Wallach is at increased risk of falling and suffering further injury, silently aspirating and developing a severe respiratory illness, and otherwise further deteriorating both physically and mentally.

A number of courts have granted compassionate release where, as here, the BOP has failed to provide adequate medical treatment.  *See*, *e.g.*, *United States v. Beck*, 425 F. Supp. 3d 573, 581-82 (M.D.N.C. 2019) (granting compassionate release for inadequate treatment of inmate's breast cancer after months of delaying and postponing necessary procedures and appointments); *United States v. Nieves-Feliciano*, 2021 WL 1170317, at *5 (D. Conn. Mar. 29, 2021) (granting compassionate release for inadequate medical care by BOP in failing to refer inmate to a specialist for unspecified circulatory system disorder); *United States v. McCall*, 465 F. Supp. 3d 1201, 1209 (M.D. Ala. 2020) (granting compassionate release for failure of BOP to correctly diagnose, monitor, and provide treatment for inmate's sickle cell disease); *United States v. Bardell*, 634 F. Supp. 3d 1083 (M.D. Fla. 2022) (granting compassionate release after BOP's failure to treat colon cancer); *United States v. Beck*, 425 F. Supp. 3d 573 (M.D.N.C. 2019) (granting compassionate release after finding that the BOP provided the defendant with "abysmal" treatment for breast cancer that compromised her prospects for survival); *United States v. Verasawmi*, No. CR 17-254 (FLW), 2022 WL 2763518, at *8 (D.N.J. July 15, 2022) (defendant's health conditions, combined with the BOP's slow and inadequate treatment of the defendant's hypertension, migraines, asthma, and depression, warranted release).

Finally, release is warranted under Section 1B1.13(b)(5)'s "residual exception."  The fact that the BOP's negligence in caring for Mr. Wallach resulted in a traumatic brain injury that will impair his ability to think, chew, swallow, walk, and otherwise take care of himself, likely for the rest of his life, constitutes a circumstance "similar in gravity" to the other extraordinary and compelling reasons listed in paragraphs (1)–(4) of § 1B1.13.  U.S.S.G § 1B1.13(b)(5).

For all of these reasons, extraordinary and compelling circumstances justify releasing Mr. Wallach and ordering home confinement as a condition of supervised release.

### B) The Section 3553(a) Factors Weigh in Favor of Reducing Mr. Wallach's Sentence

The sentencing factors set forth in section 3553(a) also weigh in favor of Mr. Wallach's release.  Mr. Wallach does not pose a danger to the community.  Nor would Mr. Wallach's release undermine the goals of sentencing.  No further punishment is needed to ensure Mr.

Wallach will not reoffend.  While Mr. Wallach's offense was serious and certainly warranted custodial punishment, his incarceration has resulted in a traumatic brain injury that will leave him with permanent physical and mental defects.  He will likely need assistance with basic activities for the rest of his life.  Under those circumstances, further incarceration is not needed to provide just punishment or deterrence.

Moreover, not releasing Mr. Wallach would also run afoul of section 3553(a)(1)(D)'s mandate that a sentence of imprisonment "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  As set forth above, the medical records demonstrate that the BOP's negligent medical care has resulted in a significant and irreversible decline in Mr. Wallach's health.  The BOP has also demonstrated an inability to provide Mr. Wallach the ongoing care he needs for his complex combination of conditions, such as physical therapy, occupational therapy, and mental health services.  Without these therapies, Mr. Wallach's condition will only decline further.  Releasing Mr. Wallach from custody will allow him to seek medical treatment in the community immediately, as well as achieve the other rehabilitative goals of sentencing.

## V.     CONCLUSION

Since his brain injury, Mr. Wallach's life has been drastically altered.  He battles paralysis on the right side of his face, has difficulty using his hands, and has double vision that contributes to his loss of balance and inability to stand or walk on his own.  Mr. Wallach respectfully requests that the Court order him immediately released from BOP custody and impose a condition of home confinement while on supervised release.

Dated: December 1, 2023                            Respectfully submitted,

                                                   /s/ Edward Swanson
                                                   Edward Swanson
                                                   Carly Bittman
                                                   SWANSON & McNAMARA LLP
                                                   Attorneys for Lewis Wallach