1   Edward Swanson (SBN 159859)
    ed@smllp.law
2   Carly Bittman (SBN 305513)
    carly@smllp.law
3   SWANSON & McNAMARA LLP
    300 Montgomery Street, Suite 1100
4   San Francisco, California 94101
    Telephone: (415) 477-3800
5   Facsimile: (415) 477-9010

6   Attorneys for Defendant Lewis Wallach

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12

13  UNITED STATES OF AMERICA,              Case No. 20-CR-00365-MMC

14          Plaintiff,                     **DECLARATION OF CARLY BITTMAN
                                           IN SUPPORT OF MOTION FOR
15      v.                                 COMPASSIONATE RELEASE**

16  LEWIS WALLACH,

17          Defendant

18

19

20

21

22

23

24

25

26

27

28

                                    1

I, Carly Bittman, declare as follows:

1.      I am an attorney at Swanson & McNamara LLP, counsel for defendant Lewis Wallach in the above-captioned action.  I submit this declaration in support of Mr. Wallach's motion for compassionate release.  I have personal knowledge of the matters set forth in this declaration, and, if called upon to testify, I could and would competently testify thereto.

2.      Attached as Exhibit A are true and correct excerpts from Mr. Wallach's medical records from the Bureau of Prisons, conditionally filed under seal.

3.      Attached as Exhibit B is a true and correct copy of the Office of the Inspector General's March 2016 report titled "Review of the Federal Bureau of Prisons' Medical Staffing Challenges."

4.      Attached as Exhibit C is a true and correct copy of the Office of the Inspector General's March 2023 report titled "Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic."

5.      Attached as Exhibit D is a true and correct copy of the Pandemic Response Accountability Committee's September 2023 report titled "Review of Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic."

6.      Attached as Exhibit E is a true and correct copy of the Office of the Inspector General's November 2023 report titled "Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee."

7.      Attached as Exhibit F is a true and correct copy of the Office of the Inspector General's May 2023 report titled "Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Waseca."

8.      Attached as Exhibit G is a true and correct copy of an article by Meg Anderson dated September 23, 2023, and titled "1 in 4 inmate deaths happens in the same federal prison. Why?"

9.      Attached as Exhibit H is a true and correct copy of a printout from the USAJOBS website (https://www.usajobs.gov/Search/Results?l=Springfield%2C%20Missouri&a=DJ03&s=location&p=1), last accessed on November 27, 2023, which lists job openings at MCFP Springfield.

10.      Attached as Exhibit I is a true and correct copy of the warden of MCFP Springfield's denial of Mr. Wallach's request for compassionate release.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 1st day of December 2023, at San Francisco, California.


_/s/ Carly Bittman_____
Carly Bittman

# EXHIBIT A

### FILED UNDER SEAL

# EXHIBIT B



# Office of the Inspector General
U.S. Department of Justice



# Review of the Federal Bureau of Prisons' Medical Staffing Challenges

Evaluation and Inspections Division 16-02                    March 2016

# EXECUTIVE SUMMARY

## Introduction

The Federal Bureau of Prisons (BOP) is responsible for incarcerating federal inmates and is required to provide them with medically necessary healthcare. However, recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs.  Additionally, medical staff shortages can impact prison safety and security.  For example, according to an After-Action Report prepared after a riot at a BOP contract prison, the BOP noted that while low medical staffing levels alone were not the direct cause of the disturbance, they affected security and health services functions.[1]

As of September 2014, the BOP had 3,871 positions in its institutions' health services units to provide medical care to 171,868 inmates.  Of those 3,871 positions, only 3,215 positions (83 percent) were filled.[2]  Although BOP policy states that the vacancy rate shall not exceed 10 percent during any 18-month period, we found that only 24 of 97 BOP institutions had a medical staffing rate of 90 percent or higher as of September 2014.[3]  Further, 12 BOP institutions were medically staffed at only 71 percent or below, which the BOP's former Assistant Director for Health Services and Medical Director described as crisis level.

Both civilian and uniformed staff hold these 3,215 filled healthcare positions. This includes 2,382 civil service employees and 833 commissioned officers of the U.S. Public Health Service (PHS), an agency of the U.S. Department of Health and Human Services, which provides public health services to underserved and vulnerable populations.  The Department of Justice's Office of the Inspector General (OIG) conducted this review to assess challenges the BOP faces in hiring medical professionals and its use of PHS officers as one method of addressing those challenges.

## Results in Brief

The OIG found that recruitment and retention of medical professionals is a serious challenge for the BOP, in large part because the BOP competes with private

---

[1]  Department of Justice (DOJ) Office of the Inspector General (OIG), *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas,* Audit Report 15-15 (April 2015), https://oig.justice.gov/reports/2015/a1515.pdf (accessed February 8, 2016).

[2]  This reflects the population in BOP-managed institutions only.  Inmates in contract institutions and residential reentry centers are excluded.

[3]  There were 121 BOP-managed institutions as of September 2014, but the BOP considers correctional complexes (multiple institutions co-located) to be a single institution when reporting staffing levels.  This reduces the number of institutions to 97.

employers that offer higher pay and benefits.  We further found that the BOP has not proactively identified and addressed its medical recruiting challenges in a systemic way.  Rather, it has attempted in an uncoordinated fashion to react to local factors influencing medical recruiting at individual institutions.  Moreover, we found that the BOP does not take full advantage of staffing flexibilities the PHS offers that could assist in addressing some of its most difficult medical staffing challenges.

*The BOP's Compensation and Incentives Offered to Civil Service Medical Staff Are Not Sufficient to Alleviate Staffing Shortages*

Multiple factors, including the location of institutions, pay, and the correctional setting, negatively impact the BOP's ability to recruit and retain medical professionals.  Civil service employee pay is governed by the General Schedule (GS) pay scale and U.S. Office of Personnel Management policies regarding how positions are classified.  We found a significant gap between GS salaries and local average salaries for comparable healthcare positions; these gaps persisted across multiple medical professions and in both urban and rural communities.  For example, BOP staff told us that it was particularly difficult to recruit pharmacists and we found that the average pharmacist salary in communities where BOP institutions are located was approximately double the mid-range salary the BOP can offer.[4]  In an attempt to narrow these gaps, the BOP has increasingly relied on monetary and nonmonetary incentives and it plans to implement an alternative federal pay system for psychiatrists in fiscal year (FY) 2016.  However, we found that these are not always sufficient to reduce the medical staffing vacancies the BOP faces.  Faced with continuous understaffing, the BOP uses temporary duty (TDY) assignments and contracted medical providers to ensure that it can continue to provide inmates with necessary medical care.  However, both of these options come with additional costs.  Additionally, according to BOP officials, the limits of the GS pay scale mean that PHS compensation and benefits are more competitive for some professions.

*The BOP Does Not Identify or Address Recruiting Challenges in an Agency-wide and Strategic Manner*

The BOP's current method of addressing medical recruiting challenges focuses primarily on individual institutions' immediate needs.  As a result, the BOP does not strategically assess which vacancies have the greatest overall impact on its ability to provide medical care to inmates.  The BOP collects and maintains data that, if analyzed, could help it better assess and prioritize its needs and develop a strategy to meet those needs agency-wide.  Such a process would include evaluating vacancies, the use of incentives, the use of TDY assignments, and the cost of outside medical care across all institutions.  This would help the BOP identify the vacancies that are most costly to leave unfilled and to prioritize staffing in those locations.

---

[4]  We compared average salaries reported by the Bureau of Labor Statistics with salaries in the middle of the range on the General Schedule salary table.  For more information, see Appendix 1.

*The BOP Does Not Use the Authority It Has to Assign PHS Officers to Positions Based on Greatest Need*

The conditions of PHS officers' employment make them more mobile than civil service employees, and the PHS has created promotion incentives that benefit PHS officers who change duty stations; but the BOP does not take advantage of these flexibilities to assign PHS officers to positions based on greatest need. BOP officials expressed concerns to us that one method of using those flexibilities, involuntary transfers, could lead to unintended effects, such as PHS officers leaving the BOP for work in other agencies. However, involuntary transfers are not the BOP's only option for determining where PHS officers should work, as the BOP may alternatively require PHS officers to spend their first few years with the BOP filling high-priority positions, which could appeal to PHS officers seeking promotion. We believe the BOP should better utilize PHS officer flexibility to address medical vacancies of greatest impact.

## Recommendations

As the BOP struggles to fill its medical staffing needs, and as medical costs continue to rise, the BOP must collect better information on its priority health services vacancies and find solutions to meet the medical needs of its inmates. In this report, we make two recommendations to help the BOP improve its ability to assess the impact of medical vacancies on BOP operations and to develop a strategy to better utilize PHS officer flexibility to address medical vacancies of greatest impact.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

The BOP's Responsibility to Provide Medical Care to All Inmates ................. 2

Scope and Methodology of the OIG Review .............................................. 6

RESULTS OF THE REVIEW ..................................................................................... 7

The BOP's Compensation and Incentives Offered to Civil Service
Medical Staff Are Not Sufficient to Alleviate Staffing Shortages ................... 7

The BOP Does Not Identify or Address Recruiting Challenges in
an Agency-wide and Strategic Manner ................................................... 16

The BOP Does Not Use Its Authority to Assign PHS Officers to
Positions Based on Greatest Need ........................................................ 20

CONCLUSION AND RECOMMENDATIONS ....................................................... 26

Conclusion ........................................................................................ 26

Recommendations ............................................................................. 27

APPENDIX 1:   EXPANDED METHODOLOGY ................................................... 28

Data Analysis ................................................................................... 28

Interviews ......................................................................................... 29

Site Visits ......................................................................................... 29

Additional Objectives ......................................................................... 29

APPENDIX 2:   THE BOP'S RESPONSE TO THE DRAFT REPORT ............................ 31

APPENDIX 3:   OIG ANALYSIS OF THE BOP'S RESPONSE ................................... 33

# INTRODUCTION

As of September 2014, the Federal Bureau of Prisons (BOP) employed over 2,300 civil service employees and over 800 U.S. Public Health Service (PHS) officers to provide medical care to an inmate population of 171,868 in 121 institutions.[5]  However, these staffing levels fell short of the BOP's staffing goals:  from fiscal year (FY) 2010 to FY 2014, the BOP's total medical staff was approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be "ideal" care.

Staffing shortages are a reflection of the BOP's challenges to recruit and retain medical staff.  Although BOP policy states that "the vacancy rate of staff positions that work directly with inmates shall not exceed 10 percent during any 18 month period," the BOP as a whole is unable to achieve this medical staffing goal, as only 24 institutions had a medical staffing rate of 90 percent or higher as of September 2014.[6]  Further, 12 institutions were medically staffed at only 71 percent or below, which the BOP's former Assistant Director for Health Services and Medical Director described as crisis level.[7]

The Office of the Inspector General's (OIG) previous report on the BOP's aging inmate population found that understaffing in institutions' health services units limits inmate access to medical care, results in an increased need to send inmates outside the institution for medical care, and contributes to increases in medical costs.[8]  Moreover, the BOP's staffing shortages continue despite significant increases in its spending on medical care.[9]  The BOP's spending on medical care increased 21 percent, from $905 million in FY 2010 to $1.1 billion in FY 2014, while

---

[5]  This reflects the pre-trial and sentenced population in BOP-managed institutions only. Inmates in contract institutions and residential reentry centers are excluded.

[6]  BOP, Program Statement 3000.03, Human Resource Management Manual (December 19, 2007).  Vacancy rates are calculated as a percentage of positions assigned to an institution.

At a meeting to discuss a working draft of this report, the BOP's Assistant Director for Human Resource Management said that while the BOP advocates for institutions to fully staff their medical positions, budgetary realities often make this unachievable.  As a result, the BOP's Central Office recognizes that institutions must balance staffing needs in all aspects of institution operations.

[7]  This official oversaw the BOP's medical care of inmates during our review, but retired in October 2015.

[8]  DOJ OIG, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons,* Evaluation and Inspections Report 15-05 (May 2015).  See https://oig.justice.gov/reports/2015/e1505.pdf (accessed February 8, 2016).

[9]  In 1994 the Government Accountability Office (GAO) reported that the BOP acknowledged nursing staff shortages but was unable to recruit staff to fill the positions because its salaries were well below that offered in the community.  GAO, *Bureau of Prisons Health Care:  Inmates' Access to Health Care is Limited by Lack of Clinical Staff,* GAO-HEHS-94-36 (February 1994).

In response to a working draft of this report, the BOP noted that other costs beside staffing, such as the costs of pharmaceuticals and medical procedures, also contribute to increased medical spending.

the BOP's overall budget increased 11 percent over that time, from $6.1 billion to $6.8 billion.

We conducted this review to build on our previous report's findings by further examining the BOP's medical staffing challenges, as well as its use and management of PHS officers as one means to address these challenges.  In this section, we describe the BOP's responsibility to provide medical care to inmates in its custody, the government-wide mission and role of the PHS, and the role of PHS officers who provide medical care inside BOP institutions.  In addition, we outline the memorandum of understanding (MOU) between the BOP and the PHS and the process used by BOP institutions to hire medical staff.

## The BOP's Responsibility to Provide Medical Care to All Inmates

The BOP is responsible for confining offenders in environments that are safe, humane, cost-efficient, and appropriately secure.  As part of this mission, the BOP provides medical care to federal inmates.[10]  Federal inmates receive medical care through institution health units or outside medical providers.  In FY 2014, the BOP employed 3,215 medical staff, including 2,382 civil servants and 833 PHS officers, to meet this need.  However, many institutions remain understaffed, limiting the amount of care that an institution can provide.  Specifically, in FY 2014, 20 BOP institutions had a medical staff vacancy rate of 25 percent or higher and 3 institutions had a vacancy rate of 40 percent or higher.  Hiring the medical professionals necessary to maintain the care that institutions must provide has proved challenging for the BOP.  We discuss these challenges later in this report.

*Established Health Units in Each BOP Institution Provide Medical Care*

To provide medical care to inmates, every BOP institution operates a health services unit.  Most units have examination rooms, treatment rooms, dental clinics, radiology and laboratory areas, a pharmacy, and administrative offices.  The BOP staffs these health units with medical professionals who provide urgent and routine medical care on an ambulatory or observation basis.  These medical professionals, who may be either civil service employees or PHS officers, include physicians, dentists, nurses, pharmacists, and mid-level practitioners.[11]  (See Figure below.)  For inmates who require more intensive, specialty care than the health services units can provide, the BOP seeks care outside the institution.[12]

---

[10]  We conducted a broad review of the BOP's management of inmate medical care in 2008. See DOJ OIG, *The BOP's Efforts to Manage Inmate Healthcare,* Audit Report 08-08 (February 2008), https://oig.justice.gov/reports/BOP/a0808/final.pdf (accessed February 8, 2016).

[11]  The BOP also contracts with medical providers to offer clinics and specialty services inside the institutions to complement the primary care offered by the civil service and PHS-employed staff.

[12]  For outside medical care, the BOP signs contracts with community hospitals and physicians with close proximity to the institution.  The BOP negotiates rates with community hospitals using comprehensive medical contracts whenever possible.  The OIG is currently conducting a related review of the effect of these rates on the BOP's budget.

**Figure**

**BOP Medical Staff, Fiscal Year 2010 to Fiscal Year 2014**



Source:  BOP staffing data

Civil service employees constitute the majority of health services staff.  The BOP uses recruitment, retention, and relocation incentives to entice civil service medical professionals to join the BOP.  Typically, the BOP uses incentives for positions that are critical for the operation of health services units or for those that are difficult to fill, allowing the BOP more flexibility in compensation.  For example, the BOP can use a recruitment bonus to increase an employee's annual rate of pay up to 25 percent, in exchange for a 2-year service commitment.[13]  The BOP also uses retention bonuses, relocation bonuses, student loan repayments, annual leave credits, and "above the minimum rate" pay to incentivize employment.[14]  When using any incentive, an institution must prepare a narrative showing that it has a great need for the employee, and that without the incentive the institution would lose an existing employee or be unable to fill a vacancy.[15]  Officials in the BOP's Central Office must approve all incentives before they can be paid to employees.[16]

---

[13]  In response to a working draft of this report, the BOP noted that the BOP Director may approve a shorter service agreement for recruitment bonuses.

[14]  Relocation bonuses are offered to current BOP employees who relocate to a hard to fill location.  Student loan repayment can be awarded up to $10,000 annually for loans covering education required for a position, such as a loan to pay for medical school.  Annual leave credit increases the rate at which one earns annual leave each pay period.  "Above the minimum rate" pay allows an agency to pay a new employee above the initial grade and step that would normally be required by the GS scale to meet the superior qualifications of a candidate.

[15]  The narrative includes information such as the qualifications needed for the position, the qualifications of the candidate, labor market factors that that affect the ability to recruit, and recent turnover, if any.

[16]  The type of incentive determines whether BOP officials in the Health Services Division or Human Resource Management Division approve the incentive.

*PHS Officers Compose the Remainder of the Health Services Staff*

In FY 2014, 833 of the BOP's 3,215 health services staff at the institutions (26 percent) were PHS officers.[17]  The PHS is led by the Surgeon General and is an agency of the U.S. Department of Health and Human Services.  The PHS has commissioned over 6,500 officers who are assigned to 23 federal agencies and the District of Columbia.[18]  PHS officers serve in a variety of positions, treating underserved and vulnerable populations in the areas of public health.  The underserved communities that PHS officers treat include populations such as federal inmates or Native American communities living on remote tribal lands.  Most PHS officers are involved in medical care delivery, disease control and prevention, biomedical research, treatment of mental health and drug abuse, or disaster response efforts.  Within the BOP, PHS officers work both in positions that provide direct clinical care to inmates and in medical care management.

The PHS is part of the uniformed service rather than the civil service.  As such, PHS officers operate under a separate personnel system with additional obligations, and they are paid according to the Uniformed Service Compensation table used for the military rather than the General Schedule table used for civil service employees.  In exchange for their willingness to serve, PHS officers also receive uniformed service benefits, including health insurance at no expense, tax-free housing and subsistence allowances, and access to military base facilities.  The PHS also offers 30 days of vacation per year, financial support for education through the Post-9/11 GI Bill, access to the U.S. Department of Veterans Affairs' home loan program, and retirement eligibility benefits after 20 years of service.

With these benefits come additional responsibilities, such as being on call at all times and deploying on critical public health missions.  PHS officers are considered available for duty at any time and are therefore not eligible to earn overtime pay.  The PHS has several types of response teams that can immediately deploy to regional, national, and international public health emergencies, such as Hurricane Katrina or the Liberian Ebola crisis.  Additionally, PHS officers must continue medical education and maintain professional competence through additional training and certifications.

The BOP's partnership with the PHS to provide medical care to underserved inmate populations dates back to the BOP's creation in 1930.  In 1991, the BOP and the PHS signed an MOU to establish the conditions, responsibilities, and procedures

---

[17]  The BOP also employs both civil service and PHS officer health services staff in its Regional Offices and Central Office.  However, for this review we focused only on health services staff in the institutions.

[18]  Some of these agencies include the BOP, the U.S. Marshals Service, the Food and Drug Administration, the Indian Health Service, the Centers for Disease Control and Prevention, the National Institutes of Health, the Department of Defense, and the District of Columbia Commission of Mental Health Services.

that would guide PHS officers working throughout the BOP.[19]  Under the terms of the MOU, the BOP annually notifies the PHS of the number of PHS officers it needs and is responsible for the cost of PHS officer compensation and benefits.  The BOP transfers funds to the PHS for this purpose quarterly, and the PHS in turn pays and manages PHS officer benefits using these funds.

*Civil Service Employees and PHS Officers Are Considered Equally for Vacant Positions, and Fill the Same Duties Once Hired*

The BOP delegates the hiring of health services staff, including PHS officers, to each BOP institution, with selection authority for most BOP institution staff delegated to the institution's Warden.[20]  Consequently, individual institutions advertise vacancies and institution staffs focus their recruitment efforts primarily on the local community surrounding each institution.[21]  Although civil service employees and PHS officers have two separate personnel systems, their position duties and responsibilities at the BOP are the same.  Hiring officials told us they select and hire qualified candidates without differentiating between the civil service and the PHS, primarily because the need for such staff is greater than the availability of candidates from either type.  One institution's Human Resource Manager told us, "Whoever comes to us, however we get that person, if they are a civilian, and we can meet their needs, we're taking them.  If they are PHS, and we can meet their needs, we are taking them.  Medical is so hard for us to recruit and hire.  If you bring us your credentials and say you're willing to work here, we'll figure it out."

During our review, BOP officials also described the challenges that can arise from having to integrate these two separate personnel systems into their health services operations to provide inmates with medical care.  Among the relevant differences we identified were leave policies, awards, drug testing, and training opportunities.  BOP officials also described how this problem is exacerbated by what they see as discordant legal decisions in response to grievances from unionized BOP employees on the one hand, and PHS officers on the other hand, over issues relating to relative seniority between the two groups.  While we did not focus our review on these challenges, we did note that several BOP officials described the inevitable tensions that can arise in a workforce where staff members share the

---

[19]  The relationship between the BOP and the PHS is also defined by statute.  See 18 U.S.C. § 4005 and 42 U.S.C. § 250.  In response to a working draft of this report, the PHS noted that these two statutes underpin the MOU.

[20]  The Warden has selection authority for all institution staff below the assistant department head level and for medical officers and dental officers in consultation with the BOP Medical Director.  This encompasses all staff members who provide medical care to inmates.  See BOP, Program Statement 3000.03, section 250.1.

[21]  The BOP also advertises nationwide job announcements for some positions, such as nurses.  However, applicants select their preferred locations as part of the online application process.  When institutions have vacancies in positions that were advertised under a nationwide job announcement, the institution receives only the names of applicants who selected as a preferred location the institution.

same jobs, workplace, and mission, yet can receive meaningfully different compensation and benefits.[22]

**Scope and Methodology of the OIG Review**

Our review examined the BOP's medical staffing challenges and its use of PHS officers to address those challenges.  We also evaluated the BOP's ability to transfer PHS officers to different locations based on staffing needs.  We analyzed BOP staffing data for both civil service employees and PHS officers from FY 2010 through FY 2014.  Specifically, our review focused on medical professionals and those employees who help the BOP provide direct care inside BOP institutions.  For the purposes of this review, we excluded all other staff.  We also analyzed the cost data associated with BOP civil service.

Our fieldwork, which we conducted from April 2015 through October 2015, included interviews, data collection and analyses, and document reviews.  We interviewed BOP Central Office officials in the Administration, Human Resource Management, and Health Services Divisions, as well as an official in the BOP's union.  We also interviewed an official in the PHS Division of Commissioned Corps Personnel and Readiness.  We used video teleconference to conduct site visits to five BOP institutions and to interview institution officials.  A detailed description of the methodology of our review is in Appendix 1.

---

[22]  In Appendix 1, we describe the extent to which we examined these issues, and our decision to focus the review on medical staffing challenges, in more detail.

# RESULTS OF THE REVIEW

**The BOP's Compensation and Incentives Offered to Civil Service Medical Staff Are Not Sufficient to Alleviate Staffing Shortages**

Despite the BOP's increased use of incentives for civil service employees, the BOP remains challenged to recruit and retain medical professionals.  Specifically, we found that the salaries and incentives the BOP offers are not competitive with those of the private sector, particularly given the need for the BOP to compensate its employees for the safety and security factors intrinsic to working in a correctional setting.  As of September 2014, the BOP was operating at an 83 percent medical care staffing level, 7 percent below its goal of 90 percent.  As a result, health services units are left understaffed, with increased workloads that limit the amount of medical care that can be provided inside an institution.  The BOP's resulting need to rely on temporary duty (TDY) assignments shifts its staffing resources among institutions, and its reliance on contractors to augment the medical care it can provide contributes to the BOP's overall spending on outside medical care.

*The BOP is Disadvantaged in Its Efforts to Recruit Civil Service Medical Professionals*

While recruitment is a challenging area for many healthcare organizations, it is particularly challenging for the BOP because of its geographic locations and local market competition, the limits on the pay it can offer its medical staff, and its correctional setting.[23]  The BOP's Assistant Director for Human Resource Management said that recruitment is also difficult because the recruiting challenges the BOP faces vary across institutions.  As of September 2014, there were 121 BOP-managed institutions located across the United States, in both urban and rural areas.

We found that in major metropolitan areas, the BOP's greatest recruiting challenge is attracting candidates that are also qualified to work in private organizations, such as hospitals and local medical centers.  For example, at one institution with several major universities in the surrounding area, the BOP has been unable to attract recent graduates who are willing to occupy entry-level positions.  The Human Resource Manager of that institution told us that the major universities have more prestigious medical facilities and offer higher pay.

At the BOP's more rural locations, we found that the remoteness of the institution often deters medical professionals.  A Warden at a more remote institution said that because the area is isolated, most medical professionals are in the area only to work at a particular, respected community hospital.  Staff at another institution told us that being in close proximity to a respected community

---

[23]  In response to a working draft of this report, the BOP noted that there are shortages of medical professionals in a variety of fields, making its challenges not unlike those the general medical community faces.

hospital is both good and bad overall, but definitively unhelpful to recruiting.  While the institution can use the hospital for services that cannot be provided inside the institution, it becomes nearly impossible to compete with the hospital for staff, because of the hospital's favorable reputation and higher pay.  An Associate Warden at another institution told us that when competing with other organizations, the institution is often unable to attract candidates.  He said that when the institution is able to hire employees, they typically leave shortly after they are hired for more lucrative offers.

*Position Grades and Compensation, Even with Incentives, Are Not Competitive with Local Markets*

In many instances, regardless of location, the federal limits on pay and incentives that hiring officials can offer potential employees pose a significant challenge for BOP institutions.  BOP hiring officials we interviewed told us that the compensation offered is not enough to competitively attract or retain medical professionals.  We found that this is especially true for the positions, such as doctors, pharmacists, and dentists, which are necessary to operate health units.

The BOP is required to classify positions according to the General Schedule (GS) pay scale, and, for physical therapists and pharmacists especially, we found the BOP struggles to offer competitive pay because the assigned grade of the positions limits the salaries they can offer.[24]  According to the BOP's Chief of Health Services Staffing and Recruitment, the current grade of physical therapist and pharmacist positions on the GS scale makes it very difficult to hire individuals into civil service positions.[25]  Rather, as of September 2014, the majority of medical professionals in those positions at BOP institutions are PHS officers.  According to BOP officials, this is because the GS grade levels the Office of Personnel Management (OPM) assigned to these civil service positions are too low and the PHS compensation and benefits are more attractive in comparison.  A Warden told us that if the BOP could offer more competitive pay through the civil service, it would be in a much better position when it comes to recruitment.

The BOP's Chief of Health Services Staffing and Recruitment said that attracting candidates for most medical positions in a correctional setting already requires the use of incentives.  However, we found that even with incentives, the BOP cannot offer competitive salaries because of the limitations imposed by the current GS pay scale.  Using data from the BOP, OPM, and the Bureau of Labor Statistics (BLS), we found that there is a large gap between the salaries the BOP pays its medical employees and those offered for similar positions in the local areas

---

[24]  The General Schedule is the position classification and pay system governing the majority of salaried personnel positions within the civil service.  OPM is responsible for administering the GS classification standards, qualifications, and pay structure.

[25]  Further, he said that most physical therapist positions are at the doctorate level and the BOP's current classification of this position does not account for that.  In response to a working draft of this report, the BOP said that this is because the BOP must follow OPM's Classification Standards, in accordance with 5 U.S.C. Chapter 51.

surrounding institutions.[26]  For example, the BLS reports that the average salary for a nurse in the local area is 34 percent higher than step 1 of the highest grade for a BOP nurse.  We found that the gap widens for other positions, with a 60 percent difference for physicians, a 102 percent difference for pharmacists, and a 133 percent difference for dentists.[27]  We also found that the salary gap was significant in both rural and metropolitan areas.  (See Table 1 below.)

**Table 1**

**OPM and the BLS Salary Comparison in Rural and Metropolitan Areas, FY 2014**

| Rural Area | Top GS Grade, Step 1 | BLS Average | Percent over BOP | Metropolitan Area | Top GS Grade, Step 1 | BLS Average | Percent over BOP |
|---|---|---|---|---|---|---|---|
| Nurse | $47,923 | $61,110 | 28% | Nurse | $51,723 | $77,468 | 50% |
| Physician | $114,872 | $187,734 | 63% | Physician | $123,981 | $192,476 | 55% |
| Pharmacist | $57,982 | $120,241 | 107% | Pharmacist | $62,579 | $120,034 | 92% |
| Dentist | $69,497 | $170,508 | 145% | Dentist | $75,008 | $159,368 | 112% |

Note:  This table does not include special pay.  See footnotes.

Sources:  BOP spending data, BLS occupational employment statistics, and OPM classification standards and locality pay tables

The BOP's Assistant Director for Human Resource Management told us that the GS scale does not meet the BOP's current needs because the assigned grades of many medical positions are too low.  The BOP's former Assistant Director for Health Services and Medical Director told us that the system is antiquated and no longer reflects today's reality or position requirements.  The BOP's Personnel Director told us that OPM convened a workgroup to rewrite the classification standards for nurses across the federal government.  However, we found that the BOP's discussions with OPM to restructure position classifications have not produced results.  The Assistant Director for Human Resource Management said that the lack of change was frustrating because nurses, for example, qualify only for a GS-5 classification, which is not competitive.[28]

---

[26]  For this analysis, we used the GS scale and step 1 of the position's highest grade to balance the variance in staff pay based on their status as a new versus more experienced employee.  For example, OPM classification standards state that a non-supervisory pharmacist can be grade 7, 9, or 11, so we used grade 11, step 1 for our analysis.  Neither the OPM data nor the BLS data includes the value of benefits in their calculations.  See Appendix 1 for more information.

[27]  This analysis does not include special pay.  OPM establishes special pay at a rate higher than basic pay for a group or category of positons in certain geographic locations where there are significant hiring challenges.  We found that even when accounting for salary increases from special pay, the gap between the BOP and the local area remains large.  For example, in Lexington, Kentucky, a dentist with special pay can earn $78,000 in the BOP while the BLS average is $176,000.  The BOP's Assistant Director for Human Resource Management said, "OPM works with the BOP on special salary rates but it's a Band-Aid on a much bigger issue."

[28]  According to the 2015 GS pay table, the base salary of a GS-5 position is $27,982.  This figure does not account for locality pay.

Position classifications are also problematic for mid-level practitioners such as physician's assistants and nurse practitioners.  The BOP's former Assistant Director for Health Services and Medical Director said that mid-level practitioners are significantly underpaid and that even incentives do not address the pay disparity.  For example, the Health Services Administrator at one institution in need of a nurse practitioner told us it has been unable to fill the vacancy because the salary is not commensurate with the education and experience required.  Specifically, she said that one of the nurse practitioner applicants to her institution had 6 years of education, but the BOP could offer only a GS-9 salary.[29]  In comparison, she further said that the BOP could offer a similar salary to a paramedic even though, in her state, paramedic qualifications can be obtained with less education.  Citing anomalies such as these, the BOP's Assistant Director for Human Resource Management described the GS scale as a one-size-fits-all system that does not always fit everyone.

In addition, we found that the private sector pays medical professionals who are not working in correctional settings significantly more than BOP civil service employees in the same positions, indicating that the salaries the BOP offers do not factor in the fact that its employees face inherent security risks associated with working in a correctional setting.  The BOP's Assistant Director for Human Resource Management said that many medical professionals do not find working in a correctional setting appealing because it is vastly different from a hospital.  The BOP's former Assistant Director for Health Services and Medical Director agreed, saying not everyone wants to work in a place that could present a threat to his or her well-being.  Despite this challenge, the BOP tries to market the benefits associated with working in a correctional setting.  As law enforcement officers, all BOP employees gain access to the law enforcement federal retirement system, health benefits, and annuity.  Still, the compensation offered to the BOP's medical professionals is less than what is offered in the local community hospitals and medical centers where there are fewer safety risks.

*Since FY 2010, the BOP Has Increased Its Use of Incentives to Recruit and Retain Civil Service Medical Employees*

Like most other federal agencies, the BOP must operate within the GS scale and is limited in what it can offer potential employees by the grade and classification of the position.  However, when the requirements and responsibilities of a position warrant more compensation than its grade and salary, the BOP can supplement compensation with various incentives.  According to BOP data, from FY 2010 to FY 2014, the BOP consistently used incentives for positions for which it had the greatest needs, including clinical nurses, general practice medical officers, and mid-level practitioners.  The BOP's Assistant Director for Human Resource Management, who has been with the BOP for 27 years, said that the BOP did not regularly need to use incentives until approximately 2000.  He said that now the BOP encourages institutions to be aggressive in recruiting for positions that have

---

[29]  According to the 2015 GS pay table, the base salary of a GS-9 position is $42,399.  This figure does not account for locality pay.

been difficult to staff and to offer as much as they can for an acceptance.  We found that more institutions have been requesting incentives to help attract medical employees who provide direct clinical care.  For example, in FY 2010, 70 percent, or 65 of 93 BOP institutions, requested incentives for their medical employees.[30]  We found that this increased to 89 percent in FY 2014, when 87 of 98 institutions requested incentives.

Consequently, from FY 2010 to FY 2014, the number of BOP medical employees receiving at least one incentive increased 74 percent.  Specifically, during FY 2010, the BOP awarded 409 incentives to medical employees, including 219 monetary incentives that were valued at $2.7 million.[31]  During FY 2014, the BOP awarded 712 incentives, including 342 monetary incentives that were valued at $4.5 million.[32]  (See Table 2 below.)

**Table 2**

**Incentives Awarded by Fiscal Year and Type, in Thousands**

| Fiscal Year | Recruitment Bonus | Relocation Bonus | Retention Allowance | Student Loan Repayment | Above Minimum Rate | Annual Leave Credit | Total |
|---|---|---|---|---|---|---|---|
| 2010 | 104 | 4 | 80 | 31 | 93 | 97 | **409** |
| | $1,445 | $60 | $932 | $279 | — | — | **$2,716** |
| 2014 | 101 | 5 | 140 | 96 | 146 | 224 | **712** |
| | $1,752 | $77 | $1,793 | $900 | — | — | **$4,522** |

Notes:  Monetary totals are in thousands.  As noted above, "above the minimum rate" pay allows an agency to set higher pay to meet the superior qualifications of a candidate or the special need of an agency.

Source:  BOP incentives data

According to BOP data, institutions frequently use recruitment and retention bonuses as incentives.  Table 3 below shows our analysis of the incentives offered to employees in positions with the greatest pay disparity when compared to the BLS average.  As noted above, special pay and incentives can help lessen the gap; but overall, BOP salary averages remain low in comparison for recruitment.

---

[30]  The BOP maintains data on correctional complexes in the aggregate, rather than separately for each institution within the complex.  As a result, the total number of locations requesting incentives is less than the overall total of 121 institutions.

[31]  Of the 409 incentives the BOP awarded, 190 were for annual leave credit or above the minimum rate pay.  The BOP does not assign monetary value for these incentives because they vary substantially by employee rate of pay.  For example, hiring officials can increase an employee's leave accrual rate from 4 hours per pay period to either 6 or 8, but the monetary value of that leave would depend on his or her salary.

[32]  Of the 712 incentives the BOP awarded, 370 were for annual leave credit or rate of pay above the minimum.

**Table 3**

**Incentives Awarded by Position, FY 2014, in Thousands**

| FY 2014 | Recruitment Bonus Total | Relocation Bonus Total | Retention Allowance Total | Student Loan Repayment Total | Incentives Total | Average Monetary Incentives per person |
|---|---|---|---|---|---|---|
| Nurse | $603 | — | $227 | $102 | **$932** | $7 |
| Physician | $414 | $25 | $480 | $63 | **$982** | $15 |
| Pharmacist | $10 | — | $59 | — | **$69** | $12 |
| Dentist | $196 | — | $280 | $40 | **$516** | $20 |

Notes:  Totals are in thousands.  For analysis, the category "Physician" combines data for general practice medical officers, internal medicine medical officers, and general medical officers.

Source:  BOP incentives data

For many nurses and medical doctors, student loan repayment is also an attractive incentive.  However, the BOP's Assistant Director for Human Resource Management said that for the BOP, student loan repayment is limited to $10,000 per employee each year.[33]  An additional incentive the BOP can use for some positions is accelerated promotion, which shortens the amount of time between salary increases.  Yet, these incentives, while helpful, have not resulted in bringing BOP medical staffing to sufficient levels.  A Health Services Administrator told us that her institution recently hired a Chief Dentist after 4 years of vacancy and was able to do that only by offering multiple incentives.  The Human Resource Manager at another institution told us that he uses a combination of incentives but even with multiple incentives, recruitment is still difficult.

We also found that institution efforts to obtain approval to use incentives are time-consuming, which sometimes results in the BOP losing candidates to other employers; but Central Office and institution staff do not agree on the reason for the delays.  Central Office staff attributes the long approval process to institution Human Resource Managers' lack of information and knowledge of the requirements for processing incentives.  The BOP's Chief of Health Services Staffing and Recruitment said that institution Human Resource Managers deal with labor relations issues, grievances, performance, and the Union, and that medical recruitment is just one small piece of the puzzle.  However, an institution Health Services Administrator told us that the paperwork required to process each one is extremely cumbersome.

The BOP's incentive approval process requires that each incentive be processed separately, even when a single employee will be receiving multiple incentives.  BOP officials told us that institution staffs wait for incentives to reach the final stages of approval at the BOP's Central Office before offering them to

---

[33]  Federal law imposes a $10,000 annual cap per employee and an overall cap of $60,000 per employee.  See 5 U.S.C. § 5379(b)(2).  The BOP's Assistant Director for Human Resource Management also noted that medical school loans are often in the range of six figures and that the amount of student loan repayment the BOP can offer does not compare to that of the private sector.

potential candidates because they are unsure which incentives they can authoritatively present to candidates prior to confirmation.  For example, a Human Resource Manager told us that because incentives are not final until approved, he has little room for negotiation and that what he can offer in competition with the local market is initially hypothetical.  The BOP's Personnel Director acknowledged that institution hiring officials lack confidence that incentives will be approved.  But, he told us, institutions should offer all they can because in practice incentives are rarely denied.  The BOP has considered automating the incentive approval process by creating a standard template for every incentive.  According to the BOP's Personnel Director, through automation, incentives would be approved more quickly and more information regarding incentive availability would be accessible.  However, the BOP has not yet implemented this change.

*Because Incentives Are Not Always Enough, the BOP Has Sought Other Alternatives to Attract Medical Professionals*

The BOP supplements its use of incentives with other alternatives that also have the effect of increasing pay.  One of these is the Physicians and Dentists Comparability Allowance Program (PCA Program).[34]  The PCA Program allows the BOP to adjust physician and dentist compensation up to $30,000 when it faces difficulty in recruiting.[35]  The adjustment for each employee is determined through negotiation with that employee and the BOP Medical Director's approval of the employee's credentials.  Eligible physicians or dentists must also enter a 1- or 2-year service agreement with the BOP.  The BOP's former Assistant Director for Health Services and Medical Director told us that this program generally makes the civil service a more lucrative option for physicians.[36]  However, the higher salary potential under the PCA Program is not always lucrative enough for other positions, such as psychiatrists.

The BOP recently received approval from the Justice Management Division and OPM to determine pay for psychiatrists using the laws governing medical professional compensation in the U.S. Department of Veterans Affairs (Title 38).[37]  Under Title 38, the BOP can increase an individual's compensation package up to a maximum of $260,000 per year, based on his or her rating from an approval

---

[34]  5 U.S.C. § 5948(a).

[35]  Recruitment difficulty is determined by a number of factors, including length of position vacancy, number of unqualified applicants, number of interviewed but underqualified applicants, and number of physicians rejecting offers of employment and citing inadequate compensation as the reason.

[36]  Physicians and dentists can earn up to $203,000 in annual salary under the PCA Program.

[37]  The Justice Management Division provides senior management guidance as it relates to DOJ policy for all matters pertaining to organization, management, and administration.

A majority of employees of the federal government are employed under personnel laws contained in Title 5 of the United States Code, which covers administrative law.  Title 38, the section of federal law covering veterans' benefits, includes an alternate personnel system for specific occupations such as medical professionals.  Under Title 38, employees are paid under separate pay schedules and pay is determined under rules separate from Title 5.

panel.[38]  The panel will determine the salary for each individual from tiers that the Department of Veterans Affairs has established based on resume, tenure, and certifications.  The BOP is also working with the National Finance Center to modify the system for salary payment processing and anticipates implementing Title 38 authority in the spring of 2016.  If the initiative is successful, the BOP told us it will consider expanding Title 38 to other positions that are difficult to staff, such as pharmacists.  BOP officials said that initially there would be minimal budgetary impact because the BOP employs relatively few psychiatrists, but that future budgets would need to incorporate increased costs if the principles of Title 38 were extended to more professions.[39]

Another benefit available to some BOP medical personnel is the opportunity to convert to the PHS from the civil service.  A PHS officer we interviewed told us that she originally took a pay cut when she joined the BOP as a civil service employee, but did so with the prospect of converting to the PHS for greater uniformed service benefits.[40]  She said that she also began her career as a civil service employee and converted to the PHS because the compensation package was more lucrative.[41]  For positions such as registered nurses and pharmacists, for which the BOP is not able to offer competitive salaries within GS constraints, we found PHS officers are likely to fill these positions.  In particular, the BOP's Assistant Director for Human Resource Management said that the BOP staffs a high number of PHS pharmacists because the BOP cannot offer a comparable salary for pharmacists.  In FY 2014, 145 of 194 pharmacists (75 percent) at BOP institutions were PHS officers, rather than civil service employees.[42]

The PHS accepts applications for a commission during defined periods throughout the year, which vary by profession.  The PHS accepts applications from physicians and dentists at any time, but accepts applications from other professions only during limited windows during the year.[43]  The PHS allows agencies employing

---

[38]  The panel will include representatives from the BOP's Health Services Division, the BOP Union, and medical doctors.

In response to a working draft of this report, the BOP estimated that typical compensation packages would not exceed $240,000 per year based on individual factors.

[39]  The BOP reported that, as of November 2015, it employed 25 psychiatrists.

[40]  The BOP allows qualified and eligible employees to convert to the PHS personnel system as long as their application for a commission is approved by the PHS.

[41]  We attempted to compare compensation in the GS and PHS systems but determined that we could not do so because the process of setting PHS officer pay is more individualized than the process of setting civil service employee pay.  For additional information, see Appendix 1.

[42]  We also found that the appeal of joining the PHS is lower when civil service salaries become more competitive.  The Chief of the BOP's Staffing and Recruitment Section told us that a majority of BOP dentists used to be PHS officers until the BOP decided to increase the position grade for dentists.  Since that change, he said, he has seen an increase in the number of BOP dentists who are civil service employees.

[43]  In previous years, the PHS application process was open to all professions at all times.  In 2010, the PHS streamlined the application process to allow applications only from certain professions at certain times throughout the year.  For example, in 2015, the PHS opened its application process to
(Cont'd.)

its officers a limited number of waivers that can be submitted outside of the normal application window for applicants that are deemed critical by the agency.  However, the BOP's PHS Liaison told us that if an employee stationed at an institution that is already well-staffed wants to convert to the PHS, he or she must transfer to a location where there is a shortage of medical staff.  The BOP's former Assistant Director for Health Services and Medical Director said that because the PHS does not commission many new officers during the regular application windows, waivers are consequently very valuable tools.  However, the number of waivers the PHS allocates to the BOP each year remains limited:  15 in 2014 and 15 in 2015.  At institutions with several vacancies, or at new institutions, the BOP will offer conversions to the PHS as an incentive to transfer between institutions or to stay with the agency.  Institution staff we interviewed acknowledged that being able to offer the option to convert to PHS is a recruitment tool they could use for hard to fill positions.  We discuss the BOP's management of PHS officers in more detail below.

*Institutions Must Rely on TDY Assignments and Contracted Medical Care because of Continuous Understaffing*

The BOP's inability to recruit and retain medical professionals has led to institutions operating at unfavorable staffing levels.  Institution staff told us that when staffing levels are low they depend on TDY assignments and medical contractors for assistance.  The BOP uses TDY and Regional Medical Assistance Support Teams to provide additional resources to its six regions.  These teams were created in 2011 to assist institutions with critical medical staffing needs.  According to BOP officials, these teams are used when institutions' health services units are 30 to 40 percent understaffed.  Both civil service employees and PHS officers serve on Regional Medical Assistance Support Teams and enlist on weeklong TDY assignments to assist.  An official at one institution in particular told us that even with PHS officers on staff, it relies on TDY from other institutions to accomplish its mission.  In FY 2014, this institution had a vacancy rate of 21 percent for medical professionals.  However, according to institution staff, relying on TDY for support is a temporary fix and should not replace a permanent solution for staffing shortages. The BOP's Assistant Director for Human Resource Management told us that rather than continuous TDY, it would be more beneficial for the BOP to pay an incentive to hire a full-time employee.  With this approach, fewer long-term expenses would stem from the repetitive use of TDY.

We found that staffing shortages lower staff morale, increase staff workload, and ultimately can reduce inmates' access to routine medical care.  A Human Resource Manager told us that because correctional settings require around-the-clock staffing, all vacancies affect staff morale.  He said that because operations never cease, the lower the staffing levels, the greater the need to use mandatory overtime and double shifts.  Additionally, staffing shortages increase the workload of those remaining staff.  The BOP's PHS Liaison told us that when there are vacancies, the existing staff becomes overworked.  A Physician's Assistant told us

---

pharmacists only during the month of August.  The BOP PHS Liaison told us that the new application process limits the number of applications the PHS processes each year.

that increased workloads can easily drain staff, which, for him, makes some of the routine care a lower priority.  A Health Services Administrator also told us that when health units do not have the staff to see inmates, they have to send them outside the institution for basic medical care because they are unable to meet their needs inside the institution.  The Warden at the same institution agreed, stating that staffing shortages greatly increase outside medical trips, subsequently resulting in an increase in outside medical spending.

Staff vacancies have an adverse impact on institution health services units and ultimately increase the BOP's outside medical spending when care cannot be provided inside the institution.  In FY 2014, the BOP spent $60 million in overtime payments to salaried employees to transport inmates outside the institution for medical care, an increase of 22 percent from the $49 million spent in FY 2010.  While acknowledging that the BOP faces many challenges to recruit and retain medical staff, particularly because of the geographic locations of institutions, the limitations of the GS scale, and the prison work environment, we believe the BOP could be doing more to proactively identify and address its medical staff vacancies.  In the remainder of this report, we discuss strategies the BOP could adopt to address these challenges.

## The BOP Does Not Identify or Address Recruiting Challenges in an Agency-wide and Strategic Manner

The BOP delegates many of the actions necessary for recruiting and hiring medical staff to its individual institutions.  These actions include conducting recruitment activities in the local labor market, advertising vacancies, interviewing candidates, preparing incentive request paperwork, and managing the institution's staffing budget.  As a result, the BOP's actions to address its recruiting challenges tend to involve reactively addressing specific problems faced by individual institutions rather than proactively identifying, prioritizing, and responding to regional or national trends in a coordinated fashion across all of its institutions.

At the Central Office level, the BOP's Health Services Division has a Staffing and Recruitment Section that has both short-term and long-term responsibilities.  In the short term, the section is responsible for understanding institutions' immediate medical staffing needs, explaining to institution human resources staff the incentives available for medical professionals, and guiding medical professionals through the BOP's hiring process.  In the long term, the section is responsible for increasing the pool of medical professionals who are interested in BOP vacancies.  The section does not advertise vacancies or make hiring decisions; these actions are delegated to each institution.  Further, the Chief of Health Services Staffing and Recruitment told us that institutions must request the section's assistance in addressing recruiting challenges.  Even when an institution requests assistance, it is not required to follow the section's guidance.  This reactive, locally delegated response to recruitment challenges has prevented the BOP from assessing which vacancies have the greatest negative impact on its ability to adequately provide medical care to inmates.

We further found that, even when the BOP has taken steps to address recruitment challenges across all of its institutions, these efforts have not resulted in a uniform approach to the issue.  For example, officials throughout the BOP have designated medical vacancies as hard to fill to justify their use of incentives to enhance recruiting.  However, we found that the BOP does not have a clear definition of this term.  As a result, it cannot easily describe the degree to which any one position is hard to fill and it cannot use this designation to help it set priorities among medical vacancies.  To illustrate, BOP policy identifies the length of time a position has been vacant as one factor that would justify using the Physicians and Dentists Comparability Allowance Program (PCA Program), but it does not give any guidance as to when the length of a vacancy should be considered problematic.[44]  The Assistant Director for Human Resource Management said that a position is considered hard to fill once the Human Resource Manager has communicated to Central Office that all recruitment efforts, absent incentives, have made hiring challenging.  Yet one institution's Human Resource Manager told us that *any* position requiring an incentive is considered hard to fill, while a different Human Resource Manager at another institution said that he considers a position hard to fill if he does not receive any applications after two or three advertisements.  A third Human Resource Manager said that, on paper, none of the positions at her institution is hard to fill; but she went on to tell us that they experienced such difficulty trying to fill a psychiatrist vacancy that the BOP's Central Office eventually reallocated the position to a different institution.

We found that one primary obstacle to the BOP developing a truly proactive, coordinated approach to addressing recruitment challenges is that it does not analyze the data it already collects to assist it in identifying and prioritizing these challenges across all of its institutions.  For example:

- *Vacancy Data:*  The Central Office Staffing and Recruitment Section monitors medical vacancies, but the Chief of Health Services Staffing and Recruitment said that the data they monitor does not differentiate between positions that are vacant because of recruitment challenges and positions that are vacant for other reasons.[45]

- *Incentive Data:*  Although the BOP collects data on the use of recruitment and retention incentives, which could help the BOP identify locations in which institutions have difficulty filling medical vacancies, the BOP does not analyze any of the data it collects on incentives for this purpose.  The BOP's Personnel Director told us that the BOP reserves for Central Office officials final approval authority for recruitment and retention incentives, instead of

---

[44]  BOP, Program Statement 6010.05, Health Services Administration (June 26, 2014), paragraph 17f.

[45]  The Chief of Health Services Staffing and Recruitment explained that, because hiring decisions are decentralized to the institution level, institutions sometimes freeze vacancies instead of filling them to ensure that funds are available in the institution's budget to cover overtime, outside medical expenses, and other costs.  He said that if an institution is not actively attempting to fill a vacancy, he would not consider that position difficult to fill.

delegating that authority to Wardens, in part so that the BOP can collect data on the use of these incentives.[46]  However, she also said that the BOP tracks the use of incentives only to ensure that spending remains within budgetary limits, and not for the purpose of helping to identify the hardest to fill vacancies in the BOP system.

- *TDY Assignment Data:*  The former Assistant Director for Health Services and Medical Director told us that when an institution resorts to requesting TDYs, it is usually because it cannot find anyone to fill the vacancies it is advertising.  Data on institution requests for support through TDY assignments could therefore help the BOP's Central Office identify institutions that are struggling to find permanent staff; but this information is not available at the Central Office level because the Regional Offices manage TDY requests and assignments.

- *Outside Medical Care Cost Data:*  Our May 2015 review of the impact of an aging inmate population found that understaffing in health services units increases the need for outside care.[47]  The cost of this care varies because the BOP signs a separate contract for each institution with local medical providers.[48]  Further, the BOP's care level system means that inmates with more significant medical needs are concentrated in a handful of institutions, with the result that staff vacancies at these institutions can have a more significant impact.[49]  A Health Services Administrator at a BOP

> **Budgetary Impact of Understaffing on Outside Medical Costs**
>
> We identified one complex for which medical staffing dropped from 35 of 46 positions filled (76 percent) in FY 2010 to 25 of 42 positions filled (60 percent) in FY 2014.  Of all BOP institutions, this institution paid the highest rates for outside medical care, with contract costs more than triple the Medicare rate.  We looked at BOP spending data and found that spending on outside medical care at this complex increased 47 percent from FY 2010 to FY 2014 (double the 23 percent increase in this spending seen by the BOP as a whole during that same time).  Given the relatively high cost of obtaining outside medical care in this location, a more proactive assessment of staffing needs could be beneficial to the BOP.
>
> Source:  OIG analysis of BOP staffing data, contract data, and spending data

---

[46]  In response to a working draft of this report, the BOP noted that the Department's Human Resources Order, DOJ 1200.1, states that approval of these incentives may not be delegated below the Personnel Officer level.  The BOP further noted that it is required to collect data on incentives to fulfill reporting requirements to the Department and OPM.

[47]  DOJ OIG, *The Impact of an Aging Inmate Population,* 18.

[48]  These costs also vary depending on whether an inmate requires inpatient or outpatient care.

[49]  The BOP assigns each inmate a care level from 1 to 4 based on documented medical history, with Care Level 1 being the healthiest inmates and Care Level 4 being inmates with the most significant medical conditions.  The BOP also assigns each institution a care level from 1 to 4, based on the institution's level of medical staffing and resources.  For more information about the BOP's care level system, see OIG, *The BOP's Efforts to Manage Inmate Healthcare.*

medical center said that by assessing only staffing levels, the BOP overlooks the needs of high care-level institutions.  We believe this causes the BOP to underestimate the value of filling priority vacancies at high care-level institutions where a greater proportion of inmates are very ill.  The Health Services Administrator emphasized, "The Bureau [of Prisons] is sending us the sickest of the sickest guys to take care of, and if we don't have the staff on board here to do even some of the basics that we need to do with them, then we end up having to send them into the community to get it done." Because the BOP does not take these variations in medical need or medical cost into account, it does not optimally prioritize filling the positions that cost the most to leave vacant.

We found that the BOP has been aware for some time that its locally delegated, reactive approach is ill suited for the medical staffing challenges it faces. Yet it has also declined opportunities to establish a more coordinated, proactive approach.  Specifically, in June 2009, a BOP working group established to examine the BOP's medical recruitment challenges recommended that the BOP centralize medical recruitment into the BOP's Consolidated Employee Services Center in Grand Prairie, Texas.[50]  The working group recommended centralization to improve customer service to applicants and to manage many functions, such as preparing incentive requests, that are the responsibility of institution staff.  In support of its recommendation, the working group wrote:  "A dedicated section would allow the agency to aggressively recruit and retain employees in an attempt to proactively address staffing concerns, rather than reactively, which continues to hinder effective operations and negatively impacts existing staff."[51]  At its July 2009 meeting, however, the BOP's Executive Staff decided not to approve any of the options the working group developed.

The working group's June 2009 findings included a section for comments from the BOP divisions most likely to be affected by the working group's proposals. In its comments, the Health Services Division said that it could not support any of the working group's proposals for several reasons, including a belief at the time that recruitment was improving and could be further enhanced through additional resources rather than through reorganization.  Instead, it recommended hiring someone to verify the professional credentials of candidates for medical vacancies, ensuring that they would be qualified to practice if offered a position.  The former Assistant Director for Health Services and Medical Director confirmed that the BOP now employs a nurse for this purpose.  The Health Services Division also recommended hiring one medical recruiter for each of the BOP's six regions to target hard to fill locations, and the BOP reported that it hired the six regional recruiters in the fall of 2015.

---

[50]  The Consolidated Employee Services Center centralizes some aspects of the hiring process and provides guidance to the institutions on hiring procedures.

[51]  Facilitator, National Health Care Staffing and Recruitment Workgroup, BOP, Executive Staff Paper, National Health Care Staffing and Recruitment Enhancement, June 9, 2009, 14.  In addition to its recommended option, the working group also researched and presented two other options in its report.

Since the 2009 comments, however, we found that the health services vacancy rate has actually risen at BOP institutions, from 15 percent in FY 2010 to 17 percent in FY 2014.  The BOP's decision to continue addressing its struggles with medical recruitment by reacting to individual institution requests rather than by developing a strategic, coordinated plan, has not led to improved results.  Meanwhile, spending on outside medical care has increased 23 percent, from $351 million in FY 2010 to $434 million in FY 2014.

This lack of strategic planning also means that the BOP cannot fully take advantage of an annual opportunity it has to articulate its staffing priorities to the PHS.  The memorandum of understanding (MOU) between the BOP and the PHS requires the BOP to "notify PHS at least annually, and more frequently if necessary, of the number of PHS Commissioned Officers, by training and experience, needed to fulfill the requirements of BOP."[52]  BOP officials told us that, while they respond to the PHS annually with this information, they do not base their response on a systemic assessment of the BOP's medical staffing needs.  Instead, they simply report the number of PHS officers already employed in BOP positions.  The former Assistant Director for Health Services and Medical Director told us that he did not think increasing the number reported would make a difference.  However, we note that the PHS already knows how many of its officers work for the BOP because it pays PHS officers and manages their benefits using BOP funds.[53]  The PHS's Deputy Director of the Division of Commissioned Corps Personnel and Readiness (PHS Deputy Director, DCCPR) told us that the PHS requests this annual projection of need in order to help shape the Commissioned Corps' annual recruitment plan and support limited force planning.

We believe that the BOP is missing an important opportunity by providing the PHS with data it *has* rather than conducting a robust analysis to determine what kind of medical staffing its institutions *need*.  If the BOP analyzed its recruitment challenges and prioritized vacancies based on the impact those vacancies have on the BOP's ability to care for its inmate population, this could help the BOP articulate specific numbers and types of PHS officers that would be of greatest benefit to address its staffing challenges.

**The BOP Does Not Use Its Authority to Assign PHS Officers to Positions Based on Greatest Need**

Both PHS policy and the PHS officers' sworn oath give the BOP the authority to place PHS officers in positions where they are most needed.  PHS officer appointees swear an oath that they are "willing to serve in any area or position or wherever the exigencies of the Service may require."  However, the BOP does not

---

[52]  MOU between the BOP, DOJ, and the PHS, Department of Health and Human Services, September 1991, paragraph III.B.

[53]  The BOP's Chief of Budget Execution told us that every month the Department of Health and Human Services generates a payroll report of PHS officers employed at the BOP, which the BOP's Budget Execution Office reconciles to ensure they transfer the appropriate amount of funds to the PHS to pay for these salaries and benefits.

take full advantage of this flexibility because, as noted above, it does not address recruitment challenges in a strategic, coordinated way and therefore does not place PHS officers in positions that maximize their benefit to the BOP.  In the section below, we discuss options that the BOP might consider to increase the efficiency of its assignment of PHS officers.

The PHS encourages its officers to pursue diverse work experiences throughout their careers.[54]  To incentivize transfers, PHS promotion boards place value on an officer's mobility, with multiple moves expected of officers seeking promotion to the higher ranks.  The PHS's Commissioned Corps Personnel Manual, which governs human resources policy for PHS officers, gives the BOP authority to initiate voluntary transfers to meet its needs or the needs of PHS officers.  It also gives the BOP the authority to initiate involuntary transfer of PHS officers at any time to meet the BOP's needs.  We found that the BOP does not currently manage these positions in ways that would encourage PHS officers who are interested in responding to the PHS incentives to transfer in ways that also benefit the BOP.

Specifically, we found that the BOP does not currently use involuntary transfers of PHS officers to address its staffing needs.  BOP officials said that they initiate involuntary PHS transfers only for disciplinary reasons or for instances in which an officer needs to be moved to a location where he or she can receive additional training and oversight.  PHS officers we interviewed at BOP institutions recognized that their status as Commissioned Officers meant that they were potentially subject to a change of duty station, but they also told us that such transfers were not actually used.  Instead, both PHS officers and civil service employees control their own duty stations in the same way:  by deciding whether to apply to an advertised vacancy at a particular institution.[55]  The BOP's Personnel Director told us, "they know where the vacancies are so if they wanted to apply to there, they easily could."  Once hired, PHS officers may also stay in a position for as long as they like, assuming satisfactory performance, just like civil service employees.

We also found that the BOP has not been proactive about using PHS officers to fill vacancies where individual institutions are struggling with particularly challenging medical personnel staffing needs.  Institution staff further told us that lengthy vacancies are common.  For example, staff at one institution told us that their Clinical Director position has gone unfilled for 15 years.[56]  A PHS nurse at

---

[54]  The PHS recommends that officers have at least three different geographic or programmatic assignments during their careers, but it does not have a specific requirement for the frequency of moves.  The BOP's PHS Liaison recommends that officers seeking promotion move every 3 to 5 years and told us that the PHS revised its application process in 2013 to require officers to be more mobile.

[55]  The BOP and the union have an informal agreement that all initial vacancies will be advertised, with both civil service employees and PHS officers eligible to apply.  The former Assistant Director for Health Services and Medical Director said that the BOP made this agreement because it would be unfair to make any vacancy open only to PHS officers.

[56]  The Clinical Director is the lead physician in an institution's health services unit and is responsible for all clinical care provided at the institution.  The Health Services Administrator at this

(Cont'd.)

another institution told us that her position had been vacant for approximately 2 years by the time she was hired and that at the time of our interview her institution had been without a Clinical Director for nearly a year.  The BOP Union President told us that a physician position at a third institution remained vacant for 5 years, which pushed more responsibility onto the mid-level providers who remained on the staff.  He questioned why the BOP allowed that position to remain unfilled instead of transferring a PHS physician from another location.

*More Effective Use of PHS Location Assignments Could Take Multiple Forms*

Multiple BOP and PHS officials told us that the BOP could do more with voluntary and involuntary transfer authorities to better align PHS officers' duty stations with the BOP's greatest needs.  In this section, we outline three options that the BOP could consider to use PHS officers as a means of addressing some of its most challenging medical staffing problems.

<u>Involuntary Transfers</u>

The use of involuntary transfers for all PHS officers would mirror the military's requirement of frequent transfers and reassignments, a process known as "force management."  BOP officials acknowledge that PHS policies give them the authority to implement force management if they choose to do so, but they told us that this would require at least three changes in how BOP institutions are managed:

1. reducing the level of control that Wardens currently have over the selection of employees to fill institution vacancies,

2. matching all PHS officers with positions available, and

3. reducing the control PHS officers currently have over their duty station.

Effectively using involuntary transfers would also require changes in how the BOP as a whole is managed, because the BOP would also need to assess which vacancies are of such high priority that they should be staffed by a transferring PHS officer rather than remaining vacant.  BOP officials told us that they had not implemented involuntary transfers because they were concerned that such a change could reduce employee engagement and increase medical staffing vacancies.  The PHS Deputy Director, DCCPR acknowledged these concerns, recommending that agencies minimize the risk of disengagement by transferring officers for defined periods of time and by giving the officers some say in the

---

institution told us that, in the absence of a Clinical Director, they had a contract physician who visited the institution twice a week, as well as three additional contract physicians who each visited the institution once a month; the Clinical Director of a different institution participated via phone in decisions concerning whether an inmate should be referred for medical care outside the institution. We note, however, that the Clinical Director providing this assistance works at an institution that is 750 miles away from the institution we interviewed, and in a different time zone.  Therefore, the lack of a Clinical Director means that onsite physician care for the 1,268 inmates at this institution is limited.

location of their subsequent transfer.[57]  Regarding the BOP's concern that involuntary transfers would cause PHS officers to leave the BOP for other agencies, he said that while the PHS encourages its officers to be mobile, it also requires a minimum 2-year commitment at each duty station and therefore will not process transfer requests for a PHS officer more frequently.

<u>Targeted Force Management</u>

BOP officials and institution staff suggested to us that the BOP could take better advantage of the PHS requirement for officer mobility by using force management in a targeted, rather than broad manner.  Some institution staff suggested that the BOP require PHS officers to spend their first few years with the BOP working in institutions that have the greatest difficulty filling vacancies.  A PHS Health Assistant Specialist told us that if someone was "hungry" enough for a PHS commission, he or she would go anywhere to take a position.  An institution's Human Resource Manager said that this would be preferable to transferring PHS officers who were already employed in the BOP, which would create a vacancy at the PHS officer's previous institution.  While the BOP told us that it tries to use its limited number of PHS waivers in this manner, we believe it could achieve more effective results if it also used this approach with all PHS officers who are new to the BOP.  In FY 2014, 17 BOP civil service employees converted to the PHS using waivers, but the BOP gained an additional 61 PHS officers in other ways.[58]

We also found that the BOP has a precedent of using targeted force management for some entry-level PHS officers.  Students entering their final year of school or professional training are eligible to apply to the PHS Senior Commissioned Officer Student Training and Extern Program (Senior COSTEP).  Those accepted by the PHS are sponsored by an agency such as the BOP, paid at the entry-level ensign rank while completing their education, and agree to work for their sponsoring agency as a PHS Commissioned Officer immediately following graduation.[59]

---

[57]  BOP officials said that it would be easier for the military to give officers a voice in the location of a subsequent transfer because all military personnel face transfer, making it easier to predict when particular positions and locations will have vacancies.  This would be more difficult in the BOP because medical positions can be also be filled by civil service employees, who cannot be transferred as easily as PHS officers can.

[58]  The BOP reported that in FY 2014, 15 civil service employees who already worked for the BOP converted to the PHS during regular application windows, 21 newly-commissioned PHS officers joined the BOP, and 25 experienced PHS officers joined the BOP from other agencies.

[59]  Ensign is the most junior officer rank in the PHS.  The required PHS service commitment is twice the length of time the Senior COSTEP officer received financial support while in school.  For example, the BOP's COSTEP program statement requires Senior COSTEP officers to serve a minimum of 8 months in training, followed by a minimum 16-month commitment to the BOP.  In 2015, the BOP and the National Institutes of Health were the only agencies who sponsored Senior COSTEP officers.

These officers are referred to as Senior COSTEP officers despite being entry-level because the PHS also has a Junior COSTEP program.  Junior COSTEP officers have more than 1 year left of their schooling and may temporarily work for the BOP, or other agencies that employ PHS officers, during semester breaks.

The BOP's COSTEP Program Statement specifies that assignments for entry-level officers participating in the Senior COSTEP program are based on the BOP's needs.[60]  A PHS officer working at the BOP's Central Office serves in the role of COSTEP Coordinator and is responsible for assessing the BOP's needs for Senior COSTEP officers and for assigning them to institutions.[61]  Institutions request to participate in the Senior COSTEP program with the knowledge that this would result in the assignment of an entry-level PHS officer to their institution rather than the selection of a local candidate after advertising a vacancy.  The COSTEP Coordinator considers the types of vacancies institutions are seeking to fill, whether the institutions asking to participate in the Senior COSTEP program are a good fit for an entry-level medical professional, and the location preferences of the Senior COSTEP officers.[62]  However, the BOP's former Assistant Director for Health Services and Medical Director said that because the BOP's goal with the Senior COSTEP program is to maximize the retention of these officers beyond their initial service commitment, the location preferences of the Senior COSTEP officers and the availability of mentors are often more important than institution needs when determining where the Senior COSTEP officers should be assigned.

If the BOP gave greater priority to institution needs, and broadened its assessment to include positions that should be filled by a more experienced clinician as well as entry-level positions, then its approach to staffing Senior COSTEP officers could be expanded to maximize the efficiency of PHS officer placements more broadly.  Such an expansion could accommodate either a decision to implement force management broadly for all PHS officers or more narrowly for only those PHS officers who are new to the BOP.[63]  However, in order for these assessments to be successful, the BOP would first have to be more strategic about analyzing and prioritizing its overall recruitment needs.[64]

<u>BOP Needs Aligned with PHS Promotion Incentives</u>

The BOP could also consider better aligning its needs with the PHS's promotion incentives, particularly the PHS's recent emphasis on mobility.  One long-time PHS officer told us that at the time he was commissioned, the PHS promoted as a perk the fact that its officers would not be subjected to involuntary

---

[60]  BOP, Program Statement 6021.04, Commissioned Officer Student Training Extern Program (COSTEP) (August 1, 2003), paragraphs 16, 17.

[61]  In a given year, no more than 30 Senior COSTEP officers are assessed for placement in BOP institutions.

[62]  The BOP PHS Liaison told us that because Senior COSTEP officers are entry level, it would not be appropriate to assign them to an institution where they would have to work independently or be the senior clinician.

[63]  PHS officers who are new to the BOP do not necessarily have to be entry level.  For example, civil service employees who convert to the PHS after they start work at the BOP already have some clinical experience.

[64]  In response to a working draft of this report, BOP officials noted that when making decisions concerning the effective management of PHS officers, they must consider the human resource implications when developing an approach to better utilizing PHS officers.

transfers.  However, the BOP's PHS Liaison told us that in 2013 the PHS revised its application process to require mobility and now screens out applicants who are not willing to move.  As a result of these changes, mobility has become a more important benchmark in the PHS promotion process.[65]

The BOP Union President told us that the BOP historically has not required PHS officers to move and has instead accommodated PHS officers who are promoted in rank by giving them additional responsibilities at their current institutions.  He suggested that the BOP's use of PHS officers would be more effective if PHS officers who needed to take on additional responsibilities due to a promotion were moved to a position in a different institution.  We believe that by encouraging such transfers, the BOP could better staff the locations where need is greatest, while also helping the transferred PHS officer demonstrate continued mobility in his or her next application for a promotion.

Like mobility, receipt of PHS awards is another factor that the PHS promotion board considers when making promotion decisions.  One such award is the PHS's isolated hardship award given to PHS officers who serve at least 180 consecutive days in an area designated as isolated, remote, insular, or constituting a hardship duty assignment.  The BOP has already sought to incentivize PHS officers' transfers by having successfully petitioned the PHS to designate five BOP institutions as "isolated hardship locations" eligible for the award.[66]  The BOP's PHS Liaison told us that a request for a sixth isolated hardship designation for the newly activating Administrative U.S. Penitentiary, Thomson, Illinois, is pending.  We believe the BOP should consider requesting additional isolated hardship designations in the future, although we note that according to the BOP's PHS Liaison, the PHS is in the process of revising its criteria for awarding the designation.

---

[65]  PHS officer promotions in rank are based on the extent to which an officer meets a number of benchmarks, including performance appraisals, awards, history of assuming roles of increasing responsibility, continuing education, mobility, willingness to take on collateral duties, integrity, participation in PHS advisory groups, mentoring, and maintenance of basic readiness standards to respond to public health emergencies.  PHS officers told us that promotions become more competitive at higher ranks because the higher ranks have fewer positions available.  A PHS promotion board, not the BOP, makes PHS promotion decisions.

[66]  The five institutions with the designation as of October 2015 are Federal Correctional Institution (FCI) Safford in Arizona, FCI Manchester in Kentucky, FCI Estill in South Carolina, Federal Prison Camp Yankton in South Dakota, and FCI Three Rivers in Texas.

# CONCLUSION AND RECOMMENDATIONS

**Conclusion**

In addition to the unavoidable challenges within the BOP's correctional setting, the medical staffing challenges the BOP faces stem in part from local market factors and the limitations of the General Schedule (GS) scale and position classifications that the BOP cannot adjust without approval from the Office of Personnel Management (OPM).  We found that the BOP has taken a number of steps to address pay disparities and understaffing challenges, particularly by increasing its use of incentives and obtaining approval to use an alternate compensation scale for psychiatrists.  However, the approval process for incentives is laborious, time-consuming, and requires extensive knowledge that not all institution staffs possess.  Further, we found that the continued reliance on short-term solutions such as temporary duty (TDY) assignments and contracted medical care has an adverse impact on overall medical costs.  We believe that in order to be more efficient with resources, the BOP must look at other avenues to increase medical staffing levels.

We also found that the BOP needs to take a more strategic, coordinated, and agency-wide approach to its recruitment challenges.  Such an approach should begin by improving the BOP's use of data to identify, prioritize, and address recruitment challenges and medical staffing needs.  For example, the BOP does not currently prioritize medical staffing vacancies based on the cost of leaving the vacancies unfilled.  These costs can be determined by analyzing the care level of particular institutions, the extent to which institutions rely on TDY assignments, or the cost of contracting for care that would be provided if the vacancy were filled.  Similarly, the BOP currently collects position-specific data on the use of incentives but does not analyze it for recruitment purposes.  If the BOP were to analyze this data to identify positions and locations that are heavily reliant on incentives, then it could use that information to more accurately identify pay disparities, assess how frequently supplemental pay is required, and compare the cost of applying multiple incentives for lower graded positions with the cost that the BOP would incur if medical positions were reclassified to higher grades.  We believe this data would also be valuable in helping the BOP support its position to the Office of Personnel Management that the reclassification of certain positions on the GS scale is necessary for effective recruitment.

Because the BOP has not prioritized medical staffing vacancies through a strategic, national assessment of its needs, it cannot place PHS officers more efficiently throughout its institutions.  PHS policy offers the BOP a great amount of latitude in determining where to station PHS officers, but the BOP does not currently take advantage of these flexibilities.  The BOP has several options for managing PHS officer placements on a national level, and we believe it can do so in ways that could benefit both the BOP and the individual PHS officers' needs.  Better assessment of priority medical vacancies could also help the BOP better articulate its requirements to the PHS when it responds to the PHS's annual request for information on the amount of PHS officers the BOP needs.  We acknowledge that

with approximately 6,500 total officers working across 23 federal agencies and the District of Columbia, the PHS is not a panacea for the BOP to fill all of its staffing needs.  However, a more thorough analysis of staffing needs throughout the BOP, rooted in a more strategic approach, could help the BOP better describe its challenges to the PHS and identify where additional staff are most acutely needed.

**Recommendations**

To ensure the BOP can recruit and retain the medical professionals that are necessary to provide medical care to the BOP's inmate population, and to foster a proactive, coordinated strategy that will allow the BOP to better use its PHS officers, we recommend that the BOP:

1.  Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations.

2.  Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty.

APPENDIX 1

# EXPANDED METHODOLOGY

**Data Analysis**

*Public Health Service and Civil Service Salary Comparison*

We attempted to compare the uniformed service pay scale with the General Schedule, but we determined that we could not accurately compare the salaries because some of the factors that influence Public Health Service (PHS) officer salaries do not have an equivalent in civil service salaries, resulting in great variance.[67]  A 2013 University of Maryland study of the PHS found that the costs associated with the PHS could not be easily quantified for comparison to the civil service.[68]  Further, the PHS Deputy Director of the Division of Commissioned Corps Personnel and Readiness (PHS Deputy Director, DCCPR) confirmed that because of the variance, the pay scales are too dissimilar to compare.

*Bureau of Labor Statistics Salary Analysis*

We used publicly available data from the Office of Personnel Management (OPM) and the Bureau of Labor Statistics (BLS) to analyze the differences in salaries between medical professionals working at the BOP and the overall salary averages of medical professionals in a given geographic location.[69]  We based our selection of geographic locations on counties that were in close proximity to BOP institutions.  We then used the county of the institution to select the applicable region for BLS data and the applicable locality for OPM data.  When analyzing OPM data, we used the highest available grade, but the lowest step for the given position according to OPM's position classification standards.  For example, dentists in the BOP can be either grade 11 or grade 12, so we used the salary of grade 12, step 1 for our analysis.  We believe this allowed for a reasonable comparison with the BLS averages because it represented a salary in the middle of the allowable range for that position.  In a separate analysis, we examined special pay tables that OPM had established for dentists and pharmacists in some BOP institutions, but we concluded that special pay was not sufficient to address the wage gap we found when comparing locality pay tables with BLS data.

---

[67]  Specifically, pay for PHS officers varies based on geographic location, base pay, years of service, dependents, specialty, allowance for subsistence, and rank.  The PHS Deputy Director, DCCPR noted that some portions of PHS officer pay are also tax-exempt.

[68]  According to the University of Maryland, the effectiveness, efficiency, efficacy, and comprehensive value of the PHS cannot be determined based on cost factors alone because there exist too many variables, inconsistencies, and un-measurable attributes to make a meaningful evaluation.  Muhiuddin Haider, *The USPHS Commissioned Corps:  A Study on Value and Contributions to DHHS Mission and National and Global Health Priorities and Initiatives* (University of Maryland, 2013).

[69]  BOP salary averages are included in the data captured by the Bureau of Labor Statistics.

*Incentives Awarded by Position*

The BOP provided data on recruitment and retention incentives awarded from FY 2010 to 2014.  We used this data to total the number of incentives awarded, and the cost associated with those of monetary value.  Our analysis of monetary incentives compared the incentives by type and position and used position counts to calculate averages.  In determining position counts, we accounted for those individuals who received more than one incentive.

**Interviews**

We interviewed Central Office officials, including the Assistant Directors of the Human Resource Management and Health Services Divisions; the BOP's Personnel Director; the BOP PHS Liaison; the Chief of Budget Execution; and the Chief of Health Services Staffing and Recruitment.

We visited five institutions via video teleconference and, during those visits, we interviewed institution senior management, as well as staff who provide direct clinical care to inmates.  We interviewed four Wardens, one Associate Warden, five Health Services Administrators, five Business Administrators, five Human Resource Managers, a Leave Maintenance Clerk, and BOP and PHS clinical staff, including: an occupational therapist, a health systems specialist, four non-supervisory registered nurses, a physician assistant, a nurse practitioner, and two pharmacists.

At PHS Headquarters, we interviewed an official in the DCCPR.

**Site Visits**

The team conducted video teleconferences with the five following institutions, representing all four healthcare levels:  Federal Medical Center Butner, Federal Correctional Institution (FCI) Danbury, Federal Medical Center Rochester, FCI Sandstone, and Federal Detention Center SeaTac.  We selected these five institutions because they had a combination of a high number or high percentage of PHS staff in FY 2014.  We were also able to use these locations to assess hiring challenges across medical, detention, and standalone institutions, in both rural and metropolitan locations.

**Additional Objectives**

At the outset of this review, we included a report objective examining the BOP's oversight of PHS officer leave, awards, drug testing, and correctional training.  We reviewed BOP and PHS policies related to these topics and asked questions on these topics during Central Office interviews and site visits described above.  However, during these interviews we learned about larger concerns that BOP staff had regarding medical staffing in general.  We met with officials from the BOP's Program Review Division and Health Services Division in September 2015 to formally close the original objective.  At that meeting, we also added a review

objective examining the challenges and limitations the BOP faces in hiring medical professionals to work in its institutions.[70]  The BOP officials we met with in September 2015 said that recruitment and retention of quality medical professionals is the BOP's biggest challenge.

---

[70]  We conducted some of our Central Office interviews after this meeting to discuss the topics raised in our new objective.

**APPENDIX 2**

# THE BOP'S RESPONSE TO THE DRAFT REPORT

**U.S. Department of Justice**

Federal Bureau of Prisons

*Office of the Director*

*Washington, DC 20534*

March 15, 2016

MEMORANDUM FOR NINA S. PELLETIER
                ASSISTANT INSPECTOR GENERAL
                OFFICE OF INSPECTOR GENERAL
                EVALUATION AND INSPECTIONS DIVISION

*Thomas R. Kane*

FROM:       Thomas R. Kane, Acting Director

SUBJECT:    Response to the Office of Inspector General's (OIG)
            DRAFT Report:  OIG Review of the Impact of the
            Federal Bureau of Prisons' Medical Staffing
            Challenges, Assignment Number A-2015-005

The Bureau of Prisons (BOP) appreciates the opportunity to respond
to the open recommendations from the draft report entitled OIG Review
of the Impact of the Federal Bureau of Prisons' Medical Staffing
Challenges.

Therefore, please find the Bureau's response to the recommendations
below:

**Recommendations**

To ensure the BOP can continue to recruit and retain the medical
professionals that are necessary to provide medical care to its
inmate population, and to foster a proactive, coordinated strategy

that will allow the BOP to better use its PHS officers, we recommend that the BOP:

**Recommendation 1:**  "Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations."

**Response:**  The BOP agrees with this recommendation and will explore options to better assess and provide targeted strategies for medical vacancies, resulting in an identified plan that will be provided to the OIG.

**Recommendation 2:**  "Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty."

**Response:**  The BOP believes the history and complexity of the relationship between the civil service and Public Health Service (PHS) personnel systems is not adequately detailed in the OIG report, and has a significant impact on BOP's management of those staff. Nevertheless, the BOP agrees with this recommendation, and will explore and develop strategies to better utilize PHS officers to address the medical vacancies of greatest consequence.  As discussed during the exit conference for this review, BOP will explore the OIG's proposed solutions in its report, as well as other options that may appropriately address the situation.

If you have any questions regarding this response, please contact Steve Mora, Assistant Director, Program Review Division, at (202) 353-2302.

2

APPENDIX 3

## OIG ANALYSIS OF THE BOP'S RESPONSE

The Office of the Inspector General (OIG) provided a draft of this report to the Federal Bureau of Prisons (BOP) for comment.  The BOP's response is in Appendix 2.  Below, we discuss the OIG's analysis of the BOP's response and actions necessary to close the recommendations.

**Recommendation 1:**  Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation and stated that it would develop a plan by assessing medical vacancies and develop more targeted strategies to fill them.

**OIG Analysis:**  The BOP's planned actions are responsive to our request.  By June 30, 2016, please provide the BOP's plan illustrating the strategies developed to fill medical vacancies.  As part of the plan, please explain how the BOP will prioritize medical vacancies based on the length of vacancies, patterns in institutions' use of incentives, patterns in institutions' use of temporary duty, the cost of outside medical care, and any other sources of data that the BOP believes demonstrate the impact of leaving the positions vacant.  Additionally, please describe how frequently the BOP plans to reassess medical vacancies and reconsider their prioritization.

**Recommendation 2:**  Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation and stated that it would explore and develop strategies to better utilize PHS officers to address the medical vacancies of greatest consequence.  The BOP further stated that it would explore the options outlined in this report, as well as other options that may appropriately address the situation.

**OIG Analysis:**  The BOP's planned actions are responsive to our request.  By June 30, 2016, please describe how the BOP plans to better use PHS officer incentives, assignment flexibilities, and temporary duty to fill the highest priority medical vacancies identified through the strategy developed in response to Recommendation 1.  As part of this response, please describe how the BOP considered the options discussed in the report.

*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.  Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig

# EXHIBIT C



# Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic

★  ★  ★

EVALUATION AND INSPECTIONS DIVISION

23-054

MARCH 2023



# EXECUTIVE SUMMARY

## Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic

### Introduction

The Federal Bureau of Prisons (BOP) is responsible for the care, safekeeping, and subsistence of federal inmates, as well as for reentry programming to help them return to the community. The BOP houses inmates in BOP-operated federal prisons and, if certain conditions are met, in contracted Residential Reentry Center (RRC) facilities, commonly known as halfway houses, or in home confinement.

The coronavirus disease 2019 (COVID-19) pandemic created significant safety and staffing challenges for the BOP due to the high risk of COVID-19 spread among staff and inmates once it is introduced into a correctional facility. Since April 2020, the U.S. Department of Justice (Department, DOJ) Office of the Inspector General (OIG) has conducted substantial oversight of the BOP's response to the COVID-19 pandemic. The resulting body of work, which the OIG previously publicly released, includes remote inspections of 16 facilities housing BOP inmates completed during the early months of the pandemic, multiple surveys of BOP staff conducted at different times, and a collection of interactive data dashboards containing up-to-date information about COVID-19 within BOP facilities. The OIG is also completing analysis of its first survey of BOP inmates.

This capstone review summarizes our overall findings regarding the BOP's response to the COVID-19 pandemic, the issues we identified through our pandemic oversight work, the topics that have emerged following that work, the challenges that the BOP will likely continue to face during and after the pandemic, and actions that the BOP should undertake to prepare for future potential healthcare emergencies.

### Recommendations

We make 10 recommendations to assist the BOP in managing challenges during and after the COVID-19

pandemic and in mitigating the effects of future public health emergencies.

### Results of the Review

The COVID-19 pandemic has required the BOP to prevent and manage the spread of COVID-19 and protect inmate and staff health and safety, while adhering to changing guidance and communicating essential information to stakeholders. As of June 21, 2022, the BOP reported that there had been over 60,000 inmate cases and 13,000 BOP staff cases of COVID-19 since the beginning of the pandemic, as well as 296 inmate deaths and 7 BOP staff deaths. We identified several areas in which the BOP should take action to address ongoing challenges, improve existing processes whose weaknesses were highlighted during the pandemic, and better prepare for future public health emergencies.

#### The BOP Should Improve and Retain Effective Practices for Protecting Staff and Inmate Health and Safety During Public Health Emergencies

We found that BOP facilities used a variety of strategies to try to implement social distancing, quarantine, and medical isolation guidance, but were often limited by facility infrastructure and population size. We also identified several areas in which the BOP should improve its processes and identify long-term changes to better protect staff and inmate health and safety during a public health emergency.

First, the BOP should review its policies and processes on placing inmates in single cells given the serious failures we identified in the BOP's use of single cells during COVID-19 modified operations. The BOP reported to the OIG that seven inmates died by suicide from March 2020 through April 2021 while housed in single-cell confinement in quarantine units related to COVID-19. We found that numerous facilities single-celled inmates during COVID-19 modified operations despite BOP guidance stating that facilities should

avoid doing so to the greatest extent possible. Additionally, although BOP guidance stated that psychology staff should be consulted for inmates proposed for single-celling, we found that this did not occur for at least five of the seven single-celled inmates who died by suicide. The BOP's postmortem documentation indicated that all seven inmates had factors that made them vulnerable to suicide. Second, the BOP should explore permanent facility modifications to help it more easily implement future infection control measures.

Third, the BOP needs to assess how it can more effectively use its home confinement authorities. For example, the BOP did not fully utilize its authorities to help address inmate population issues at prisons with COVID-19 outbreaks and social distancing, quarantine, and staffing challenges. While the BOP transferred a substantial number of inmates from prisons to home confinement during the first few months of the pandemic, the BOP actually transferred fewer inmates during the first year of the pandemic than it had during the year immediately preceding the pandemic. We note that, due to the decreasing inmate population overall, the percentage of inmates transferred to home confinement was similar for both years. Additionally, we found that the BOP did not meet its facility population reduction goals at some minimum and low security facilities. Of the inmates who were transferred to home confinement during the first year of the pandemic, less than 2 percent failed to comply with program rules.

### The BOP Should Take Appropriate Steps to Address Staffing Shortages and Staff Morale

We found that the COVID-19 pandemic exacerbated the effects of preexisting BOP medical and nonmedical staffing shortages, increased staff workloads, and impeded facilities' ability to fully respond to the pandemic. The pandemic also strained BOP staff morale. Staff reported experiencing stress or anxiety at work due to the pandemic and identified a need to improve communication between BOP leadership and staff. Staff expressed concerns about inconsistent or changing guidance regarding leave and when to quarantine. The BOP can improve how it communicates the available staff support options.

### The BOP Should Improve Its Communication of Essential Information to Stakeholders

We identified a significant deficiency in the BOP's communication with inmates' families regarding COVID-19 related serious illnesses. Despite BOP policy requiring facilities to "promptly" notify inmate families of a serious illness, we found that, in almost one-third of the 49 cases of COVID-19 related inmate deaths we reviewed, facilities took more than 3 days to try to notify families of the inmates' serious illness.

We also received numerous complaints about the BOP's communications with inmates, the public, and attorneys, despite the BOP's attempts to communicate proactively during the pandemic. We identified issues with the BOP's notifications to crime victims and limitations with its website data.

### The BOP Should Provide Clear Guidance on the Use of Healthcare Protective Equipment and Compliance with Healthcare Safety Guidance

Our remote inspections identified numerous personal protective equipment (PPE)-related issues, perceived PPE shortages, and staff concerns and confusion about guidance on PPE and face coverings. While PPE supply stabilized and staff concerns and confusion decreased during the pandemic, in OIG surveys staff and inmates identified an issue with the inconsistent use of face coverings when social distance could not be maintained. Additionally, our remote inspections found that the BOP encountered challenges managing COVID-19 testing delays early during the pandemic. Long turnaround times when the market for testing supplies was burdened meant that inmates sometimes had to wait several days for test results, and some facilities did not properly follow quarantine guidance to manage the risk of COVID-19 transmission between inmates awaiting test results.

### The BOP Should Respond to Ongoing Pandemic Challenges and Prepare for Future Public Health Emergencies

We found that aspects of the BOP's COVID-19 pandemic response evolved over time and that the BOP should capture lessons learned from its COVID-19 response. First, the BOP should continue to explore ways to safely accommodate inmate access to mental healthcare, programming, counsel, recreation, commissary, and communication options during extended modified pandemic operations. Second, to protect inmates and staff, the BOP should continue COVID-19 vaccine educational campaigns for inmates and ensure that inmates and staff have access to the vaccine. Finally, to prepare for future public health emergencies, the BOP should document best practices and lessons learned from its ongoing COVID-19 challenges related to its continued use of modified operations and vaccines.

# Table of Contents

Introduction .................................................................................................................................1

    Background ...........................................................................................................................1

    The OIG's COVID-19 Oversight of the BOP.........................................................................6

    Scope and Methodology.......................................................................................................8

    The BOP's COVID-19 Response...........................................................................................8

Results of the Review.................................................................................................................16

    The BOP Should Improve and Retain Effective Practices for Protecting Staff and Inmate Health and
Safety During Public Health Emergencies......................................................................... 17

    The BOP Should Take Appropriate Steps to Address Staffing Shortages and Staff Morale ....................... 44

    The BOP Should Improve Its Communication of Essential Information to Stakeholders ........................... 62

    The BOP Should Provide Clear Guidance on the Use of Healthcare Protective Equipment and
Compliance with Healthcare Safety Guidance .................................................................. 75

    The BOP Should Respond to Ongoing Pandemic Challenges and Prepare for Future Public Health
Emergencies...................................................................................................................... 82

Conclusion and Recommendations ...........................................................................................99

    Conclusion..........................................................................................................................99

    Recommendations ........................................................................................................... 100

Appendix 1:  Purpose, Scope, and Methodology ....................................................................102

    Standards ......................................................................................................................... 102

    Purpose and Scope .......................................................................................................... 102

    Methodology.................................................................................................................... 102

Appendix 2:  Previous, Related OIG Work................................................................................106

Appendix 3:  The BOP's COVID-19 Guidance ..........................................................................109

    Guidance for Federal and Contract Prisons .................................................................... 109

    Guidance for Residential Reentry Centers ...................................................................... 109

Appendix 4:  The BOP's Early Use of Medical Isolation and Quarantine ...............................111

Appendix 5:  Factors Affecting COVID-19 Testing Practices and Availability .........................112

    Availability of COVID-19 Tests......................................................................................... 112

    CDC Guidance on COVID-19 Testing............................................................................... 112

    BOP Use of COVID-19 Rapid Tests ................................................................................. 113

Appendix 6:  Home Confinement and Compassionate Release:  Key Differences...........................114

Appendix 7:  BOP COVID-19 Vaccine Guidance:  Priority Levels for Inmate Vaccination (Eliminated in
January 2022).........................................................................................................................115

Appendix 8:  The BOP's Response to the Draft Report ........................................................................116

Appendix 9:  OIG Analysis of the BOP's Response.............................................................................120

# Introduction

## Background

Coronavirus disease 2019 (COVID-19) is an infectious respiratory disease caused by the SARS-CoV-2 virus. COVID-19 was first identified in December 2019 and spread quickly, reaching the level of global pandemic by March 2020.  By June 2022, there had been over 85 million confirmed cases of COVID-19 in the United States.  The COVID-19 pandemic created challenges for the Federal Bureau of Prisons (BOP) as it worked to prevent and manage the spread of COVID-19 among its staff and the inmates in its custody.  The Centers for Disease Control and Prevention (CDC) has noted that the confined nature of correctional and detention facilities, combined with their congregate environments, "heighten[s] the potential for COVID-19 to spread once introduced" into a facility.  Federal inmates typically eat, sleep, and participate in activities in close proximity to one another in these facilities, which can include custody, housing, healthcare, food service, education, recreation, and workplace components in a single physical setting.  As of June 21, 2022, the BOP reported that there had been over 60,000 inmate cases and 13,000 BOP staff cases of COVID-19 since the beginning of the pandemic, as well as 296 inmate deaths and 7 BOP staff deaths attributed to COVID-19.

In response to the COVID-19 pandemic, beginning in April 2020, the U.S. Department of Justice (Department, DOJ) Office of the Inspector General (OIG) began conducting intensive oversight of the BOP, including 16 remote inspections of facilities housing inmates in BOP custody completed within the first several months of the pandemic, 5 surveys of BOP staff and inmates conducted at various times, and a collection of interactive data dashboards reflecting staff and inmate COVID-19 cases and deaths in each BOP facility over time.  During the inspections, we examined how the pandemic affected those facilities and assessed the steps BOP officials took to prepare for, prevent, and manage COVID-19 transmission within the facilities, as well as whether each facility's policies and practices complied with BOP directives implementing CDC guidance and DOJ policy and guidance.  In this capstone report, we highlight the BOP's response to the pandemic, including an overview of the themes we identified during the remote inspections, other topics that emerged after those inspections, and challenges that the BOP will likely continue to face during and after the pandemic.  This report seeks to assist the BOP in managing those challenges and mitigating the effects of future public health emergencies.

## The Federal Bureau of Prisons

The BOP is responsible for the care, safekeeping, and subsistence of federal inmates as they serve their sentences of imprisonment, as well as for providing reentry programming to help them return to the community.  When we began this review, the BOP housed inmates in its custody in three main facility types: BOP-operated federal prisons, privately operated (contract) prisons, and contracted Residential Reentry Centers (RRC).  In this report, we use the phrase "facilities housing BOP inmates" to encompass all three facility types.  In addition, the BOP has inmates in its custody who are serving their sentence of imprisonment in home confinement.  Below, see Figure 1 for the number of inmates in each facility type and in home confinement in March 2020, 2021, and 2022.

- **Federal Prisons:**  The BOP currently operates 121 federal prisons (also called institutions) across the country.[1]  The BOP designates its prisons at five security levels (minimum, low, medium, high, or administrative) based on a variety of infrastructure and security features.  Thirty-nine of the prisons are located within 15 Federal Correctional Complexes, which encompass multiple facilities of different security levels in proximity.  The BOP also assigns each prison a Care Level from 1 (Low) to 4 (High), based on the institution's level of medical or mental healthcare staffing and resources.  BOP Health Services staff provide medical care for inmates in federal prisons.

- **Contract Prisons:**  In March 2020, the BOP housed inmates at 12 contract prisons operated by 3 vendors.  According to the BOP, the vast majority of federal inmates housed in contract prisons were criminal aliens or non-U.S. citizens subject to possible deportation.  Contract prisons provided medical care to inmates inside the facilities.  In January 2021, President Joseph R. Biden, Jr., signed Executive Order (E.O.) 14006 instructing the Attorney General not to renew DOJ contracts with private prisons.[2]  The last contract ended on November 30, 2022.  The BOP transferred inmates previously housed in contract prisons to federal prisons.

- **RRCs:**  Commonly known as halfway houses, RRCs are contracted to supervise inmates who are generally nearing completion of their sentences and to help prepare them for their transition back into the community.  RRCs supervise and provide reentry services for inmates assigned to both RRC facilities and home confinement.  Inmates in both RRC facilities and home confinement are in BOP custody and are therefore included in the population totals in Figure 1 below.  Between March 2020 and March 2022, the BOP maintained contracts for services at over 150 RRC facilities operated by over 75 different vendors nationwide.  Unlike federal and contract prisons, RRC facilities do not offer in-house medical care; inmates receive care from community medical providers.

---

[1]  This figure does not include Metropolitan Correctional Center (MCC) New York.  In August 2021, the Department announced that it was closing MCC New York, at least temporarily, to assess steps to improve conditions at the facility.

[2]  E.O. 14006 on Reforming Our Incarceration System to Eliminate the Use of Privately Operated Criminal Detention Facilities, January 26, 2021, www.federalregister.gov/documents/2021/01/29/2021-02070/reforming-our-incarceration-system-to-eliminate-the-use-of-privately-operated-criminal-detention (accessed November 10, 2022).

Figure 1



Annual Snapshots of the BOP's Inmate Population

|  | March 2020 | March 2021 | March 2022 |
|---|---|---|---|
| ■ Federal Prisons | 146,367 | 124,600 | 134,231 |
| ■ Contract Prisons | 17,519 | 12,584 | 6,017 |
| ▨ RRC Facilities | 8,089 | 6,141 | 6,966 |
| ▨ Home Confinement | 2,649 | 7,514 | 5,627 |
| ▨ Other | 691 | 819 | 696 |

Notes:  Less than 1 percent of inmates in BOP custody are housed in other types of facilities, including contract juvenile facilities and jails or short-term detention facilities.

Source:  OIG analysis of BOP public website data

As Figure 1 reflects, the overall BOP inmate population decreased substantially between March 2020 and March 2021.  While we did not examine the specific causes, we note that there are likely several factors contributing to the decrease in BOP population.  For example, the BOP's inmate population had already been decreasing each year since a peak in 2013 due to, among other things, various statutory and sentencing guidelines changes.  There was also a substantial drop in the number of federal sentencings in fiscal year (FY) 2020 as the COVID-19 pandemic affected the work of the Department and the courts, resulting in far fewer arrests and convictions and therefore fewer people entering BOP custody.[3]  Additionally, there was an increase in compassionate release motions granted by the courts during FY 2020.[4]  The population decrease is unrelated to the increase in the number of inmates in home

---

[3] U.S. Sentencing Commission, *2020 Annual Report and Sourcebook of Federal Sentencing Statistics*, www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf (accessed November 16, 2022), 7, 48.

Bureau of Justice Statistics, *Federal Justice Statistics, 2020*, bjs.ojp.gov/content/pub/pdf/fjs20.pdf (accessed December 12, 2022), 4.

[4] U.S. Sentencing Commission, *Compassionate Release:  The Impact of the FIRST STEP Act and COVID-19 Pandemic* (March 2022), www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220310_compassionate-release.pdf (accessed November 16, 2022), 3.

confinement during that same period because, as mentioned above, an inmate transferred to home confinement remains in the BOP's custody.

The increase in the number of inmates in home confinement between March 2020 and March 2021 shown in Figure 1, as we discuss in greater detail in the Results of the Review, was not due to an overall increase in the number of inmates transferred from BOP facilities to home confinement.  Rather, our analysis showed that fewer inmates were transferred from BOP facilities to home confinement from April 2020 through March 2021 than were transferred during the prior year (April 2019 through March 2020).  We found that, as described below, the increase was most likely attributable to the fact that inmates were spending longer amounts of time in home confinement as a result of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), passed by Congress in March 2020, which allowed the BOP to transfer inmates to home confinement with more time remaining on their sentences than allowed under its regular home confinement authorities, which we discuss below.  The CARES Act also allowed prerelease inmates who had been placed in RRCs to be transferred from RRCs to home confinement earlier than under the BOP's standard prerelease process.  Eligible inmates residing in RRC facilities whom the BOP transferred to home confinement increased the home confinement population while decreasing the number of inmates residing in RRC facilities.

## COVID-19 at Facilities Housing BOP Inmates

As mentioned above, the COVID-19 pandemic created significant challenges for the BOP in preventing and managing the spread of COVID-19 among its staff and the inmates in its custody.  In its 2023 Congressional Budget Submission, the BOP reported that there had been over 60,000 inmate cases of COVID-19 since March of 2020.  According to data presented on the BOP website, as of January 26, 2023, 131 federal inmates and 130 BOP staff at BOP-managed facilities and RRCs had confirmed positive test results (active cases); 46,559 inmates and 14,990 staff had recovered from the disease; and there had been 312 inmate and 7 staff deaths attributed to COVID-19.[5]  Also as of January 26, 2023, the BOP reported that 55,283 inmates in its custody at that time had received a positive COVID-19 test result at some point.  Figures 2 and 3 below show the number of inmate and staff active COVID-19 cases at BOP facilities from March 31, 2020, through September 30, 2021.

---

[5]  "Active cases" includes open and lab-confirmed cases of COVID-19 contracted by inmates or staff in BOP custody or employment.  Once someone has recovered or died, that individual is no longer considered an active case.  "Recovered" reflects the number of inmates or staff in BOP custody or employment but does not include inmates who had been released or staff who had left BOP employment.  Because of these definitions, the number of active and recovered cases is lower than the total cases reported by the BOP in its 2023 Congressional Budget Submission.  We discuss limitations of the data posted on the BOP's website in the report section The BOP's Transparency and Communication with the Public.

**Figure 2**

**Number of Inmate Active Cases in BOP Facilities, March 31, 2020–September 30, 2021**



Source:  OIG Office of Data Analytics visualization of data collected from the BOP's public website

**Figure 3**

**Number of Staff Active Cases in BOP Facilities, March 31, 2020–September 30, 2021**



Source:  OIG Office of Data Analytics visualization of data collected from the BOP's public website

## The OIG's COVID-19 Oversight of the BOP

Between April and June 2020, the OIG conducted remote inspections of 16 facilities housing BOP inmates: 11 BOP-managed federal prisons, 3 privately managed contract prisons, and 2 contracted RRCs.[6]  The inspections examined how the pandemic affected each facility; the steps that the BOP took to prepare for, prevent, and manage COVID-19 transmission; and whether each facility's policies and practices complied with BOP directives implementing CDC guidance and DOJ policy and guidance.

Between April 2020 and April 2021, the OIG conducted five surveys to gauge staff and inmate experiences during the pandemic.  In April and May 2020, we conducted three surveys (BOP federal staff, contract prison staff, and RRC staff) to collect information on staff concerns, effects, and immediate needs at the outset of the pandemic; we included facility-specific survey results in each of the 15 remote inspection reports.  In February 2021, we conducted a follow-up survey of staff working at the BOP's federal prisons to collect staff perspectives on how their respective institutions were managing the pandemic; we presented those survey results in an interactive web-based product.[7]  In March and April 2021, the OIG conducted a novel survey of federal inmates to understand their experiences during the pandemic.  After receiving responses from 25,504 inmates, we applied statistical weighting techniques to generate results that represent 123,219 (or 97.5 percent) of the inmates held in BOP-operated facilities at the time of the survey launch.[8]  Table 1 below presents the number of responses and response rates to the five OIG surveys of BOP staff and inmates.

---

[6]  The OIG published 15 reports for the 16 remote inspections; the results of the inspections of two nearby institutions are in a single report.

[7]  See DOJ OIG, "Staff Perceptions of the Federal Bureau of Prisons' Management of the Coronavirus Disease 2019 Pandemic: A Follow-up Survey of BOP Staff," February 2021, experience.arcgis.com/experience/582f32f0127c4c86870b2e129c05b9bc.

[8]  Because we applied statistical weights, we refer to the *estimated percentage of inmates* rather than the percentage of respondents when referencing inmate survey analysis in this report.  We plan to present additional results from the inmate survey in an interactive, web-based product.

Table 1

OIG Surveys Issued to BOP Staff and Inmates, April 2020–April 2021

| | Invitations Sent | Open Period | Response Rate | Total Responses |
|---|---|---|---|---|
| **Surveys Issued to Staff** | | | | |
| Federal Prison Staff (All Staff) | 38,651 | April 21–29, 2020 | 28% | 10,735 |
| Contract Prison Staff | 2,689 | May 1–11, 2020 | 29% | 774 |
| Contract RRC Staff | 1,514 | May 5–12, 2020 | 26% | 395 |
| **Total Staff Responses to 2020 Surveys** | | | | **11,904** |
| Federal Prison Staff (institution only) | 34,925 | February 2–17, 2021 | 19% | 6,578 |
| **Survey Issued to Inmates** | | | | |
| Federal Inmates in BOP-Operated Facilities | 126,379 | March 28–April 27, 2021 | 20% | 25,504 |

Source:  OIG surveys

The OIG also used multiple data sources to better understand trends across facilities housing and monitoring inmates.  We collected data on BOP staff and inmate COVID-19 cases and deaths, inmate testing, vaccination efforts, home confinement, and modified operations that the BOP posted on its public website. The OIG published and maintains a collection of interactive dashboards of BOP staff and inmate COVID-19 cases and deaths and inmate testing over time, as well as estimated inmate vaccination percentages.[9]  (The text box below lists our COVID-19 oversight work for the BOP.)

Lastly, we received complaints sent to the OIG Hotline by individuals with concerns about the BOP's handling of the pandemic, including inmates, their attorneys, friends and family, and BOP staff.[10]  We analyzed 3,190 complaints received from February through September 2020 to identify trends; we did not substantiate or assess the validity of each complaint.

---

[9]  DOJ OIG, "Interactive Dashboards Relating to COVID-19 within the Federal Bureau of Prisons," experience.arcgis.com/experience/ab22fb4c564e4f4b986e257c685190e8/page/page_0/.

[10]  If you know about waste, fraud, abuse, misconduct, or whistleblower retaliation within DOJ, you may report it to the OIG Hotline, oig.justice.gov/hotline.

## Scope and Methodology

In this capstone review, we highlight the BOP's response to the COVID-19 pandemic, present an overview of the themes we identified across the remote inspections and surveys described above, discuss topics that emerged following that work, and identify challenges that the BOP will likely continue to face during and after the COVID-19 pandemic. This report seeks to assist the BOP in managing those challenges and mitigating future effects of public health emergencies within its facilities.  In addition to the remote inspections and surveys that we began in April 2020, from June 2020 through May 2022 we conducted additional fieldwork, which consisted of document reviews, data analysis, and additional interviews.  We analyzed applicable policies and guidance in place through November 2021.  Due to the summary nature of this product, the scope of the fieldwork for individual topics and sources varies but generally extends no later than the end of FY 2021.  See Appendix 1 for a more detailed description of the review methodology.  See Appendix 2 for a summary of previous OIG reviews of the BOP that relate to the topics discussed in this review.

## The BOP's COVID-19 Response

In January 2020, the BOP began planning its response to reduce the transmission of COVID-19 in facilities housing BOP inmates.  The BOP also established an Incident Command Center to centrally manage its COVID-19 response; published guidance for BOP facilities and other facilities housing BOP inmates; modified its inmate management system, SENTRY, to collect new COVID-19 data from each prison; and established a centralized process for collecting data to be published on the BOP's public website.

### COVID-19 Guidance

CDC and BOP guidance on how to prevent and manage COVID-19 evolved over the pandemic in response to improved scientific understanding of the disease and the scale of the outbreak in the United States.  BOP physicians

**Remote Inspections**

**Federal Institutions**
1. FCC Lompoc
2. FCC Tucson
3. MDC Brooklyn
4. FCC Oakdale
5. FCC Pollock
6. FMC Fort Worth
7. FCC Coleman
8. FCI Terminal Island
9. FCC Butner
10. FCI Milan
11. MCC Chicago

**Contract Prisons**
12. CI Dalby
13. CI McRae
14. CI Moshannon Valley

**Residential Reentry Centers**
15. Brooklyn House
16. Toler House

**Staff and Inmate Surveys**

**Staff Surveys**
- April 2020 BOP Federal Staff Survey
- May 2020 Contract Prison Staff Survey
- May 2020 RRC Staff Survey
- February 2021 BOP Staff Survey

**Inmate Survey**
- April 2021 BOP Inmate Survey

**Dashboards of BOP COVID-19 Data**

The OIG maintains a public collection of interactive dashboards of BOP staff and inmate COVID-19 cases and deaths and inmate testing data over time.

Key:  CI=Correctional Institution; FCC=Federal Correctional Complex; FCI=Federal Correctional Institution; FMC=Federal Medical Center; MCC=Metropolitan Correctional Center; MDC=Metropolitan Detention Center

and other officials consulted with the CDC early during the pandemic and continued working closely with the CDC throughout the pandemic, basing the BOP's COVID-19 guidance on CDC guidelines.  BOP managers and medical officials emphasized to us that they based their COVID-19 management strategy on the CDC's evidence-based recommendations, which evolved quickly as the CDC and medical community learned more about the novel virus.  As the CDC modified its guidelines for the general public, and subsequently for

correctional settings, the BOP progressively updated guidance to the facilities housing federal inmates.  To ensure maximum consistency in virus control measures, BOP Central Office officials directed Wardens to follow CDC and BOP guidance.  On March 23, 2020, the CDC issued interim guidance to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities, noting that modifications based on a facility's individual structure and resources may be needed.[11]  The BOP worked with the CDC to develop the CDC's interim guidance, and the BOP's guidance to its federal and contract prisons mirrored this guidance.

In late August 2020, the BOP began issuing consolidated guidance in its COVID-19 Pandemic Response Plan, which includes 11 modules on topics such as infection prevention and control measures; screening and testing; inmate programming and services; and BOP employee, volunteer, and contract staff management. The BOP posted the COVID-19 Pandemic Response Plan on its intranet for staff to reference and continued to update it throughout 2020, 2021, and 2022 based on guidance from stakeholders, including the CDC and DOJ; the BOP intends to continue updating the plan as the CDC updates its COVID-19 guidance.  See Appendix 3 for more information on the BOP's guidance to federal prisons, contract prisons, and RRCs.

## Modified Operations and Social Distancing

The BOP implemented modified operations intended to help mitigate the spread of COVID-19 and implement social distancing inside BOP facilities.  In its March 13, 2020 Phase Two Action Plan, the BOP announced that it was suspending inmates' in-person social and legal visits, stopping nonmedical inmate transfers, canceling staff travel and training, restricting contractors' and volunteers' access to BOP facilities, and requiring Wardens to modify operations to maximize social distancing by staggering inmates' meal and recreation times.  In its March 31, 2020 Phase Five Action Plan, the BOP began requiring inmates to remain in their cells or housing units for extended periods based on health concerns.  Some facilities described this action as a "Shelter in Place" or a similar term to distinguish it from a punitive lockdown.  These movement and gathering restrictions remained in place until the BOP's August 5, 2020 Phase Nine Action Plan instructed inmate programming, including residential programs and Evidence-based Recidivism Reduction Programs and Productive Activities, to resume with social distancing modifications; instructed the resumption of outdoor recreation time, not including group sports or use of gym equipment; and instructed Wardens to develop safety plans to restore UNICOR operations to 80 percent capacity by September 1, 2020, and to 100 percent by October 1, 2020.[12]  The BOP's August 31, 2020 Modification of Phase Nine Action Plan provided guidance for the safe resumption of in-person social visits at facilities.  The BOP's Phase Two Action Plan measures were initially scheduled to last 30 days, and the Phase Five Action Plan referenced the enactment of a 14-day nationwide action to minimize movement to decrease the spread of the virus.  The BOP extended most of these measures multiple times until November 2020, when they were extended until further notice.

---

[11]  CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," March 23, 2020 (updated May 3, 2022), www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (accessed July 11, 2022).

[12]  Federal Prison Industries, called UNICOR, is a government corporation within the BOP that offers work opportunities and job training for inmates at federal prisons throughout the United States.

In August 2021, the BOP moved to a Modified Operations Matrix Plan that provided guidance on how facilities should modify their operations based on the individual facilities' COVID-19 medical isolation rates, percentages of staff and inmates who had completed a COVID-19 vaccination series, and the local county transmission rates of COVID-19.[13]  The BOP's public website provided updates on facilities' operational levels on a scale of Level 1 to Level 3, with guidance for Level 1 facilities to generally follow normal operations and Level 3 facilities to implement more restrictive COVID-19 related modifications.  Under this Modified Operations Matrix Plan, the BOP also provided guidance for general COVID-19 modifications to all facilities regardless of their operational levels.  In November 2022, the BOP removed from its Modified Operations Matrix Plan the direction that facilities consider staff and inmate vaccination rates as indicators for modified operations; the BOP's Modified Operations Matrix Plan, as reflected in its November 30, 2022 COVID-19 Pandemic Response Plan, directed facilities to consider two primary factors in modifying operations:  facility COVID-19 medical isolation rates and COVID-19 community risk.

## Personal Protective Equipment and Cloth Face Coverings

The BOP issued its first consolidated guidance on the use of personal protective equipment (PPE) in specific COVID-19 scenarios on March 18, 2020, and updated it several times as the pandemic progressed.[14]  The BOP issued guidance on the use of cloth face coverings on April 6, 2020.  The BOP disseminated its PPE instructions to staff via email and made them available on its employee intranet.  Beginning in August 2020, the BOP also updated its PPE and face covering guidance in versions of its COVID-19 Pandemic Response Plan posted to its employee intranet.  The BOP's PPE and cloth face covering instructions mirrored CDC recommendations on using PPE in correctional facilities and cloth face coverings where social distancing is difficult to maintain (see the text box).  These instructions identified three types of protection for an individual's nose and mouth and described the situations in which each type of protection should be used:

> **CDC Definitions**
>
> **PPE:**  a variety of barriers used alone or in combination to protect mucous membranes, skin, and clothing from contact with infectious agents.  Depending on the situation, PPE may include gloves, surgical masks, N95 respirators, goggles, face shields, and gowns.
>
> **Cloth Face Coverings:**  items fashioned from common materials or household items that are intended to keep the wearer from spreading respiratory secretions when talking, sneezing, or coughing.  The CDC does not consider cloth face coverings to be PPE.
>
> Source:  CDC

- **N95 Respirators:**  Tight-fitting masks that filter out at least 95 percent of airborne particles and provide the wearer with respiratory protection.  The BOP's instructions advised that N95 respirators were for use by staff working on units with inmates in medical isolation, staff present when inmates received certain medical procedures, and staff in close contact with an inmate suspected of or confirmed with COVID-19.  The BOP's March and April 2020 guidance, which followed CDC guidance,

---

[13]  Isolation is used to separate people who have a confirmed or suspected case of COVID-19 from people who are not infected to prevent contact and reduce the risk of transmission.  In a correctional setting, the CDC recommends using the term "medical isolation" to distinguish the isolation from punitive action.  See CDC, "Interim Guidance."

[14]  Prior to March 18, the BOP's Action Plans recommended PPE for individuals in close contact with someone diagnosed with COVID-19 and for people performing temperature screenings.  The guidance also recommended educating staff about how to correctly put on and take off PPE.

noted that N95 respirators were in short supply and permitted the use of surgical masks in certain situations if no N95s were available.

- **Surgical Masks:**  Loose-fitting, fluid-resistant masks that protect the wearer against large droplets, splashes, or sprays of bodily or other hazardous fluids and protect others from the wearer's respiratory emissions but do not provide the wearer with respiratory protection.  Surgical masks are for use by staff working in quarantine units, as well as inmates in medical isolation or quarantine.  The BOP's October 2020 update to its COVID-19 Pandemic Response Plan states that staff should also wear surgical masks when providing routine health services to inmates and performing staff screening and temperature checks.

- **Cloth Face Coverings:**  Reusable nose and mouth coverings made of cloth worn to help reduce the spread of COVID-19 by asymptomatic persons.  Pursuant to CDC guidelines, the BOP does not consider cloth face coverings to be PPE.  Rather, they are for use by staff and inmates in all areas of the facility other than medical isolation or quarantine units.  The BOP's April 6, 2020 guidance advised that UNICOR was manufacturing cloth face coverings for all facilities and the BOP would issue all staff and inmates three cloth face coverings for personal use.  In an email to all staff on April 15, 2020, the BOP mandated that "all BOP staff and inmates will wear face coverings provided by [the BOP]."  On August 24, 2020, the BOP issued a memorandum stating that facility staff are required to wear facility-approved face coverings at work when social distancing is not possible and in common areas.  When the BOP moved to its Modified Operations Matrix Plan in August 2021, staff and inmates were instructed to wear cloth face coverings according to the instructions for their facility's modified operations level.

## Medical Isolation and Quarantine

Medical isolation and quarantine are measures that help prevent the spread of COVID-19 (see the text box).  Throughout the pandemic, BOP facilities ideally had a variety of physically separate quarantine and medical isolation spaces:  medical isolation for inmates with confirmed COVID-19, medical isolation for inmates with suspected COVID-19, quarantine for close contacts of those with confirmed or suspected COVID-19, quarantine for incoming inmates, and quarantine for outgoing inmates.  For more detailed information on the BOP's early use of medical isolation and quarantine as part of its approach to COVID-19, see Appendix 4.

### CDC Definitions

**Medical Isolation:**  confinement of an individual with a confirmed or suspected COVID-19 case to prevent contact with others and to reduce the risk of transmission.

**Quarantine:**  confinement of an individual who has had close contact with a COVID-19 case to determine whether that individual develops symptoms of the disease.

Source:  CDC

## COVID-19 Testing

Viral COVID-19 testing is used to diagnose or screen individuals for current infection with SARS-CoV-2, the virus that causes COVID-19.  The BOP's protocols surrounding COVID-19 testing evolved over the pandemic and with changes in CDC recommendations, availability of tests, and COVID-19 outbreaks in facilities housing BOP inmates.  (See Appendix 5 for more detailed information on factors that affected the BOP's testing protocols.)  As a result, COVID-19 testing at facilities housing BOP inmates also evolved:

- **Testing at Federal Prisons:**  The BOP's initial guidance on COVID-19 testing mirrored the CDC's guidance and limited testing to only *symptomatic* inmates consistent with local health authority protocols.  In late April 2020, the BOP announced that it had acquired rapid test equipment and that it would begin to expand testing of *asymptomatic* inmates to "assist the slowing of transmission [by] isolating those individuals who test positive and quarantining contacts."  However, due to equipment availability, it took several weeks for all BOP facilities to receive rapid test machines and test kits.  On May 19, the BOP published guidance identifying high, intermediate, and low testing priorities for facilities that were limited in the number of tests they could conduct.  As access to testing supplies stabilized over the following months, the BOP again expanded its testing strategies. On September 28, the BOP identified indications for testing both symptomatic and asymptomatic inmates and noted that facilities should consult with BOP medical officials to prioritize testing if a facility's ability to test was limited.

- **Testing at Contract Prisons:**  Contract prisons received the same BOP guidance on testing as part of the BOP's Action Plans issued between March and October 2020.  Like the federal prisons, all contract prisons housing BOP inmates acquired rapid testing equipment for COVID-19.

- **Testing at RRCs:**  The RRC contractual model relies on community providers for inmate healthcare, including medical tests, so COVID-19 testing was not directly provided at these types of facilities. Instead, inmates at RRC facilities and in home confinement under RRC supervision relied on testing resources in the local community.

## COVID-19 Vaccination

Both the CDC and the BOP have identified COVID-19 vaccination as an important tool for controlling the spread of the virus and reducing serious illness and death from COVID-19.  According to the CDC, COVID-19 vaccines reduce the risk of COVID-19, including the risks of serious illness and death among people who are fully vaccinated, and can reduce the spread of disease, which helps protect those who get vaccinated and the people around them.  As of January 2022, there were three COVID-19 vaccines authorized or approved for adults in the United States.

In November 2020, the BOP began planning for the distribution of COVID-19 vaccines for staff and inmates in federal prisons.  The BOP developed a vaccine task force and worked in partnership with Operation Warp Speed, a government-led public-private partnership between various entities to facilitate and accelerate the development, manufacturing, and distribution of the vaccine across the United States.  The BOP also worked with the CDC, developing a memorandum of agreement to receive and administer the vaccines at no cost to the BOP.  The BOP first offered the COVID-19 vaccine to full-time staff due to the risk of possible introduction of the virus by staff traveling between BOP facilities and the community.  The BOP distributed remaining doses of the vaccine to inmates based on priority levels determined by its COVID-19 Vaccine Guidance, which outlines four priority levels for vaccinating inmates in federal facilities.  These levels prioritized inmates in certain jobs and housing situations, inmates 65 years and older, and inmates with underlying medical conditions as eligible to receive the vaccine first.

The BOP offered all staff and federal inmates the vaccine on a voluntary basis.  In September 2021, an Executive Order required COVID-19 vaccination for all federal employees subject to exemptions as required

by law.[15]  Federal inmates are not required to receive the COVID-19 vaccine, and the BOP told us that historically inmate vaccinations are not required unless court ordered.  Inmates and staff located at RRCs and contract prisons (when they were in operation) are referred to community resources, such as state and local health departments, to receive COVID-19 vaccinations.  Inmates housed at RRCs and contract prisons were not part of the total CDC allotments of the vaccines distributed to the BOP under the current memorandum of agreement.

## Home Confinement

BOP inmates with less than 12 months remaining on their sentences are typically eligible for transfer to an RRC, and some of these RRC-eligible inmates are permitted to complete the final portion of their sentences (10 percent or 6 months, whichever is shorter) in home confinement, under the supervision of an RRC or the U.S. Probation Office per 18 U.S.C. § 3624(c)(2).[16]  Additionally, under the FIRST STEP Act of 2018 (FSA), inmates age 60 or older are eligible for home confinement for the last third of their sentences and terminally ill inmates are eligible for longer periods of home confinement if they meet certain additional eligibility criteria.[17]  Inmates on home confinement are still in federal custody.  They may work and participate in approved activities but must otherwise remain at home.  Inmate compliance with these conditions is monitored through electronic monitoring equipment or regular contact with supervisory staff, in person or by telephone.  An inmate's failure to remain at approved locations, return at required times, or otherwise follow the program rules may result in disciplinary action, including return to a BOP facility.

In a March 26, 2020 memorandum, then Attorney General William P. Barr directed the BOP to prioritize the use of its existing statutory authorities to grant home confinement, described above, and provided a non-exhaustive list of factors for the BOP to consider when assessing inmates for home confinement placement.

### CARES Act Home Confinement

On March 27, 2020, one day after then Attorney General Barr's memorandum, the CARES Act was signed into law, authorizing the BOP Director to lengthen the maximum amount of time under 18 U.S.C. § 3624(c)(2) that an inmate may be placed in home confinement "if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP]."[18]  Barr made such a finding in an April 3, 2020 memorandum, in which he directed the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at those facilities "where COVID-19 is materially affecting

---

[15]  E.O. 14043 on Requiring Coronavirus Disease 2019 Vaccination for Federal Employees, September 9, 2021, www.federalregister.gov/documents/2021/09/14/2021-19927/requiring-coronavirus-disease-2019-vaccination-for-federal-employees (accessed November 10, 2022).

[16]  According to the BOP, the U.S. Probation Office monitors a small percentage of BOP inmates on home confinement though a program called Federal Location Monitoring.  Participation is contingent on whether the U.S. Probation Office accepts the BOP's home confinement referral.  Most inmates on home confinement are monitored by an RRC.

[17]  See 34 U.S.C. § 60541(g).  The FSA reauthorized and modified a pilot program for eligible elderly and terminally ill offenders that was conducted under the Second Chance Act of 2007.  Eligibility criteria ruled out inmates who had been convicted of crimes of violence, sex offense, terrorism, or espionage; had a history of escape or attempted escape; or posed a substantial risk to the public or of criminal conduct if granted home confinement.

[18]  Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136.

operations."[19]  This finding expanded the pool of inmates who could be considered for home confinement by allowing the BOP to consider inmates for placement earlier than they would have been eligible otherwise.[20]

The CARES Act did not specify what should happen to inmates on CARES Act home confinement after the pandemic ends.  In January 2021, the DOJ Office of Legal Counsel published an initial opinion stating that the BOP would be required to recall inmates currently on home confinement to BOP facilities after the COVID-19 emergency period ends unless the inmates are otherwise eligible for home confinement under 18 U.S.C. § 3624(c)(2).[21]  That would have meant that only inmates with less than 6 months or 10 percent of their sentence remaining would have been allowed to remain in home confinement and the BOP would have had to return inmates who did not meet those eligibility requirements to BOP facilities at the end of the pandemic.  The Office of Legal Counsel reversed this opinion on December 21, 2021, concluding that the CARES Act language and the BOP's preexisting home confinement authorities give the BOP discretion to permit inmates in extended home confinement to remain there after the COVID-19 emergency period ends.  In June 2022, the Department published a regulatory proposal consistent with the December 21, 2021 Office of Legal Counsel opinion.

### Comparison of Home Confinement to Compassionate Release

Under the federal compassionate release statutes, 18 U.S.C. § 3582(c)(1)(A) or 18 U.S.C. § 4205(g), as applicable, the BOP or an inmate may request that a federal judge reduce the inmate's sentence for "extraordinary and compelling reasons," such as age, terminal illness, other physical or medical conditions, or family circumstances.[22]  Home confinement and compassionate release authorities have different eligibility criteria, approval processes, and decision makers, all of which we summarize in Appendix 6.  A primary difference is that, while home confinement allows an inmate to serve a portion of his or her sentence at home while still in BOP custody, compassionate release generally ends an inmate's sentence early.  Additionally, while home confinement authorities were expanded by the CARES Act and through the Attorney General's memoranda, compassionate release authorities were not expanded.  When responding to compassionate release motions filed by inmates with the courts, the Department's position has been that the risk of contracting COVID-19 alone is not an "extraordinary and compelling circumstance" warranting

---

[19]  William P. Barr, Attorney General, memorandum for Director of Bureau of Prisons, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, April 3, 2020, www.justice.gov/file/1266661/download (accessed July 11, 2022), 1.

[20]  The OIG is conducting a separate review of the BOP's use of home confinement as a response to the COVID-19 pandemic.  That review is assessing the BOP's processes for implementing its home confinement authorities under the CARES Act, considering the eligibility criteria outlined in the Attorney General's memoranda, and evaluating Wardens' recommendations for inmates who did not meet the Attorney General's criteria to be placed in home confinement.

[21]  The then President declared the COVID-19 pandemic a national emergency on March 13, 2020.  Under the CARES Act, the expanded home confinement authority will end "30 days after the date on which the national emergency declaration terminates."

[22]  18 U.S.C. § 3582(c)(1)(A) is applicable for inmates whose offenses occurred on or after November 1, 1987.  18 U.S.C. § 4205(g) was repealed effective November 1, 1987, but remains the controlling law for inmates whose offenses occurred prior to that date.

compassionate release.[23]  Although 13 of our 15 remote inspection reports briefly discuss the compassionate release requests the respective facilities received during the first several weeks of the pandemic, we do not examine compassionate release requests and outcomes in this capstone report.

---

[23]  See, for example, Response by the United States in Opposition to Defendant's Emergency Motion for Immediate Reduction of Sentence at 13-17, *United States of America* v. *Saad,* No. 16-cr-20197 (E.D. Mich. 2020), and Government's Response to Defendant's Motion for Compassionate Release at 9-11, *United States of America* v. *Franco,* No. 14-10205-01-EFM (D. Kan. 2020).

# Results of the Review

The COVID-19 pandemic required the BOP to adapt to unique challenges in trying to prevent and manage the spread of COVID-19 and protect inmate and staff health and safety while adhering to changing guidance and communicating essential public health information to stakeholders.  Our remote inspections, staff and inmate surveys, and review of other BOP information identified several areas in which the BOP should take action to better prepare for future public health emergencies and improve and address existing processes whose weaknesses, and in some cases failures, were highlighted during the pandemic.  We identified particularly serious failures by BOP facilities in their compliance with the BOP's March 2020 guidance on the single-celling of inmates during modified operations and their handling of inmates vulnerable to suicide while quarantined due to COVID-19.  These findings, coupled with prior OIG findings regarding the mental health effects of the BOP's placement of inmates in single cells for extended periods of time, led us to conclude that the BOP should undertake a comprehensive review of its policies regarding the single-celling of inmates.

We also found that medical and nonmedical staffing shortages at a number of BOP facilities had predictable and significant ramifications on their ability to respond effectively to the pandemic.  We determined that the BOP should take steps to address its staffing shortages, as well as staff morale issues that arose during the pandemic, and that it also needs to improve its processes for communicating essential information to stakeholders and correct a significant deficiency that we identified regarding its notification to families about inmates' COVID-19 related serious illnesses.

Further, we found that the BOP should improve certain processes to mitigate the risk of infection transmission inside facilities and protect the health of staff and inmates while also retaining best practices to prepare for future pandemics.  Among the challenges that we found the BOP faced during the COVID-19 pandemic was the limitation on its ability to maintain social distancing in many of its prisons and to ensure that there was sufficient space to appropriately medically isolate inmates who had COVID-19 symptoms, quarantine those who had been exposed to inmates with symptoms, and quarantine incoming and outgoing inmates.  Yet, despite these challenges, our remote inspections concluded that, at a number of facilities, the BOP did not fully leverage the home confinement authorities that it was given in the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) that could have permitted facilities to reduce their inmate population and thereby assist in mitigating COVID-19 transmission and improve inmate-to-staff ratios.  Indeed, we found that, overall, the number of inmates whom the BOP transferred from facilities to home confinement was lower during the first year of the pandemic (April 2020 through March 2021) compared to the prior year, though we note that, due to the decreasing inmate population overall, the percentage of inmates transferred to home confinement was similar for both years.  We determined that the BOP should assess how lessons learned related to the use of its home confinement authorities during the COVID-19 pandemic could apply to future public health emergencies and that it should monitor the challenges that can arise related to a significant increase in home confinement use.

Finally, we identified several other areas that the BOP should address, including inmate access to counsel and other essential services during emergency or modified operations, as well as taking additional actions to better prepare for potential future public health emergencies.

## The BOP Should Improve and Retain Effective Practices for Protecting Staff and Inmate Health and Safety During Public Health Emergencies

Throughout the COVID-19 pandemic, to protect staff and inmate health and safety, the BOP needed to adapt to unique challenges in trying to prevent and manage the spread of COVID-19 in its facilities and in contract facilities housing BOP inmates.  We found that some related BOP processes must be reassessed or require further improvements to better protect the health and safety of inmates and staff.  For example, we identified serious failures by BOP facilities in their compliance with the BOP's March 2020 guidance regarding the single-celling of inmates during modified operations and found that the BOP's existing practices were not sufficient to protect inmates vulnerable to suicide while quarantined due to COVID-19.  The BOP should comprehensively review existing policies and processes on single-cell confinement, as well as those designed to protect inmates vulnerable to suicide.  Additionally, we found that the BOP should ensure that it captures lessons learned during the pandemic.  Identifying and retaining best practices for inmate social distancing, quarantine, and medical isolation, especially those that address space and infrastructure limitations, by incorporating them into standard operations and pandemic contingency plans will help the BOP respond effectively to future public health emergencies.  Assessing how lessons learned in the BOP's use of home confinement during the pandemic could apply to other public health emergencies could also help the BOP respond more effectively in the future.

### The BOP Should Ensure that Its Processes Prevent Inappropriate Single-Cell Assignments and Protect Inmates Vulnerable to Suicide When Quarantined

The BOP reported to the OIG that from March 2020 through April 2021 seven inmates died by suicide while housed in single-cell confinement in quarantine units related to COVID-19.  Our review identified serious failures by BOP facilities in their compliance with the BOP's March 2020 guidance regarding the single-celling of inmates during modified operations.  One provision of the BOP guidance stated that facilities should limit single-celling of inmates (i.e., housing inmates alone in cells) to the greatest extent possible when inmates were confined to their cells during COVID-19 related modified operations.  Contrary to this provision, we found that inmates in numerous BOP facilities were single-celled during periods when the facilities were in COVID-related modified operations.

An additional provision of the March 2020 guidance advised facilities that Psychology Services staff should be consulted regarding any inmates proposed for single-celling to assess whether they were vulnerable inmates.  Yet, we found that psychology staff did not assess the suitability of single-cell assignments for at least five of the seven inmates who died by suicide prior to their single-cell placement.  Further, postmortem documentation indicated that all seven inmates had factors that made them vulnerable to suicide.  According to internal BOP documentation, a single-cell environment may afford an inmate greater privacy and increased opportunity to effectuate their death by suicide.  We also noted that the BOP has had ongoing challenges with the use of single-cell confinement.  Our 2017 report on the BOP's use of restrictive housing for inmates with mental illness noted that single-celling may present risks to inmate mental health,

17

and both of our recommendations from that report regarding the use and oversight of single-celling remained open as of February 2023.[24]

### Guidance on Single-Celling During the COVID-19 Pandemic

At the outset of the pandemic, BOP directives to limit single-celling of inmates warned about the risks of single-celling and inmate suicide.  On March 13, 2020, the Assistant Director of the Reentry Services Division (RSD) issued to all Wardens a memorandum that stated, "If inmates are confined to their cells, single celling should be eliminated to the greatest extent possible to reduce the isolation and privacy that can facilitate suicide."  The memorandum further stated, "Psychology Services staff should be consulted regarding any inmates proposed for single celling to ensure they are not particularly vulnerable individuals and/or to make recommendations."  The BOP incorporated this memorandum language into its October 2020 COVID-19 Pandemic Response Plan and its subsequent versions.[25]

On March 23, 2020, the CDC published guidance for correctional facilities that identified the housing of inmates in quarantine separately in single cells as the ideal practice from an infection control perspective.[26] However, contemporaneous BOP guidance issued by the RSD, described above, directed Wardens to limit single-celling to reduce the risk of inmate suicide and did not make exceptions for inmates housed in quarantine units.  On February 1, 2021, almost 1 year later, the RSD issued to Wardens another memorandum, which stated, "Single celling must stop, particularly in restrictive housing and quarantine, except when approved by the Warden on a case by case basis."  The RSD memorandum noted that from October 1, 2020, through February 1, 2021, 15 total inmates had died by suicide, 12 of whom were single-celled at the time of their deaths.  Four of those 12 inmates who died by suicide were in single cells related to COVID-19 quarantine, while the remaining 8 were in single cells for other reasons.[27]  One additional inmate suicide occurred in a COVID-19 quarantine unit after the RSD issued this directive, in addition to two

---

[24]  DOJ OIG, _Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness_, Evaluation and Inspections (E&I) Report 17-05 (July 2017), oig.justice.gov/reports/review-federal-bureau-prisons-use-restrictive-housing-inmates-mental-illness.

In response to a draft of this report, the BOP stated that since May 2021 it has implemented two successive Restrictive Housing Work Groups to reduce the number of individuals in restrictive housing and to make restrictive housing safer for all individuals who are placed there.  Because this occurred after the period of our review, we did not assess the efficacy of the work groups.

[25]  For example, the BOP's November 30, 2022 COVID-19 Pandemic Response Plan stated, "If medical isolation in single cells is necessary (inmates are not cohorted), Psychology Services staff should be consulted to ensure inmates proposed for single celling are not particularly vulnerable individuals and/or to make recommendations."  The COVID-19 Pandemic Response Plan also stated, "If quarantining in single cells is necessary (inmates are not cohorted), consult Psychology Services staff for mental health suitability for placement in single cell."

[26]  As described in the Introduction to this report, "quarantine" refers to the confinement of an individual who has had close contact with a COVID-19 case to determine whether that individual develops symptoms of the disease.  The BOP used quarantine for incoming inmates, inmates who were close contacts of those with confirmed or suspected COVID-19, and outgoing inmates.  During our remote inspections, we learned that some facilities used vacant housing units for quarantine purposes.

[27]  We made this determination based on the number of single-celled inmate suicides in quarantine units that the BOP reported to the OIG in April 2021.  The OIG did not review the circumstances of all inmate suicides presented in the RSD memorandum or the reasons that the BOP single-celled the eight inmates who were not part of our review.

inmate suicides that occurred prior to October 1, 2020, for a total of seven inmate suicides in COVID-19 quarantine units between March 2020 and April 2021.  In connection with this capstone report, we reviewed these seven inmate suicides.

The required internal BOP psychological reconstruction reports following the seven inmate suicides that occurred in COVID-19 quarantine units recommended that those facilities avoid single-celling inmates and also recommended that they document decisions about single-cell placement.[28]  Although BOP policy did not require facilities to use a single-cell approval form, our review found that some BOP facilities had successfully implemented the use of such a form.[29]  At facilities that used this form, single-celling inmates required the Warden's approval with input from correctional supervisors, the Unit Manager, and the Chief Psychologist prior to single-celling an inmate.  However, we found no evidence that any of the facilities that housed the seven inmates whose cases we reviewed used such a form at the time of the inmates' single-cell assignments.  A detention center where one of the inmate suicides occurred utilized such a form prior to the pandemic but did not use it in the case of the inmate who died by suicide during the pandemic.  The BOP's psychological reconstruction documentation noted that the detention center did not consistently use the single-cell request form during the pandemic due to "competing quarantine and isolation needs."

We found that five of the BOP's psychological reconstruction reports recommended that facilities implement enhanced documentation or procedures to ensure that relevant staff receive notifications about who is single-celled and to minimize the amount of time any inmate is housed in a cell alone.  One report recommended that a facility develop staff notification procedures to decrease the number of single-celled inmates, including inmates in quarantine.

We have the same concerns about the BOP's single-celling of inmates that we identified in our 2017 restrictive housing review, which found that single-cell confinement may present added risks to inmate mental health.  Our 2017 review also found that the BOP did not track its housing of inmates in single-cell restrictive housing unit confinement and that policies addressing single-cell confinement were inadequate.  As of February 2023, the BOP had yet to fully implement six of our 2017 recommendations, including five recommendations regarding the BOP's policies and tracking of single-cell confinement and restricted

---

[28] See BOP Program Statement 5324.08, Suicide Prevention Program, April 5, 2007, www.bop.gov/policy/progstat/5324_008.pdf (accessed July 11, 2022).  The policy provides guidance regarding the completion of an after-action review, or psychological reconstruction report, by a BOP psychologist in the event of an inmate suicide.  The report includes background information about the inmate, the circumstances surrounding the inmate's death, a conclusion, and recommendations.  The OIG did not conduct investigative analysis of the BOP's psychological reconstruction documentation or independently assess the BOP's psychological reconstruction findings and recommendations.

[29] In response to a draft of this report, the BOP stated that in May 2021 it established a Single Cell Task Force to review single-celling practices and inmate suicide and to provide recommendations to reduce single-celling and provide increased oversight for those housed alone.  The BOP stated that it has since implemented several of the task force's recommendations and, based on the task force's work, has provided guidance to each region concerning regular review and oversight of those housed alone.  The BOP further stated that each region has provided a single-cell review form to facilities and requires regular oversight and reporting of the use of single cells to the Regional Office.  Because establishment of the task force and these practices occurred after the period of our review, we did not assess their efficacy.  Finally, the BOP stated that vulnerable inmates may at times need to be single-celled due to their level of disruptive behavior, isolation, or quarantine.

housing, two of which specifically address single-celling.[30]  In response to these recommendations, the BOP stated that as of September 2022 it had completed final steps for approval of its revised Special Management Unit (SMU) policy and that it had planned to conduct discussions with the national union regarding revisions to its Special Housing Unit (SHU) policy.[31]  The BOP also stated that as of September 2022 it had developed a SHU mental health dashboard extension to its SHU dashboard program that would generate rosters of inmates housed in a SHU and include inmate mental healthcare level assignments, the length of time they had spent in a SHU, the number of days they had been single-celled, and other information.  Further, the BOP has struggled to enforce multiple directives to limit single-celling at facilities during the pandemic.[32]  The occurrence of inmate suicide in single-celled quarantine units at many facilities presents a significant risk for the BOP in ensuring inmate safety.

### *Use and Conditions of Single-Celling in Quarantine Units*

All seven single-celled inmate suicides we reviewed occurred by hanging.  One of the inmate suicides occurred after Health Services staff failed to conduct pill line in restrictive housing for 2 days, in violation of the BOP's Patient Care policy, resulting in the inmate missing two doses of antidepressant medication.[33]  Staff failure to conduct pill line was reportedly due to staffing issues, which are more broadly discussed in The BOP Should Take Appropriate Steps to Address Staffing Shortages and Staff Morale section of this report, as well as staff error.  Separately, initiation of lifesaving measures for one inmate who died by

---

[30]  DOJ OIG, *Use of Restrictive Housing.*  Five of the open recommendations regarding the BOP's policies and tracking of single-cell confinement and restricted housing are to:  (1) establish in policy the circumstances that warrant the placement of inmates in single-cell confinement while maintaining institutional and inmate safety and security and ensuring appropriate, meaningful human contact and out-of-cell opportunities to mitigate mental health concerns; (2) define and establish in policy extended placement in measurable terms; (3) track all inmates in single-cell confinement and monitor, as appropriate, the cumulative amount of time that inmates with mental illness spend in restrictive housing, including single-cell confinement; (4) identify all forms of restrictive housing utilized throughout its institutions and ensure that all local policies are updated to reflect standards for all inmates in restrictive housing consistent with established nationwide policies; and (5) evaluate and limit as appropriate the consecutive amount of time that inmates with serious mental illness may spend in restrictive housing.  Recommendations 1 and 3 are related to single-cell confinement.  A sixth open recommendation is specific to a restrictive housing unit at one BOP facility.

[31]  BOP Program Statements 5217.02, Special Management Units, August 9, 2016, www.bop.gov/policy/progstat/5217_02.pdf, and 5270.11, Special Housing Units, November 23, 2016, www.bop.gov/policy/progstat/5270.11.pdf (both accessed November 9, 2022).  A SMU is a type of restrictive housing that the BOP established to house inmates who require greater management of their interactions with others to ensure the safety, security, or orderly operation of BOP institutions and to protect the public.  The BOP defines SHUs as "housing units in Bureau institutions where inmates are securely separated from the general inmate population, and may be housed either alone or with other inmates."

[32]  In response to a draft of this report, the BOP stated that the Psychology Services Branch provides quarterly reviews of common recommendations and concerns detailed in psychological reconstruction reports and disseminates that information to Wardens for training purposes.  Additionally, the BOP stated that facilities with increased rates of suicide (two suicides in 2 years) receive Risk Reduction Reviews from a multidisciplinary BOP team to examine adherence to psychological reconstruction recommendations, compliance with relevant policy, issues of facility culture, and training needs.  The BOP stated that as of February 2023 it had completed these reviews at multiple facilities.

[33]  BOP Program Statement 6031.01, Patient Care, June 31, 2014, www.bop.gov/policy/progstat/6031_004.pdf (accessed July 11, 2022).  "Pill line" refers to BOP medical staff's administration of prescribed medication to inmates, during which staff may directly observe inmates consuming their medication.

suicide were delayed for several minutes because officers did not have immediate access to keys to the inmate's cell door, which was inconsistent with the BOP's Patient Care policy.[34]

BOP psychological reconstruction reports found that two inmates who had recently entered BOP custody and were recent arrivals to their facilities likely experienced opioid withdrawal symptoms prior to their suicides.  The reconstruction teams recommended that both facilities update local procedures to improve opioid withdrawal monitoring.  One report recommended that staff conceptualize opioid withdrawal as an acute risk for suicide and that the facility's Psychology Services Division staff complete additional Suicide Risk Assessment (SRA) training.[35]

According to the BOP's psychological reconstruction reports, conditions of confinement in the quarantine unit may have contributed to inmate hopelessness and depression.  In a description of quarantine unit conditions, one reconstruction report noted that "[staff] rounds and puzzles are not sufficient for occupying one's mind for what was likely 112 waking hours per week."  Another report observed that inmates in the quarantine unit had only three 15-minute periods per week in which they were permitted out of their cells.  According to one reconstruction report, quarantine and isolation conditions limited access to resources that can prevent suicide, such as peer support, psychology services, and telephones to call family or counsel.  The BOP also found no evidence that one of the inmates was provided any educational or recreational activities or offered telephone calls, despite Regional Office direction that inmates be afforded programming and two 15-minute phone calls per month.

Additionally, we found that two of the inmates who died by suicide had both completed the BOP's required 14-day quarantine period for inmates newly admitted to a BOP facility and tested negative for COVID-19.  As a result, under BOP guidance, they could have been removed from single-cell quarantine at the time of their deaths.[36]  However, we found that two of the inmates who died by suicide remained in quarantine for 2 to 3 days after receiving their negative COVID-19 test results.  In both cases, the reconstruction reports noted that the inmates would have been placed with cellmates had the BOP removed them from quarantine.

---

[34]  The Patient Care policy says, "ACA standards require a four-minute response to life- or limb-threatening medical emergencies."

[35]  We did not consider the totality of potential suicide risk factors in this review.  In response to a draft of this report, the BOP stated that it already considers opioid withdrawal as an acute risk for suicide, that its SRA allows clinicians to provide substance use history as part of the clinical information gathered to conceptualize the inmate's risk of suicide, and that current intoxication is listed as a dynamic risk factor in the SRA.  Further, the BOP issued clinical guidance in February 2020 that discusses the risk of suicide for inmates with substance abuse disorder and stated that frequent patient assessments are indicated during the withdrawal period, with particular attention to thoughts of self-harm.  The guidance further stated that patients in active substance withdrawal are at increased risk of suicide and stated that extra care was warranted, including monitoring inmates for thoughts of self-harm.  Additionally, the BOP stated that national training for BOP psychology staff included content connecting withdrawal and substance use, including opioid use, to suicide risk.

[36]  BOP guidance states that inmates in quarantine should be retested for COVID-19 on or after 14 days of quarantine. Inmates may be discharged from quarantine if those test results are negative.

*Conclusion*

We identified serious failures by BOP facilities in their compliance with the BOP's March 2020 guidance regarding the single-celling of inmates during modified operations. We were particularly troubled to find that the BOP did not address at the time these persistent deficiencies and violations of multiple BOP policies in single-celled quarantine suicide cases spanning many facilities.[37]  Inmate suicide in single-cell units, including in COVID-19 quarantine units, remains a continued serious risk area for the BOP, and the BOP's internal oversight mechanisms have not been able to adequately address the scope of the problem. We recognize the inherent and conflicting challenges posed in a correctional environment during a pandemic, including the need to balance infection control measures, such as medically isolating or quarantining inmates to prevent the spread of the virus, with directives to stop single-celling inmates. However, quarantining inmates during the pandemic did not require them to be placed in single cells given the number of inmates who were being quarantined at the time. Further, the BOP failed to follow its own guidance that recognized that single-celling of inmates generally should not occur for quarantine purposes and that inmates should be assessed for possible vulnerability to suicide before being single-celled. That did not occur in at least five of the seven inmate suicide cases we reviewed, and in all seven of those cases the inmates had factors that made them vulnerable to suicide. To address these serious failures and limit the risk of single-celled suicide, including in quarantine and other pandemic-related housing, the BOP should conduct a thorough assessment of its policies, processes, and oversight surrounding the single-cell placement of inmates.

*Recommendations*

To ensure that BOP processes prevent inappropriate single-celling assignments and protect inmates vulnerable to suicide, including when they are quarantined, we recommend that the BOP:

1. Conduct a thorough assessment of single-celling policies and processes, including those applicable to inmates housed in quarantine and medical isolation units and to inmates vulnerable to suicide.

2. Ensure that actions, including any policy revisions, the BOP takes to close the two open recommendations from our 2017 restrictive housing report that reference single-celling also apply to single-celling during quarantine and medical isolation.

## The BOP Should Ensure that Lessons Learned in Attempting to Address Space and Infrastructure Limitations at Its Facilities Are Captured for Future Public Health Emergencies

CDC guidance for correctional and detention facilities emphasized the importance of social distancing, quarantine, and medical isolation as tools to manage and help prevent the spread of COVID-19. The CDC also acknowledged that the guidance "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Over the course of the pandemic, BOP facilities relied on a variety of guidance and protocols when responding to the public health emergency, including those from the CDC, BOP Central Office, and individual facility plans.

---

[37] The OIG is currently conducting a review of BOP inmate deaths in custody to assess the circumstances surrounding nonnatural inmate deaths at BOP facilities.

We found that many BOP facilities, due to infrastructure limitations, faced challenges in maintaining social distancing and in quarantining inmates. While we found that BOP facilities took a variety of actions to achieve appropriate social distancing and quarantining of inmates, we also found, as discussed in the next section of this report, that at some facilities the BOP did not fully utilize its home confinement tools, including those provided for in the CARES Act, that could have allowed it to better manage social distancing, reduce exposure risks to staff and inmates, and help address staffing challenges at a number of those facilities. Separately, as described below, we found that, although the BOP developed a plan in the summer of 2020 to reduce the population in its minimum and low security facilities, as of December 2021 the BOP had not met its goals at many facilities. It is important for the BOP to capture lessons learned and best practices, at both individual facility and agency-wide levels, from the COVID-19 pandemic. Doing so will help the BOP ensure that its public health emergency response plans are as useful as possible for facilities that may need to implement them in the future.

### Social Distancing

The OIG's remote inspections, as well as the BOP's internal compliance reviews, found that facilities implemented a variety of social distancing measures in line with CDC guidance. However, because inmates live, eat, sleep, and work in communal environments, maintaining the recommended 6 feet of space between people was a challenge. Interviewees, complainants, and staff and inmate survey respondents all indicated that social distancing in BOP facilities could be improved. For example, between March and September 2020, the OIG received over 400 complaints regarding social distancing challenges. Additionally, the 2021 inmate survey results revealed that an estimated two-thirds (66 percent) of inmates were rarely or never able to maintain a distance of 6 feet between themselves and other inmates or BOP staff in common spaces during the pandemic. Thirty-four percent of 2021 BOP Staff Survey respondents also believed that social distancing of inmates is a Top 5 area in which the BOP most needs to improve.

We found that the physical infrastructure of facilities contributed to social distancing challenges. The housing units in federal and contract prisons generally fall into two general categories: cell-type housing and open dormitory housing. The photographs below show examples of these types of housing units. In cell-type housing units, cells include beds, a toilet, and a sink and are generally occupied by one to four inmates. Cell doors lock, providing the option for controlled access to communal spaces, including showers, phones, and recreation areas. High and medium security facilities generally have cell-type housing. In open dormitory housing, there is generally a large room with rows of bunk beds. The room may be divided using partial-wall partitions between beds, in a configuration also called cubicle housing. Inmates in open dormitory housing are generally free to move between sleeping, restroom, and communal areas. Furniture, such as beds, is generally fixed and cannot be rearranged to increase distance among inmates. Low and minimum security facilities have mostly open dormitory or cubicle housing. However, housing unit layouts vary across facilities.[38] For example, most housing units at Federal Medical Center (FMC) Fort Worth, an

---

[38] Administrative facilities have specialized missions, such as detaining pretrial offenders; treating inmates with serious or chronic medical conditions; or containing extremely dangerous, violent, or escape-prone inmates.

administrative facility, have cells without doors, meaning that, while there is more separation between inmates, they can still move freely within the unit.[39]

 

*Left,* Solid-Door Cell-Type Housing Unit with Central Common Area at Federal Correctional Complex (FCC) Tucson, *Right,* Barred-Door Cell-Type Housing Unit at FCC Lompoc

Source:  BOP, with OIG enhancement

 

*Left,* Open Dormitory Housing Unit at Metropolitan Detention Center Brooklyn, *Right,* Partitioned, Open Dormitory, or Cubicle Housing Unit at FCC Coleman

Source:  BOP, with OIG enhancement

Interviewees, including the then BOP Medical Director, agreed that the inability to social distance in open dormitory housing units is likely one of the reasons why some BOP facilities experienced larger COVID-19 outbreaks than others.  In contrast, staff at Metropolitan Detention Center (MDC) Brooklyn, an administrative detention center that has mostly self-contained, tiered housing units with closed cells, told us that the physical layout of MDC Brooklyn helped the facility to limit contact between inmates and between

---

[39]  DOJ OIG, *Remote Inspection of Federal Medical Center Fort Worth,* E&I Report 21-012 (December 2020), oig.justice.gov/reports/remote-inspection-federal-medical-center-fort-worth.

housing units.[40]   These observations are in line with a CDC study on mass testing initiatives in correctional settings suggesting that inmates in dormitory settings were at greater risk of COVID-19 infection.[41]

Through our remote inspections of BOP facilities, we found that BOP staff in facilities housing inmates employed a variety of strategies to increase social distancing in housing units and in some cases to overcome the limitations of the physical layout and infrastructure of the facilities.   Below, the text box describes some examples of social distancing strategies and the photographs show two of the strategies:

---

[40]  DOJ OIG, *Remote Inspection of Metropolitan Detention Center Brooklyn*, E&I Report 21-002 (November 2020), oig.justice.gov/reports/remote-inspection-metropolitan-detention-center-brooklyn, 1.

MDC Brooklyn is an administrative facility with the mission to detain pretrial offenders.  It houses inmates at all security levels, including unsentenced pretrial detainees and sentenced inmates.

[41]  See Liesl M. Hagan et al., "Mass Testing for SARS-CoV-2 in 16 Prisons and Jails—Six Jurisdictions, United States, April–May 2020," U.S. Department of Health and Human Services/CDC, *Morbidity and Mortality Weekly Report*, no. 33 (August 2020), www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6933a3-H.pdf (accessed July 11, 2022).

**Social Distancing Strategies Identified Through OIG Remote Inspections of BOP Facilities**

- Staggering inmates' access to common areas (FCC Tucson, CI Moshannon Valley, CI Dalby, CI McRae, FCC Oakdale, and FCC Pollock)

- Reducing the number of inmates participating in a program or activity or offering alternatives to in-person programs (FCC Tucson, CI Dalby, and CI McRae)

- Increasing space between computer stations (MDC Brooklyn)

- Instructing inmates in bunk beds to sleep "head-to-toe" (FCI Milan, FCC Oakdale, Toler House RRC)

- Moving inmates from open dormitory housing to cell-type housing (FCC Oakdale)

- Creating temporary housing units in other areas of the facility to increase space between inmate bunks (FCC Lompoc, FMC Fort Worth, FCI Terminal Island)

- Installing plexiglass barriers to create separations in open dormitory housing (MCC Chicago)

- Installing plastic sheeting to cover doorways of cells that do not have a solid door (FMC Fort Worth)

Key:  CI=Correctional Institution; FCI=Federal Correctional Institution; FCC=Federal Correctional Complex; FMC=Federal Medical Center; MCC=Metropolitan Correctional Complex; MDC=Metropolitan Detention Center; RRC=Residential Reentry Center

Source:  OIG remote inspections of BOP facilities





*Top,* Plastic Sheeting Covering Open Cell Doors at FMC Fort Worth

*Bottom,* Wooden Frames Holding Plexiglas Barriers Separating the Floors of an Open Dormitory Housing Unit at MCC Chicago

Source:  BOP, with OIG enhancement

26

Another strategy that the BOP used to improve social distancing and reduce exposure risk was to reduce the number of inmates in its facilities.  While the BOP developed a plan to reduce the inmate population levels at low and minimum security facilities during the pandemic and reduced the populations at some facilities, it did not uniformly meet its intended population targets at all facilities in 2020 and 2021.  On June 19, 2020, the BOP issued to facility Wardens a memorandum that outlined a plan to reduce the inmate population levels at minimum and low security facilities due to COVID-19, setting temporary population targets intended to help with social distancing and to guide decision making regarding inmate movement. The plan included population targets for 144 minimum and low security facilities, satellite facilities, and cohorts at facilities of other security levels.

OIG analysis of population data, as of June 4, 2020, at the 108 minimum and low security facilities and satellite facilities we examined indicates that the BOP would have needed to reduce its overall minimum and low security population by over 2,700 inmates in order to meet the population targets set in its June 2020 memorandum.[42]  While over half of the facilities were already at or below their target populations in June 2020, 49 of the 108 facilities needed to decrease their populations to meet the targets.  By December 2020, the overall population of minimum and low security inmates was below the total target population but 26 facilities still had populations that exceeded their targets.  The number of facilities that did not meet the BOP's population targets increased to 38 facilities by December 2021 (see Table 2 below).

Table 2

Minimum and Low Security Facilities and Satellite Facilities Meeting Population Targets,
June 2020–December 2021

|  | June 2020 | December 2020 | June 2021 | December 2021 |
|---|---|---|---|---|
| Facilities Meeting Target Population | 59 | 82 | 79 | 70 |
| Facilities Not Meeting Target Population | 49 | 26 | 29 | 38 |

Source:  OIG analysis

In its 2022 performance budget, the BOP reported that there was extra space available at its low and minimum security facilities.  Specifically, the BOP reported that, for the first time in many years, the system-wide population was below rated capacity at its low security facilities and that it had a 52 percent surplus capacity at its minimum security facilities as of March 25, 2021.  Although these lower populations could help facilitate social distancing at low and minimum security facilities, the BOP's higher than intended populations at some facilities could present barriers to improving social distancing.

---

[42]  We analyzed population data at 108 facilities, which include 37 minimum and low security facilities as well as 69 minimum and 2 low security satellite facilities that the BOP generally counts as part of its other facilities.  For this analysis, we excluded the minimum and low security cohorts at medium and administrative security facilities because the population datasets for those facilities did not distinguish between the various security levels.  See Appendix 1 for additional discussion of our methodology.

Maintaining facility populations below a prison's rated capacity could help the BOP respond effectively to future public health emergencies that require social distancing, as well as address some of its staffing challenges.  However, this could be a challenge given that the BOP's medium and high security facilities continue to experience overcrowding, according to the BOP's 2022 performance budget.  A BOP Facilities Management official explained that BOP facilities were designed to house a specific number of inmates based on their classification and security requirements.  If facilities are at or near capacity, there may not be enough space to leave beds empty in order to allow inmates to maintain social distance while sleeping.

### *Quarantine and Medical Isolation*

We found that the amount of available space affected the facilities' abilities to create quarantine and medical isolation areas.  The facilities we inspected that had vacant cell-type housing available had an easier time designating enough space for their needs, and some facilities created temporary housing units to increase the number of beds available.  However, at some facilities, such as Federal Correctional Complex (FCC) Butner, a large outbreak of COVID-19 overwhelmed the available space.[43]  Having sufficient quarantine and medical isolation space appeared to be a widespread and ongoing concern during the pandemic.  Thirty percent of respondents to the OIG's 2021 BOP Staff Survey reported that there was "usually not enough space" or "never enough space" for inmates who needed to be placed in quarantine over the course of the pandemic.  Thirty percent also reported that there was "usually not enough space" or "never enough space" for inmates who needed to be placed in medical isolation.

As described in the Background of this report, facilities needed to designate as many as five separate areas for quarantine and medical isolation purposes.[44]  Interviewees at 7 of the 16 facilities we inspected, including 5 of the 11 federal facilities, specifically reported using vacant housing areas in their facilities for quarantine or medical isolation.  For example, at FCC Oakdale, staff initially established medical isolation and quarantine space in a vacant housing unit and used a second unit that had been empty while mold remediation work was completed to create additional space for inmates typically housed in the open dormitory camp.[45]  Several facilities we inspected used temporary housing solutions, such as converted visitation rooms or tents outfitted with electricity and restrooms (see the photographs below), to supplement quarantine and medical isolation space.

Finally, several of the facilities we inspected also used SHUs as quarantine or medical isolation areas.  In particular, facilities with open dormitory style housing relied on the cell-type housing of SHUs to quarantine or medically isolate inmates.  The BOP's COVID-19 Pandemic Response Plan specifies that, when facilities use restrictive housing for medical isolation, the conditions of confinement should be "operationally distinct"

---

[43]  DOJ OIG, *Remote Inspection of Federal Correctional Complex Butner,* E&I Report 21-031 (January 2021), oig.justice.gov/reports/remote-inspection-federal-correctional-complex-butner, 5.

[44]  Per CDC, "Interim Guidance," medical isolation and quarantine locations should be separate and, if possible, incoming inmates should be quarantined separately from individuals quarantined due to contact with a COVID-19 case.

[45]  DOJ OIG, *Remote Inspection of Federal Correctional Complexes Oakdale and Pollock,* E&I Report 21-003 (November 2020), oig.justice.gov/reports/remote-inspection-federal-correctional-complexes-oakdale-and-pollock, 16.

from the use of restrictive housing for disciplinary or administrative reasons.[46]  For example, facilities should try to provide similar access to radio, television, reading materials, personal property, and commissary as would be available in the inmate's regular housing unit and should consider allowing increased telephone privileges so inmates can maintain connection with others.  In addition, the BOP stated that inmates in the SHU for medical quarantine or isolation purposes are categorized as being in administrative detention and are placed on a medical hold until cleared for COVID-19.  However, we note that inmates in SHUs may be housed alone in their cells, and we identified concerns with the BOP's use of single-celling for quarantine purposes, as we discussed above.  In May 2022, Executive Order (E.O.) 14074 directed the BOP to identify alternatives to the use of restrictive housing for quarantine and medical isolation.[47]



*Left*, Exterior of Medical Tents at FMC Fort Worth; *Center*, Interior of a Medical Tent Set-up at FMC Fort Worth; *Right*, Restroom Facilities for the Medical Tents at FMC Fort Worth

Source:  BOP, with OIG enhancement

### Capturing Lessons Learned and Considering Facilities Modifications

In August 2020, the BOP issued the first version of its COVID-19 Pandemic Response Plan, which compiled COVID-19 guidance and "best practices" identified during the first months of the pandemic for limiting the spread of the disease in its facilities.  The COVID-19 Pandemic Response Plan also instructs BOP facilities to periodically review agency and institution plans to "identify what has worked well (best practices), what has

---

[46]  According to the BOP's SHU policy, inmates in disciplinary detention status have personal property impounded, may have limited commissary privileges, and may have their participation in programming activities suspended.  Inmates in administrative detention status have access to a reasonable amount of personal property, reasonable access to commissary, and access to programming activities to the extent that such access does not jeopardize facility operations or public safety.

[47]  E.O. 14074 on Advancing Effective, Accountable Policing and Criminal Justice Practices to Enhance Public Trust and Public Safety, May 25, 2022, www.federalregister.gov/documents/2022/05/31/2022-11810/advancing-effective-accountable-policing-and-criminal-justice-practices-to-enhance-public-trust-and (accessed September 26, 2022).

not, and deviations from established guidance (opportunities for improvement)." However, in a July 2021 report on the BOP's COVID-19 response, the U.S. Government Accountability Office (GAO) recommended that the BOP take additional steps to ensure that lessons learned and best practices are captured, particularly those discussed among BOP officials during their regular information sharing teleconferences.[48] The GAO further recommended that the BOP develop and implement an approach for ensuring that its facilities are applying the best practices, as appropriate.

The BOP has reported that it considered potential permanent changes to facility infrastructure to help mitigate the risk of infection transmission inside its facilities. For example, Federal Correctional Institution (FCI) Terminal Island reported that it was considering placement of computers in the housing units instead of using a shared computer lab, which could help ensure access to the Trust Fund Limited Inmate Computer System (TRULINCS) inmate email system during extended modified operations while limiting cross-contamination among housing units.[49] The BOP should also look for opportunities to incorporate proactive infrastructure changes into its planned construction, modernization, and repair projects.[50] In its fiscal year 2022 budget submission, the BOP reported having 904 ongoing major and minor modernization and repair projects at its facilities. The BOP Facilities Management Branch Chief told us that the BOP plans to prioritize projects targeting the efficiency of heating, ventilation, and air conditioning systems, as these systems may affect the spread of COVID-19.[51]

### Conclusion

Building on these steps already taken or in progress, we recommend that the BOP specifically look at the challenges related to the limitations of existing facility infrastructure and the methods that have been successful in mitigating those challenges. First, as described above, facilities have unique challenges based on their specific layouts, populations, and other circumstances. In addition to ensuring that best practices are shared such that similarly situated facilities can benefit from lessons learned during the pandemic, facility-specific measures and solutions should be captured and updated in individual facility pandemic plans. Updating these plans will ensure that future facility leadership will have access to information on what has worked well in their facility's context if they need to respond to a public health emergency in the future. The BOP reported that it has already made several updates to its pandemic contingency plans based

---

[48] GAO, *BOP Could Further Enhance Its COVID-19 Response by Capturing and Incorporating Lessons Learned*, GAO-21-502 (July 2021), www.gao.gov/products/gao-21-502 (accessed July 11, 2022), 58.

[49] TRULINCS enables electronic messaging (email) between inmates and approved contacts in a monitored and secure manner. DOJ, OIG, *Remote Inspection of Federal Correctional Institution Terminal Island*, E&I Report 21-025 (January 2021), oig.justice.gov/reports/remote-inspection-federal-correctional-institution-terminal-island.

[50] Since 2017, the OIG has identified aging infrastructure at BOP facilities as an area of concern in its *Top Management and Performance Challenges* reports. The OIG is currently conducting an audit of the BOP's efforts to construct and maintain its institutions. See DOJ OIG, "Audit of the Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions," oig.justice.gov/node/23304.

[51] The CDC states that the risk of spreading the virus that causes COVID-19 through ventilation systems is not yet clear. However, the CDC does recommend improvements to building ventilation as tools to use in conjunction with other measures, such as social distancing, hand hygiene, and vaccination, to help reduce risk of exposure to the virus. See CDC, "Ventilation in Buildings," updated June 2, 2021, www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html (accessed July 11, 2022).

on CDC guidance as detailed information was gathered on vaccinations, testing, and treatment of COVID-19 and that it intended to continue collaborating with the CDC as part of its pandemic response.

Second, the BOP should build on its lessons learned by exploring potential permanent changes to facility infrastructures that could help the BOP more easily implement infection prevention and control measures in the future.  While these projects require sufficient funding, the BOP should take the opportunity to consider how it could incorporate modifications that would help with managing public health emergencies into other planned modernization and repair projects.

### Recommendations

To ensure that lessons learned are captured for future public health emergencies, we recommend that the BOP:

3. Compile and regularly update best practices for addressing space limitations to meet social distancing, quarantine, and medical isolation needs.

4. Explore options for permanent changes to facility infrastructures that would allow for better implementation of social distancing and other infection control measures.

### The BOP Should Assess How Lessons Learned Implementing CARES Act Home Confinement Could Apply to Future Public Health Emergencies While Monitoring How RRC Providers Manage a Larger Home Confinement Population

On April 3, 2020, the Attorney General gave the BOP the authority under the CARES Act to transfer to home confinement additional eligible inmates who would not have been eligible under the BOP's other existing authorities at the time of transfer (see the text box below).  We concluded in five of our remote inspections that the BOP did not fully leverage its home confinement authorities under the CARES Act to transfer inmates within 6 months of release from the inspected facilities to home confinement.  Greater use of these authorities could have allowed the BOP to better address the social distancing and quarantine challenges that many facilities faced, as well as assist with the staffing issues that it faced.

During this review, we found that the BOP's implementation of the Attorney General's memoranda on home confinement and related direction from the Department, as well as available resources, affected the extent to which the BOP transferred inmates to home confinement under the CARES Act.  We also found that several factors led to delays in home confinement transfers, limiting the efficacy of home confinement as a tool to manage active COVID-19 outbreaks.  Additionally, as described below, while the number of inmates transferred by the BOP to home confinement increased substantially in May and June 2020, shortly after the CARES Act was passed, the overall number of inmates transferred by the BOP to home confinement during the first year of the CARES Act—from April 2020 through March 2021—was actually less than the number of transfers that occurred from April 2019 through March 2020.  However, we note that, due to the decreasing inmate population overall, the percentage of inmates transferred to home confinement was similar for both years.  We also determined that, despite the lower number of facility-to-home-confinement transfers compared to the prior year, the BOP's home confinement population more than tripled during the first year of the CARES Act, generally due to (1) the longer period of time that inmates were remaining in home confinement because the CARES Act allowed the BOP to transfer inmates to home confinement with more

than 6 months remaining on their sentence and (2) the fact that the BOP also transferred inmates from Residential Reentry Center (RRC) facilities to home confinement in response to the pandemic, including under CARES Act authorities.  Additionally, we determined that the home confinement failure rate for inmates transferred to home confinement during the first year of the CARES Act was less than 2 percent. Failure in the home confinement setting occurs when an inmate commits misconduct or fails to comply with program rules, such as by using illicit drugs, missing check-ins, or committing new criminal activity.

---

**The BOP's Pre-Pandemic Home Confinement Authorities**

**Prerelease Inmates:**  Inmates nearing the end of their sentences are routinely considered for home confinement as part of their transition back into the community.  Eligible inmates can spend up to 10 percent of their total sentence or 6 months, whichever is shorter, in home confinement under 18 U.S.C. § 3624(c)(2).

**Elderly Inmates:**  Eligible inmates age 60 or older who have served at least two-thirds of their sentence may be placed in home confinement until the end of their sentence through a pilot program reauthorized under the FIRST STEP Act (FSA), codified at 34 U.S.C. § 60541(g).

**Terminally Ill Inmates:**  Eligible inmates who are terminally ill may be placed in home confinement through a pilot program reauthorized under the FSA, codified at 34 U.S.C. § 60541(g).

**Additional Home Confinement Authority During the COVID-19 Pandemic**

**Inmates Eligible Under the CARES Act:**  The CARES Act, Public Law No. 116-136, removed the 6 months or 10 percent of the total sentence time limit under 18 U.S.C. § 3624(c)(2) during the pandemic emergency period, allowing inmates to be considered for home confinement earlier in their sentences than usual.  Memoranda from the Attorney General and the BOP defined additional eligibility criteria for home confinement placement under the CARES Act.

Sources:  OIG summary of 18 U.S.C. § 3624(c)(2), 34 U.S.C. § 60541(g), and Public Law No. 116-136

---

In order to implement the Attorney General's April 3 memorandum and pre-CARES Act home confinement memorandum from March 26, the BOP issued its own memoranda to institutions on April 3, April 22, and May 8, 2020.  Generally, under these BOP-issued memoranda, inmates were eligible for home confinement if they:

- were not serving a sentence for a crime of violence, a sexual offense, or terrorism;

- did not present a substantial risk of engaging in criminal conduct or endangering the community, as determined by the BOP;[52]

---

[52]  To assess inmates' recidivism risk, the BOP uses the Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) system, which the Department developed in response to the FSA.  The FSA directed the Department to complete its initial risk and needs assessment for each federal inmate by January 15, 2020, which, among other things, calculated inmates' recidivism risk using a point system that classifies inmates into either minimum, low, medium, or high risk categories based on:  (1) infraction convictions during current incarceration, (2) number of programs completed, (3) work programming, (4) drug treatment while incarcerated, (5) noncompliance with financial responsibility, (6) history of violence, (7) history of escape, (8) education score, (9) age at time of the assessment,

- did not have a history of serious misconduct, such as violence or gang activity, while incarcerated;

- did not have a current detainer requesting the inmate's custody after sentence completion;[53]

- had a verifiable reentry plan, appropriate residence for home confinement, and ability to get any medical needs met appropriately in the community;

- had particular COVID-19 risk factors, as described in the CDC guidelines; and

- had served at least 50 percent of their sentence or had 18 months or less remaining on their sentence and had served at least 25 percent of their sentence (beginning with the April 22 memorandum).

The BOP's April 22, 2020 memorandum also granted Wardens additional authority to seek home confinement approval, for inmates who did not meet the criteria outlined in the memoranda, by sending to BOP Central Office the inmates' information for further consideration.  A committee of Central Office officials reviewed these referrals and approved or denied the transfers to home confinement.  However, a November 16, 2020 BOP memorandum, while reiterating the criteria for home confinement consideration and providing additional guidance, eliminated a Warden's ability to refer to the Central Office inmates who did not meet the home confinement criteria.  This meant that Wardens would make the final decisions on which inmates to refer for home confinement but could not refer or seek approval for inmates who did not meet the memoranda criteria for CARES Act home confinement.[54]  Five months later, in an April 13, 2021 memorandum, the BOP reverted to the practice outlined in the April 2020 memorandum allowing Wardens to seek approval from the Central Office for inmates with COVID-19 risk factors who did not meet all of the other eligibility requirements; the memorandum also emphasized the importance of continuing to review at-risk inmates for home confinement placement in accordance with the CARES Act and Attorney General guidance.

From the outset of the BOP's effort to review inmate eligibility for home confinement transfer, BOP Central Office and Regional Office officials sought to assist facilities in identifying eligible inmates by providing them with rosters of inmates who might meet the criteria listed in the guidance.  According to a Correctional

---

(10) instant violent offense, (11) sex offense, and (12) criminal history score.  For more information, see Office of the Attorney General, The First Step Act of 2018:  Risk and Needs Assessment System–Update (January 2020), nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf (accessed July 13, 2022).

[53]  A detainer may come from a federal, state, or local jurisdiction and may be related to criminal charges or noncriminal charges (e.g., material witnesses, deportation, probation/parole violator warrants, child support, etc.).

[54]  BOP Central Office continued to review referrals in cases related to court orders, settlement agreements, or other legal matters.  Documents we reviewed indicated that the Department was aware of this change and considered it to be an appropriate step.

Programs Division official, BOP facility staff were expected to review the inmates on the rosters and any other inmates they believed might be eligible.

OIG analysis of BOP data showed that the BOP transferred fewer inmates to home confinement during the first year it was given CARES Act authorities than the year prior. From April 2020 through March 2021, the BOP transferred 28,353 total inmates to home confinement, including 6,781 inmates who were specifically transferred under CARES Act authorities. By comparison, from April 2019 through March 2020, the BOP transferred 29,273 total inmates to home confinement. Although the number of transfers to home confinement was lower, the percentage of inmates transferred to home confinement was similar for both years due to the decrease in the inmate population overall. Additionally, the average number of inmates residing in home confinement during that same time period more than tripled. Two related factors contributed to the increased home confinement population. First, the CARES Act allowed the BOP to transfer inmates to home confinement regardless of the amount of time remaining on their sentence, as opposed to the standard prerelease home confinement statute that generally allowed transfers only for inmates with no more than 6 months remaining on their sentence; therefore, inmates were spending longer amounts of time in home confinement before their sentences ended.[55]

Second, Attorney General directives to maximize the use of home confinement authorities during the pandemic, including the CARES Act, also applied to inmates at RRC facilities. Inmates could be transferred from RRC facilities to home confinement, reducing the in-house RRC population and increasing the home confinement population.[56] Additionally, on April 3, 2020, the BOP's Residential Reentry Management Branch issued a memorandum to all RRC contract providers to use home confinement "to the fullest extent practicable, as outlined in the Attorney General's [March 26] memorandum." While we did not examine BOP-wide data on the number of inmates transferred specifically from RRCs to home confinement, our remote inspections of Brooklyn House RRC and Toler House RRC found that those RRCs heeded this direction and moved many of their inmates into home custody settings as the pandemic worsened. Additionally, respondents to our 2020 survey of RRC contract staff generally indicated that their RRC facilities had increased the number of inmates on home confinement early during the pandemic. Specifically, 80 percent (247 of 307) of respondents who answered the survey question about measures their RRC facility was employing at the time of the survey stated that the number of residents placed on home confinement had increased.

As Figure 4 below shows, the vast majority of home confinement placements before April 2020 were part of the BOP's regular prerelease process, through which inmates generally spend a maximum of 6 months in home confinement prior to their release. The CARES Act resulted in an unprecedented increase in the number of inmates in home confinement for far more than 6 months. For example, as of December 2021,

---

[55]  As discussed in the Introduction to this report, inmates in home confinement are supervised by RRCs or the U.S. Probation Office but remain in BOP custody and are therefore included in the BOP's inmate population totals.

[56]  The BOP's April 3 memorandum to RRC contract providers further noted that referrals must be made based on appropriateness for home confinement and that consideration should be given to whether inmates had a demonstrated verifiable reentry plan that would prevent recidivism and maximize public safety. A subsequent BOP memorandum to RRC contract providers on April 7, 2020, provided an update following the passage of the CARES Act and the Attorney General's April 3 memorandum and stated that the BOP was working to "ensure that all individuals who are appropriate for home confinement placement within our RRCs are placed on home confinement as soon as practical."

over 2,800 inmates in CARES Act home confinement had more than 1 year remaining on their sentences, including some inmates who had over a decade remaining.  We discuss the effects of an increased home confinement population later in this section.

### Figure 4

**Number of Inmates Transferred Under Home Confinement Authorities, April 2019–March 2021**



Notes:  Data labels show total inmates transferred each month.  "Elder HC" refers to transfers of elderly and terminally ill inmates to home confinement under 34 U.S.C. § 60541(g).  The pre-CARES Act average is the average number of inmates transferred to home confinement each month from April 2018 through March 2020.

Source:  OIG analysis of BOP data

Figure 4 also shows a large increase in the number of transfers to home confinement in May and June 2020, following the passage of the CARES Act.[57]  While the majority of inmates whom the BOP transferred to home confinement during that time were part of the BOP's regular prerelease process rather than under CARES Act authorities, a large number of additional inmates were released using the CARES Act authority.  In the second half of 2020, the number of monthly transfers to home confinement dropped and remained below the pre-CARES Act average, with a small percentage of the releases being made using the CARES Act authority.  According to a GAO report on the BOP's COVID-19 response, BOP officials told the GAO that the BOP transferred fewer inmates from July through December 2020 because it had developed a list of inmates

---

[57]  Although the CARES Act passed at the end of March 2020, it often took a few weeks for an inmate to be reviewed for home confinement and complete a mandatory quarantine period before being transferred to home confinement.  The lower number of inmates transferred in April as compared to May and June reflects these delays.  We discuss factors contributing to delays in home confinement transfers later in this section.

eligible for home confinement during the early stages of the pandemic.[58]  The GAO report stated that, as a result, the transfer process was front loaded during the initial stages of the pandemic, from May through June 2020, resulting in a decrease in home confinement transfers after July 2020.  As we discuss in the next section, the BOP's general practice of limiting eligibility for CARES Act consideration to inmates with COVID-19 risk factors also affected the number of inmates who were transferred to home confinement.

### *The Effect of the BOP's Implementation of the Attorney General's Memoranda and BOP Resource Limitations on Inmate Transfers Under Expanded Home Confinement Authorities*

The OIG has previously reported that the BOP failed to broadly consider home confinement for inmates with a short amount of time remaining on their sentences during the pandemic, instead focusing its use of CARES Act and Attorney General authorities primarily on inmates with enhanced vulnerability to COVID-19.[59]  In five of our remote inspections of BOP facilities during the pandemic, we concluded that the BOP did not fully leverage the available home confinement authorities because only small proportions of potentially eligible inmates were transferred from those facilities to home confinement.  In particular, these inspections raised concerns about the number of inmates who were scheduled to be released within 6 months but who remained at BOP facilities instead of being transferred to home confinement.  We noted in those reports that some inmates who were within 6 months of release could have been eligible for home confinement under the BOP's regular authorities and that they would be releasing into the community shortly.[60]  The conclusions in our remote inspection reports are in line with a 2016 OIG audit report on the BOP's management of inmate placements in RRCs and home confinement.  In the 2016 report, we found that the BOP could more strategically identify inmates suitable for placement directly into home confinement and that the BOP had underutilized direct home confinement placement as an alternative to RRC placement for transitioning low risk, low need inmates back into society despite BOP policy and guidance stating that direct home confinement placement was preferred for such inmates.[61]

During this review, we found that the BOP's implementation of the Attorney General's memoranda on home confinement—based on the Department's direction to the BOP following both memoranda—affected the extent to which the BOP transferred inmates to home confinement under the CARES Act.  DOJ officials in the Offices of the Attorney General and the Deputy Attorney General worked directly with BOP executives to convey specific direction on how to implement the Attorney General's March 26 and April 3, 2020 memoranda.  For example, one document we reviewed described the Department's interest in making inmates with one or more COVID-19 risk factors who had 18 months or less remaining on their sentences and who had served at least 25 percent of their sentences a priority for home confinement.  Other

---

[58]  GAO, *BOP Could Further Enhance Its COVID-19 Response,* 46.

[59]  See DOJ OIG, *Top Management and Performance Challenges Facing the Department of Justice–2021* (October 2021), oig.justice.gov/reports/top-management-and-performance-challenges-facing-department-justice-2021.

[60]  BOP policy provides that inmates who fit certain categories, such as those who present certain public safety risks, should not ordinarily participate in RRC or home confinement.  BOP Program Statement 7310.04, Community Corrections Center Utilization and Transfer Procedures, December 16, 1998, www.bop.gov/policy/progstat/7310_004.pdf (accessed July 13, 2022).

[61]  DOJ OIG, *Audit of the Federal Bureau of Prisons' Management of Inmate Placements in Residential Reentry Centers and Home Confinement,* Audit Report 17-01 (November 2016), oig.justice.gov/reports/audit-federal-bureau-prisons-management-inmate-placements-residential-reentry-centers-and.

documents described the Department's evolving direction to the BOP about which of the home confinement criteria it considered "hard," meaning that the BOP should not approve any inmates who did not meet all such criteria, and other criteria the BOP could use to exercise its discretion when determining whether to transfer inmates to home confinement.

A Correctional Programs Division official told us that, in practice, at the facility level, inmates had to meet *all* of the factors listed in the BOP's home confinement memoranda to be considered eligible for home confinement.  As discussed above, between April and November 2020, and again starting in April 2021, BOP memoranda allowed Wardens to refer to the Central Office review committee inmates who did not meet all the listed factors for case-by-case home confinement consideration.  We reviewed documentation describing discussions between the BOP and the Department that indicate that, at least beginning in May 2020, the Department viewed certain criteria, including the presence of COVID-19 risk factors, as criteria that could be "waived" at the Central Office level when considering inmates whom Wardens referred to Central Office for home confinement consideration.  However, the same Correctional Programs Division official and a Health Services Division official told us that they understood the Attorney General's memoranda to mean that *only* inmates with COVID-19 risk factors defined by the CDC could be transferred to home confinement under the CARES Act.  They pointed to language in the Attorney General's April 3, 2020 memorandum directing the BOP to "immediately review all inmates who have COVID-19 risk factors, as established by the CDC."[62]  Additionally, the lack of COVID-19 risk factors was a reason that BOP staff gave for denying CARES Act home confinement at facilities we inspected, including at MDC Brooklyn, where 139 of the 196 inmates who had been deemed ineligible for home confinement as of June 1, 2020, were denied due to lack of medical risk.

The OIG is conducting a separate review of the BOP's use of home confinement as a response to the COVID-19 pandemic; that review is assessing the BOP's processes for implementing its home confinement authorities under the CARES Act, considering the eligibility criteria outlined in the Attorney General's memoranda, and evaluating Wardens' recommendations that inmates who did not meet the Attorney General's criteria be placed in home confinement.  That review will also select particular cases for examination to determine whether there were irregularities in the BOP's processes.  Accordingly, while this report draws some conclusions about the BOP's use of home confinement, it does not draw specific conclusions regarding the BOP's processes related to implementing its home confinement authorities during the pandemic or make recommendations in this area.

A BOP Reentry Services Division official told us that available resources additionally affected the extent to which the BOP transferred inmates to home confinement.  RRC contractors are retained by the BOP to monitor inmates in home confinement, and we were told that RRC and home confinement capacities are limited to what the RRC contractors can reasonably manage.[63]  According to this official, the BOP wanted to focus its limited resources on (1) inmates with the greatest risk of contracting COVID-19 and (2) inmates who would be participating in the program as part of the traditional reentry philosophy in preparation for release from BOP custody.  This same official pointed to the addition of the time-served criteria for home

---

[62] Barr, memorandum for Director of Bureau of Prisons, April 3, 2020, 1.

[63] The U.S. Probation Office can also monitor BOP inmates on home confinement.  However, according to the BOP, the Probation Office monitors a small percentage of BOP inmates on home confinement while RRCs monitor most inmates on home confinement.

confinement consideration in the BOP's April 22, 2020 memorandum, which prioritized for home confinement inmates who had served a certain portion of their sentences, or who had only a relatively short amount of time remaining on their sentences, as a way the BOP tried to prioritize its limited resources in the community.

The Department has recently indicated its support of the BOP's interpretation of the Attorney General's memoranda and the BOP's implementation of the expanded home confinement authorities.  In response to the OIG's 2021 *Top Management and Performance Challenges* report, which discussed the OIG's findings from our remote inspection reports, the Department responded that it believes that the BOP properly executed the Attorney General's memoranda and that it was appropriate for the BOP to focus its efforts on medically vulnerable inmates.  The Department further responded, "Although transferring healthy offenders with short sentences to home detention may have temporarily reduced the inmate population in some facilities, it would have drained available home detention resources from medically vulnerable offenders who were most at risk for contracting COVID-19 and subsequently developing serious illness or dying." While we appreciate the BOP's home confinement resource challenges, some BOP facilities also faced significant staffing and resource challenges, particularly those facilities where COVID-19 outbreaks occurred. Thus, deciding that inmates, particularly those who presented a low safety risk, could not be referred for transfer to home confinement at the facility level if they did not have any COVID-19 health risk factors, even if they met all of the other factors that the BOP and Department developed, meant that facility populations could have remained higher, including at facilities experiencing staffing shortages and space and infrastructure limitations.

We separately received OIG Hotline complaints about home confinement indicating that there was confusion among some inmates and other stakeholders about the eligibility criteria and the BOP's home confinement decisions.  Home confinement was one of the most significant concerns for complainants; from March through September 2020 we received over 800 complaints related to home confinement, most of them from inmates.  Complainants frequently requested inmate transfers to home confinement, and many complainants expressed interpretations of the home confinement eligibility criteria that differed from the BOP's interpretation.[64]  According to some complainants, the BOP approved certain inmates for home confinement but subsequently reversed its decisions as guidance evolved.

We observed that the BOP's communication with the public regarding home confinement only restated the criteria in the Attorney General's memoranda without clarifying them in plainer language or describing how the BOP was interpreting or implementing the criteria.  For example, while the BOP provided a Frequently Asked Questions section on home confinement on its public website during the pandemic, the section did not mention the additional time-served criteria the BOP was using to determine eligibility for home confinement.  Clearly stating to the public how and why the BOP was implementing and prioritizing its

---

[64]  We analyzed complaints to identify trends but did not substantiate or assess the validity of individual complaints or examine whether individual inmates were eligible for home confinement.

expanded home confinement authorities could have helped the BOP be more transparent with inmates and other stakeholders at a time of high stress and uncertainty.[65]

### *The Home Confinement Review Process, COVID-19 Outbreaks, and Quarantine Protocols Potentially Contributed to Delays in Home Confinement Transfers*

The Attorney General's April 3, 2020 memorandum instructed the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at those prisons "where COVID-19 is materially affecting operations."[66]  We found, however, that the BOP's April 22 guidance, which implemented the April 3 memorandum, did not specifically address the Attorney General's instruction to "immediately maximize appropriate transfers to home confinement."  A BOP Correctional Programs Division official stated that the Central Office sent additional rosters of potentially eligible inmates to facilities that were experiencing an increase in COVID-19 cases, following an initial roster of eligible inmates sent to all BOP facilities.  This official further stated that the BOP authorized temporary duty (TDY) assignments at certain facilities to assist with reviewing inmates for potential transfer to home confinement.  According to this official, the BOP expected institution staff to review inmates and complete referrals for home confinement as quickly as possible.

We found that the time it took to transfer inmates, coupled with the active COVID-19 outbreaks, potentially limited the effect that transfers to home confinement had on managing the outbreaks.  The BOP facilities we inspected reported that it took at least 2–4 weeks between an inmate's identification for home confinement consideration and his or her transfer date.  For example, our FCC Lompoc remote inspection found that the process for reviewing inmates for home confinement, coupled with the 14-day quarantine period the Attorney General memoranda required to ensure that inmates placed into the community did not have COVID-19, resulted in 3 or more weeks between the time the Central Office identified an inmate for transfer consideration to the date the inmate was actually transferred to home confinement.  By May 13, 2020, over 900 inmates at FCC Lompoc had contracted COVID-19 and only 8 inmates had been transferred to home confinement under CARES Act authorities and BOP guidance.  These delays are reflected in the relatively low number of CARES Act transfers BOP-wide in April 2020 as compared to May and June of 2020, as shown in Figure 4 above.

COVID-19 outbreaks may have also affected the ability of BOP facilities to promptly transfer inmates to home confinement.  For example, at FMC Fort Worth, officials told us that some of the inmates approved for home confinement had their transfers delayed because those inmates had tested positive for COVID-19.  As we discuss in the Introduction, facilities needed to designate several separate quarantine and medical isolation spaces for inmates, including separate spaces for isolation of inmates with COVID-19 and for quarantine for outgoing inmates, including those transferring to an RRC or home confinement.  Outbreaks meant that there were sometimes competing quarantine and medical isolation needs.  For example, an FCC Butner staff member reported that during a large outbreak the designated quarantine space was being used to quarantine outgoing inmates so it could not be used for exposure-related quarantine.  While transferring inmates to home confinement allowed for improved social distancing, time and competing

---

[65]  We discuss other topics related to the BOP's communication with stakeholders in the section titled The BOP Should Improve its Communication of Essential Information to Stakeholders.

[66]  Barr, memorandum for Director of Bureau of Prisons, April 3, 2020, 1.

resources may have limited the effect that home confinement transfers had on the virus spread in affected facilities.

***Potential Challenges for RRCs Due to the Increased Number of Inmates in Home Confinement***

We found that in the year following the passage of the CARES Act, from April 2020 through March 2021, there was an average of 12,480 inmates under RRC supervision, either living in an RRC facility or in home confinement.  This was a 41 percent increase in the average population under RRC supervision over a comparable period before the CARES Act.  And, when we specifically examined inmates in home confinement, we found that the number of inmates in home confinement more than tripled, averaging 7,372 inmates in home confinement during the first year of the CARES Act as compared to 2,271 inmates in home confinement during the year before the CARES Act.  Figure 5 below shows the number of inmates living in RRC facilities and in home confinement before and during the first year of the CARES Act.

### Figure 5

### Total Inmate Population in Community-Based Custody, April 2019–March 2021



Source:  OIG analysis of BOP data

As we discussed above, one of the reasons for this increase was the CARES Act provision allowing inmates to be transferred to home confinement with more than 6 months remaining on their sentence; therefore, inmates were spending longer amounts of time in home confinement than would be permitted under standard prerelease authorities, resulting in an unprecedented increase in the number of inmates in extended home confinement.  When using its CARES Act authority, the BOP transferred inmates directly

from prisons to home confinement.[67]  The addition of the CARES Act authority also allowed prerelease inmates who had been placed in RRCs to transfer from RRCs to home confinement earlier than under the BOP's standard prerelease process.  Eligible inmates residing in RRC facilities whom the BOP transferred to home confinement increased the home confinement population while decreasing the number of inmates residing in RRC facilities.  Under the RRC contractual model, RRCs may typically place inmates in home confinement if (1) they met a home confinement eligibility date provided by the BOP and (2) the RRC could verify a suitable home address with mechanisms, such as a landline telephone, in place to maintain accountability.

Our remote inspections of Brooklyn House RRC and Toler House RRC found that the RRCs received direction from BOP officials that they could expand the use of home visit passes, which are traditionally used to allow for temporary, short-term home visits.  Expanded home visit passes offered RRCs the flexibility to temporarily reduce the in-house RRC populations and increase social distancing at RRC facilities.  Our inspections of Brooklyn House RRC and Toler House RRC found that, by using these flexibilities and home confinement, the only inmates who continued to reside in those RRCs at the time of our fieldwork were homeless or lacked a suitable home residence for placement.  Between home confinement and the use of other flexibilities, RRCs needed to supervise a much larger population of inmates located outside of RRC facilities.

The increased home confinement population may pose challenges for RRCs and in the management of inmates in community-based custody.  Changes in managing home confinement populations, RRC staffing and cost concerns, and addressing failures in the home confinement setting are all areas that the BOP will need to continue to monitor as the population in home confinement remains high during the COVID-19 pandemic and beyond.  Below, we present the specific challenges in each area.

### Monitoring a Larger Home Confinement Population

In response to the COVID-19 pandemic, the BOP allowed RRCs to reduce certain monitoring and accountability measures that it typically requires.  For example, on March 24, 2020, the BOP allowed RRC staff to suspend routine breathalyzer and drug testing and replace in-person check-ins, employment site checks, and home site checks with virtual accountability measures such as telephone or video calls.  On April 3, 2020, the BOP's Reentry Services Division (RSD) further modified guidance for interaction with and monitoring of inmates placed in a home setting.  The April 3 guidance required that all inmates in home confinement be monitored via technology tools but allowed for virtual supervision and confirmation of electronic monitoring equipment functionality in certain circumstances, with the expectation that RRCs would physically verify inmate location via visual confirmation at least monthly.

An RSD official told us that the initial increase of inmates in home confinement was manageable due to the reduced RRC contractual requirements.  However, as the pandemic continued, it became difficult to maintain contract compliance with increasing home confinement and RRC populations.  Once all modified operations end, RRC contractors will need to meet all of the terms and conditions of their contracts, such as onsite monitoring, employment assistance, and drug and alcohol counseling, that were suspended during

---

[67] Under the BOP's prerelease process, inmates often spend a period of months in RRC facilities as a part of the transition back into the community before moving into home confinement.

the pandemic.  The DOJ Office of Legal Counsel has determined that inmates placed in home confinement under the CARES Act can remain there after the pandemic ends, and in June 2022 the Department published a regulatory proposal consistent with the Office of Legal Counsel's opinion.[68]  Therefore, the population of inmates in home confinement will likely continue to be higher than it was pre-pandemic.  However, other factors may also affect the population of inmates in RRC custody, including those in home confinement.  For example, on September 10, 2021, the BOP issued a memorandum to RRCs announcing that inmates on CARES Act home confinement who have underlying federal convictions for nonviolent drug offenses may be considered for clemency on an expedited basis by the Biden administration.  The memorandum instructed RRCs to encourage inmates in home confinement and RRC facilities to apply for sentence commutation.  Regardless of the effect that these external factors have on the number of inmates in home confinement, the BOP will need to ensure that RRCs are appropriately managing inmate populations in compliance with their contractual requirements during and after the pandemic.

### Retaining Sufficient Services as RRCs Adjust to Staffing and Cost Changes

The shift in the RRC-managed population to predominately home confinement inmates required RRCs to adjust their operations and reallocate their resources.  For example, RRCs have needed more field staff to conduct home visits and more global positioning system (GPS) equipment to monitor their larger home confinement populations.  These changes may result in staffing and costs concerns for RRC providers as they experience additional costs driven by the pandemic.  BOP RSD officials told us that some RRC contractors had reported reduced staffing and challenges hiring new staff and that some RRCs had needed to provide hazard pay in order to retain staff.  Additionally, RRCs generally are paid based on a negotiated daily rate for each inmate housed at the RRC facility and are paid half the daily rate to monitor an inmate in home confinement.  The BOP reported that it has already received funding adjustment requests from some RRC providers and that it expects to receive more.  The BOP further observed that new contract solicitations have included higher prices.  While the OIG did not independently conduct RRC cost assessments for this review, we note that the shift toward supervising more inmates in home confinement and fewer in RRC facilities may affect whether RRCs can afford their operational costs.  The BOP may need to explore options to retain necessary services in an environment in which traditional RRC providers may be less able or willing to provide services to meet the demands of the larger home confinement population.

### Handling Failure in the Home Confinement Setting

Although failures in the home confinement setting were rare during the first year of the CARES Act, RRCs and the BOP have fewer options for managing failures in CARES Act home confinement.  Failure in the home confinement setting occurs when an inmate commits misconduct or fails to comply with program rules, such as by using illicit drugs, missing check-ins, or committing new criminal activity.  Typically, if an inmate fails in home confinement or if the home setting is no longer an appropriate place for that inmate, the BOP can move the inmate into an RRC.  However, RRC placements are generally limited to 12 months and the CARES Act did not authorize extended placement in RRCs when it authorized extended placement in home confinement.  Therefore, if an inmate in home confinement under the CARES Act with more than 12 months remaining on his or her sentence breaks the rules, the BOP must decide between returning the inmate to a BOP facility or letting the inmate remain in home confinement.  The BOP reported that this limitation makes

---

[68]  See DOJ Office of Legal Counsel, Slip Opinion, "Discretion to Continue the Home-Confinement Placements of Federal Prisoners After the COVID-19 Emergency," December 21, 2021, www.justice.gov/olc/file/1457926/download (accessed July 13, 2022).

it more challenging to address lower-level noncompliance because it does not have an intermediate sanction to impose before returning the inmate to a BOP facility.

RSD officials expressed concerns about long-term placements in home confinement and anticipated an increase in program failures.  In particular, RSD officials anticipated that, when normal inmate monitoring, such as drug testing, resumed, failures would increase.  OIG analysis of home confinement failure data through March 2021 indicates that the home confinement failure rate for inmates released under CARES Act authorities was low and only slightly higher than the failure rate for inmates released under preexisting authorities.  Of the 6,781 inmates who were transferred to home confinement under the CARES Act from April 2020 through March 2021, 116 (1.7 percent) had failed in the home confinement setting as of the end of March 2021.  By comparison, there were 21,572 inmates transferred to home confinement under other authorities during the same period and 249 (1.2 percent) had failed in the home confinement setting as of the end of March 2021.  As shown in Figure 6 below, the majority of home confinement failures were related to drug or alcohol use.  The most serious infraction, new criminal conduct, was infrequent for both inmates placed in home confinement under the CARES Act and inmates placed under other home confinement authorities.

## Figure 6

### Causes of Home Confinement Failures, April 2020–March 2021



Notes:  In the home confinement setting, "Escape" refers to failing to remain at approved locations or failing to check in at required times.  "Other" encompasses violations that do not fit into the categories listed.  Some examples include no longer having an appropriate residence for home confinement and repeated noncompliance with the conditions of home confinement.

Source:  OIG analysis of BOP data

### Conclusion

During our remote inspections, and in our work on this capstone review, we found that the BOP limited its use of the CARES Act home confinement authorities by generally requiring that inmates have COVID-19

health risk factors in order to be eligible for transfer to home confinement.  We also found that the BOP experienced challenges in timely transferring eligible inmates to home confinement at the outset of the pandemic.  The OIG is taking a deeper look at some of these issues in its ongoing review of the BOP's use of home confinement as a response to the COVID-19 pandemic.

Ultimately, the BOP did transfer a substantial number of inmates to home confinement in May and June 2020; but we determined that the number of inmates transferred to home confinement during the first year of the pandemic was actually lower than the number of inmates transferred during the year immediately prior to the pandemic.  We also found that the overall number of inmates monitored on home confinement increased and remained high because inmates were being transferred to home confinement with longer periods of time remaining in their sentences and therefore were spending more time in home confinement.  Additionally, inmates who had been serving their sentences in RRC facilities were transferred to home confinement.  In light of the increase in the number of inmates supervised by RRCs in the home confinement setting, we believe that the BOP should continue to assess the effects of the larger home confinement population on RRCs and their ability to monitor, manage, and provide services for inmates in home confinement.  While we do not make specific recommendations on this topic in this report, we encourage the BOP to continue to assess how it can most effectively use its available authorities to appropriately place inmates in home confinement during and after the COVID-19 pandemic.

## The BOP Should Take Appropriate Steps to Address Staffing Shortages and Staff Morale

During our remote inspections, we identified several facilities that faced COVID-19 challenges due to staffing shortages and found that the BOP used overtime, augmentation, and TDY assignments in an effort to alleviate them.  The effects of insufficient staffing were also illustrated in our BOP staff surveys, indicating a need for more custody and medical staff in federal facilities, as well as a range of professional and personal impacts on staff due to the pandemic.  Additionally, we found that staffing shortages at BOP facilities may have impeded some facilities' ability to respond to the COVID-19 pandemic in a timely and thorough manner.  Finally, our remote inspections found that the pandemic strained staff morale and that facilities varied in their abilities to support staff.

### COVID-19 Exacerbated the Effects of Staffing Shortages, Increased Staff Workloads, and Impeded Some Facilities' Ability to Fully Respond to the Pandemic

During our remote inspections, we found that the BOP has continued to struggle with staffing issues, including existing vacancies, staff absences, and increased workloads.  The OIG has highlighted the BOP's staffing shortages as a long-standing issue in *Top Management and Performance Challenges* reports dating back to 2015.[69]  The OIG discussed facilities' medical staffing shortages in particular in our 2016 *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*.[70]  As shown in Table 3 below, the BOP increased its total number of onboarded staff from FY 2018 through FY 2021.  However, as of September 2022 the

---

[69]  Each year, the OIG prepares a report on *Top Management and Performance Challenges Facing the Department of Justice,* which is required by statute to be included in the Department's Agency Financial Report.  The OIG's 2021 report continued to highlight the BOP's staffing shortages.  See DOJ OIG, *Top Management and Performance Challenges–2021.*

[70]  DOJ OIG, *Review of the Bureau of Prisons' Medical Staffing Challenges*, E&I Report 16-02 (March 2016), oig.justice.gov/reports/review-federal-bureau-prisons-medical-staffing-challenges.

BOP had over 2,500 staff vacancies, including 21 percent of its authorized Correctional Officer positions. The number of onboarded Correctional Officers declined from 17,114 at the end of September 2021 to 16,153 at the end of September 2022. As of September 2021, the BOP also reported that 14 percent of its Health Services positions were vacant, as shown in Table 4 below. A December 2020 OIG Management Advisory Memorandum on the BOP's FY 2019 overtime hours and costs noted that the BOP uses overtime as a mechanism to supplement staffing and found that the BOP spent over $300 million in overtime costs during FY 2019.[71] As part of the OIG's ongoing work with the Pandemic Response Accountability Committee, we are also assessing the BOP's healthcare personnel shortages during the COVID-19 pandemic, the impact of healthcare personnel shortages, and strategies to attract and retain healthcare personnel.

**Table 3**

**BOP Staff Vacancy Rates, September 2017–September 2022**

| As-of Date | All BOP Employees | | | Correctional Officers | | |
|---|---|---|---|---|---|---|
| | Authorized Positions | Onboarded Positions | % Vacant | Authorized Positions | Onboarded Positions | % Vacant |
| End of September 2017 | 37,974 | 36,350 | 4% | 20,921 | 18,170 | 13% |
| End of September 2018 | 38,557 | 34,414 | 11% | 19,361 | 17,142 | 11% |
| End of September 2019 | 38,557 | 34,666 | 10% | 20,446 | 17,031 | 17% |
| End of September 2020 | 38,680 | 35,869 | 7% | 20,446 | 17,134 | 16% |
| End of September 2021 | 38,884 | 35,886 | 8% | 20,446 | 17,114 | 16% |
| End of September 2022 | 38,995 | 34,094 | 13% | 20,446 | 16,153 | 21% |

Notes: "Authorized Positions" refers to the total possible staff positions, as reported in the BOP's Enacted Spend Plans. This number does not necessarily reflect the number of staff positions for which the BOP received funding in the given year. In each year except FY 2018, the BOP received funding for fewer than the number of authorized positions. For this table, the OIG calculated the vacancy rates using onboarded and authorized positions. The BOP's Administration Division told us that it calculated vacancy rates using funded positions instead of authorized positions, which is different from the manner that we present in this table. However, the Administration Division was not able to provide the OIG the number of funded Correctional Officer positions.

Source: BOP Congressional Budget Submissions and BOP Administration Division data

---

[71] DOJ OIG, *Management Advisory: Analysis of the Federal Bureau of Prisons' Fiscal Year 2019 Overtime Hours and Costs*, Audit Report 21-011 (December 2020), oig.justice.gov/reports/management-advisory-analysis-federal-bureau-prisons-fiscal-year-2019-overtime-hours-and.

Table 4

BOP Health Services Staff Vacancy Rates, September 2019–September 2021

| As-of Date | Total Positions | Onboarded Positions | % Vacant |
|---|---|---|---|
| September 2019 | 3,746 | 3,052 | 19% |
| September 2020 | 3,878 | 3,246 | 16% |
| September 2021 | 3,806 | 3,255 | 14% |

Notes:  "Health Services Staff" includes civil service and U.S. Public Health Service (PHS) staff (described below) at the Central Office, six Regional Offices, and BOP facilities.  There were between 95 and 103 onboarded Central and Regional Office Health Services staff each year.  The BOP's Administration Division does not track Health Services positions and they are not reported in BOP budget documentation, so the OIG requested this data from the BOP separately from the data in Table 3 above.  Thus, the data is not directly comparable to the data we present in Table 3.

Source:  BOP data

In our 2021 BOP Staff Survey, 78 percent of respondents said that their facility's Correctional Officer staffing is insufficient and 53 percent said that their facility's Health Services staffing is insufficient.  BOP policy states that the vacancy rate of staff positions that work directly with inmates shall not exceed 10 percent during any 18-month period.[72]  Although our remote inspections did not assess individual facilities' compliance with this policy, we identified examples of what we believe are insufficient staffing levels, especially for Health Services staff positions, at several facilities.  For example, our remote inspection reports identified the following staffing issues:

- During our remote inspection of FCC Lompoc, Lompoc's Health Services Administrator indicated that prior to the COVID-19 outbreak the facility's medical staff had a 38 percent vacancy rate.[73]

- Our remote inspection of MDC Brooklyn found that the facility's vacancy rates for Health Services positions were between 33 percent and 27 percent from March 15 through May 9, 2020.  Additionally, MDC Brooklyn's Custody Department was approximately 14 percent vacant from mid-March through mid-May 2020 and the facility received staff on TDY assignment to fill vacancies.[74]

---

[72]  BOP Program Statement 3000.03, Human Resource Management Manual, December 19, 2007, www.bop.gov/policy/progstat/3000_003.pdf (accessed July 11, 2022).

[73]  The Lompoc Health Services Administrator told the OIG that prior to the COVID-19 outbreak the facility's medical staffing was at only 62 percent.  See DOJ OIG, Remote Inspection of Federal Correctional Complex Lompoc, E&I Report 20-086 (July 2020), oig.justice.gov/reports/remote-inspection-federal-correctional-complex-lompoc.

[74]  BOP staff on TDY assignments deploy to other BOP institutions or offices on a temporary basis to address staffing needs.  Our remote inspection of MDC Brooklyn found that the facility staffed between 20 and 22 of its 30 authorized Health Services positions (between 67 and 73 percent) from March 15 to May 9, 2020.  MDC Brooklyn's Custody Department was approximately 86 percent filled from mid-March through mid-May 2020.

- During our remote inspection of FCC Coleman, management and Health Services staff identified medical staffing shortages as the greatest challenge facing FCC Coleman in its efforts to combat COVID-19.[75]  At the time of the remote inspection, Coleman's Health Services Department had about a 20 percent vacancy rate.

BOP data, BOP staff survey results, and our remote inspections identified instances of COVID-19 related staff unavailability or absences:

- Based on our 2021 BOP Staff Survey results, 24 percent of BOP staff respondents reported that they contracted COVID-19 and believed it was due to work exposure, 23 percent reported taking leave due to demands at home, and 28 percent reported that they were required to work longer shifts. The effect that the pandemic had on BOP staff work assignments and schedules, based on our 2021 BOP Staff Survey, is further illustrated below in Figure 7.

- As of October 2021, BOP data indicated that over 7,800 current staff members had contracted and recovered from COVID-19.[76]

- At FCI Milan, three-quarters of the facility's healthcare staff caught COVID-19 at some point, most of them during the first week of the facility's outbreak in April 2020.[77]

- At FCC Oakdale, staff reported numerous absences due to illness, the need to quarantine, and fear of reporting to work, which forced some remaining staff to work longer shifts.

---

[75]  At the time of our remote inspection, Coleman's Health Services Department had only 66 of its 83 authorized medical personnel on hand.  See DOJ OIG, *Remote Inspection of Federal Correctional Complex Coleman*, E&I Report 21-026 (January 2021), oig.justice.gov/reports/remote-inspection-federal-correctional-complex-coleman.

[76]  This data does not account for individuals who may have contracted and recovered from COVID-19 while working at the BOP but who were no longer employed by the BOP.

[77]  DOJ OIG, *Remote Inspection of Federal Correctional Institution Milan*, E&I Report 21-032 (January 2021), oig.justice.gov/reports/remote-inspection-federal-correctional-institution-milan.

**Figure 7**

**2021 BOP Staff Survey Results:  Impact on Staff**



How has the COVID-19 pandemic affected your work **schedule/assignments**? (Check all that apply.)

Source:  OIG dashboard of 2021 BOP Staff Survey data

Additionally, BOP staff who continued to work during the COVID-19 pandemic requested a large number of temporary job modifications that we believe may have affected their ability to conduct their usual work.[78] OIG analysis of BOP data showed that, from March 2020 through May 2021, over 1,700 temporary job modifications related to the ongoing COVID-19 pandemic were approved.  About 58 percent of the temporary job modifications involved duty modifications beyond the BOP's social distancing and face covering requirements.  These modifications included remaining separate from others or staying away from the facility, both of which severely limit the work that BOP facility staff can do, especially for staff whose jobs generally require in-person contact with inmates.

### *Staffing Shortages and Increased Workloads Due to COVID-19 Protective Measures*

We found that modified operations and increased infection prevention and control measures due to the COVID-19 pandemic increased BOP facility staff workloads.  Staff needed to take on additional responsibilities, including regularly screening inmates and staff for symptoms of COVID-19; managing quarantine and medical isolation units; and taking on tasks, such as food service, cleaning, and laundry, normally done by inmate work crews, in an effort to manage and reduce transmission of COVID-19 in

federal facilities.  At some BOP facilities we inspected, so many inmates were simultaneously hospitalized for COVID-19 that dozens of Correctional Officers per shift were assigned to accompany and supervise them.  For example, at FMC Fort Worth, teams of two Correctional Officers are required to accompany each inmate receiving care at a hospital.  Our inspection found that at one point in April 2020 as many as 81 Correctional Officers were assigned to the hospital and were not available to fill posts at the FMC due to the risk of further COVID-19 transmission.[79]  Additionally, restrictions on inmate movement meant that staff had to bring services into the housing units rather than allowing inmates to gather in a common area to receive services.  For example, our inspection of FCC Pollock found that Education Department staff performed rounds and made materials available to inmates for self-study when inmates could not visit classrooms.[80]  Our inspection of FCC Tucson found that Health Services staff had to provide all medical services, such as sick calls and medication deliveries, inside housing units, which Tucson management described as "taxing."[81]

We also found that facility staff were asked to work overtime to cover staffing shortages during the pandemic.[82]  For example, the remote inspection of FCC Oakdale noted an increased use of overtime to address COVID-19 related staffing issues.  Collectively, Oakdale staff worked more than 18,700 overtime hours between March 29 and April 25, 2020, during the height of Oakdale's COVID-19 crisis.  This was a 487 percent increase from the 3,186 collective overtime hours that Oakdale staff worked between February 2 and 29, 2020.  The BOP acknowledged that some Oakdale staff volunteered to work shifts as long as 40 hours straight but asserted that no staff member was mandated to work beyond a 16-hour shift.  Nurses and Correctional Officer Lieutenants were mandated to work up to 12-hour shifts rather than their standard 8-hour shifts.  The 2021 BOP Staff Survey results indicated that the use of overtime was widespread during the pandemic, with 46 percent of staff respondents reporting that they had been asked to work overtime and 39 percent of staff respondents reporting that they had been required to work overtime.  These numbers were higher for Correctional Officers, with 64 percent of Custody staff (Correctional Officer) respondents reporting that they had been asked to work overtime and 72 percent reporting that they had been required to work overtime.  In addition to overtime, staff workloads during the pandemic contributed to delayed family notifications of inmate serious illness.  We discuss that issue below in The BOP Should Improve Its Communication of Essential Information to Stakeholders section of the report.

Finally, we found that BOP staff were often pulled from their normal duties to perform tasks in areas that were short staffed.  In our 2021 BOP Staff Survey, 66 percent of respondents reported that they had been asked to perform tasks outside their normal duties.  Further, at FCC Oakdale, staff from the Recreation, Education, Religious Services, Facilities Management, and Human Resources Departments were reassigned

---

[78]  Temporary job modifications allow the BOP to place staff members at work posts different from their normal job responsibilities.

[79]  BOP Program Statement 5538.07, Escorted Trips, December 10, 2015, www.bop.gov/policy/progstat/5538_07.pdf (accessed July 11, 2022).

[80]  DOJ OIG, *Remote Inspection of Federal Correctional Complexes Oakdale and Pollock*.

[81]  DOJ OIG, *Remote Inspection of Federal Correctional Complex Tucson*, E&I Report 20-087 (July 2020), oig.justice.gov/reports/remote-inspection-federal-correctional-complex-tucson.

[82]  Previous OIG work has examined the BOP's use of overtime.  In FY 2019, BOP employees worked 6.71 million overtime hours, the equivalent of 3,107 full-time positions.  See DOJ OIG, *The Federal Bureau of Prisons' Fiscal Year 2019 Overtime Hours and Costs*.

to cover general inmate supervision posts.  A BOP Central Office official told us that, during the pandemic, facilities used education staff to augment correctional posts, which often resulted in insufficient staff to run education or recreation programming for inmates.[83]  The OIG has previously raised concerns about augmentation because it often places program staff into critical security positions and interferes with the BOP's ability to ensure the safety of its staff and inmates, as well as its ability to provide inmate programs.[84]  The GAO has also identified concerns in this area, specifically noting that the BOP has not assessed the risks associated with both overtime and augmentation, despite increased use of both practices between 2015 and 2019.[85]

### Staffing Shortages' Effect on Some Facilities' Ability to Fully Respond to the COVID-19 Pandemic

We found that medical staffing shortages affected the BOP's ability to provide routine medical care at certain facilities.  The remote inspections of FCC Lompoc and MDC Brooklyn found that medical staffing shortages may have negatively affected the facilities' ability to screen inmates for COVID-19 symptoms in addition to providing routine medical care to inmates.  MDC Brooklyn Health Services staff indicated that sick-call wait times increased significantly due to COVID-19, as the facility faced a much higher volume of sick calls compared to the prior year.  Staff also reported that 160 inmate sick call requests, dating to early July 2020, had not been scheduled or completed as of late September 2020.  MDC Brooklyn Health Services staff told us that, in addition to medical staffing shortages, the requirement for healthcare providers to visit inmates in housing units also lengthened the time it took for providers to evaluate and treat patients.  In addition, as discussed previously, it was determined that, at another facility where an inmate had died by suicide, staff had failed to conduct pill line in restrictive housing, a failure that reportedly occurred due to staffing issues as well as staff error.

Shortages of staff also affected the implementation of COVID-19 control measures at certain facilities.  At FCC Lompoc, an insufficient number of correctional staff members resulted in Lompoc officials delaying mandates on staff movement restrictions until 15 days after the BOP directed facilities with COVID-19 cases to maximize social distancing to help control the spread of the infection.  Lompoc officials told us that they could not fully implement staff movement restrictions due to COVID-19 concerns until the arrival of adequate TDY staff because the facility did not have enough staff to fill all mandatory correctional posts, both at FCC Lompoc and at the local hospitals where some inmates were receiving care.  Additionally, staffing shortages at FCI Milan due to a COVID-19 outbreak made it difficult for that facility to restrict staff movement to prevent the spread of the virus.

### The BOP's Efforts to Address Staffing Shortages During the COVID-19 Pandemic

In addition to utilizing overtime and augmentation, as we described above, the BOP used a variety of methods to address the ongoing staffing shortages at its facilities.  To address its immediate needs, the BOP

---

[83]  Augmentation is the assignment of non-custody staff members to assume the duties of a Correctional Officer.  The BOP practices augmentation to address custody staffing shortages.  In response to augmentation practices described in a draft of this report, the BOP stated that it assigns necessary work to any staff member as all staff are correctional workers first and expected to complete work duties as a law enforcement professional first.

[84]  DOJ OIG, *Top Management and Performance Challenges Facing the Department of Justice–2019* (October 2019), oig.justice.gov/reports/top-management-and-performance-challenges-facing-department-justice-2019, 3.

[85]  See GAO, *BOP Could Further Enhance Its COVID-19 Response,* 57–59.

used short-term measures such as sending staff on TDY assignments and receiving additional support from the U.S. Public Health Service (PHS), a branch of deployable medical officers from the U.S. Department of Health and Human Services who serve in federal agencies.  The BOP also continued efforts to increase employee retention and hire new staff during the pandemic.  As shown in Table 3 above, the BOP increased its total staff from FY 2018 through FY 2021; however, in FY 2022, the number of total staff declined and 21 percent of the BOP's budgeted Correctional Officer positions remained vacant.

TDY staff are deployed from other BOP facilities or offices on a temporary basis to address a facility's immediate need for staff and ultimately return to their official duty post when the assignment is completed.[86]  During our inspections, we found that the BOP deployed TDY staff to alleviate medical staffing shortages, decrease staff overtime hours, and assist staff with inmate supervision duties.  Between March 2020 and April 2021, the BOP deployed 1,770 TDY staff for COVID-19 related assignments.  As shown in Figure 8 below, the majority of the TDY assignments occurred during the beginning of the pandemic, in April and May 2020, though TDY surges occurred at various facilities throughout the first year of the pandemic.  Overall, 59 BOP facilities and offices, including MDC Brooklyn, FCI Terminal Island, FMC Fort Worth, FCC Lompoc, and FCC Oakdale, received TDY staff to fill vacancies related to the COVID-19 pandemic.  We found that, out of the 11 federal facilities we inspected, FCC Oakdale received the largest number of TDY staff, a total of 156 TDY staff placements between March 2020 and April 2021.  Oakdale staff told the OIG that the additional help from TDY staff eased the burden on Oakdale's staff and made them better able to focus their efforts to contain the spread of COVID-19 at the facility.

---

[86]  During our remote inspection of MDC Brooklyn, we conducted independent analysis of healthcare staffing levels and found that many positions were vacant.  These vacancies were caused by extended absences from the institution due to a variety of reasons, including military leave, TDY assignments to other institutions, and extended sick leave.  See DOJ OIG, *Remote Inspection of MDC Brooklyn.*

Figure 8

Number of BOP Staff Beginning a COVID-19 TDY Assignment, by Month, March 2020–April 2021



Source: OIG analysis of BOP data

The BOP employs both civil service employees and PHS officers to provide medical care to inmates in BOP facilities. A 1991 memorandum of understanding (MOU) between the BOP and PHS established conditions, responsibilities, and procedures governing the assignment of PHS officers to BOP facilities. As of May 2021, there were 670 PHS officers working at BOP facilities nationwide, according to a PHS Captain serving as a liaison on behalf of the BOP. PHS officers serve in various health service roles, including as nurses, physicians, pharmacists, and dentists. From April 28 through August 1, 2020, 28 additional PHS officers were deployed on a temporary basis to BOP facilities with the highest need nationwide in response to the COVID-19 pandemic.

The PHS Captain told us that the BOP and the PHS have been working on an updated MOU that would more clearly outline the staffing support that the PHS provides to the BOP. Current discussions related to updating the MOU include enhanced deployment plans, requirements of staff fitness for duty, and occupational and health safety plans for PHS staff deployed to BOP facilities. We believe that the BOP should continue its planned updates to the MOU with the PHS to clearly outline the medical staff support needed at BOP facilities that would help the BOP address medical staffing shortages beyond the pandemic.

To combat staffing shortages, the BOP has implemented programs aimed at hiring and retaining Correctional Officers and medical professionals. In recent years, the BOP has used recruitment incentives, relocation incentives, retention incentives, and other such programs in an effort to hire and retain staff. Beginning in September 2019, in an effort to retain staff, the BOP offered a 5 percent salary increase as part of a group retention incentive to approximately 3,000 employees who were eligible to retire as of the end of

calendar year 2019.  This 5 percent group retention incentive was to be in effect until December 31, 2022. As of September 2019, 2,929 BOP staff had accepted the incentive, and, as of November 2022, 1,461 BOP staff continued to receive this incentive while remaining employed at the BOP despite their retirement eligibility.

In addition, according to a February 2021 GAO report, the BOP may repay federally insured student loans to attract job candidates or retain current staff.  The GAO report further noted that, following U.S. Office of Personnel Management (OPM) approval, the BOP has established higher pay rates for some specialist positions, such as physicians and psychologists, as well as allowances for certain eligible physicians or dental professionals who enter into service agreements.[87]  Additionally, all BOP facilities were instructed to hold at least one recruitment event per month to recruit more external staff and the BOP offered a $1,000 recruitment incentive for staff who successfully recruited new hires.

For this report, we did not analyze the pay scales of BOP medical staff or potential challenges with staff recruitment.  However, our 2016 report on the BOP's medical staffing challenges found that the BOP was required to classify positions according to the General Schedule pay scale, and, for physical therapists and pharmacists especially, the BOP struggled to offer competitive pay because the assigned grade of the positions limited the salaries they could offer.[88]

To further understand the BOP's staffing shortages, we analyzed staffing data from 2018 through 2021. BOP staff retention remained largely the same over this 3-year period, with the BOP reporting total staff separation rates as 8.3 percent in 2018 and 7.4 percent in 2019.  During the pandemic, in 2020, the separation rate for BOP employees was similar, at 7.6 percent.  As shown in Figure 9 below, the number of separations month by month was fairly consistent throughout the 3-year period, despite the pressures of the ongoing pandemic.

---

[87]  GAO, *Bureau of Prisons:  Opportunities Exist to Better Analyze Staffing Data and Improve Employee Wellness Programs*, GAO-21-123 (February 2021), www.gao.gov/products/gao-21-123 (accessed December 21, 2021), 27.

In January 2020, to improve healthcare recruiting and retention, the Department and OPM formally granted the BOP authority to pay physicians and dentists using the laws governing medical professional compensation in the U.S. Department of Veterans Affairs (Title 38 Pay Plan), which allows the BOP to offer staff in those positions higher pay than the BOP would otherwise be able to offer.

[88]  DOJ OIG, *Review of the Bureau of Prisons' Medical Staffing Challenges,* 8–9.  Our 2016 report also found that there was a large gap between the salaries the BOP pays its medical employees and those offered for similar positions in the local areas surrounding facilities.

In response to a draft of this report, the BOP stated that the pay scales of BOP medical staff, compared to those of medical staff in the general public, remain a major hurdle to the BOP's recruitment of medical staff.  Separately, the OIG, in collaboration with the Pandemic Response Accountability Committee, is conducting a review of healthcare staffing in federal healthcare programs, including the BOP, to determine whether these programs experienced shortages in healthcare personnel during the pandemic, the impact of any shortages, and strategies used by agencies to reduce shortages of healthcare personnel for future pandemics.

Figure 9

Comparing BOP Staff Separations, by Month, April 2019–March 2021



Note:  "Staff Separations" include retirements, transfers to other agencies, resignations, terminations, removals, and deaths.

Source:  OIG analysis of BOP data

From April 2020 through January 2021, the BOP ran an advertising and marketing campaign to hire additional custody and Health Services staff through expanded recruitment efforts that reached an estimated 6.5 million viewers.  This hiring campaign represented an attempt to rebrand and market the BOP for new recruits and included the use of online recruiting, social media, and web analytics to reach and engage new applicants.  The BOP held live social media events geared toward the recruitment of nurses and Correctional Officers to reach wider audiences and drive applicants to the BOP application portal.  However, new staff hiring levels appear to have remained largely the same despite the BOP's increased focus on recruitment and retention.  OIG analysis of BOP hiring data indicates that the number of new staff hired during the first year of the pandemic was similar to the number of staff hired during the year before the pandemic.  The BOP hired 3,882 new staff from April 2019 through March 2020 and 3,823 new staff from April 2020 through March 2021.  In March 2021, the then BOP Director told the House Appropriations Committee, Commerce, Justice, Science, and Related Agencies Subcommittee, that the BOP was able to hire new staff in 2020 but lost the same number of staff due to separations.

*Conclusion*

Overall, our inspections found that staffing shortages impeded the ability of some BOP facilities to provide routine medical care to inmates during the COVID-19 pandemic and implement effective infection mitigation strategies at various federal facilities, as well as straining already heavy staff workloads with additional responsibilities.  In addition, as we discuss in the next section, the pandemic had a serious impact on staff morale.  To alleviate staffing shortages, the BOP used overtime and augmentation and deployed TDY staff to requesting facilities most often related to COVID-19.  The OIG has repeatedly highlighted the BOP's staffing shortages issues, including its medical staffing shortages, in our *Top Management and Performance Challenges* reports.  Additionally, a December 2021 GAO report found that the BOP lacks a plan for

identifying and addressing staffing challenges and has not leveraged available data to help identify and address the causes and potential impacts of staffing challenges.[89]  Although we are not making any new recommendations on this topic given the GAO's open recommendations, we encourage the BOP to continue implementing additional proactive strategies to address staffing challenges and better prepare for public health emergencies in the future.

## Staff Were Negatively Affected by the COVID-19 Pandemic, and the BOP Should Take Appropriate Steps to Support Staff Morale

Our remote inspections found that the pandemic strained staff morale and that facilities varied in their abilities to support staff.  In addition to the negative effects of staffing shortages on facility staff that we described above, 70 percent of facility staff respondents from the 2021 BOP Staff Survey reported having experienced stress or anxiety at work due to the pandemic.  Further, BOP Central Office Psychology Services Branch officials we interviewed heard concerns from BOP staff related to facilities' implementation of COVID-19 related guidance, confusion regarding staff leave and quarantine, and fear of transmitting COVID-19 to family members.  At FCC Oakdale, management's failure to adequately communicate and engage with staff at the beginning of the complex's COVID-19 outbreak confused staff and created an environment in which staff felt that management did not appreciate them or lacked concern for their overall well-being.  According to medical staff at FCC Milan, persistent staffing shortages took a toll on the health and well-being of medical staff.  We also found that staff throughout the BOP expressed concerns regarding leave, including inconsistent and changing guidance about leave and quarantine due to COVID-19.  Lastly, 2021 BOP Staff Survey respondents indicated that providing mental health resources for staff was one of the top five areas in which the BOP most needed to improve its pandemic response.

### *Staff's Mixed Perceptions of BOP Facility Leadership's Communication*

We found in our remote inspections and staff survey responses that there were mixed reports about the BOP's communication with its staff during the pandemic.  Respondents to the 2021 BOP Staff Survey identified facility leaders' communication with staff as the top area that the BOP most needed to improve in its handling of the pandemic.  Further, our inspection reports found that facility leadership communication failures contributed to FCC Oakdale's delay in implementing the BOP's February 2020 staff screening guidance and FCC Lompoc staff's ignorance about a close contact who had tested positive for COVID-19, the latter of which potentially exposed others to the virus.  In contrast, 2020 BOP Staff Survey respondents at eight BOP-managed facilities we inspected praised facility executive leadership for their proactive communication with staff members.  Additionally, our inspections of the Toler House Residential Reentry Center (RRC) and three contract prisons found that contract facility leadership generally communicated information clearly to staff.  The GAO's July 2021 report on the BOP's COVID-19 response recommended that the "BOP Director should routinely evaluate how the BOP communicates COVID-19 guidance to facility staff and that the BOP modify its approach, as needed, based on the results to ensure that BOP protocols are clearly communicated to staff."[90]  The totality of staff perspectives that we received highlighted the

---

[89]  GAO, *BOP:  Opportunities Exist,* 41.

[90]  GAO, *BOP Could Further Enhance Its COVID-19 Response,* 58.

importance of the BOP's communication with staff in maintaining facility safety and staff well-being during the pandemic.

### *Staff's Concerns About Inconsistent and Changing Guidance Regarding Leave*

We found that BOP facility staff reported confusion about guidance on staff use of leave and quarantine due to COVID-19.  To reduce the spread of COVID-19, the CDC advised the general public in 2020 to stay home if they were sick, had been in close contact with someone who had symptoms consistent with COVID-19, or had been in close contact with someone who tested positive for the disease.[91]  OPM and the CDC issued additional guidance to help federal employees whose ability to report to work may be affected by COVID-19, and the BOP subsequently issued its own guidance.  Despite this guidance, we found that BOP staff were confused about their eligibility to use various types of leave and about the directions on whether to quarantine or continue reporting to work if they had been exposed to COVID-19.

BOP staff also expressed confusion about which types of leave they should use and their abilities to use leave during the pandemic.  In March 2020, the BOP's Human Resources Management Division issued guidance advising that employees who were symptomatic or diagnosed with COVID-19 should use accrued or advance sick leave to cover the period of illness.  The BOP's guidance further advised that asymptomatic employees who were told not to return to work by either a local health authority or the BOP's Health Services Division should either telework, if possible, or be placed on Weather and Safety leave.  In April 2020 the BOP issued additional guidance explaining how the additional 80 hours of paid sick leave authorized by the Emergency Paid Sick Leave Act applied to BOP employees.[92]

During our remote inspection fieldwork, BOP employees from 4 of the 11 federal facilities we inspected told us that they were unsure about aspects of the leave guidance, such as the types of leave afforded in various situations or how staff should determine when it was appropriate to return to work.  Nationally, 45 percent (3,695 of 8,153) of 2020 BOP Staff Survey respondents who answered the survey question, "Which of the following are immediate needs for your institution during the COVID-19 pandemic," identified needing greater flexibilities for use of administrative leave due to COVID-19 related absences.  Staff concerns about leave guidance and staff's ability to use leave were also expressed in complaints submitted to the OIG during the pandemic.  Respondents to the 2021 BOP Staff Survey reported continued confusion about leave guidance, as less than half stated that guidance on using leave for COVID-19 reasons was easy to understand.

### *Staff's Reported Confusion About Whether to Quarantine or Report to Work*

Another area of confusion for staff was whether they should quarantine or report to work following COVID-19 exposure.  Early during the pandemic, CDC guidance on this topic applicable to BOP staff changed.  Specifically, the CDC's March 23, 2020 interim guidance on management of COVID-19 in correctional facilities recommended that if a staff member was identified as a close contact of a COVID-19 case he or she should self-quarantine at home for 14 days before returning to work.  However, the U.S. Cybersecurity

---

[91]  The CDC defines close contact as being within 6 feet for at least 15 minutes over a 24-hour period.

[92]  The Families First Coronavirus Response Act, enacted on March 18, 2020, made full-time federal employees generally eligible for expanded leave provisions if they were unable to work because of COVID-19.  On April 1, 2020, the Emergency Paid Sick Leave Act went into effect as part of the Families First Coronavirus Response Act.  Emergency Paid Sick Leave Act paid sick leave was available for use by federal employees from April 1, 2020, through December 31, 2020.

Infrastructure and Security Agency identified personnel in corrections as critical infrastructure workers and the CDC's April 9, 2020 guidance for critical infrastructure workers stated that asymptomatic workers exposed to COVID-19 could report to work following additional precautions.[93]  For BOP correctional staff, this represented a significant change from the CDC's correctional facilities guidance that advised asymptomatic staff to quarantine for 14 days at home following COVID-19 exposure.  A BOP Central Office Health Services official we interviewed described her own frustration about these inconsistencies and the resulting confusion and told us that representatives from the national union representing BOP Correctional Officers had expressed similar frustration.

On May 4, 2020, in a Families First Coronavirus Response Act Frequently Asked Questions document, the BOP's Human Resources Management Division wrote that asymptomatic employees should continue to report to work until advised otherwise.  We did not find evidence that the BOP issued additional detailed guidance on this topic for non-TDY staff until September 2020, when the BOP issued the first version of its COVID-19 Pandemic Response Plan.  This plan included an instructional flowchart for symptomatic facility and non-facility staff who had been potentially exposed to COVID-19, in addition to guidance for asymptomatic facility and non-facility staff who had been potentially exposed to COVID-19.

Respondents from our 2020 BOP Staff Survey also expressed confusion about whether to report to work if they had been exposed to COVID-19 and were asymptomatic.  Some 2020 respondents reported instances in which they were advised by their physician to quarantine but told by the BOP to continue reporting to work.  Similarly, a Central Office Health Services official we interviewed cited instances in which BOP staff had received mixed messages from healthcare providers.  A 2020 BOP Staff Survey respondent observed that, by not offering administrative leave for the purposes of quarantining staff who had been exposed to COVID-19, the BOP's practices were inconsistent with those of local law enforcement or fire departments.[94]

Prior to the BOP's issuance of its COVID-19 Pandemic Response Plan, facility staff working in different parts of the BOP reported receiving different instructions on what to do if they had been exposed to COVID-19.  Federal staff working directly in facilities most commonly reported in our 2020 BOP Staff Survey that if they were exposed to COVID-19 they were expected to continue reporting to work unless they developed symptoms (45 percent, or 4,141 of 9,163).  In contrast, federal staff working in the BOP's Central and Regional Offices most commonly reported in our 2020 BOP Staff Survey that if they were exposed to COVID-19 they were expected to quarantine for 14 days (47 percent, or 328 of 693).[95]  Additionally, numerous 2020

---

[93]  The CDC's suggested precautions included screening for elevated temperature and other symptoms, wearing a face mask or cloth face covering, social distancing, and regular cleaning and disinfecting workspaces.

[94]  For example, news media reported in March 2020 that the New York City Fire Department initially quarantined Emergency Medical Services workers who had been exposed to COVID-19 before changing its policy to require exposed staff to continue working unless they developed symptoms.  Ali Watkins, "Last Week One Paramedic Was Infected.  Now Over 150 Are in Quarantine," *The New York Times,* March 20, 2020, www.nytimes.com/2020/03/20/nyregion/coronavirus-nyc-emergency-response.html (accessed July 13, 2022).

[95]  Central and Regional Office respondents were also three times as likely as institution respondents to say that they were advised that they should use administrative leave or COVID-related leave if they were quarantined due to exposure to COVID-19.  Specifically, 34 percent of Central and Regional Office respondents (235 of 693) said that they were advised that they should use administrative leave or COVID-related leave, compared to only 10 percent of institution respondents (955 of 9,163).

BOP Staff Survey respondents—nearly one in five facility respondents and one in seven Central and Regional Office respondents—reported that the guidance they had received on what to do if they had been exposed to COVID-19 was conflicting.[96]

Uncertainty about whether to report to work or quarantine was of particular concern for staff returning from TDY assignments at other BOP facilities to their facilities of record.  As we discussed above, the BOP utilized TDY staff to assist some facilities in their response to COVID-19, including at locations with high COVID-19 transmission.  During our inspections, some staff reported concerns about the risk of COVID-19 transmission from TDY staff returning to their home facilities.  Our inspection of FCC Oakdale found that staff returning from March 2020 TDY assignments in New York City, one of the areas hit hardest by COVID-19 at the time, were not initially given instructions about quarantine procedures and reported to work before being told to return home and quarantine for 14 days.  Seven 2020 BOP Staff Survey respondents reported that TDY staff members returning from locations with high COVID-19 transmission were not required to quarantine.  Similarly, in eight complaints submitted to the OIG in April and May 2020, complainants alleged that TDY staff returned to work without quarantining upon return to their primary work locations.  Staff confusion about appropriate quarantine practices for returning TDY staff continued through 2021, as only 44 percent of 2021 BOP Staff Survey respondents reported that guidance on quarantining staff following TDY assignments or official travel was easy to understand and that their facility followed communication and guidance on this issue.

The BOP's guidance for staff members returning to work from COVID-19 related TDY assignments evolved throughout the pandemic and likely contributed to staff's reported confusion.  Between April and September 2020, the BOP issued three versions of guidance for staff returning from COVID-19 TDY assignments that included instructions on whether to report to work for both facility and non-facility staff in various scenarios (for a scenario example, see Table 5 below).  For some staff members, the BOP's guidance on whether to report to work or take leave and quarantine at home changed each time the BOP updated its guidance.  For example, we identified that an asymptomatic Correctional Officer returning from a TDY assignment working on a quarantine unit at a facility with active COVID-19 cases to his or her home facility with no active COVID-19 cases would have received the instructions presented in Table 5.

---

[96]  Overall, 19 percent of federal institution respondents (1,750 of 9,163) and 14 percent of Central and Regional Office respondents (97 of 693) reported that they had received conflicting guidance.

**Table 5**

**The BOP's TDY Guidance, May–September 2020**

| Scenario | Date | Applicable BOP TDY Guidance |
|---|---|---|
| An asymptomatic Correctional Officer returns from a TDY assignment working on a quarantine unit at a facility with active COVID-19 cases to their home facility with no active COVID-19 cases. | April 9, 2020 | Report to work.[a] |
| | May 20, 2020 | Stay at home and use 10 days of Weather and Safety Leave. |
| | September 11, 2020 | Stay at home and use 14 days of Weather and Safety Leave.[b] |

[a]  The April 9, 2020 guidance stated that Wardens could decide, contingent on staffing needs, to place an asymptomatic staff member returning from TDY on home quarantine for 14 days if he or she had been identified as a prolonged close contact of a COVID-19 positive case *and* did not have the appropriate PPE or had experienced a breach in PPE.  The guidance further stated that staff who fit this category did not need to wear a face mask if a temporary job modification for a 14-day period could be provided to permit the staff member separation of greater than 6 feet from other individuals.  On April 15, 2020, the BOP mandated that all staff and inmates would wear BOP-provided face coverings.

[b]  The September 11, 2020 guidance stated that an asymptomatic staff member who had been assigned to a quarantine unit, isolation unit, hospital duty, or inmate transport while on TDY "shall be placed on Weather & Safety Leave for 14 calendar days, unless otherwise determined by the [Warden] of their home institution (because of staffing needs)."

Source:  OIG analysis of the BOP's 2020 TDY guidance

We found that during the pandemic there was uncertainty throughout the BOP about where to direct questions regarding leave and reporting to work.  Concerns about use of leave and leave guidance were among the most common issues that staff raised in their calls to the BOP's COVID-19 staff support line, which we discuss below.  At Central Office, the Human Resources Management Division was primarily responsible for the dissemination of guidance, which was largely derivative of OPM or DOJ guidance, about types of leave available to employees while the Health Services Division generally disseminated health guidance developed by the CDC.  According to an official at the Occupational Health and Safety Branch within the Health Services Division, it was challenging for the branch to monitor updates to CDC guidance and the branch did not receive alerts when the CDC updated its guidance.

During interviews, BOP Occupational Health and Safety Branch staff told us that there had been constant challenges and areas of confusion regarding the use of leave for quarantine or isolation purposes and that it often referred those questions to the Human Resources Management Division.  Despite these reported referrals, Human Resources Management Division staff advised us that they were unaware of staff members' confusion about leave during the pandemic and that facility staff concerns about leave were typically directed to the Regional Offices.  Our analysis of call logs documenting calls made to the staff support line found that Central Office employees working on the staff support line often advised callers to consult their facilities regarding questions about leave and reporting to work.  However, only 50 percent of 2021 BOP Staff Survey respondents reported that their facility followed guidance on the use of leave for

COVID-19 reasons.  Based on persistent BOP staff confusion about guidance on leave issues and differing directions about whom staff should consult, the BOP should clarify to staff where to direct leave inquiries.[97]

### The BOP Should Better Communicate Support Options to Staff

We found that the BOP could have better communicated the support options available to staff during the pandemic.  The primary support options available to BOP staff during the pandemic include:  (1) the Employee Assistance Program (EAP), which "provides employees and their family members with access to resources that help address work-related problems, traumatic incidents, substance abuse, mental illness, and other personal problems"; (2) a COVID-19 staff support line maintained by the BOP Central Office; and (3) Crisis Support Teams, which provide peer support to staff in response to critical incidents.[98]  We found during our remote inspections that some facilities took actions to mitigate the effects of the pandemic on staff well-being.  For example, management at contract prison Correctional Institution (CI) Moshannon Valley instituted morale and welfare teams composed of local staff to check on the well-being of staff and inmates during the pandemic.[99]  Additionally, staff at three facilities we inspected told us that Crisis Support Teams were available to provide emotional support to staff.  However, the BOP modified the support options available to staff during the pandemic, including changing EAP providers and creating and eventually discontinuing the COVID-19 specific 24-hour staff support line.  Below, we discuss the support options available to staff during the pandemic:

- **EAP:**  In December 2020, the BOP switched to a new EAP provider to provide enhanced resources to staff.  BOP staff had expressed concerns about the effectiveness of the previous EAP provider the BOP utilized during the first 8 months of the pandemic.  Although we did not assess the quality of EAP services as part of this review, a 2021 GAO report recommended that the BOP collect EAP participation and cost data in a more timely manner and routinely collect and evaluate feedback on its EAP.[100]  The BOP Central Office announced the new EAP provider's services using several methods, such as a video message from the then BOP Director, a written announcement posted to the BOP's intranet, and virtual training.  Of the 98 percent of 2021 BOP Staff Survey respondents who reported that they had heard of the EAP, approximately three-quarters stated that they had not used it.

---

[97]  In response to a draft of this report, the BOP stated that, following the issuance of the GAO's July 2021 report regarding the BOP's COVID-19 response, the BOP adjusted its annual employee feedback survey to include two new questions related to staff perspectives on its COVID-19 guidance as of December 2021.  The BOP stated that it has analyzed the results of this survey and is continuing its communication strategy for COVID-19 guidance based on those results.  See GAO, *BOP Could Further Enhance Its COVID-19 Response.*

[98]  In response to a draft of this report, the BOP stated that it changed the name "Crisis Support Team" to "Correctional Support Team" (CST).  In this report, we refer to Crisis Support Teams to reflect the period of our review.  The BOP stated that it has restructured CSTs to place more emphasis on regional involvement in oversight of and communication with facility CSTs.

[99]  DOJ OIG, *Remote Inspection of Federal Bureau of Prisons Contract Correctional Institution Moshannon Valley, Operated by the Geo Group, Inc.,* E&I Report 20-097 (August 2020), oig.justice.gov/reports/remote-inspection-federal-bureau-prisons-contract-correctional-institution-moshannon-valley.

[100]  GAO, *BOP:  Opportunities Exist,* 41.

- **COVID-19 Staff Support Line:**  From April through December 2020, the BOP made a 24-hour COVID-19 staff support line available for facility staff to discuss their concerns with a BOP staff member. Central Office psychologists and chaplains took turns fielding staff support line calls in 24-hour shifts.  Central Office staff told us that support line staff elevated some of the concerns that callers raised to BOP leadership, with caller consent.  While the BOP updated its announcement about the activation of the COVID-19 staff support line on its internal employee website on April 3, 2020, 36 percent of facility staff respondents to our 2021 BOP Staff Survey had not heard of the staff support line.[101]  Further, our review of staff support line call logs indicated that some staff were unclear about how the support line worked.  Moreover, the BOP's COVID-19 Pandemic Response Plan as of September 7, 2021, incorrectly listed the staff support line as an available resource for staff over 9 months after the line had ended.  While the then BOP Director's April 2020 announcement stated that vocalizing concerns was a better way for staff to cope with pandemic stress than not speaking about them, his December 2020 message about the support line ending encouraged staff to contact an email box about their future COVID-19 concerns.

  We found that the staff support line generally served as a useful source of support for staff who used it during the pandemic and that, overall, the number of staff calls to the support line decreased over time.  Specifically, 74 percent of 2021 BOP Staff Survey respondents who called the staff support line reported that they found it to be helpful.  Additionally, call log summaries indicated that callers expressed appreciation for the staff support line, which helped multiple callers resolve issues by sharing resources or providing guidance and support.  However, the staff support line was available to staff for only about the first 8 months of the pandemic; a Central Office official told the OIG that the new EAP provider effectively replaced the support line.

- **Crisis Support Teams:**  BOP data indicated that there were 289 Crisis Support Team activations in 2020, including 58 activations as a result of the pandemic.  According to a psychologist at one BOP facility we inspected, a Crisis Support Team provided facility staff with resources related to mental health, childcare, and community services.  A Central Office official explained that during the pandemic it was challenging to fully implement the Crisis Support Team peer support model, which entails peer support staff walking throughout facilities and talking to staff members, due to staff movement restrictions and limited face-to-face interactions.  Lastly, 84 percent of 2021 BOP Staff Survey respondents reported that they had heard of Crisis Support Teams but had not used them, while 9 percent reported they had used them and found them helpful.

---

[101]  In response to a draft of this report, the BOP stated that its current EAP provider offers in-the-moment crisis support for staff similar to what was provided through the COVID-19 staff support line.  The BOP stated that its recently negotiated Staff Wellness and CST policies emphasize communication and training with staff regarding available support services to help staff develop skills to maintain wellness during a public health emergency.  Additionally, the BOP stated that the Psychology Services Branch created materials to be used in person and virtually so that they may be available for staff during future public health emergencies.  Finally, the BOP stated that it has built a page on its employee intranet site for all staff safety and support services and that it would be rolled out in conjunction with the official release of three staff safety and support policies.  We did not assess the draft policies in this review.

*Conclusion*

Ongoing staffing shortages during the sustained COVID-19 pandemic had a significant and negative effect on staff morale.  Staffing shortages have contributed to staff workload responsibilities and the BOP's use of overtime, staffing augmentation, and reliance on TDY staff during the pandemic.  While this report does not make new recommendations for the BOP to address its ongoing staffing shortages, the GAO's February 2021 report recommendations to the BOP represent important next steps for the BOP to continue its efforts to address staffing challenges.[102]  In addition, BOP staff often expressed concerns and confusion regarding guidance about leave and quarantine procedures, highlighting the need for the BOP to provide clear guidance.  Additionally, 2021 BOP Staff Survey respondents chose mental health resources as one of the top five areas that the BOP should seek to improve, which, when combined with reports of staff unawareness about the staff support line and incorrect BOP guidance about its availability, highlights the need for the BOP to better communicate support options available to facility staff.  Clearly communicating staff support options, namely those the BOP described that it recently expanded, including the current EAP provider's crisis support services, the restructured CST, the intranet page for staff safety and support services, and the staff wellness materials, should help enable staff to take full advantage of all the resources available to them.

*Recommendation*

To improve staff support during public health emergencies, we recommend that the BOP:

5.  Assess methods to engage with staff during public health emergencies to ensure that the BOP provides sufficient staff support and clearly communicates support options available to staff.

## The BOP Should Improve Its Communication of Essential Information to Stakeholders

We identified a significant deficiency in the BOP's communication with inmates' families regarding COVID-19 related serious illness notifications.  We also received numerous complaints about the BOP's communications with the public, inmates, and other stakeholders, including complaints from inmates' attorneys, about the BOP's lack of transparency regarding its management of COVID-19 inside facilities and the information it shared on its public website.  Additionally, our remote inspections of particular facilities identified communication failures at some facilities that inhibited the ability of those facilities to fully respond to the COVID-19 pandemic, while other remote inspections found that facility leadership was proactive and clear in communicating with staff and inmates.  The BOP should strengthen its overall communication as the pandemic continues and for future public health emergencies.  In The BOP Should Take Appropriate Steps to Address Staffing Shortages and Staff Morale section above, we discussed the BOP's challenges and issues in communicating with BOP staff.  In this section, we discuss the BOP's communications with inmates, families of inmates, contract facilities, crime victims, and the public.  We discuss concerns regarding the BOP's communication with inmates' attorneys and further discuss inmate access to counsel in The BOP Should Respond to Ongoing Pandemic Challenges and Prepare for Future Public Health Emergencies section.

---

[102]  GAO, *BOP:  Opportunities Exist,* 41.

## The BOP Should Improve Its Procedures for Notifying Families About Inmate Serious Illness

During our remote inspections of BOP facilities, we found that facilities did not always comply with the BOP's policy to promptly notify families when an inmate develops a serious illness.[103]  The BOP's Patient Care policy requires facilities to "promptly" notify the family of an inmate with any serious illness that it is of "immediate concern" to the family.[104]  In the case of an inmate death, the BOP requires facilities to notify family of the deceased in the same manner as a serious illness notification; the Warden or designee must call the designated person listed in the deceased inmate's Acknowledgment of Inmate Form, BP-A0408, "immediately" to inform him or her of the circumstances surrounding the death and "as soon as practical" must also mail a condolence letter to the inmate's family advising them of the circumstances of the death.[105]

We reviewed 49 cases of inmates who died of COVID-19 between April and July 2020 at 4 of the BOP-managed facilities we inspected:  FCC Butner, FCC Coleman, FMC Fort Worth, and FCI Terminal Island.  We found that, in just under a third of the inmate deaths we reviewed, facilities took more than 3 days to attempt to notify family of the inmate's serious illness, including complicating factors related to COVID-19 infection.  Although the BOP's Patient Care policy does not specify a timeframe for prompt notification of serious illness, we believe that these instances of attempted family notification that took the BOP more than 3 days do not represent prompt notification as intended in the policy.  For notifications of inmate deaths, in almost all of the cases we reviewed the inmates' family was notified within 1 day of the inmate's death.

### *BOP Guidance on Family Notification*

The BOP's Patient Care policy outlines the effective delivery of medically necessary healthcare in order to preserve and extend the life of inmates in BOP custody.[106]  Consistent with that goal for seriously ill or dying inmates, the policy states that an inmate's serious illness is of immediate concern to the inmate's family and requires the facility to notify the inmate's family "promptly."  However, the policy does not include a standard definition for what constitutes a serious illness, a standardized procedure for how to determine whether and when a serious illness is deemed to be of immediate concern to an inmate's family, or a timeframe for prompt notification.  The procedure for family notification of an inmate's serious illness begins with the Health Services Unit, which is responsible for notifying the Warden and Chaplain by phone or in person of the inmate's condition.  Then the Warden or designee will arrange notification of the inmate's family.  The Patient Care policy also directs facilities to develop supplemental guidance incorporating the specific information covered in the policy's Serious Illness and Death Procedures section. These supplements can include specific definitions, steps to take, timeframes, and assignment of responsibilities.

---

[103]  In this report section, we use the term "family" to describe the next of kin or the individual listed in the BOP's Acknowledgment of Inmate form.

[104]  BOP Program Statement 6031.04, Patient Care, June 3, 2014, www.bop.gov/policy/progstat/6031_004.pdf (accessed July 12, 2022).

[105]  BOP Program Statement 5553.08, Escapes/Deaths Notifications, January 4, 2017, www.bop.gov/policy/progstat/5553.08.pdf (accessed July 12, 2022).

[106]  BOP Program Statement 6031.04.

The BOP has an additional, more detailed policy on handling notification in the case of an inmate death. The BOP's Escapes/Deaths Notifications policy requires timely notifications to a variety of interested parties, including family members.[107]  Upon an inmate's death, the Warden or official designee is responsible for contacting the deceased inmate's family, or person named on the inmate's BP-A0408 form, by telephone "immediately" to communicate the circumstances surrounding the inmate's death.[108]  According to the Escapes/Deaths Notifications policy, if the inmate's file does not contain family or a designated person's contact information, Unit Management must attempt to locate and notify family members to determine the disposition of the deceased inmate's remains and property.  The policy further states that the Warden, or designee, is responsible for mailing a letter of condolence "as soon as practical" to the inmate's family advising of the circumstances of the death.

### Delays in Notifying Inmates' Families of Serious Illness Related to COVID-19

Among the cases of inmate deaths related to COVID-19 that we reviewed, we found that the BOP did not always timely notify the family of an inmate with serious illness before the inmate died.  Based on available documentation provided by the BOP, we analyzed 49 cases of inmate death related to COVID-19 and determined that 40 of those inmates (82 percent) were determined to be seriously ill prior to their deaths.[109]  Of the 40 serious illness cases we examined, the BOP attempted to notify 18 families (45 percent) within 0–3 days of the inmate's serious illness and 12 families (30 percent) more than 3 days after the inmate became seriously ill, including 8 families whom the BOP notified over 1 week after the inmate became seriously ill. In six cases, the BOP did not notify the inmate's family of the inmate's serious illness prior to his or her death.[110]  In contrast, when inmates died, the BOP typically notified their families within 1 day of their deaths.  We found a variety of reasons for delays in the BOP's serious illness notification, including staff workload, limited staff access to emergency contact information, inability to contact family, and varying definitions of serious illness, as we discuss further below.

### Staff Workload

FCC Butner, which had some of the longest delays in family notification of inmate serious illness, pointed to staff workloads during the pandemic as a reason for its delayed notifications.  In one case at FCC Butner, an inmate had been in the hospital with respiratory failure for 18 days and on a ventilator for 5 days before the inmate's family was contacted.  In a second case, an inmate had been on a ventilator for 16 days before the inmate's family was contacted.  FCC Butner staff reported that delays in family notification were due to the unprecedented demands on BOP staff during the ongoing public health crisis.  FCC Butner staff reported that they had to set aside their normal duties, including notifying next of kin in the case of inmate serious

---

[107]  BOP Program Statement 5553.08.

[108]  The BP-A0408 form also allows inmates to list additional emergency contacts whom the BOP may contact in the event of an inmate's serious illness or other emergency.

[109]  For those 40 cases, we determined an inmate to be seriously ill if documentation showed that he or she was experiencing respiratory failure, moved to the intensive care unit in the hospital, placed on a ventilator, or determined to be seriously ill by a physician.  For the remaining nine cases, we could not determine whether the inmate was determined to be seriously ill based on the information the BOP provided.

[110]  In an additional four cases of inmate serious illness, BOP documentation did not reflect the exact timeline of the serious illness determination and the family notification of serious illness.

illness or death, to support the emergency medical mission of providing care and security for a large population of at-risk and sick inmates during the pandemic.

### Limited Access to Emergency Contact Information

We found that another cause of delayed serious illness notification was the availability of Unit Team staff with access to inmate emergency contact information found in Section 4 of an inmate's Form BP-A0408.  For example, in one case we reviewed, FCI Coleman staff did not notify an inmate's emergency contact immediately after being notified of the inmate's quickly deteriorating illness.  An Associate Warden at the facility told us that the Unit Team staff, who normally would have reached out to the inmate's emergency contact to offer the contact the opportunity to visit the inmate, had already departed on the Friday evening when the hospital called to report that the inmate's condition was declining.[111]  He also told us that only Unit Team staff have access to the inmate's emergency contact information and that they handle notifications the next business day rather than after hours.  This means that the family of an inmate who becomes seriously ill on a Friday night would not be notified until Monday.  In the FCC Coleman case, the inmate died on Sunday, before the BOP could make a serious illness notification.  An FCC Coleman official told us that, to make after-hours notifications possible, a policy change requiring a Unit Team member to report to the facility after hours would be necessary.  An official at FMC Fort Worth also identified the lack of access to inmate emergency contact information as a problem, noting that delays in staff obtaining the form could result in delays notifying families.

### Challenges Contacting Families

The BOP's Inmate Classification and Program Review policy specifies that a designated BOP staff member verify information in the Acknowledgment of Inmate Form, BP-A0408, which includes emergency contact and next of kin information, at the time of inmate program reviews, which occur at least every 180 days (or at least every 90 days if an inmate is within 12 months of release).[112]  However, we found that BOP staff faced challenges identifying and contacting families, which contributed to delays in their serious illness notifications of inmates' families.  In cases we reviewed, BOP staff described trying a variety of methods to identify and reach family members when they could not reach them using the inmate-provided emergency contact information.  These methods included reviewing pre-sentencing materials, conducting internet searches, and requesting that the local police department attempt to contact the next of kin at the inmate's last known address.  While the BOP's policy on inmate death notifications requires the BOP to attempt to locate next of kin if no one is listed on the inmate's emergency contact form, the BOP's policy on inmate serious illness notification does not require this.  However, the case documents we reviewed indicated that BOP staff members attempted to identify inmates' next of kin for serious illness notifications as well.  For example, at FCI Terminal Island, for 10 days BOP staff attempted to contact family about one inmate's serious illness but were unable to speak to the emergency contact or leave a voicemail at the phone number on file.  Eventually, the FCI was able to contact another family member about the inmate's serious illness as a result of multiple attempts by BOP staff to find next-of-kin information.

---

[111]  A BOP press release indicates that the inmate was placed on a ventilator that day.

[112]  BOP Program Statement 5322.13, Inmate Classification and Program Review, May 16, 2014, www.bop.gov/policy/progstat/5322_013.pdf (accessed February 13, 2023).

We also found cases in which challenges making contact with the listed emergency contact or family member meant that the inmate's family was unable to be involved in making time-sensitive end-of-life decisions.  For example, in one case at FCC Butner, the hospital made end-of-life decisions for an inmate after FCC Butner was unable to reach the inmate's family members.  FCC Butner finally reached the inmate's next of kin after the inmate's death.  At FMC Fort Worth, one staff member told us that inmate emergency contact forms are updated only when an inmate enters the facility, which indicated that inmate emergency contact information could be outdated.

### *Varying BOP Definitions of Serious Illness*

Finally, we found that the four facilities for which we reviewed inmate COVID-19 deaths had varying definitions for what constitutes a serious illness and at what time BOP staff should notify the family.  For example, FCC Butner specifies that a serious illness is one with such severity that it threatens an inmate's life and that the attending physician will make that determination and notify the family.  In contrast, FCI Terminal Island reported that it notifies families only of inmates who are critically ill, specifying that a critical illness is one in which death is considered imminent, as contrasted with a serious illness, which may persist for weeks or months.  An FMC Fort Worth staff member told us that the acting Clinical Director established the threshold between seriously ill and critically ill designations to be when an inmate can no longer make decisions for himself or herself.  Finally, FCC Coleman specifies that if an inmate is diagnosed with a terminal illness family should be notified within 72 hours but does not specify a timeframe for notification in the case of nonterminal illness.  The other three facilities for which we reviewed inmate COVID-19 deaths do not specify timeframes for serious illness notification.

The lack of clear thresholds for serious illness caused delays in the BOP's time-sensitive family notifications. For example, during our remote inspection of FCI Terminal Island, we learned that the facility did not notify the family of an inmate that he had been hospitalized and intubated due to COVID-19 until after the inmate had died.[113]  At the time, Terminal Island staff told us that the facility was not required to notify family members when an inmate was intubated.  However, a Western Regional Office official also told us that, as a result of FCI Terminal Island's failure to notify the inmate's family of his serious illness, the Western Regional Office issued verbal guidance shortly after the inmate's death, followed by written guidance on May 4, 2020, to all facilities in the region stating that they should notify the families of COVID-19 positive inmates who become hospitalized.

The issuance of E.O. 14074 in May 2022 requires the Attorney General to issue guidance to federal law enforcement agencies and other entities responsible for death notifications of persons in correctional or law enforcement agency custody on best practices for timely notification of family members and designated emergency contacts.[114]  Additionally, in May 2022, the Family Notification of Death, Injury, or Illness in Custody Act of 2022 was introduced in the U.S. Senate.  If enacted, the legislation would require the Department to establish policies and procedures to promptly notify family members or emergency contacts

---

[113] "Intubated" refers to endotracheal intubation, a type of medical procedure in which a tube is placed into a patient's windpipe to facilitate breathing.

[114] E.O. 14074.

of the death, serious illness, or serious injury of persons in federal custody, including all inmates in BOP-managed facilities.

*Conclusion*

Overall, among the facilities we inspected there were several instances of delayed notification to families about inmate serious illness and some families did not receive notification of inmates' serious illnesses prior to their deaths.  Although we recognize that the COVID-19 public health emergency put an unprecedented strain on BOP custody and medical staff, the stresses of the pandemic revealed weaknesses in the BOP's guidance and procedures for family notification that must be addressed.  For example, having uniform guidance on what constitutes a serious illness and when staff should notify families in the case of an inmate's serious illness could help ensure that families receive these time-sensitive notifications regardless of the BOP facility in which the inmate is housed.  Additionally, ensuring that family contact information is updated at least every 180 days, as required by policy, and is made readily available to the BOP staff who make family notifications could help the BOP contact inmates' families more quickly and reduce the need for the BOP to take additional steps to find alternate emergency contact or family contact information.

*Recommendations*

To improve its procedures for notifying inmates' families about serious illness related to COVID-19 and other serious illnesses, we recommend that the BOP:

6.  Immediately update guidance regarding (1) when staff should notify the families of inmates who become seriously ill or die, including a specific timeframe, and (2) uniform criteria for what constitutes a serious illness.

7.  Ensure that inmate family information, or the inmate emergency contact form, is updated according to policy and readily available for BOP staff who need to notify next of kin in cases of inmate serious illness or death.

## The BOP Should Improve Its Communication with Other Key Stakeholder Groups

*The BOP's Guidance for Contract Facilities*

During our remote inspections, we found that COVID-19 related guidance that the BOP developed early during the pandemic was delayed in distribution to contract facilities despite being largely applicable to contract prison settings.  Services provided by RRCs (and contract prisons, when in operation) are governed by contractual agreement and carried out by non-BOP personnel, so modified operations require approval from the BOP and new requirements must be formally implemented into contractual agreements.  During the pandemic, contract operators had to determine how BOP guidance would fit within the existing arrangements for services and ensure that they consistently communicated the guidance to facility staff at the over 150 RRCs and 11 contract prisons nationwide. [115]

---

[115]  At the time of our remote inspections, the BOP had contracts with over 150 RRCs and 11 contract prisons.  Following the January 2021 E.O. 14006, the BOP began transferring inmates out of contract prisons as the contracts expired.  The

During our three contract prison remote inspections, we found that contract prison staff implemented strategies outlined in the BOP's technical directions and CDC guidance.  However, between February and April 2020, the BOP's Privatization Management Branch, which provides guidance to and oversight of contract prison vendors, issued guidance, known as technical directions, to contract prisons later than the BOP issued guidance to BOP-managed facilities.[116]  Contract prisons received most of these guidance documents between 1 and 5 days after comparable guidance was issued to BOP-managed facilities, but some delays were more significant.  During our remote inspections, a BOP official asserted that the BOP's underlying contracts with contract prison vendors required the vendors to comply with the CDC's COVID-19 guidance.  Our remote inspections of contract prisons CI Giles W. Dalby, CI Moshannon Valley, and CI McRae found that in early April 2020 the BOP modified its contracts to require contract staff, in the event of an epidemic or pandemic, "to check with the CDC daily for updates and…implement those changes timely to prevent further spread of the disease."[117]  In two of our three contract prison remote inspections, the vendors did not wholly agree with the BOP's interpretation that they should have consulted and implemented CDC guidance before the BOP modified its contracts in early April 2020.  After issuing our remote inspection reports, we found evidence that the BOP continued to issue technical directions to contract prisons regarding COVID-19.  Our three reports concluded that the prompt issuance of guidance to contract prison vendors, even that which reiterates CDC guidance, was vital to the BOP's effective contract prison oversight and ensuring that inmates receive the same quality of care in contract prisons as in BOP-managed facilities.

Whereas contract prison staff generally implemented the protocols and modified operations stipulated in BOP guidance and the COVID-19 Action Plans, the BOP deferred to the RRC contractors in operational decisions on the handling of certain aspects of the pandemic.  The BOP's March 13, 2020 guidance to facilities specifically mentioned sharing the guidance with contract prisons and RRCs "so that similar protocols can be implemented," and the BOP issued additional guidance specific to RRCs.  However, BOP guidance to RRCs did not cover certain key decisions.  For example, there was a lack of specific guidance from the BOP to RRCs to govern the use of personal protective equipment (PPE) and face coverings in RRC general population settings.  Absent such guidance, Toler House RRC required the use of PPE only in certain cases and did not widely distribute masks to its resident inmates for 3 weeks after the CDC

---

BOP's last contract prison contract ended on November 30, 2022 and as of December 1, 2022 all inmates housed in contract prisons had been moved to BOP facilities.  E.O. 14006 on Reforming Our Incarceration System to Eliminate the Use of Privately Operated Criminal Detention Facilities, January 26, 2021, www.federalregister.gov/documents/2021/01/29/2021-02070/reforming-our-incarceration-system-to-eliminate-the-use-of-privately-operated-criminal-detention (accessed November 10, 2022).

[116]  The BOP's contracts with private prisons included a clause defining a technical direction as providing "technical direction on contract performance."  Technical direction does not include "additional work that is outside the scope of the contract" or "action that would cause an increase or a decrease in contract pricing."

[117]  DOJ OIG, Remote Inspection of Federal Bureau of Prisons Contract Correctional Institution Giles W. Dalby, Operated by Management & Training Corporation, E&I Report 20-096 (August 2020), oig.justice.gov/reports/remote-inspection-federal-bureau-prisons-contract-correctional-institution-giles-w-dalby; Remote Inspection of Federal Bureau of Prisons Contract Correctional Institution Moshannon Valley, Operated by the Geo Group, Inc., E&I Report 20-097 (August 2020), oig.justice.gov/reports/remote-inspection-federal-bureau-prisons-contract-correctional-institution-moshannon-valley; and Remote Inspection of Federal Bureau of Prisons Contract Correctional Institution McRae, Operated by CoreCivic, E&I Report 20-098 (August 2020), oig.justice.gov/reports/remote-inspection-federal-bureau-prisons-contract-correctional-institution-mcrae-operated.

recommendation for individuals to wear cloth face coverings while Brooklyn House RRC did not enforce the use of PPE such as masks and gloves for staff and inmates until late April 2020.[118]

Additionally, despite the risk of inmates contracting COVID-19 while using public transportation to travel to and from an RRC, the BOP did not explicitly require RRCs to quarantine asymptomatic inmates either upon entry into custody or departure from the RRC for long-term home placement.  Although there was no explicit requirement, the BOP expressed that its intent was to have inmates quarantine before arrival to the home setting.  Absent any such formal requirement, Brooklyn House RRC did not formally quarantine individuals entering RRC custody or departing to a home placement.  Challenges with the interpretation and implementation of relevant COVID-19 guidance at RRCs and contract prisons underscore the importance of the BOP's communication with these entities during the COVID-19 pandemic and other public health emergencies.

### The BOP's Communication with Inmates

We found that, although the BOP took steps to communicate relevant COVID-19 information to inmates during the pandemic, the reports we received about the effectiveness of this communication varied.  The BOP employed various mechanisms, such as town halls, inmate bulletins, and guidance posters (see an example below), to communicate pertinent COVID-19 information to inmates.  According to interviewees at four BOP facilities we inspected, facility staff hosted weekly town halls to inform inmates about proper hygiene practices, share CDC guidance updates, and explain the status of modified operations.  Inmate bulletins and COVID-19 guidance signs posted throughout BOP facilities and RRCs informed inmates about the prevalence of COVID-19 at the facilities and recommended best practices regarding sanitation and the proper use of PPE.  Staff also provided these resources to inmates housed at BOP facilities via their TRULINCS email accounts, and interviewees at some facilities told us that staff responded to inmate questions sent by TRULINCS email.

---

[118]  DOJ OIG, *Remote Inspection of the GEO Group, Inc.'s Toler House Residential Reentry Center, Newark, New Jersey*, E&I Report 21-007 (November 2020), oig.justice.gov/reports/remote-inspection-geo-group-incs-toler-house-residential-reentry-center-newark-new-jersey, and *Remote Inspection of the CORE Services Group, Inc.'s Brooklyn House Residential Reentry Center, Brooklyn, New York*, E&I Report 21-006 (November 2020), oig.justice.gov/reports/remote-inspection-core-services-group-incs-brooklyn-house-residential-reentry-center.



CDC Guidance Poster Displayed at FCC Lompoc in 2020

Source: www.CDC.gov

During our remote inspection of FCC Tucson, two facility interviewees told us that they thought that the FCC had clearly communicated information to inmates. Respondents to the 2020 BOP Staff Survey from two BOP-managed facilities reported that facility Wardens were proactive in sharing information with inmates. Additionally, our remote inspections of Toler House RRC and three contract prisons found that in general contract facility leadership clearly communicated information to inmates.

However, we received over 185 complaints about deficiencies in the BOP's communication with inmates submitted by inmates, their friends and family, and other complainants.[119]  Further, our analysis of 2021 Inmate Survey results at BOP-managed facilities estimated that 47 percent of the inmates reported that the information they received from the BOP about how to protect themselves from COVID-19 infection was poor, and an estimated 7 percent said that they received no information.  In comparison, an estimated 46 percent said that the information was good or fair, 15 and 31 percent, respectively.[120]  The totality of responses we received from complainants and inmate survey respondents at BOP-managed facilities highlights the importance of communication of information to the inmate population during public health emergencies.

### The BOP's Communication with Crime Victims

We found that the BOP did not always timely notify crime victims during the pandemic.  The BOP issues notifications to victims of crime to provide them with information about specific inmate case events, including an inmate's admission to or release from a BOP-managed or contract facility, transfer to an RRC or home confinement, escape, or death.  The Department's Victim Notification System generates notifications that BOP staff provide to victims via mail, email, or telephone based on victim contact preferences.[121]  We

---

[119]  As noted in the Introduction, we analyzed complaints to identify trends.  Although we did not substantiate or assess the validity of each complaint, we present the thematic issues that we identified in our complaint review to illustrate various stakeholder perspectives about the BOP's response to the pandemic, including concerns about the BOP's communication with inmates and other stakeholders.

[120]  We present inmate survey responses in this report to illustrate the range of views expressed by inmate survey respondents about their experiences during the pandemic.  The number of inmate survey respondents (25,504) represents a fraction of the number of inmates in BOP custody.  Because we applied statistical weights, we refer to the *estimated percentage of inmates* rather than the percentage of respondents.

[121]  The Victim Notification System links the Federal Bureau of Investigation, all Assistant U.S. Attorney's Offices, and the BOP through the DOJ intranet.  The system maintains victim information and makes notification(s) during the arrest, arraignment, prosecutorial, and confinement phases to ensure that victims and witnesses are advised of the significant

found that during the pandemic the number of the BOP's missed or incomplete notifications issued to crime victims increased by 86 percent from April 1, 2020, through March 31, 2021, compared to the same time period of the previous year. There were also 121 delayed notifications that were not completed until after the inmate's release or transfer date from April 1, 2020, through March 31, 2021, a decrease compared to the same time period of the previous year. However, 40 percent of those delayed notifications occurred in the cases of inmates who transferred to an RRC or home confinement under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

The BOP reported that limitations to the Victim Notification System data may have contributed to delayed or missed crime victim notifications. While the system generates notifications automatically, it relies on inmate data updated from the BOP's SENTRY system every 24 hours. As a result, the Victim Notification System may not reflect immediate changes to an inmate's release or home confinement transfer date or be able to generate a notification in the event of an inmate's court-ordered immediate release until after the release has occurred. Late or unexpected changes to an inmate's transfer or release date, such as those that occurred during the pandemic due to accelerated home confinement placements and court-ordered releases, may have affected the BOP's ability to timely notify victims.

Additionally, once a victim is notified about the date of an inmate's forthcoming transfer to an RRC, the Victim Notification System does not generate another notification if the date changes. Unit Team staff at BOP facilities must therefore generate manual notifications for victims when there are changes to an inmate's RRC transfer date, in addition to when there are court orders for immediate release. BOP Central Office officials told us that, during accelerated home confinement placements due to the pandemic, mail notifications might not have reached victims before the inmates were transferred out of BOP facilities. In August 2021, the BOP reported that it was updating the Victim Notification System to reduce errors and limit the need for facility staff to generate manual notifications.

### *The BOP's Transparency and Communication with the Public*

In an April 2021 written statement to Congress, the then BOP Director stated that the BOP had made an effort to be transparent about its COVID-19 operations, plans, and statistics and had published "one of the most detailed and thorough COVID pandemic resource areas across government on its public website." We found that, while the BOP shared and regularly updated relevant COVID-19 information on its public website throughout the pandemic, the information did not always provide a complete picture for stakeholders. Early during the pandemic, the BOP created a COVID-19 resource area on its public website to provide the public with the BOP's plans, operations, and COVID-19 related data. When 2021 BOP Staff Survey respondents were asked to select up to 5 areas in which the BOP most needed to improve its handling of the COVID-19 pandemic, 906 respondents (16 percent) selected "BOP Central Office's communication with the public" as an area for improvement. Additionally, we received OIG Hotline complaints about information posted to the BOP's public website and the BOP's communication with stakeholders.

The BOP first posted COVID-19 related data to its public website at the beginning of the pandemic, and the types of COVID-19 related information that it shared on its public website evolved over time (see Figure 10

---

stages in the criminal justice process. For more information, see BOP Program Statement 1490.06, Victim and Witness Notification Program, May 23, 2002, www.bop.gov/policy/progstat/1490_006.pdf (accessed July 12, 2022).

below).  Press releases reported expanded inmate COVID-19 testing plans, various phases of the BOP's COVID-19 Action Plan, and COVID-19 related inmate deaths at BOP facilities.

### Figure 10

### Timeline of the BOP's Posting of COVID-19 Data to Its Public Website

**March 13, 2020**
• The BOP began publicly posting daily COVID-19 positive inmate cases by complex and staff cases by duty city.[a]

**March 28, 2020**
• The first inmate death due to COVID-19 was reported on the BOP public website.

**April 6, 2020**
• The BOP began publicly posting the number of inmates on home confinement: 5,472 as of January 31, 2022, and 37,503 total from March 26, 2020, through January 31, 2022.

**April 7, 2020**
• The BOP began reporting inmate and staff active cases and deaths due to COVID-19 by facility.[b]

**May 7, 2020**
• The BOP began publicly posting staff and inmate recoveries from COVID-19 by facility.

**June 13, 2020**
• The BOP began publicly posting the number of inmates with completed, pending, and positive tests by facility.

**February 1, 2021**
• The BOP began publicly posting the total number of vaccine doses distributed  to and administered by the BOP, as well as the number of staff and inmates whose vaccine series was completed at a federal facility.

**August 23, 2021**
• The BOP began publicly posting COVID-19 operational levels by facility to display the extent of modified operations.

[a]  "Complex" includes facilities with different security levels that are located in proximity.

[b]  The BOP began reporting BOP-wide recoveries from COVID-19 on April 8, 2022.  "Active cases" refers to the number of individuals with lab-confirmed and open cases at a particular complex or facility on a particular day.

Notes:  The BOP posted all of the above statistics for federal facilities.  For RRCs, the BOP reported statistics regarding active and recovered cases, testing, and deaths due to COVID-19 but did not post vaccination statistics.  For private prisons, the BOP reported statistics regarding active and recovered cases and deaths due to COVID-19 but did not post testing or vaccination statistics.

Source:  OIG analysis of BOP data

We observed some limitations in the COVID-19 case, testing, and vaccination data posted on the BOP's website.  Below, we discuss examples of these limitations.

*Case Data*

Although the BOP publishes on its website counts of active and recovered COVID-19 cases among inmates currently in BOP custody and current BOP staff (see the example to the right), it does not publish a cumulative total of COVID-19 cases reported over the course of the pandemic.  The active case counts do not include inmates or staff who recovered or died, and the recovered case counts do not include inmates or staff who die, inmates who have subsequently been released from BOP custody, or staff who have left BOP employment.  These omissions mean that the BOP's publicly posted data does not represent the full extent of cumulative COVID-19 cases among inmates and staff over the course of the pandemic.  Further, the BOP website does not mention that the staff and



Map of Active COVID-19 Cases on the BOP's Website, as of August 16, 2020

Source:  www.bop.gov

inmate recovery data presented excludes inmates who left BOP custody or staff who left BOP employment, which could lead stakeholders to draw incorrect conclusions about the BOP's data.

On October 1, 2020, the OIG released a collection of interactive dashboards relating to COVID-19 in BOP facilities that allow the public to view active and recovered COVID-19 cases and deaths over time for inmates and staff at individual federal facilities and aggregated across all federal facilities, among other data trends.  While this presentation of the BOP's data allows stakeholders to see trends over time, it also highlights the limitations of the BOP's public data.  For example, the OIG's presentation of BOP data on recovered cases shows a decreasing number of recovered inmates over time beginning in late March 2021 because some inmates who recovered from COVID-19 were subsequently released from BOP-managed facilities.  Because of this, the BOP's recovered cases data cannot be used as a cumulative measure of the number of inmates who recovered from COVID-19.

*Testing Data*

Similar issues exist with the BOP's publicly posted data on testing, which also includes only inmates currently in BOP custody.  The BOP publicly posts the following statistics for inmates in current BOP custody:  the number of inmates who (1) have completed testing, (2) have pending tests and no previously completed test, and (3) have ever had a positive test.  However, the published pending inmate test data is not a useful metric for the amount of testing conducted because it counts only the first time an inmate received a COVID-19 test even though inmates have been tested multiple times over the course of the pandemic.  Additionally, the BOP website states that some inmate COVID-19 tests, such as tests performed in local hospitals, for example, are not reported to the BOP.  Further, the BOP reported that it did not publicly post testing data for contract prisons when the BOP housed inmates in contract prisons due to the underlying data not being machine readable.  This omission resulted in stakeholders lacking visibility into testing at BOP contract prisons.  Finally, while in April 2022 the BOP added a note to the COVID-19 testing data section of its public website that it had conducted over 1 million COVID-19 tests for more than 200,000 inmates, the BOP does not publicly share the definitive number of COVID-19 tests that it has administered to inmates.  These limitations result in a lack of complete public data about the BOP's testing effort over the course of the pandemic.

*Vaccination Data*

The BOP publishes data on the logistics of its vaccination progress at BOP-managed facilities, including the BOP-wide cumulative number of doses distributed and administered by the BOP and the number of staff and inmates whose vaccination series was completed by the BOP at each facility.  However, the BOP does not publish data that allows stakeholders to see the proportion of vaccinated individuals at any of the facilities, as the published data displays only the cumulative number of BOP-administered vaccinations completed at each facility.  Unlike the BOP's public testing and COVID-19 case data for inmates, which includes inmates in current BOP custody only, the public vaccination data includes both inmates in current BOP custody and those who have left BOP custody.  Despite this key difference in the BOP's reporting of COVID-19 statistics, there is no explanation on the BOP website that the presented vaccination totals include inmates who have left BOP custody.  The absence of this explanation could lead stakeholders to draw incorrect conclusions about the BOP's vaccination data.

In addition, the BOP's facility-specific vaccination data reflects only the number of staff and inmate vaccinations completed by the BOP at each facility and does not reflect the number of fully vaccinated inmates and staff currently at that facility.  It also does not include vaccinations completed in the community;  namely, the data does not include inmates who received full vaccinations prior to entering BOP custody or who received the vaccine through community resources at an RRC, contract prison, or while on home confinement.  As new inmates may have received full vaccinations prior to entering BOP custody, the BOP's decision to publicly share vaccination data only for those whose vaccination series was completed by the BOP may make it increasingly difficult for stakeholders to glean useful, complete insights from the BOP's public vaccination data about individual facility vaccination levels.  On May 25, 2022, President Biden signed E.O. 14074, which directed the Attorney General to undertake several actions, which include expanding the sharing and publication of BOP data on vaccination, testing, infections, and fatalities due to COVID-19 "in a manner that ensures the thoroughness and accuracy of the data; protects privacy; and disaggregates the data by race, ethnicity, age, sex, disability, and facility."[122]  Compliance with this Executive Order offers the BOP the opportunity to reassess the data that it publishes and to address the limitations we have identified here.

The OIG's collection of [interactive dashboards](#) includes OIG-estimated percentages of fully vaccinated inmates across BOP-managed institutions based on inmate vaccination data that the OIG receives from the BOP weekly.  The dashboards also display the distribution of inmate vaccination percentages by BOP-managed facility.

### Attorney and Judicial Concerns Regarding BOP Communication

We learned of reports from defense counsel representing inmates housed at BOP facilities that the BOP did not always provide them with transparent information during the pandemic.  For example, defense counsel representing inmates at one BOP detention center that we inspected alleged that there was a lack of transparency about how the facility was managing its response to the COVID-19 crisis and that facility legal counsel did not answer questions about inmates.  In a separate interview with representatives from the Federal Public and Community Defenders, attorneys alleged that the BOP was not transparent about some of the terminology used on its public website and that the BOP's information about its selection of inmates

---

[122]  E.O. 14074.

for home confinement and compassionate release had not been transparent.  To ensure access to current and accurate information about two facilities' responses to the pandemic, a judge for the Eastern District of New York issued an April 2020 order that required the Wardens of MDC Brooklyn and Metropolitan Correctional Center (MCC) New York to provide biweekly status updates on their facilities' responses to COVID-19 to the court, the Executive Director of the Federal Defenders of New York, and the U.S. Marshals and U.S. Attorneys for the Eastern and Southern Districts of New York.[123]  We discuss inmate access to counsel in detail in The BOP Should Respond to Ongoing Pandemic Challenges and Prepare for Future Public Health Emergencies section of this report.

### Conclusion

Although we acknowledge that the BOP has taken steps to proactively and transparently communicate with stakeholders during the COVID-19 pandemic, we identified weaknesses in the BOP's communication with key stakeholders and believe that the BOP needs to continue to find ways to more effectively communicate with all of its stakeholders.  The totality of information about the BOP's communication during the pandemic that we received highlights the need for the BOP to improve its communication of information to stakeholders during current and future public health emergencies.  While the BOP should assess its communication with all stakeholders, we make one specific recommendation to the BOP regarding its communication with crime victims, in addition to the recommendation regarding family notification above.

### Recommendation

To improve its procedures to notify crime victims, we recommend that the BOP:

8.  Implement processes to ensure timely crime victim notifications, even under emergency conditions such as during a pandemic.

## The BOP Should Provide Clear Guidance on the Use of Healthcare Protective Equipment and Compliance with Healthcare Safety Guidance

The BOP reported that, while it was initially affected by the same supply shortages as the rest of the nation, it has since amassed sufficient quantities of PPE.  According to the former BOP Director's congressional testimony and Central Office officials we interviewed, the BOP has since made PPE available to its facilities.  Staff concerns and confusion early during the pandemic about the BOP's PPE and face covering requirements appear to have decreased over time.  However, the BOP faced persistent challenges ensuring staff and inmate compliance with face covering requirements.  We found through our remote inspections and April 2020 BOP Staff Survey results that BOP staff reported multiple challenges regarding access to PPE and other PPE-related issues at the beginning of the pandemic.  For example, 2020 BOP Staff Survey respondents at all 16 facilities we inspected identified more PPE for staff as a top five immediate need.  Additionally, during FY 2020 we received over 130 OIG Hotline complaints concerning an inadequate supply of PPE and face coverings.  However, in our 2021 BOP Staff Survey, facility staff respondents generally reported widespread availability of PPE and face coverings at facilities.  Similar to the PPE supply challenges, the BOP and the nation were affected by limited COVID-19 testing capacity early during the pandemic.  This

---

[123]  As noted in the Introduction, the Department announced in August 2021 that it was closing MCC New York, at least temporarily, to assess steps to improve conditions at the facility.

resulted in long turnaround times for test results, which meant that COVID-19 positive and negative inmates were sometimes housed together for several days, increasing the risk of transmission among them. Further, our remote inspections found that in 2020 some facilities did not properly follow the BOP's quarantine guidance to manage the risk of COVID-19 transmission between inmates awaiting test results. Since then, testing capacity has increased and the BOP added rapid testing options into its protocols, reducing the risk of long wait times for results.

## The BOP Experienced PPE Supply Challenges at the Beginning of the Pandemic

We found numerous PPE-related issues and perceived PPE shortages for staff at the time of our remote inspections in 2020.  For example, our remote inspection of MDC Brooklyn found that some Health Services staff were unable to obtain the necessary PPE to evaluate inmates with COVID-19 symptoms and treat them in medical isolation and Health Services staff told us that they believed the facility had sufficient PPE supplies but did not provide the necessary PPE to healthcare providers.  At FCC Oakdale, we found that some staff lacked the proper PPE when in close contact with COVID-19 infected inmates; according to interviews we conducted, staff concern about access to PPE was so dire after the first inmate tested positive in late March 2020 that PPE supplies were being taken from the complex's medical unit after hours and without permission.  Further, our remote inspections of FCI Milan and FCC Oakdale identified incidents in which staff transported sick inmates to local hospitals without wearing the appropriate PPE.  Additionally, our FCI Terminal Island remote inspection report found that temporary duty (TDY) staff were not fit tested for N95 respirators until days after they arrived at the facility.  By the time we issued our 2021 BOP Staff Survey, however, approximately 95 percent of BOP-wide staff respondents reported that they had been fit tested for an N95 respirator.  Results from our 2021 survey also generally found widespread availability of PPE and face coverings at facilities.

Our remote inspections of BOP contract facilities identified unique PPE-related challenges.  Unlike at federal facilities, PPE supply levels at BOP contract prisons and Residential Reentry Centers (RRC), due to the privatized and decentralized nature of the BOP's contract model, depend on the ability of the dozens of contractors to acquire PPE independently.  We found that for at least 2 weeks supply issues made two of the three contract prisons we inspected unable to comply with an April 3, 2020 CDC recommendation for individuals to wear cloth face coverings in public settings where social distancing measures are difficult to maintain.  Further, our remote inspection of Toler House RRC found that the facility did not distribute face masks to all of its residents until nearly 3 weeks after the April 3 CDC recommendation.  In addition, our Brooklyn House RRC remote inspection found that distribution of PPE at the RRC gradually expanded over the March–May 2020 timeframe and was shaped by both availability of supplies and a lack of PPE guidance.[124]

At the beginning of the pandemic, the BOP maintained a central stockpile of PPE supplies for federal facilities at its Centralized Fill and Distribution Center in Pollock, Louisiana.  By late April 2020, the BOP had created primary and secondary regional logistics sites for all six BOP regions to store PPE and provide PPE to BOP facilities.  The BOP's Administration Division at its Central Office procured PPE and sent it to the regional logistics sites.  Central Office officials told us that they purchased PPE for the regional logistics sites

---

[124]  The BOP did not provide RRCs with specific guidance on PPE and face covering requirements.  We discuss this limited guidance further in The BOP Should Improve Its Communication of Essential Information to Stakeholders section of this report.

in large quantities and never ran out of any PPE supplies.  Internal BOP compliance inspection reports from July 2020 through March 2021 show that 94 percent of the inspected facilities ensured that sufficient PPE was available to all staff.  At the time of our 2020 BOP Staff Survey, most facility respondents (64 percent, or 5,866 of 9,166) reported receiving a limited amount of PPE each week.[125]

BOP facilities requested PPE through Central Office's Emergency Operations Center, which routed the requests to the regional logistics sites; BOP facilities also had the option to purchase their own PPE to bolster availability.  The Central Office monitored PPE levels at the regional logistics sites and facilities daily via an electronic dashboard.  Internal BOP compliance inspection reports found that 96 percent of inspected facilities uploaded PPE inventories to a Central Office dashboard on a weekly basis.  According to Central Office officials we interviewed, the use of the Centralized Fill and Distribution Center and regional logistics sites were effective in the BOP's maintenance and distribution of PPE during the pandemic.  Those officials explained that it would be worthwhile for the BOP to consider replicating in other areas the PPE model that it used during the COVID-19 pandemic.

*Conclusion*

PPE supply challenges affected the BOP early during the pandemic, and our remote inspections found numerous PPE-related issues at BOP facilities, contract prisons, and RRCs.  While the BOP subsequently resolved supply issues to provide adequate PPE to facilities, the BOP should consider how its PPE supply model could support distribution efficiency beyond the current pandemic.

*Recommendation*

To mitigate future PPE supply and distribution challenges, we recommend that the BOP:

9. Determine how the Centralized Fill and Distribution Center and regional logistics sites model could support distribution efficiency beyond the current pandemic.

## BOP Staff Expressed Concerns About PPE and Face Covering Guidance Early During the Pandemic

Though the confusion now appears to have waned, at the beginning of the pandemic BOP staff expressed concerns and confusion about PPE and face covering guidance.  Our remote inspection reports identified instances of unclear BOP guidance and direction regarding the use of PPE.  For instance, staff at FCC Oakdale who supervised COVID-19 positive inmates were not advised that they would be interacting with COVID-19 positive inmates and were not furnished proper PPE prior to inmates' isolation.  By early April 2020, staff at FCI Milan had escorted at least one, and possibly more, inmates with COVID-19 symptoms to a

---

[125]  On April 3, 2020, the CDC began recommending cloth face coverings for situations in which social distancing was difficult.  CDC, "Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission," April 3, 2020.

On April 6, the BOP began issuing two surgical masks per week to all staff and one per week to all inmates as an interim measure while the BOP's UNICOR factories manufactured cloth face coverings.  Once a facility received its shipment of UNICOR-manufactured cloth face coverings, distribution of surgical masks was discontinued.  At the time of our BOP Staff Survey in late April 2020, some staff reported that they were still receiving two surgical masks per week.

local hospital without wearing appropriate PPE, which potentially contributed to an increased risk of those staff contracting and spreading COVID-19.[126]  In our FMC Fort Worth inspection, for example, we found that the Warden sent a memorandum in March 2020 requiring staff to utilize PPE in the isolation unit but did not specify what types of PPE were required.  During FY 2020 we received over a dozen OIG Hotline complaints from BOP staff about the BOP's guidance on the use of PPE.

We found during our 2020 remote inspections that BOP staff were confused about the proper PPE requirements for specific situations.  We received dozens of 2020 BOP Staff Survey responses from staff who believed that they should have received surgical masks or N95 respirators instead of cloth face coverings.  We were also told that the BOP's national union had requested that the BOP provide N95 respirators to all staff at all federal facilities.  The then BOP Medical Director stated that it would have been inappropriate for the BOP to distribute N95 respirators for general use, as the BOP followed CDC recommendations and required N95 respirators for staff only in certain situations, such as when transporting confirmed or suspected COVID-19 positive inmates.  The BOP Occupational Safety and Health Branch Chief explained that, prior to the pandemic, N95 respirators were in plentiful supply and the BOP did not place any limits on when staff could wear them; the BOP's decision to control access to N95 respirators due to more limited supplies during the pandemic was a factor in staff frustration with the BOP's guidance.

According to the then BOP Medical Director, another source of confusion about PPE requirements was that some staff may not have understood the difference between medical isolation and quarantine and why there were different PPE requirements for those two types of units.  Additionally, we believe that a visit to FCC Oakdale by CDC and Office of the Attorney General staff who wore N95 respirators while FCC Oakdale was experiencing a COVID-19 outbreak contributed to BOP staff's perception that the surgical masks provided by the BOP were insufficient.

Some feedback we received from BOP staff indicates that the BOP's guidance about whether staff could wear their own face coverings in lieu of those the BOP provided may have been unclear, particularly during the early phases of the pandemic.  See the photographs below for examples of a BOP staff member wearing PPE, as well as the cloth face coverings manufactured by UNICOR and provided to BOP staff and inmates by the BOP.  Neither the BOP's initial face covering guidance on April 6, 2020, nor the Department's face covering guidance on April 14, 2020, prohibited BOP staff from wearing their own personal face coverings. However, our FCC Coleman remote inspection found that the facility prohibited staff from wearing personal face coverings prior to the BOP's April 15, 2020 guidance mandating that BOP staff and inmates wear BOP-provided face coverings.[127]  This caused confusion among some staff and led to staff concerns that their safety was not a management priority.  Our FCI Milan remote inspection also found that management discouraged staff from wearing their own masks to avoid causing the inmates stress.

---

[126]  The BOP identified inmate transport as a situation in which staff should wear an N95 respirator, eye protection, gloves, and a gown in its April 2, 2020 Vehicle Transport of Inmates Safety Check for COVID-19 guidance and in several versions of its Guidance for COVID-19 Personal Protective Equipment issued in late April 2020.

[127]  As part of our FCC Coleman remote inspection, our review of 2020 BOP Staff Survey responses and OIG Hotline complaints found that some staff and inmates questioned the quality and effectiveness of the BOP-issued surgical masks and UNICOR-produced cloth face coverings, which resulted in some staff wearing personal face masks because they felt that they provided better protection.  See DOJ OIG, *Remote Inspection of FCC Coleman*.

In our 2020 BOP Staff Survey, respondents reported in 34 open-ended comments that they were prohibited from wearing their own masks or face coverings and instead could wear only those that the BOP provided while other respondents reported in 20 comments that they were permitted to wear their own masks or face coverings.  On August 24, 2020, the BOP issued a memorandum to all staff advising that facility staff were permitted to wear only face coverings provided by the BOP or purchased from a BOP



*Left*, A BOP Staff Member Wearing PPE at FCC Lompoc's COVID-19 Staff Screening Location in 2020, *Right,* BOP-Provided Cloth Face Coverings

Source:  BOP, with OIG enhancement

Employee's Club with approval from the Warden.  Despite this guidance, 66 percent of 2021 BOP Staff Survey respondents reported that they were permitted to supply their own nose and mouth coverings.

Confusion among BOP staff about PPE and cloth face covering requirements appears to have waned over the course of the pandemic.  For example, over 90 percent of 2021 BOP Staff Survey respondents said COVID-19 communication and guidance on wearing cloth face coverings and PPE was easy to understand.  Over the course of the pandemic, the BOP continued to update its PPE guidance to staff for specific situations.  The BOP's October 8, 2020 update to its COVID-19 Pandemic Response Plan included a table that described the recommended use of PPE in various situations for both staff and inmates.  Further, the Pandemic Response Plan provided detailed explanations for when staff and inmates should use N95 respirators, surgical masks, or cloth face coverings.

*Conclusion*

We recognize the inherent challenges that the BOP faced as CDC and DOJ guidance on this topic evolved during our remote inspections and over the course of the pandemic.  Nonetheless, reports of staff confusion about PPE guidance early during the pandemic led us to conclude that the BOP should continue to update and clearly communicate guidance regarding PPE and face coverings as circumstances evolve.  Because our 2021 BOP Staff Survey results indicated that staff confusion in this area has declined, we do not make any recommendations in this report regarding PPE guidance to staff.

## BOP Facilities Struggled to Ensure Compliance with Face Covering Requirements

We found that across the BOP there was inconsistent staff and inmate compliance with BOP guidance that required staff and inmates to wear face coverings inside facilities.  As discussed in the Introduction, staff

and inmates were first required to wear face coverings in April 2020.[128]  On August 24, 2020, additional BOP guidance regarding the mandatory use of face coverings for BOP staff stated that employees who refused to wear face coverings and failed to follow a direct order to do so could be referred to the BOP's Office of Internal Affairs for misconduct.  Nearly 95 percent of 2021 BOP Staff Survey respondents reported that they always or often covered their noses and mouths while working in the facilities, but only 82 percent of respondents reported that they observed other staff always or often doing so.[129]  Even fewer respondents (68 percent) reported that inmates always or often covered their noses and mouths.  Similarly, staff and inmate improper use or non-use of PPE and face coverings was a top concern for individuals who submitted OIG Hotline complaints:  the OIG received over 530 complaints related to this issue between March and September 2020.

Our 2021 Inmate Survey also revealed face covering compliance issues.  Results varied depending on reference group:  inmates referring to themselves, to other inmates, or to staff.  An estimated 84 percent of inmates self-reported always or often wearing cloth face coverings over their nose or mouth in common areas.  In comparison, an estimated 53 percent of inmates indicated that other inmates always or often wore face coverings and an estimated 44 percent reported that staff did so always or often.  BOP internal compliance inspections conducted between July 2020 and March 2021 found that only 66 of 90 inspected facilities (73 percent) had appropriate use of face coverings by BOP staff and inmates.  Facilities at which lack of compliance with face covering guidance was observed took corrective actions, including distributing additional face coverings and making regular announcements to remind staff and inmates that face coverings were required.  However, it is unclear whether those corrective actions were effective in increasing compliance.

### Conclusion

To correct persistent face covering noncompliance at facilities, the BOP should assess ways to improve staff and inmate face covering compliance and regularly communicate the need to comply with healthcare protective equipment measures.

### Recommendation

To ensure consistent staff and inmate compliance with face covering guidance, we recommend that the BOP:

10. Assess how to improve staff and inmate compliance with healthcare protective equipment measures at its facilities and issue clear guidance to facilities about the importance of compliance.

---

[128]  On April 6, 2020, the BOP issued initial guidance to Wardens referencing the issuance of face coverings to staff and inmates and directing facilities to issue surgical masks as an interim measure while advising that UNICOR would manufacture cloth masks.  On April 13, the BOP issued its Phase Six Action Plan, which stated that all staff and inmates would be issued appropriate face coverings and strongly encouraged to wear them in public areas when social distancing could not be achieved.  The BOP's April 15 guidance on the Mandatory Use of Face Coverings, sent to all staff via email, mandated that all staff and inmates wear BOP-provided face coverings.

[129]  Seventy-five percent of respondents reported that they always covered their noses and mouths while working in facilities, and 20 percent reported often doing so.

## Some BOP Facilities Did Not Take Required Preventive Measures When Waiting for Inmate COVID-19 Test Results Early During the Pandemic

Our remote inspections generally found that facilities housing BOP inmates complied with COVID-19 testing guidance and that, as testing capacity increased nationally, the BOP incorporated testing into quarantine strategies at its facilities.  (See Appendix 5 for more information on the factors affecting COVID-19 testing practices and availability.)  While increased access to various rapid testing options has since decreased the turnaround time for test results, we found that long turnaround times for results early during the pandemic meant that COVID-19 positive inmates were sometimes housed with COVID-19 negative inmates for several days, especially during the first several months of the pandemic.

> **Federal COVID-19 Testing Report**
>
> In January 2021, the Pandemic Response Accountability Committee, of which the DOJ OIG is a member, published a report on COVID-19 testing efforts at six federal agencies, including the BOP.  For more information about types of tests conducted, testing costs, and demographics of those who were tested, see the committee's *Federal COVID-19 Testing Report*.

The BOP began to conduct COVID-19 tests through a contracted commercial laboratory, as well as through partnerships with public health laboratories, in March and April 2020.  However, receiving test results from these laboratories could take several days.  BOP medical officials told us that the turnaround time for commercial laboratory results was usually 2–4 days but that during late July into August 2020 it was as long as 10–14 days due to increased demand for testing nationwide.  In some instances, the turnaround time limited facilities' abilities to timely separate inmates who had tested positive for COVID-19 from inmates who had tested negative.  Our remote inspection reports on FMC Fort Worth, FCI Terminal Island, FCC Oakdale, and FCC Butner all described situations in which inmates were housed together for up to 7 days before being separated into medical isolation and quarantine units.  This resulted in an increased risk of COVID-19 transmission among inmates, as inmates whose test results were positive could have infected inmates whose test results were negative in the days before the results were received.

In some cases, this risk was exacerbated by the lack of preventive measures taken while awaiting test results.  For example, at FCC Butner, our remote inspection found that, after COVID-19 positive and negative inmates in the Low Security Correctional Institution were separated into housing units based on their test results, the units housing negative inmates were not treated like quarantine units despite those inmates having had close contact with inmates who tested positive for COVID-19.  At FCC Oakdale, inmates waiting for test results still left their housing units for meals instead of having meals delivered to the unit and staff working in the unit were not advised of inmates' positive results or instructed to wear appropriate PPE.  The Regional Medical Director told the OIG that she was "disappointed" with how the situation was handled at FCC Oakdale and, in hindsight, believed that she and the Regional Medical Team should have more explicitly communicated to Oakdale officials their expectation about the protocols to follow during the wait period.

### Conclusion

Compounding the delays due to test results turnaround time, facilities also took additional time to process the test results and develop a plan to appropriately place inmates into medical isolation or quarantine.  Given the logistics involved in ensuring sufficient medical isolation and quarantine spaces, moving groups of inmates safely, and cleaning and sanitizing housing areas between occupants, we recognize that some delays may occur.  However, given the risks associated with further spread of the virus in a communal living environment where staff move between units, ensuring that facilities are following quarantine guidance is

essential for minimizing transmission risk if there are delays.  In response to a draft of this report, the BOP provided updated guidance from its December 2022 COVID-19 Pandemic Response Plan indicating that, because the virus has become endemic, broad-based testing in housing units was no longer required.[130] Additionally, in November 2022, the CDC updated its guidance for management of COVID-19 in correctional and detention facilities to state that facilities should base their quarantine policies on their risk tolerance instead of routinely recommending quarantine for people exposed to someone with COVID-19.  Due to these guidance changes, we do not make any recommendations regarding testing and quarantine guidance in this report.

## The BOP Should Respond to Ongoing Pandemic Challenges and Prepare for Future Public Health Emergencies

Aspects of the BOP's response to the COVID-19 pandemic—vaccination and modified operations at BOP facilities—have evolved over time along with various factors, including COVID-19 case counts and changes to federal guidance and legislation.  For example, the BOP implemented programmatic and operational changes for inmates' daily activities and responded to evolving circumstances surrounding distribution of the COVID-19 vaccine to inmates and staff.

As circumstances evolve, the BOP should continue to ensure inmate access to essential services during modified operations, protect staff and inmate health and safety, and capture lessons learned to prepare for future public health emergencies.  First, the BOP should continue to explore ways to safely accommodate inmate access to mental healthcare, programming, counsel, recreation, commissary, and communication options during extended COVID-19 related modified operations and restrictions at facilities.  Second, to protect inmates and staff, the BOP should continue COVID-19 vaccine educational campaigns for inmates and ensure that inmates and staff have access to the vaccine.  Finally, to prepare for future public health emergencies, the BOP should document best practices and lessons learned from ongoing COVID-19 challenges related to its continued use of modified operations and vaccines.  Capturing lessons learned from these aspects of the BOP's COVID-19 response, which have evolved significantly during the pandemic, should assist the BOP in preparing for future public health emergencies and improve its ability to adapt to changing circumstances, prioritize the health of staff and inmates, and ensure continued inmate access to essential services.

### The BOP Should Safely Accommodate Inmate Access to Services During COVID-19 Modified Operations and Future Public Health Emergencies

BOP facilities, contract prisons, and RRCs around the country modified their operations, tailoring them to the unique circumstances of the facility and the presence of COVID-19 in the surrounding area.  As the period of modified operations continues, the BOP must continue to explore ways to balance COVID-19 prevention with inmate mental health and access to essential services.  Our remote inspections and review of BOP documentation found that the BOP's modified operations resulted in reductions in, or suspension of, programming, recreation, social visitation, and commissary.  In particular, we also identified significant

---

[130]  The BOP also provided a January 2022 memorandum issued to Clinical Directors and Health Services Administrators at all BOP facilities stating that whenever mass testing was being considered at a facility it was important to communicate with the Regional Office to develop a plan based on the facility's specific epidemiological situation. Additionally, the BOP maintains an archive of previous COVID-19 guidance it has issued.

challenges related to inmate access to legal counsel during the pandemic.  Following our remote inspections, modified operations continued to significantly affect most BOP facilities through 2022.  Additionally, as we discuss throughout the following sections, the BOP should document best practices and lessons learned to ensure that it is prepared to accommodate inmate access to these services during future public health emergencies.

As described in the Introduction to this report, in August 2021 the BOP implemented a Modified Operations Matrix Plan that provides guidance on how individual BOP facilities should make modifications to their operations.  The plan allowed for BOP facilities to intensify or relax current infection control mitigation strategies based on local COVID-19 risk factors.  The plan also provided guidance on level-specific infection prevention procedural modifications and generally called for increased modifications at facilities with higher COVID-19 indicators such as medical isolation rates and facility vaccination rates.  According to the BOP's public website, over 90 percent of listed BOP facilities remained under intense modifications, or "Level 3 Operations," as of June 2022.  The BOP directed these facilities to follow its COVID-19 Pandemic Response Plan, which instructed facilities under Level 3 operations to modify congregate activities and advised that virtual methods for such activities were preferred to in-person meetings.

### Inmate Mental Health

As discussed above, inmate suicide in single-cell confinement in quarantine units has been a significant issue during the pandemic and we found that psychology staff had not assessed the suitability of single-cell placement for at least five of the seven inmates who died by suicide in quarantine units.  (Following these suicides, BOP psychological reconstruction reports recommended that psychology staff at one facility complete additional suicide risk assessment training and that two facilities improve opioid withdrawal monitoring.)  The prevalence of inmate suicide in quarantine units underscores the importance of providing inmates with mental healthcare during modified operations when inmates are confined to their cells.  In a March 13, 2020 memorandum issued to facility Wardens, the Reentry Services Division (RSD) Assistant Director stated that facilities must ensure that they prevent mental health emergencies and provide appropriate care to vulnerable inmates.  The memorandum stated that facility psychologists must conduct daily rounds to inmate housing units to observe and communicate with inmates.

Our remote inspections and staff and inmate survey results found varied perceptions of inmate mental healthcare during the pandemic.  Staff at several facilities we inspected told us that, under the Shelter in Place (or lockdown) early during the pandemic, when modified operations were most restrictive, Psychology Services staff generally visited housing units daily to evaluate inmates.  Further, psychologists at several of the facilities we inspected told us that they maintained the provision of mental healthcare to inmates during modified operations.  When we asked 2021 BOP Staff Survey respondents to identify the areas that the BOP most needs to improve in its handling of the COVID-19 pandemic, providing mental healthcare to inmates was the second least selected response out of 15 possible responses, indicating that it was not among the top areas that institution staff felt needed improvement.  However, inmate survey results show that, of the roughly three-quarters of inmates who responded that they had received mental healthcare, a higher proportion of inmates rated the quality of care during the pandemic as poor (an estimated 63 percent) compared to before the pandemic (an estimated 49 percent) and that during COVID-19 lockdowns an estimated 74 percent of respondents rated their mental healthcare as poor.

Although psychologists at two facilities we inspected reported that daily rounds to housing units enabled Psychology Services to have more opportunities to interact with inmates than normal, during our inspection fieldwork we received reports expressing concerns about inmate mental health and access to psychological care.  Specifically, we found that approximately 40 complaints submitted to the OIG detailed concerns about inmate mental health during the pandemic.  In addition, during our remote inspection of FCI Terminal Island, staff told the OIG that the facility managed inmate mental health well, although a 2020 BOP Staff Survey respondent from FCI Terminal Island reported that inmates needed better and more frequent access to mental health services.  As discussed above, BOP psychological reconstruction documentation noted that, at least one facility, quarantine and medical isolation conditions limited access to resources that can prevent suicide, such as peer support, psychology services, and telephones to call family or counsel.

According to Psychology Services staff at some facilities, lockdowns have been very stressful for inmates and could exacerbate some inmates' mental health issues.  The Chief Psychologist at FCC Tucson told us in 2020 that mental health issues could increase among inmates due to the monotony of being in their cells for 22 hours a day.  Moreover, previous OIG work has raised concerns about mental health for inmates housed in such conditions.  Our 2017 report on the BOP's use of restrictive housing for inmates with mental illness noted that the Department defined restrictive housing as "placement in a locked room or cell and the inability to leave the room or cell for the vast majority of the day, typically 22 hours or more."[131]  Further, the report cited BOP policy as recognizing that "an inmate's mental health may deteriorate during restrictive housing placement."[132]  As of February 2023, 6 of the 15 recommendations from our 2017 restrictive housing report remained open, including a recommendation that the BOP evaluate and limit as appropriate the consecutive amount of time that inmates with serious mental illness may spend in restrictive housing.  In May 2022, E.O. 14074 directed the BOP to identify alternatives to the "use of facility-wide lockdowns to prevent the transmission of SARS-CoV-2, or to the use of restrictive housing for detainees and prisoners who have tested positive for SARS-CoV-2 or have known, suspected, or reported exposure."[133]

In the absence of regular programming and group therapy sessions, some facilities provided inmates with mental health handouts, treatment journals, and therapeutic resources.  For example, at FCC Tucson, inmates dealing with mental health challenges were provided with secure audio devices programmed with cognitive behavioral therapy techniques to help inmates cope with anxiety.  We learned following our remote inspections that the use of these devices was widespread at some facilities and that the BOP had awarded a contract to supply these devices at all facilities to complement the FIRST STEP Act (FSA) programming curriculum.

Since RRCs lack medical and psychology staff at their facilities, inmates at RRCs could be at even greater risk of mental health challenges.  At the time of our remote inspections, Brooklyn House RRC and Toler House RRC had switched to remote interactions for mental healthcare.

---

[131]  DOJ OIG, *Use of Restrictive Housing*.

[132]  BOP Program Statement 5310.16, Treatment and Care of Inmates with Mental Illness, May 1, 2014, www.bop.gov/policy/progstat/5310_16.pdf (accessed July 13, 2022), 16.

[133]  E.O. 14074.

*Inmate Programming*

We found that COVID-19 has significantly affected the ability of BOP facilities to provide programming for inmates.  In the BOP's March 13, 2020 Phase Two Action Plan, the Central Office directed facilities to implement modified operations and stated that programs should continue to be operated "when feasible."  During our remote inspections, we learned that certain group programs and community meetings ceased during modified operations in order to maintain social distancing.  Specifically, we were told that the Residential Drug Abuse Program (RDAP) and Mental Health Step Down Unit Program had been discontinued at FCC Butner and our remote inspection of FCI Milan found that Milan had suspended group programming.[134]  Our remote inspections at contract facilities CI Moshannon Valley and CI McRae also identified reductions in programming during the pandemic.  As of April 2021, the BOP reported that it was exploring the purchase of tablets for inmates as an alternative program delivery method and that it would issue a request for proposal for tablets once Congress approved the BOP's FSA spending plan.

We found that disruptions to inmate programming continued at BOP facilities beyond the period of our remote inspection fieldwork.  In August 2020, the BOP issued its Phase Nine Action Plan and its modification, which directed facilities to resume programming, outdoor recreation, and in-person social visits.  The Action Plan stated that "inmate programming is an essential function in our facilities, and delivery of [FSA] approved Evidence-Based Recidivism Reduction (EBRR) Programs and Productive Activities is required by law."[135]  The FSA provides that an inmate who "successfully completes evidence based recidivism reduction programming or productive activities, shall earn time credits" toward prerelease custody (i.e., transfer to an RRC or home confinement) or supervised release (i.e., post-imprisonment supervision).  The BOP's Phase Nine Action Plan stipulated that residential programs, such as the RDAP, would immediately resume full-time treatment, with social distancing modifications, and that delivery of non-residential EBRR Programs and Productive Activities would resume.  However, the guidance also stated that facilities with active COVID-19 cases could make exceptions to programming requirements for the safety of staff and inmates and submit modification requests to the Regional Director.  BOP data indicated that as of November 2020 at least 20 facilities had submitted waiver requests to suspend programming and inmate programming remained suspended at some facilities without waiver requests.[136]  In response to some facilities' waiver requests, Central Office staff provided feedback or discussed the initial waiver

---

[134]  The RDAP provides intensive drug treatment programming to inmates.  The Mental Health Step Down Unit Program provides evidence-based treatment to seriously mentally ill inmates to maximize their ability to function and minimize relapse and the need for inpatient hospitalization.  Inmates enrolled in either program are housed in a secured unit separate from general population housing units.

[135]  The FSA defines an EBRR Program as a group or individual activity that:  (1) has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; (2) is designed to help inmates succeed in their communities upon release from prison; and may include (3) social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills.  In addition, the FSA defines a Productive Activity as a group or individual activity that is designed to allow inmates determined to have a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating.

Pursuant to 18 U.S.C. § 3621(h), "The Director of the Bureau of Prisons shall provide all prisoners with the opportunity to actively participate in evidence-based recidivism reduction programs or productive activities, according to their specific criminogenic needs, throughout their entire term of incarceration."

[136]  The BOP indicated that there were potential errors in the dataset that it provided; the errors may have affected the accuracy of the figure presented in this sentence.

requests with facilities rather than approving them in an effort to encourage programming to continue. Central Office officials told us that, in practice, Wardens have some discretion during the pandemic regarding whether to deliver programming.

Due to the Phase Nine Action Plan's emphasis on the importance of FSA programming, we specifically reviewed available BOP FSA programming data during the pandemic. We found that FSA EBRR Programs and Productive Activities remained suspended at many facilities as of November 2020. In December 2020, a Central Office staff member sent a reminder email to facility program staff to prioritize EBRR Programs and Productive Activities led by BOP staff, contractors, or volunteers and to consider the use of alternative spaces for programming. Among the possible COVID-19 related factors that the BOP reported as contributing to programming disruptions were staff and inmate illness, precautions taken to prevent staff and inmate illness, and limited inmate transfers and movement within facilities. We also learned that staffing challenges affected program offerings; staff unavailability due to temporary job modifications and augmentation contributed to the BOP's inability to run programming at some facilities (we discuss temporary job modifications and staff augmentation in The BOP Should Take Appropriate Steps to Address Staffing Shortages and Staff Morale report section).

The BOP conducted an internal assessment of the COVID-19 pandemic's effect on FSA programming and determined that the pandemic had a high impact on "most programs" because they were "interrupted for a month or more or did not occur with any consistency across sites." The BOP reported that during the pandemic all FSA programming either fit this description or was moderately affected by COVID-19, meaning that it "may have stopped for a period of days or weeks but then quickly resumed." According to the BOP's internal assessment and our interview with a BOP official, while residential programming such as the RDAP was affected by the pandemic, it was generally less affected than nonresidential programs because services were provided in housing units and did not require inmates to interact across housing units. Historical data provided by the BOP showed an overall decline in inmate program participation through March 2021, compared to pre-pandemic participation. The data also showed marginal increases in program enrollment several times during the pandemic beginning in August 2020, when the BOP issued Phase Nine Action Plan directives to resume the program. Figure 11 below shows inmate program enrollment in the RDAP before and during the pandemic.

The significant disruption of FSA programming is concerning given the potential effects on the ability of inmates to earn time credits. According to a November 2021 OIG Management Advisory Memorandum, BOP data as of March 30, 2021, indicated that nearly half (60,146 out of 123,186) of all inmates in BOP custody were eligible to earn time credits if they had completed EBRR Programs or Productive Activities.[137]

We found that the BOP has experienced challenges in systematically tracking inmate enrollment in other FSA programming, which has made it difficult to fully assess the effect of the pandemic on BOP-wide inmate program participation. According to the BOP, there is no mechanism to compare pre- and post-pandemic FSA program participation rates because the BOP changed how it tracks program participation following

---

[137] See DOJ OIG, *Management Advisory Memorandum: Impact of the Failure to Conduct Formal Policy Negotiations on the Federal Bureau of Prisons' Implementation of the FIRST STEP Act and Closure of Office of the Inspector General Recommendations*, E&I Report 22-007 (November 2021), oig.justice.gov/reports/management-advisory-memorandum-impact-failure-conduct-formal-policy-negotiations-federal.

passage of the FSA.[138]  Further, the BOP reported that, when it began to develop reports to track inmate program participation in and completion of EBRR Programs and Productive Activities during the pandemic, it took months to create and test the reports for data accuracy.  The BOP was able to provide us with FSA programming participation totals beginning in November 2020, 8 months after the start of the pandemic. As shown in Figure 12 below, FSA program enrollment in FSA EBRR Programs and Productive Activities increased between November 2020 and October 2021.

Figure 11

BOP Inmate Participants in RDAP Programming, January 2020–March 2021

Figure 12

BOP Inmate Participants in FSA EBRR Programs and Productive Activities, November 2020–October 2021



Note:  This figure presents the total number of participating inmates as of the last day of each month.

Source:  OIG analysis of BOP data

Source:  OIG analysis of BOP data

In addition, we found that some facilities housing female inmates did not have any inmates complete gender-specific programming for significant periods of time during the pandemic, based on our review of available EBRR Programs and Productive Activities programming completion data.  We reviewed completion data from 10 Productive Activities that were intended to occur at all-female facilities from January 15 through September 30, 2020, and found that there were 0 inmate program completions for half (5 of 10) of those Productive Activities.  During the subsequent 6-month period, program completion totals remained at 0 for 3 of the 10 Productive Activities for which the listed locations were all-female facilities.  Although the data did not cite COVID-19 as the reason for the lack of completions, we are concerned that the BOP's female inmate population has not received essential programming in several areas during the pandemic. The programs with zero completions for female inmates included curricula to address cognition, trauma,

---

[138]  The FSA, which was passed in December 2018, requires that, after 2 years of the FSA's enactment, the Department submit to Congress information on the types and effectiveness of recidivism reduction programs and productive activities provided by the BOP, including the capacity of each program and activity at each prison and any gaps or shortages in the capacity of such programs and activities.

mental health, and anger issues.  We identify this lapse in programming completions for female inmates during the pandemic in light of concerns described in our 2017 review of the BOP's management of its female inmate population, which found that the BOP's programming and policy may not fully consider the needs of female inmates.[139]  It is important for the BOP to ensure continued access to programming for female inmates during the pandemic.

### *Legal Visiting*

Our remote inspections generally found that the BOP facilitated inmate access to legal calls with counsel at facilities we inspected but that it experienced some challenges providing inmate access to counsel visits during the pandemic.  When the BOP directed facilities to suspend all in-person legal and social visits on March 13, 2020, facilities' Unit Teams arranged legal calls for inmates.[140]  During our remote inspection of FCI Terminal Island, facility staff reported that they facilitated inmates' legal communications to the extent possible but legal communication was limited during the pandemic; an attorney representing inmates alleged that the facility was unable to grant inmate legal call requests for a 3-week period.  In August 2020, the BOP's Phase Nine Action Plan provided guidance for in-person legal visits at facilities able to safely conduct such visits, though inmates continued to have the option of visits by telephone or video teleconference (VTC).

According to our 2020 BOP Staff Survey results, 35 percent of BOP staff respondents (BOP-wide, as opposed to from a single institution) and 62 percent of RRC staff respondents (RRC-wide) reported that inmates had access to their counsel when requested, through facility phones, while 54 percent of BOP staff respondents did not know what strategies their facilities employed to facilitate inmate communication with legal counsel. Our analysis of complaints submitted to the OIG Hotline found over 100 complaints from April through September 2020 concerning inmate access to counsel or access to legal materials, including challenges reported by inmates' attorneys attempting to contact their clients.  In addition, our analysis of the 2021 Inmate Survey shows that an estimated 84 percent of inmates who needed to contact their attorney during COVID-19 lockdowns reported that they were rarely or never allowed to do so.  In comparison, an estimated 47 percent of inmate respondents said they were rarely or never allowed to contact their attorney before the pandemic and an estimated 59 percent of inmate respondents said that they were rarely or never allowed to contact their attorney during non-lockdown periods of the pandemic.  These percentages represent approximately 60 percent of all inmates who responded to the survey question regarding access to attorneys; the other 40 percent either did not need to contact an attorney during the three reference periods or declined to answer the question.

Inmates' continued access to legal counsel is especially important at Federal Detention Centers (FDC), where pretrial inmates facing federal charges are typically housed.  When we examined April 2020 BOP Staff Survey responses from the BOP's staff assigned to its detention centers, we found that only 59 percent of respondents (349 of 595) reported that inmates were able to communicate with their attorneys upon

---

[139]  DOJ OIG, *Review of the Federal Bureau of Prisons' Management of Its Female Inmate Population*, E&I Report 18-05 (September 2018), oig.justice.gov/reports/review-federal-bureau-prisons-management-its-female-inmate-population.

[140]  On March 13, 2020, the BOP issued its COVID-19 Phase Two Action Plan, which permitted facilities to accommodate case-by-case requests for in-person legal visits.

request using facility telephones.[141]  Both FDCs that we inspected, MDC Brooklyn and MCC Chicago, received a large volume of legal call requests, and in response to the pandemic the BOP provided tablets or VTC units to facilitate inmate access to counsel and to the courts.[142]  At MDC Brooklyn, a Unit Manager described the accommodation of inmate legal calls as Unit Teams' greatest challenge during COVID-19, as Unit Team staff had to monitor emails multiple times per day to ensure that inmates had access to counsel.  Following the BOP's issuance of its Phase Nine Action Plan, which provided guidance regarding in-person legal visits, our remote inspection of MDC Brooklyn found that the facility resumed in-person legal visits by appointment in September 2020 while continuing to conduct most visits by telephone or VTC.  As mentioned above in the Attorney and Judicial Concerns Regarding BOP Communication section, an Eastern District of New York judge issued an April 2020 order that required the Wardens of MDC Brooklyn and MCC New York to provide biweekly status updates to the court and other organizations on their facilities' responses to COVID-19.  During a 2019 inspection and review, the OIG found that MDC Brooklyn failed to provide timely and complete information to inmates' attorneys and the courts about its decision to cancel legal visits during a power outage and conditions inside the facility during the outage.[143]

Although some BOP facilities effectively utilized VTC for virtual attorney-client visits, we found that the BOP did not provide VTC access for attorney-client video visits at all facilities during the pandemic.  While the two detention centers we inspected had tablets or VTC units available for inmate legal calls and access to virtual court proceedings, not all BOP facilities utilized VTC capabilities for these purposes.  Prior to the pandemic, all BOP facilities were equipped with VTC capabilities, though requests to use VTC for these purposes were reportedly rare because inmate-attorney visits generally occurred in person or over the phone while court appearances were generally held in person.[144]  According to a Central Office official, there was a significant increase in requests for attorney-client video visits as a result of the pandemic.  Although the BOP reported purchasing 175 VTC units during the pandemic, the BOP reportedly did not have enough units to support demand.  In addition, the Central Office official told us that there was a need for more staff to help support the increased demand for VTC calls at facilities.

According to the Central Office official we interviewed, facility physical infrastructure challenges limited the BOP's ability to conduct attorney-client video visits at some facilities.  For example, some older facilities needed to add internet ports in rooms intended for VTC use.  Technological limitations at some facilities included insufficient bandwidth that led to poor audio and video quality.  During the pandemic, the BOP initiated a pilot project that sent tablets or laptops for attorney-client video visits to six facilities, including four detention centers.  However, the devices were reportedly unable to hold sufficiently strong mobile data connections at some of the facilities.  Given these reported challenges and the importance of inmate access

---

[141]  For this analysis, we evaluated responses from MDC Brooklyn, MCC Chicago, MDC Guaynabo, FDC Honolulu, FDC Houston, MDC Los Angeles, FDC Miami, MCC New York, FDC Philadelphia, MCC San Diego, and FDC SeaTac.

[142]  DOJ OIG, Remote Inspection of Metropolitan Correctional Center Chicago, E&I Report 21-053 (March 2021), oig.justice.gov/reports/remote-inspection-metropolitan-correctional-center-chicago.

[143]  DOJ OIG, Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates, E&I Report 19-04 (September 2019), oig.justice.gov/reports/review-and-inspection-metropolitan-detention-center-brooklyn-facilities-issues-and-related.

[144]  The BOP uses VTC also for telemedicine, Psychology Services programming, and religious services.

to counsel, the BOP should continue to explore ways to facilitate inmate access to counsel during modified operations at BOP facilities.

*Recreation*

Our remote inspections generally found that the facilities we inspected staggered inmate recreation times, following the BOP's March 13, 2020 Phase Two Action Plan, which required Wardens to implement modified operations at facilities to maximize social distancing.  Inmate access to recreation varied at facilities we inspected and was especially limited during periods of high COVID-19 transmission at the facilities.  For example, inmate access to recreation was suspended during COVID-19 outbreaks at FCC Oakdale and FCC Coleman.

Our 2017 review of the BOP's use of restrictive housing for inmates with mental illness underscored the importance of inmate access to recreation, particularly when inmates are confined to their cells.  As part of that review, the Chief Psychologist at FMC Carswell told us that it is "important for the mental and physical well-being of a person to get sun and fresh air and you cannot do that indoors."[145]  During our COVID-19 remote inspections, Chief Psychologists at two facilities recommended beginning to allow inmates access to the outdoor recreation yard and one of the Chief Psychologists stated that such increased access could mitigate potential mental health issues.  Additionally, 23 respondents to our 2020 BOP Staff Survey identified the ability to grant inmates access to recreation, especially outdoor recreation, as an immediate need.  In June 2020, the then BOP Correctional Programs Division Assistant Director told us that he spoke to Regional Directors about allowing small groups of inmates at facilities with COVID-19 cases to rotate to the recreation yard.  In August 2020, the BOP issued its Phase Nine Action Plan, which stated that recreation yard access would resume for inmates in the general population and for inmates in Special Housing Units consistent with standards outlined in policy.[146]  However, as of November 2020, available BOP data indicated that at least 20 facilities were not holding outdoor recreation.[147]  According to the BOP, outdoor recreation was available to inmates at all BOP facilities as of May 2022.

*Commissary*

Our remote inspections found that at federal facilities and contract prisons commissaries generally remained available to inmates who wished to make purchases during modified operations.  Staff at several facilities we inspected delivered commissary items that inmates had purchased to housing units in order to limit the risk of COVID-19 transmission.  While several of our remote inspections found that there were no disruptions to commissary, temporary commissary suspensions occurred at some facilities, including MDC Brooklyn, FCC Butner, MCC Chicago, and FCC Oakdale, for reasons such as staffing challenges or lockdown considerations.  According to BOP staff we interviewed, some facilities reduced the inmate spending limit on

---

[145]  DOJ OIG, *Use of Restrictive Housing,* 23.

[146]  According to the BOP's Phase Nine Action Plan, general population inmates should have access to the recreation yard at least 3 times per week and inmates in groups of no more than 100 should be able to access the recreation yard for at least 1 hour at a time, provided they remain socially distant from one another.  Phase Nine further stated that facilities with active COVID-19 cases could make exceptions to these programming requirements for the safety of staff and inmates.

[147]  BOP-provided data contained inconsistencies in the number of facilities not holding outdoor recreation.  We state "at least 20" because the BOP could not report the definitive number.

commissary purchases.  We were told that spending restrictions at one facility were intended to reduce the burden on staff working in the commissary, many of whom had other duties.  In addition, during FY 2020 there were over 65 complaints submitted to the OIG Hotline about inmate access to commissary during the pandemic.  Inmates residing at RRCs, who normally would have had the opportunity to make purchases in the community, also had reduced opportunities to do so as these facilities restricted inmate movement because of the pandemic.  For example, during our remote inspection fieldwork we noted that inmates at Toler House RRC were permitted to leave their facility only once per month to pick up medication and hygiene supplies.

### *Inmate Contact with Friends and Family*

Inmates typically have contact with friends and family through in-person social visits, telephone calls, TRULINCS email, and regular mail.  When the BOP suspended social visits on March 13, 2020, it took certain measures to accommodate inmates' ability to communicate with friends and family.  The CARES Act required the BOP Director to "promulgate rules regarding the ability of inmates to conduct visitation through [VTC] and telephonically, free of charge to inmates, during the covered emergency period," if the Attorney General found that "emergency conditions [would] materially affect the functioning of the [BOP]."[148]  In response to an inquiry from Senator Cory Booker regarding the cost of inmate telephone calls and video visits, the BOP reported that, as of March 13, 2020, it had increased each inmate's monthly telephone time from 300 minutes to 500 minutes to help compensate for the lack of visits.[149]  The BOP further reported to Senator Booker that, as of April 9, 2020, telephone calls and video visits were made free of charge to inmates, although, as we explain below, social video visits were available only to certain facilities housing female inmates.  According to a June 2021 BOP Operations Memorandum scheduled to expire in June 2022, the BOP may, on a case-by-case basis, continue to authorize inmates to have visitation through VTC and telephonically, free of charge to inmates.

Our remote inspections found that the availability of communication tools was limited for inmates under modified operations and the amount of time inmates had access to phones and TRULINCS email varied across facilities, from 10 minutes to 3 hours at a time and from 3 days per week to every day.  We also found that temporary suspensions of inmate access to phones or TRULINCS email occurred during our inspections of FCC Butner, FCC Oakdale, and FCI Terminal Island.  Specifically, staff at FCC Butner and FCI Terminal Island told us that there were certain times when they temporarily suspended inmate access to TRULINCS computer terminals and phones in order to limit COVID-19 transmission.  Additionally, a staff survey respondent at FCI Milan reported that having such limited time outside their cells meant that inmates had to choose between calling their loved ones and showering or cleaning the housing unit. Although only 9 percent of 2020 BOP Staff Survey respondents overall said that their facilities had decreased inmates' ability to communicate with loved ones by restricting access to telephones and

---

[148]  On April 3, 2020, Attorney General Barr found that emergency conditions were materially affecting the functioning of the BOP.  The "covered emergency period" refers to the period beginning on the date the President declares a national emergency under the National Emergencies Act (50 U.S.C. § 1601 et seq.) and ending 30 days after the date on which the national emergency declaration terminates.  The emergency period was subsequently extended and remained in effect as of August 2022.

[149]  Michael D. Carvajal, Director, BOP, letter to the Honorable Cory A. Booker, U.S. Senator, April 10, 2020.

computers, we found that this response was selected by nearly half of respondents at one facility that implemented a 14-day lockdown, which was in effect during our entire survey window.

Although the BOP made video visits free of charge to inmates during the pandemic beginning in April 2020, the use of VTC for social visits was available only to certain subsets of the inmate population throughout the pandemic.  Pre-dating the pandemic, the use of TRULINCS video services for social visits at BOP facilities had been available only to the BOP's female inmate population.  BOP officials told the OIG that, as of August 2021, video social visits were not available for all female inmates.  According to BOP data as of May 2022, video social visits were available at 25 of the 27 BOP facilities that house female inmates.  Additionally, we learned that in 2018 the BOP decided not to expand TRULINCS video services to other facilities.  However, according to a Central Office official, the BOP has issued a request for information to explore the expansion of social video visiting at facilities.  The BOP also initiated a pilot program to provide tablets for social video visits to inmates hospitalized with COVID-19 (see the text box).

> **Tablet Pilot Program for Hospitalized Inmates**
>
> During the pandemic, the BOP initiated a pilot program that provided tablets for social video visits to inmates hospitalized with COVID-19.  These tablet video calls were conducted via a secure connection and allowed hospitalized inmates to virtually meet with family members and loved ones who would otherwise have been unable to visit them in the hospital during the pandemic.  In November 2020, the BOP issued a technical bulletin to facilities providing instructions on how to request the purchase of approved tablets for hospitalized inmates.  According to a Central Office official, the pilot program was successful and expanded over time.  The BOP initially provided tablets to 5 BOP facilities, and 17 facilities had received tablets as of June 2021.
>
> Source:  BOP

The BOP's August 31, 2020 Modification of the Phase Nine Action Plan stated that non-contact social visits would restart at BOP facilities no later than October 3, 2020, and outlined COVID-19 mitigation measures such as scheduled visits, social distancing, and sanitation of visiting spaces.  According to the BOP's August 31, 2020 COVID-19 Pandemic Response Plan, an agency-level decision to suspend or resume inmate social visits can be made based on agency- and pandemic-specific circumstances.  The response plan further states that "visitation should not occur at [facilities] with a COVID-19 movement moratorium or when active facility transmission is occurring."

*Conclusion*

We identified disruptions to inmate access to programming, legal counsel, recreation, commissary, and communication options during the period of modified operations because of the pandemic.  The pandemic also heightened the importance of continued inmate access to mental healthcare.  While we do not make specific recommendations in this section, as the period of modified operations continues, we encourage the BOP to explore ways to accommodate inmate access to these essential services and prepare for a transition to normal operations.  In addition, we encourage the BOP to document best practices and lessons learned to ensure that it is prepared to accommodate inmate access to these essential services in the event of future public health emergencies.

## The BOP Should Continue to Ensure that All Inmates and Staff Have Access to the COVID-19 Vaccine

On December 16, 2020, the BOP began administering the COVID-19 vaccine to staff and inmates.  The BOP received, distributed, and administered the vaccine to full-time BOP staff and inmates housed at BOP-managed facilities in collaboration with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation, formerly known as Operation Warp Speed.  The BOP received allotments of the COVID-19 vaccine directly from the CDC, at no cost to the BOP, as part of a memorandum of agreement between the BOP and the CDC.  To distribute vaccines both fairly and efficiently, the BOP developed COVID-19 Vaccine Guidance, which provides direction on vaccine eligibility for inmates and staff.  This guidance was intended to promote vaccine use as a means for controlling the spread of COVID-19 within federal facilities and to protect the health of inmates and staff, as well as outside community members at risk of exposure.  The BOP's COVID-19 Vaccine Guidance identified vaccines as an important tool to stop the pandemic and followed criteria established by the Advisory Committee on Immunization Practices and the CDC.[150]

The BOP offered the vaccine to full-time staff first due to the risk of staff contracting the virus because they travel between BOP facilities and the community.  The BOP then distributed the remaining vaccine doses to inmates based on the priority levels determined by the BOP's COVID-19 Vaccine Guidance.[151]  To guide its decisions surrounding vaccine allocation orders sent to CDC, the BOP established a vaccine allocation subcommittee that developed sub-allocation plans for facilities and relied on its COVID-19 Vaccine Guidance document.  Ultimately, the CDC determined the quantity of vaccines allocated to the BOP in coordination with Operation Warp Speed.  A Central Office Health Services Division official told us that starting in early December 2020 BOP facilities received the vaccine through the sub-allocation process based on priority.  The vaccine supply was very limited at that time, and some facilities had to wait several weeks to receive second doses after initial distributions were received at the facility, according to the Health Services Division official.  The BOP told us that some vaccine shipments initially went to primary BOP facility locations

> **BOP Director Congressional Testimony on Vaccine Status**
>
> As of January 26, 2022, approximately 80 percent of Bureau staff are fully vaccinated, and 70 percent of inmates are fully vaccinated against COVID-19.  The Bureau continues to offer and encourage both booster and primary vaccine doses to all inmates upon arrival at a Bureau facility and to all staff.  We achieved a milestone in the distribution and administration of COVID-19 vaccines, exceeding 288,000 total doses administered, as of January 26, 2022, to staff and inmates.
>
> Source:  Michael Carvajal, Director, BOP, before the U.S. House of Representatives Committee on the Judiciary, "Oversight of the Bureau of Prisons," February 3, 2022

---

[150]  The Advisory Committee on Immunization Practices includes 15 voting members who make vaccine recommendations.  The Secretary of the U.S. Department of Health and Human Services selects members of the committee following an application and nomination process.

[151]  The BOP makes its COVID-19 Vaccine Guidance available to the public for information only, and the guidance may be adapted for the unique situations within federal facilities, according to the BOP's public website.  See, for example, BOP, COVID-19 Vaccine Guidance:  Federal Bureau of Prisons Clinical Guidance, Version 16, January 6, 2022, www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf (accessed July 28, 2022).

in proximity to other BOP facilities and were subsequently transported to the other facilities.  On January 28, 2021, the then BOP Director received a certificate of achievement recognizing the BOP for leading all jurisdictions and federal entities in the rate of vaccination utilization, having the highest percentage of vaccines administered per doses allocated nationally at that time.  On February 3, 2022, the then BOP Director testified at a congressional hearing that, as of January 26, 2022, approximately 80 percent of BOP staff and 70 percent of inmates were fully vaccinated against COVID-19 (see the text box above).  According to the OIG's collection of interactive dashboards, an estimated 71 percent of inmates BOP-wide were fully vaccinated against COVID-19 as of August 2022.[152]

### Inmate Vaccination

The BOP's COVID-19 Vaccine Guidance initially outlined priority levels for inmate vaccination.  These levels prioritized inmates based on factors such as job assignments, certain housing situations, age, and risk factors.  Appendix 7 contains the BOP's March 11, 2021 COVID-19 Vaccine Guidance priority levels for inmates at BOP facilities.  Vaccine priority levels within the BOP's COVID-19 Vaccine Guidance have changed over time in response to the evolving pandemic and the availability of vaccines.  For example, once vaccines became more readily available across the country, the BOP introduced into its guidance booster shots for both immunocompromised and non-immunocompromised inmates after their prospective vaccine series were completed.  By January 6, 2022, the BOP had published Version 16 of its COVID-19 Vaccine Guidance, which eliminated priority levels for inmate vaccination and provided guidance for facilities to offer primary vaccination and a single booster shot to all inmates.  We expect the BOP's COVID-19 Vaccine Guidance to continue to evolve in response to CDC guidance and the ongoing pandemic.

According to the BOP's Patient Care policy, medical treatment, including medication, is generally given only when an inmate consents.[153]  However, certain diagnostic procedures for specific communicable diseases may be required for the protection of all inmates and staff.  In addition, medical treatment, including prescribed medication, may also be required for an inmate if there is a court order in place for a specific treatment plan, if a physician determines that the inmate's life is in danger, or if it is determined that the inmate may pose a risk to others by refusing medical treatment.  Accordingly, the BOP does not require inmates to receive the COVID-19 vaccine.  A Health Services Division official told us that the BOP generally does not require vaccines or medical care for inmates unless court ordered.  The BOP's COVID-19 Vaccine Guidance, Version 11.0, stated that the BOP must obtain documentation of vaccine consent or declination for all staff and inmates.

In the 2021 Inmate Survey, when asked what they would do when COVID-19 vaccinations were available, an estimated 62 percent of BOP inmates were either already vaccinated or planned to receive a COVID-19 vaccine.  An estimated 24 percent of inmates had already declined or would decline to be vaccinated against COVID-19, and an estimated 14 percent were undecided.

---

[152]  This OIG-estimated percentage represents fully vaccinated inmates currently in custody at any BOP-managed facility, regardless of the location of vaccine administration.

[153]  BOP Program Statement 6031.01.

The BOP told us that it encouraged multiple strategies to educate inmates about the COVID-19 vaccine and to increase vaccine use among inmate populations.  These strategies included conducting town halls with inmates to answer frequently asked questions, sending inmates vaccine information through TRULINCS, and ensuring that educational posters were prominently displayed throughout BOP-managed facilities.  To the right is an example of an educational poster that the BOP displayed in BOP-managed facilities.

As of September 30, 2021, the BOP reported that it had administered full vaccinations to 101,806 inmates in BOP-managed facilities.[154]  As discussed in The BOP's Transparency and Communication with the Public section of this report, although the BOP updates the number of total BOP-administered doses and full staff and inmate vaccinations completed, by federal facility, on its public website each weekday, the BOP website lacks information about the proportion of vaccinated individuals at individual facilities.



✸ **Your** Choice ✸

COVID-19 vaccines work- They are **95% effective**.

✸

**Two doses** are needed for the vaccine to work.

✸

**No serious side effects** — Sore arms or headaches were most common.

✸

BOP Educational Poster Displayed in BOP Facilities

Source:  BOP

As discussed in the Introduction, federal inmates and staff located at RRCs and contract prisons (when they were in operation) are referred to community resources, such as state and local health departments, to receive COVID-19 vaccinations.  As of November 16, 2021, the BOP reported that all inmates in contract prisons had been offered the vaccine and that 5,554 inmates housed in those facilities were fully vaccinated.  Figure 13 below shows the total number of inmates whose COVID-19 vaccination series was completed at a BOP facility between February and September 2021.

---

[154]  This metric reflects inmates who either received both doses, or at least the final dose, of the complete vaccine series at a BOP-managed facility.

**Figure 13**

**Total Number of Inmates whose Vaccination Series Was Completed by the BOP, February 2021–September 2021**



Notes:  An inmate is counted as having received a full vaccination series completed by the BOP when he or she has received a complete vaccine series and both doses, or at least the final dose, of the vaccine series were administered at a BOP facility.  Inmates who received all rounds of their vaccination series in the community rather than a BOP-managed facility are not reflected in the data.

Source:  OIG Office of Data Analytics visualization of data collected from the BOP's public website

### *Staff Vaccination*

Prior to initiating inmate vaccinations, the BOP first offered COVID-19 vaccines to BOP staff and U.S. Public Health Service officers assigned to the BOP to decrease the possible introduction of COVID-19 into federal facilities and protect the health of inmates, staff, and local communities.  The BOP's COVID-19 Vaccine Guidance Version 11.0 stated that if vaccine supplies were low the BOP should prioritize staff to receive the vaccine based on job functions that pose a higher risk of transmission of infection.  Table 6 below displays the BOP's employee sub-priorities for staff vaccination, based on the BOP's COVID-19 Vaccine Guidance Version 11.0.

Table 6

BOP COVID-19 Vaccine Guidance:  Sub-Priorities for Employee Vaccination

| First Sub-Priority | **Staff with potential for close contact with sick persons** (e.g., healthcare workers, workers in isolation or quarantine units, and those performing COVID-19 symptom screens and temperature checks) |
|---|---|
| Second Sub-Priority | Staff who are currently on COVID-19 related temporary job modifications |
| Third Sub-Priority | Staff in nursing care units and other residential healthcare units |
| Fourth Sub-Priority | Staff involved in receiving and discharge of inmates at facilities or performing inmate transfer or escort functions |
| Fifth Sub-Priority | Staff with other potential close contact with inmates (e.g., performing pat searches, supervising inmate work details) |
| Sixth Sub-Priority | All other staff |

Source:  BOP COVID-19 Vaccine Guidance Version 11.0, March 11, 2021

Beginning in December 2020, the BOP offered staff and federal inmates the COVID-19 vaccine on a voluntary basis.  As of September 2021, E.O. 14043 required full COVID-19 vaccination for all federal employees, subject to exemptions as required by law, by November 22, 2021.[155]  Additionally, all federal employees were required to upload proof of their vaccination status via an online application.  The BOP had a similar online application for all BOP staff to upload proof of their vaccination status.  The BOP continued to offer and encourage both booster and primary vaccine doses to all inmates upon arrival at a BOP facility and to all staff.  In January 2022, a federal court in Texas issued an injunction against President Biden's COVID-19 vaccine mandate for the federal workforce, pausing implementation of E.O. 14043.  Additionally, a federal employee union filed a lawsuit challenging the vaccine mandate.  The case aims to invalidate the Executive Order and subsequent guidance from the Safer Federal Workforce Task Force and OPM.

As of September 30, 2021, the BOP reported that it had administered full vaccinations to 20,226 BOP staff.[156]  According to our 2021 BOP Staff Survey, 55 percent of staff respondents said that they had been vaccinated prior to the survey, 8 percent said that they would get vaccinated as soon possible, 10 percent said that they might vaccinate at a later date, 9 percent were undecided on their vaccination plans, and 18 percent said that they did not plan to get vaccinated.  Custody staff respondents were more likely to say that they did not plan to get vaccinated (26 percent) compared to 11 percent of Health Services staff respondents who stated that they had no plans to get vaccinated.  In addition to encouraging the display of educational posters in BOP facilities, the BOP reported that it has encouraged staff to ask questions about the vaccine.  Figure 14

---

[155]  E.O. 14043 on Requiring Coronavirus Disease 2019 Vaccination for Federal Employees, September 9, 2021, www.federalregister.gov/documents/2021/09/14/2021-19927/requiring-coronavirus-disease-2019-vaccination-for-federal-employees (accessed November 10, 2022).

[156]  This metric reflects staff who received both doses, or at least the final dose, of the complete vaccine series at a BOP-managed facility.

below displays the total number of BOP staff whose COVID-19 vaccination series was completed at a BOP facility between February 2021 and September 2021.

Figure 14

Total Number of BOP Staff Whose Vaccination Series Was Completed by the BOP, February 2021–September 2021



Note:  A staff member is counted as having a full vaccination series completed by the BOP when he or she has received a complete vaccine series and both doses, or at least the final dose, of the vaccine series were administered at a BOP facility.  Staff who received all rounds of their vaccination series in the community rather than at a BOP facility are not reflected in the data.

Source:  OIG Office of Data Analytics visualization of data collected from the BOP's public website

**Conclusion**

The BOP has promoted the COVID-19 vaccine among inmates and staff and collaborated with the CDC regarding vaccine allotment and distribution.  The BOP has reported that significant percentages of inmates and staff were fully vaccinated as of January 2022.  Additionally, the BOP has updated its COVID-19 Vaccine Guidance based on contemporaneous public health advisements and the BOP began offering primary vaccination and booster shots to all inmates at federal facilities on January 6, 2022.  Given the BOP's efforts to fully vaccinate inmates and staff and promote vaccination, and considering the status of E.O. 14043, we do not make recommendations in this report regarding vaccination.  The BOP should continue to encourage COVID-19 vaccination and assess the effectiveness of its educational campaigns to encourage vaccination in federal facilities.  To prepare for future public health emergencies, the BOP should document best practices and lessons learned from its COVID-19 vaccination campaign.

# Conclusion and Recommendations

## Conclusion

The COVID-19 pandemic tested the BOP's ability to respond to a widespread public health emergency and required the BOP to implement a variety of strategies to increase social distancing inside its facilities and to create spaces for quarantine and medical isolation.  We concluded that the BOP should compile and regularly update best practices it has identified from its COVID-19 response to assist preparations for future public health emergencies.  We also identified serious failures by BOP facilities in their compliance with the BOP's March 2020 guidance on the single-celling of inmates during modified operations and found that the BOP should review existing practices regarding single-celling of inmates, including inmates vulnerable to suicide.  Additionally, we identified several areas for improvement in the BOP's pandemic response regarding processes to protect the health and safety of inmates and staff.  The BOP should address these issues by exploring permanent changes to facility infrastructures to help it more easily implement infection mitigation strategies.

Further, the number of inmates on home confinement increased during the pandemic and the BOP should continue to monitor the effects of this increase on Residential Reentry Center (RRC) providers.  Our remote inspections concluded that, at a number of facilities, the BOP did not fully leverage the home confinement authorities that the BOP was given in the Coronavirus Aid, Relief, and Economic Security Act that could have permitted facilities experiencing COVID-19 outbreaks to reduce their inmate population and thereby assist in mitigating COVID-19 transmission and help with staffing issues.  While we found that, overall, the BOP significantly increased the number of inmates in home confinement during the pandemic, we determined that the BOP should assess how it can most effectively use its home confinement authorities during and after the COVID-19 pandemic, as well as monitor the challenges that can arise related to a significant increase in home confinement use.

Staffing shortages during the pandemic impeded the BOP's ability to provide routine medical care at some facilities and to implement COVID-19 control measures at various facilities.  Staffing shortages also contributed to increased staff workloads and negatively affected staff morale.  We concluded that the BOP needs to better communicate support options to staff working at facilities, which we based on reports of staff confusion regarding the BOP's leave and quarantine guidance, reports of staff unawareness about a COVID-19 staff support line, and responses to our 2021 BOP Staff Survey regarding the BOP's need to improve its provision of mental health resources to staff.

We found also that the BOP should improve its communication of essential information to stakeholders.  First, the BOP must update its family notification processes and guidance to ensure that inmates' families can be appropriately involved in time-sensitive decisions if an inmate becomes seriously ill.  Second, although the BOP took steps during the pandemic to communicate proactively with stakeholders, we received numerous complaints about the BOP's communications with inmates, the public, and other stakeholders, including complaints from inmates' attorneys.  We also identified issues with the BOP's notifications to crime victims and limitations with its website data.

Personal protective equipment (PPE) supply challenges and COVID-19 testing challenges affected the BOP early during the pandemic, and our remote inspections found numerous PPE-related issues at BOP facilities,

contract prisons, and RRCs.  While the BOP subsequently resolved supply issues to provide adequate PPE to facilities, the BOP should determine how its PPE supply model could support distribution efficiency beyond the current pandemic.  We found that BOP staff were confused about PPE and face covering guidance, particularly early during the pandemic, though our 2021 BOP Staff Survey results indicated that staff confusion in this area has declined.  To correct persistent face covering noncompliance at facilities, the BOP should assess how to improve staff and inmate compliance with healthcare protective equipment measures at its facilities and issue clear guidance to facilities about the importance of compliance.  Additionally, we found that long turnaround times for test results when the market for testing supplies was burdened meant that inmates sometimes had to wait several days for test results and some facilities that we inspected did not properly follow quarantine guidance to manage the risk of COVID-19 transmission between inmates awaiting test results.

The BOP should also continue to monitor several ongoing challenges related to its COVID-19 response as circumstances evolve, as well as take additional actions to better prepare for potential future public health emergencies.  We identified disruptions to inmate access to essential services, such as programming, legal counsel, recreation, commissary, and communication options during the period of modified operations.  The BOP should explore ways to accommodate inmate access to these essential services and prepare for a transition to normal operations.  In addition to continuing to ensure staff and inmate access to the COVID-19 vaccine, the BOP should continue to educate inmates about the vaccine and assess the effectiveness of ongoing vaccine educational campaigns.  Finally, to prepare for future public health emergencies, the BOP should document best practices and lessons learned from ongoing COVID-19 challenges related to its continued use of modified operations and vaccines.

## Recommendations

To assist the BOP in managing challenges during and after the COVID-19 pandemic and in mitigating the effects of public health emergencies in the future, we recommend that the BOP:

1.  Conduct a thorough assessment of single-celling policies and processes, including those applicable to inmates housed in quarantine and medical isolation units and to inmates vulnerable to suicide.

2.  Ensure that actions, including any policy revisions, the BOP takes to close the two open recommendations from our 2017 restrictive housing report that reference single-celling also apply to single-celling during quarantine and medical isolation.

3.  Compile and regularly update best practices for addressing space limitations to meet social distancing, quarantine, and medical isolation needs.

4.  Explore options for permanent changes to facility infrastructures that would allow for better implementation of social distancing and other infection control measures.

5.  Assess methods to engage with staff during public health emergencies to ensure that the BOP provides sufficient staff support and clearly communicates support options available to staff.

6.  Immediately update guidance regarding (1) when staff should notify the families of inmates who become seriously ill or die, including a specific timeframe, and (2) uniform criteria for what constitutes a serious illness.

7.  Ensure that inmate family information, or the inmate emergency contact form, is updated according to policy and readily available for BOP staff who need to notify next of kin in cases of inmate serious illness or death.

8.  Implement processes to ensure timely crime victim notifications, even under emergency conditions such as during a pandemic.

9.  Determine how the Centralized Fill and Distribution Center and regional logistics sites model could support distribution efficiency beyond the current pandemic.

10. Assess how to improve staff and inmate compliance with healthcare protective equipment measures at its facilities and issue clear guidance to facilities about the importance of compliance.

# Appendix 1:  Purpose, Scope, and Methodology

## Standards

The OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012).

## Purpose and Scope

The OIG conducted this capstone review to assess the BOP's response to the COVID-19 pandemic and highlight themes we identified through our COVID-19 oversight work, including remote inspections of 16 facilities housing BOP inmates, 5 surveys of BOP staff and inmates, and a collection of interactive dashboards.  This capstone review also examines COVID-19 topics that have emerged following that work. Finally, this review identifies challenges that the BOP will likely continue to face during and after the pandemic and actions that the BOP should undertake to prepare for potential public health emergencies in the future.

The COVID-19 oversight work we summarize in this report covers a variety of time periods.  The remote inspections covered the period from April through June 2020.  The first set of BOP staff surveys we conducted covered April and May 2020, and the follow-up survey of staff at the BOP's federal prisons covered February 2021.  The survey of federal inmates covered March and April 2021.  The interactive data dashboards reflecting staff and inmate COVID-19 cases and deaths in each BOP facility over time were launched on October 1, 2020, and present data starting from March 31, 2020.  The OIG added data on inmate vaccination trends at BOP-managed facilities to the collection of the interactive dashboards in August 16, 2022, with data beginning August 4, 2021.  Our additional fieldwork, conducted from June 2020 through May 2022, included data collection and analysis, interviews, and document reviews.  To provide the most recent information on evolving BOP operations and practices, we reviewed supporting documentation provided by the BOP in January and February 2023 to a draft of this report and included applicable updates.

## Methodology

### Review and Summary of Previous COVID-19 Oversight Work

We reviewed our 15 remote inspection reports on 16 facilities and 5 surveys of staff and inmates to collect common themes and challenges identified in that body of work.  We also reviewed the underlying support for the reports, including documents received during the remote inspections and records of interviews conducted for those projects.  Additionally, we relied on data collected in support of the OIG's interactive dashboards to report on inmate and staff COVID-19 cases and vaccinations to inform our assessment of the BOP's public data reporting.

### Data Collection and Analysis

The OIG used a variety of data provided by the BOP to assess and evaluate the BOP's response to the COVID-19 pandemic and the effects that the pandemic had on BOP operations, staff, and inmates.  The scopes of individual data sets vary but generally extend no later than the end of FY 2021.

To examine changes in the BOP population over time, we analyzed snapshots of BOP population data that are regularly updated on the BOP's public website.  To determine whether the BOP met its population targets for minimum and low security facilities during the pandemic, we compared population snapshots from the BOP's public website to the target populations set in the BOP's June 19, 2020 memorandum to facility Wardens.  The memorandum lists population targets for minimum and low security facilities, including minimum and low security satellite facilities that are typically counted as part of other BOP facilities and minimum and low security cohorts at medium and administrative security facilities, by security level and gender, for a total of 141 individual minimum and low security groups.  The population data we used did not have breakouts by gender, so we combined the population targets at facilities that housed both genders at the same security level.  We excluded minimum and low security groups at medium and administrative security facilities because the population data we used did not break out population totals by security level at these facilities.  Due to these limitations, we ultimately compared population snapshots to the set target populations at 108 minimum and low security locations:  7 minimum security facilities, 30 low security facilities, 69 minimum security satellite facilities, and 2 low security satellite facilities.

To assess the effects of the pandemic on BOP staffing, we compiled data on overall staffing between September 2017 and September 2021 from BOP budget documents and data received from the BOP, as well as data on Correctional Officer and Health Services staffing specifically.  We also requested and analyzed data on temporary job modifications requested and offered between March 2020 and May 2021, temporary duty assignments made specifically to address needs related to COVID-19 between March 2020 and September 2021, and hiring and separations data before and during the pandemic.

To assess the use of staff support resources, we analyzed the call logs for the COVID-19 staff support line to examine call frequency and topic areas for questions and concerns.  The call logs covered the period that the staff support line was active, April 3, 2020–December 1, 2020.  We also reviewed data on Crisis Support Team activations in 2020, including those specifically related to the COVID-19 pandemic.

To assess the BOP's communication with various stakeholders, we analyzed data on family notification and victim notification.  For family notification, we compiled a dataset of dates of inmate serious illnesses and deaths related to COVID-19 and dates that families were notified to assess the timeliness of those notifications.  The scope of this data set encompassed inmate deaths related to COVID-19 that occurred at FCC Butner, FCC Coleman, FMC Fort Worth, and FCI Terminal Island between April and July 2020.  We selected these locations because they had reported inmate COVID-19 deaths at the time of the OIG's remote inspections.  For our analysis of the BOP's crime victim notification process, we requested data from the Victim Notification System to understand the frequency of delayed and missed notifications about inmate transfers to a Residential Reentry Center (RRC) or home confinement before and during the pandemic, as well as for notifications regarding inmates transferred to home confinement under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).  We chose to use April 1, 2019–March 31, 2020, as the pre-pandemic period and April 1, 2020–March 31, 2021, as the during-pandemic period to roughly align the two periods before and after passage of the CARES Act on March 27, 2020.

We created a dataset of results from the BOP's internal COVID Compliance Review Checklists, which the BOP used to conduct oversight of its facilities' implementation of COVID-19 guidance, to understand the frequency of pandemic-response compliance issues across facilities reviewed by the BOP.  The dataset comprised results from internal compliance reviews of 90 BOP institutions completed between August 2020

and April 2021.  Because the BOP used several versions of the checklist over the course of its compliance reviews, we analyzed only topics that were consistent across the checklist versions.

We requested and analyzed a variety of BOP data related to home confinement and the population under RRC supervision.  To examine the effect of expanded home confinement authorities under the CARES Act, we reviewed the number of transfers that occurred under each of the BOP's home confinement authorities. We also examined the population under RRC supervision, comprising both inmates in home confinement and inmates housed at RRC facilities.  For both datasets, we chose to use April 2019–March 2020 as the pre-pandemic period and April 2020–March 2021 as the during-pandemic period to roughly align the two periods before and after passage of the CARES Act.  To compare the percentage of inmates transferred to home confinement during these two periods, we used total population snapshots from within 6 weeks of April 1 each year and subtracted the home confinement population at that time from the total inmate population to better estimate the pool of inmates not already in home confinement that year.[157]  We divided the total number of transfers for each yearlong period by the total number of inmates not already in home confinement to estimate the percentage of the inmate population transferred to home confinement each year.  Finally, we analyzed failures in the home confinement setting to understand the types and frequency of failures between April 2020 and March 2021.  We also used the failure data to compare the types and frequency of failures between inmates in home confinement under the CARES Act and under the BOP's other home confinement authorities.

To assess the effect that the COVID-19 pandemic had on inmate programming, we requested and analyzed available data from the BOP.  The BOP provided data on Residential Drug Abuse Program participation from January 2020 through March 2021 and for Evidence Based Recidivism Reduction Program and Productive Activities participation between November 2020 and October 2021.

## Interviews

In addition to reviewing the OIG interviews conducted to support the remote inspections, we conducted over 35 new interviews with BOP staff working in the Health Services Division; Reentry Services Division; Office of General Counsel; Program Review Division; Administration Division; Correctional Programs Division; Information, Policy, and Public Affairs Division; and Human Resource Management Division, including group interviews with other BOP Central Office and Regional Office staff.  We also interviewed representatives of the Federal Public and Community Defenders Office and staff from the DOJ Office of the Deputy Attorney General.

The primary issues we assessed through our interviews were the BOP's response to the COVID-19 pandemic; preventive health measures put in place to minimize the spread of COVID-19; development and implementation of policy and directives for disease management; access to healthcare services, supplies, and treatment options; and communication practices with staff and outside stakeholders.  We also assessed the BOP's implementation of the CARES Act and other relevant authorities.  Through our interview with non-

---

[157]  Although there are multiple potential methods to estimate the total BOP inmate population not already in home confinement, including using a different population snapshot or an average population over the year, we chose to use a snapshot from prior to each year as defined above because we believe it to be the best estimate of total inmates not already in home confinement given the data available.

BOP staff, we assessed the reported challenges encountered by inmate counsel during the pandemic.  Our interview with Office of the Deputy Attorney General staff sought to understand the Department's involvement in the creation of, and the BOP's implementation of, the Attorney General's home confinement guidance.

## Policy and Document Review

In addition to the documentation that we collected to support the remote inspections, we reviewed BOP program statements, BOP educational materials for disease prevention, and information on the BOP's public website relevant to the scope of our review.  We also reviewed BOP guidance sent to BOP facilities, contract facilities, and RRCs during the COVID-19 pandemic.  We reviewed various versions of the BOP's COVID-19 Pandemic Response Plan, COVID-19 Vaccine Guidance, and COVID-19 Action Plans.  We also reviewed a memorandum of understanding between the BOP and the U.S. Public Health Service, a memorandum of agreement between the BOP and the CDC, Attorney General memoranda related to home confinement, and BOP memoranda related to suicide prevention.  In addition, we reviewed the CARES Act and presidential Executive Orders, federal statutes, and CDC guidance.  Lastly, we reviewed BOP budget documentation, BOP psychological reconstruction documentation, BOP communications with inmates' family members, FIRST STEP Act programming documentation, BOP Technical Directions, and BOP staff exit survey data.

## Complaints Analysis

We reviewed over 3,300 complaints submitted to the OIG Hotline and directly to the OIG to assess COVID-19 related trends.  The scope of complaints received by the OIG for the purposes of this analysis was February 27–September 30, 2020.  Complaints came from several sources, including but not limited to BOP inmates, their attorneys, friends and family, and BOP staff.  During our review, we determined that 3,190 complaints were COVID-19 related and directly relevant to our review scope.  We then analyzed and categorized the complaints by primary topic categories to assess trends, but we did not substantiate or assess the validity of each complaint.  The complaints sometimes detailed multiple issues or potential topic categories, and our analysis of complaints by topic category may not have captured each discrete issue detailed in each complaint.  Examples of topic categories that we identified in the complaints include home confinement, improper or nonuse of personal protective equipment, and challenges of social distancing.

# Appendix 2:  Previous, Related OIG Work

As described in the Introduction to this report, the OIG conducted a variety of COVID-19 pandemic oversight work, including remote inspections, surveys, and interactive dashboards.  (See the text box in the Background section for links to the published results of that work.)  Over the past several years, the OIG has also conducted reviews and audits of topics that are relevant to the BOP's response to the COVID-19 pandemic.  From contingency planning and staffing to inmate medical and mental healthcare, the COVID-19 pandemic has reemphasized the importance of these issues:

- *Review of the Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, May 2015.  As of FY 2013, inmates age 50 and older were the fastest growing segment of the inmate population in BOP-managed institutions.  The review found that the increasing population of aging inmates resulted in a need for increased trips outside of institutions for medical care but that institutions did not have enough Correctional Officers to staff such trips and had limited medical staff to meet older inmates' health needs within institutions, resulting in delays receiving medical care.  The review also found that the physical infrastructure at BOP institutions could not adequately house aging inmates and that overcrowding throughout the BOP system limits access to lower bunks or handicapped-accessible cells that aging inmates often require.  Additionally, the review found that insufficient support and access to medical care may limit the placement of aging inmates on home confinement.  The OIG made eight recommendations to the BOP as a result of this review.  As of September 2022, the OIG had closed seven of the recommendations and one remained open.

- *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, March 2016.  In September 2014, the BOP's institutions had 83 percent of its 3,871 Health Services positions filled and 12 of 97 institutions were medically staffed at or below 71 percent.  The review found that multiple factors, including institution locations, pay, and the correctional setting, negatively affect the BOP's ability to recruit and retain medical staff.  The review also found that the BOP did not identify or address these challenges in a strategic manner.  In response to the OIG's two recommendations that the BOP use data to assess and prioritize medical vacancies and develop ways to address the vacancies, the BOP exempted 429 medical vacancies from a 2017–2018 hiring freeze and as of October 2018 had filled 303 of those positions.  Considering the difficulty of filling these high-demand positions, the BOP continued to offer employment incentives and enacted several strategies, including expanding and examining its recruiting practices and identifying hiring obstacles.  The BOP also implemented a pilot program allowing U.S. Department of Health and Human Services Public Health Service officers, who already make up a significant percentage of the BOP's medical staff, to fill temporary clinical assignments to satisfy professional licensing requirements.  Both recommendations are closed.

- *Audit of the Federal Bureau of Prisons' Management of Inmate Placements in Residential Reentry Centers and Home Confinement*, November 2016.  Among other things, this audit found that the BOP underutilized direct home confinement placement as an alternative to Residential Reentry Center (RRC) placement for transitioning low-risk, low-need inmates back into society.  Between October 2013 and March 2016, the home confinement population averaged nearly 159 percent of contracted monitoring capacity, despite the apparent underutilization.  The OIG made five recommendations to the BOP as a result of this audit.  In particular, the OIG recommended that the

BOP reevaluate the availability of alternatives to RRC placement, including consideration of increasing direct home confinement placement and home confinement monitoring capacity.  All five recommendations are closed.

- *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, July 2017.  This review identified significant issues with the adequacy of the BOP's policies and its implementation efforts surrounding the use of restrictive housing units for inmates with mental illness.  In particular, the review found that inmates, including those with mental illness, were housed in single-cell confinement for long periods of time.  The review also found that the BOP did not sufficiently track or monitor inmates with mental illness, including those in restrictive housing. The OIG made 15 recommendations to the BOP as a result of this review.  As of February 2023, 6 of the 15 recommendations from this report remained open, including recommendations regarding the use and oversight of single-celling.

- *Review of the Federal Bureau of Prisons' Management of Its Female Inmate Population*, September 2018.  This review concluded that the BOP had not been strategic in its management of female inmates and that the BOP needed to take addition steps to ensure that the needs of female inmates are met at the institution level.  In particular, the review identified instances in which the BOP's programming and policy had not fully considered the needs of female inmates, which made it difficult for inmates to access key programs and supplies.  As a result of this review, the OIG made 10 recommendations, all of which are closed.

- *Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates*, September 2019.  This review examined the BOP's response to an electrical fire in January 2019 that caused a 7-day power outage at MDC Brooklyn.  The review found that MDC Brooklyn did not effectively communicate with stakeholders its decision to suspend legal and social visiting during the power outage and did not provide sufficient information to the public about the fire and the conditions of confinement during the power outage.  The review also found that MDC Brooklyn's contingency plans did not address how and when staff should alert external stakeholders about significant disruptions that affect legal and social visits and conditions of confinement.  The OIG made nine recommendations to the BOP as a result of this review.  As of September 2022, seven of the recommendations remained open.

- *Review of the Federal Bureau of Prisons' Pharmaceutical Drug Costs and Procurement*, February 2020.  Among other things, the report recommended that the BOP assess the costs and benefits of a Central Fill and Distribution program for institutions that do not have in-house pharmacies to determine whether the program would be helpful to control long-term costs.  As a result of this review, the OIG made nine recommendations, all of which are closed.

- *Analysis of the Federal Bureau of Prisons' Fiscal Year 2019 Overtime Hours and Costs*, December 2020.  This analysis found that 31,126 BOP employees worked 6.71 million overtime hours—the equivalent of 3,107 full-time positions, at a cost of $300,874,769—during FY 2019.  The vast majority of the overtime hours were worked by Correctional Officers.  Health Services staff accounted for 4 percent of overtime hours, working almost 238,000 hours of overtime.  The OIG did not make recommendations as part of this analysis.

- *Management Advisory Memorandum:  Impact of the Failure to Conduct Formal Policy Negotiations on the Federal Bureau of Prisons' Implementation of the FIRST STEP Act and Closure of Office of the Inspector General Recommendations*, November 2021.  This Management Advisory Memorandum reported that there had been a 20-month period during the COVID-19 pandemic during which formal policy negotiations had not occurred between the BOP and its national union.  The lack of formal negotiations disrupted aspects of the BOP's implementation of the FIRST STEP Act of 2018, as well as policy changes to address OIG recommendations on systemic correctional and safety issues. The OIG made two recommendations, both of which are closed.

# Appendix 3:  The BOP's COVID-19 Guidance

## Guidance for Federal and Contract Prisons

On January 31, 2020, the BOP issued its first COVID-19 related memorandum to BOP medical staff, identifying the potential risk of exposure within BOP facilities, and informed recipients about risk factors, symptoms, and preventive measures.  The memorandum also recommended screening new inmates for COVID-19 risk factors and symptoms and recommended the use of PPE for those in close contact with persons who may have COVID-19.  Between January and October 2020, the BOP issued a series of memoranda to federal and contract prisons outlining phases of its overarching COVID-19 Action Plan and additional guidance addressing specific topics.  The OIG published timelines of BOP guidance in its remote inspection reports, including the inspection of Metropolitan Correctional Center (MCC) Chicago.

In late August 2020, the BOP began issuing consolidated guidance in its COVID-19 Pandemic Response Plan, which included modules on topics such as infection prevention and control measures; screening and testing; inmate programming and services; and BOP employee, volunteer, and contract staff management. The BOP posted the COVID-19 Pandemic Response Plan on its intranet for staff to reference and continued to update it throughout the period of our review, in 2020, 2021, and 2022, based on guidance from stakeholders, including the CDC and DOJ;  the BOP intends to continue updating the plan as the CDC updates its COVID-19 guidance.  As an additional step for contract prisons (which were in operation during our review period), on April 1, 2020, the BOP modified its underlying contracts with private prison vendors, emphasizing that in the event of an epidemic or pandemic the "contractor shall check with the CDC daily for updates and shall implement those changes timely to prevent further spread of the disease."

## Guidance for Residential Reentry Centers

There is no specialized CDC guidance for community correctional settings like Residential Reentry Centers (RRC), but the CDC stated that its correctional setting guidance can be adapted to the specific circumstances of other custodial settings as needed.  The CDC stated that guidance topics "related to healthcare evaluation and clinical care of persons with confirmed and suspected COVID-19 infection and their close contacts may not apply directly to facilities with limited or no onsite healthcare services."  The CDC cautioned staff working in these types of facilities—which include RRCs—to coordinate closely with their state, local, tribal, and/or territorial health department when they identify inmates or staff with confirmed or suspected COVID-19.

In March 2020, the BOP called for modified operations at RRCs, including (1) discontinuing social movements, (2) restricting residents on home confinement and limiting trips beyond their approved residence locations, (3) discontinuing groups and nonessential facility services by external providers and vendors, (4) discontinuing access to outside religious services (with in-house alternative accommodations), and (5) removing the requirement of in-person visits for certain inmates deemed to be at high risk for illness.  In May 2020, the BOP's Residential Reentry Management Branch provided guidance to RRCs regarding the gradual resumption of normal RRC operations, advising contract providers to follow local guidance where applicable and to tailor the application of local guidance based on local circumstances, staffing concerns, and individual population concerns.  This phased-in approach to returning to regular operations called for vulnerable inmates to continue to shelter in place before eventually resuming public interactions while practicing social distancing, minimizing exposure to social settings where social distancing

is not practicable, observing all precautionary measures, and wearing appropriate personal protective equipment.  In September 2021, the Residential Reentry Management Branch provided guidance to all RRCs, instructing case managers to help inmates apply for commutation of their sentences under a Biden-Harris administration clemency initiative.  Inmates who had been convicted of nonviolent drug offenses or were on home confinement under Coronavirus Aid, Relief, and Economic Security Act authorities were potentially eligible.

# Appendix 4:  The BOP's Early Use of Medical Isolation and Quarantine

The use of medical isolation and quarantine was part of the BOP's approach to managing COVID-19 as early as its Phase One Action Plan issued on January 31, 2020.  Below, we provide a timeline of the BOP's recommendations to facilities:

- **January 2020:**  The BOP recommended that institutions screen incoming inmates for risk factors and COVID-19 symptoms, placing symptomatic inmates in medical isolation and asymptomatic inmates with risk factors in quarantine for 14 days.  The BOP screened inmates for two risk factors:

  - recent travel from, or through, locations that the CDC identified as having increased epidemiological risk and

  - close contact with anyone diagnosed with COVID-19.

  The BOP's choice to screen for these risk factors was in line with the CDC's guidance to healthcare providers in January and February 2020.

- **February–March 2020:**  As the number of COVID-19 cases in the United States grew in February and March 2020, the BOP directed facilities to establish quarantine areas in case they were needed.

- **Mid-March 2020:**  Following the first cases of COVID-19 in BOP facilities in mid-March 2020, the BOP's Phase Four Action Plan mandated that all facilities screen incoming inmates for COVID-19 symptoms, placing those who were asymptomatic in quarantine for at least 14 days and those who were symptomatic in medical isolation until they met CDC criteria for release from medical isolation. At the same time, the BOP mandated that facilities screen inmates for COVID-19 symptoms prior to leaving the facility for routine reasons and medically isolate inmates who were symptomatic.

- **Late March 2020:**  In its Phase Five Action Plan on March 31, 2020, the BOP emphasized that institutions should quarantine close contacts of any suspected or confirmed COVID-19 cases.

- **April 2020:**  In its April 13, 2020 Phase Six Action Plan, the BOP added a quarantine requirement for all inmates being released, including those releasing to Residential Reentry Centers or to home confinement.  The BOP also emphasized specific medical isolation instructions, including a requirement that inmates in medical isolation be placed in a single cell if possible and the possible strategies for determining when an inmate could be safely released from medical isolation.

# Appendix 5:  Factors Affecting COVID-19 Testing Practices and Availability

## Availability of COVID-19 Tests

During January and February 2020, diagnostic testing for COVID-19 in the United States was almost exclusively handled by CDC laboratories.  In early February, the CDC received the first "emergency use authorization" from the U.S. Food and Drug Administration (FDA) to produce and distribute its laboratory-based COVID-19 test kit.[158]  By February 6, the CDC had begun shipping the test kits to public health laboratories; but within days, laboratories began reporting that the test kits did not work properly.  Over the next few weeks, the CDC identified a contaminated test component, determined that the test could be run without that component, and worked with the FDA to allow the tests to be run without it.  It wasn't until late February 2020 that healthcare providers began to have access to COVID-19 testing through public health laboratories in their areas.  In March 2020, commercial laboratories began offering their own FDA-approved testing for COVID-19 and healthcare providers were able to obtain test kits from these vendors as well.

## CDC Guidance on COVID-19 Testing

The CDC's COVID-19 testing recommendations evolved over the course of the pandemic and as new information about the virus became available.  When the CDC test kits first became available in February 2020, criteria for testing was limited to individuals who had both symptoms of lower respiratory infection and possible exposure to COVID-19 due to recent travel to China or recent close contact with someone diagnosed with COVID-19.  As the virus spread in the United States, the CDC updated its recommendations for populations to be tested.  On March 4, 2020, the CDC expanded its criteria, stating that clinicians should use their judgment about whether a patient should be tested based on the patient's symptoms and how COVID-19 was affecting the local area.

From late March through mid-June 2020, the CDC's testing guidance included priority categories, recognizing the potential for testing resources to be limited.  Priority categories generally focused on symptomatic individuals and those at higher risk of severe illness if infected with COVID-19.  For example, on April 27 the CDC identified symptomatic staff and residents in congregate living settings, including correctional facilities, as high priority for COVID-19 testing.  In June 2020, the CDC broadened its testing guidance by removing prioritization categories, and, in September 2020, the CDC again updated its testing guidance to further emphasize testing asymptomatic individuals due to the potential for asymptomatic and pre-symptomatic transmission of COVID-19.

---

[158]  Under § 564 of the Federal Food, Drug, and Cosmetic Act of 1938, the FDA may grant emergency use authorization for unapproved medical products or unapproved uses of approved medical products to be used in an emergency to diagnose, treat, or prevent serious or life-threatening diseases when certain criteria are met, including that there are no adequate, approved, and available alternatives.  See FDA, "Emergency Use Authorization," content current as of September 26, 2022, www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization (accessed September 27, 2022).

## BOP Use of COVID-19 Rapid Tests

Testing capacity increased again through April and May 2020 with the introduction of COVID-19 rapid tests, which allowed tests to be analyzed quickly where the sample was collected rather than requiring it to be sent to a laboratory for analysis.  The BOP began receiving rapid molecular RNA test machines (rapid test machines) and test kits from the Strategic National Stockpile in April 2020.[159]  The BOP reported that all institutions had received at least one rapid test machine by mid-June 2020, and, as of September 2020, every BOP facility had at least two rapid test machines.  In late 2020, the FDA began approving at-home COVID-19 test kits, and, in January 2021, the BOP added the use of these rapid antigen self-tests to its testing guidance as well.

---

[159]  The Strategic National Stockpile, run by the U.S. Department of Health and Human Services, helps supplement state and local medical supplies and equipment during public health emergencies.  U.S. Department of Health and Human Services, "Strategic National Stockpile," last reviewed August 9, 2021, www.phe.gov/about/sns/Pages/default.aspx (accessed July 13, 2022).

# Appendix 6:  Home Confinement and Compassionate Release: Key Differences

| | Home Confinement | Compassionate Release |
|---|---|---|
| **Statutory Authority** | 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541(g)[a] | 18 U.S.C. § 3582(c)(1)(A) or 18 U.S.C. § 4205(g)[b] |
| **What It Does** | Allows an inmate to serve the final portion of his or her sentence (generally, 10 percent or 6 months, whichever is shorter) at home rather than in a prison or a Residential Reentry Center (RRC).  An inmate on home confinement is still in BOP custody and is subject to monitoring requirements. | Generally ends an inmate's sentence early.  Upon compassionate release, individuals are typically no longer in BOP custody.  However, they may still be subject to probation or supervised release. |
| **Who Is Eligible** | Inmates nearing the end of their sentences who are referred for RRC placement.  Candidates for home confinement under RRC supervision typically have an appropriate residence, low reentry support needs, and a low risk of reoffending. | Inmates with "extraordinary and compelling circumstances," which may include advanced age, terminal illness, other physical or medical conditions, or family circumstances |
| **How It Is Requested** | BOP staff routinely consider inmates for home confinement near the end of their sentences as part of their transition back into the community. | An inmate, or another person on behalf of the inmate, may submit a compassionate release request to the Warden at the inmate's institution.  If the BOP approves the request, it is submitted to the U.S. Attorney's Office for consideration by the court.  An inmate may petition the court directly if the BOP denies the inmate's request or if 30 days elapse after petitioning the Warden, whichever occurs first. |
| **Who Makes the Decision** | The BOP approves or denies home confinement placement. | Federal judges in the U.S. court system approve or deny compassionate release. |
| **Changes During the COVID-19 Pandemic** | The Coronavirus Aid, Relief, and Economic Security Act removed the time limit (6 months or 10 percent of the total sentence time) under 18 U.S.C. §§ 3624(c)(2), allowing inmates to be considered for home confinement earlier in their sentences than usual. | No change.  The Department took the position that the risk of COVID-19 alone is not an "extraordinary and compelling circumstance" warranting compassionate release. |

[a]  18 U.S.C. § 3624(c)(2) is applicable for inmates who are approaching the end of their sentences.  34 U.S.C. § 60541(g) is applicable for elderly or terminally ill inmates.

[b]  18 U.S.C. § 3582(c)(1)(A) is applicable for inmates whose offenses occurred on or after November 1, 1987.  18 U.S.C. § 4205(g) was repealed effective November 1, 1987, but remains the controlling law for inmates whose offense occurred prior to that date.

Source:  OIG summary of federal statutes and BOP policy

# Appendix 7:  BOP COVID-19 Vaccine Guidance:  Priority Levels for Inmate Vaccination (Eliminated in January 2022)

| Priority Level 1 | • Inmates assigned to health service jobs<br>• Inmates in certain housing situations (e.g., nursing care centers or other residential healthcare units)<br>• Inmates in other job assignments considered high priority by the BOP |
| --- | --- |
| Priority Level 2 | • Inmates age 65 years and older<br>• Inmates of any age that meet one or more CDC criteria for being "at increased risk" for severe illness from COVID-19 (e.g., those with medical conditions such as cancer or chronic kidney disease)<br>• Inmates in job assignments considered a priority by the BOP |
| Priority Level 3 | • Inmates age 50 to 64 or inmates of any age with certain underlying medical conditions who might be at increased risk for severe illness from COVID-19 |
| Priority Level 4 | • All other inmates upon completion of all preceding priority levels and following current CDC guidance |

Source:  BOP COVID-19 Vaccine Guidance, Version 11.0, March 11, 2021

# Appendix 8:  The BOP's Response to the Draft Report



**U.S. Department of Justice**

**Federal Bureau of Prisons**

---

*Office of the Director*                         *Washington, DC 20534*

March 9, 2023

MEMORANDUM FOR      RENE L. ROCQUE
                    ASSISTANT INSPECTOR GENERAL
                    EVALUATION AND INSPECTIONS DIVISION

FROM:               Colette S. Peters, Director

SUBJECT:            Response to the Office of Inspector General's (OIG) Formal Draft Report:
                    Capstone Review of the Federal Bureau of Prisons' Response to the
                    Coronavirus Disease 2019 Pandemic, Assignment Number A-2020-011

The Bureau of Prisons (BOP) appreciates the opportunity to formally respond to the Office of the
Inspector General's (OIG) above-referenced formal draft report. The BOP has completed our review
and offer the following comments regarding the recommendations.

**Recommendation 1:**  Conduct a thorough assessment of single-celling policies and processes,
including those applicable to inmates housed in quarantine and medical isolation units and to
inmates vulnerable to suicide.

**BOP Response:**  BOP notes as an initial matter that single-celling in the context of medical
isolation and quarantine is not restrictive housing.  Guidance concerning this topic is separately
addressed through relevant Health Services Division (HSD) materials previously provided to
OIG including BOP's COVID-19 Pandemic Plan Module 4.  As acknowledged in the draft
formal report, BOP established a Single Cell Task Force ("Task Force") in May of 2021 that
reviewed single-celling practices and provided recommendations.  In response to this
recommendation, BOP will assess the work of the Task Force to ensure that single-celling
policies and processes, including those applicable to adults in custody housed in quarantine and
medical isolation units and to adults in custody vulnerable to suicide, are addressed.

**Recommendation 2:**  Ensure that actions, including any policy revisions, the BOP takes to
close the two open recommendations from our 2017 restrictive housing report that reference
single-celling also apply to single-celling during quarantine and medical isolation.

**BOP Response:**  To the extent medical isolation or quarantine occurs in a restrictive housing
environment, BOP will ensure the protections applicable to those settings are utilized.

OIG Formal Draft Report response: Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic,
Assignment Number A-2020-011
March 10, 2023
Page 2 of 4

However, single-celling in the context of medical isolation and quarantine is not restrictive housing. As a result, guidance concerning this topic is separately addressed through relevant HSD materials including BOP's COVID-19 Pandemic Plan Module 4, which states, "If medical isolation in single cells is necessary . . . Psychology Services staff should be consulted to ensure inmates proposed for single celling are not particularly vulnerable individuals and/or to make recommendations."

Additionally, BOP currently reviews all single cell placements in restrictive housing. When a BOP facility needs to place an adult in custody in a single cell, employees seek concurrence from Psychology, Medical, Unit Team, and the Captain prior to requesting the Warden's approval for placement.

**Recommendation 3:** Compile and regularly update best practices for addressing space limitations to meet social distancing, quarantine, and medical isolation needs.

**BOP Response:** The BOP concurs with this recommendation and will continue to compile and regularly update best practices for addressing space limitations to meet social distancing, quarantine, and medical isolation needs. Current best practices include but are not limited to the following: (1) separating those in medical isolation should always take priority; (2) when identifying spaces for isolation, quarantine, or movement observation, it is preferable to have these areas in separate units; (3) if it becomes necessary to house these types of adults in custody in different ranges or floors within the same unit, providing at least a 6-feet distance between the different groups is optimal (e.g., empty cell between cohorts with clear signage); (4) consider spaces not being utilized such as those used for education, religious services, visiting, recreation, or facilities; and (5) tents, shower stations, and mobile hand hygiene stations may need to be obtained to create separate spaces at some facilities.

**Recommendation 4:** Explore options for permanent changes to facility infrastructures that would allow for better implementation of social distancing and other infection control measures.

**BOP Response:** The BOP concurs with this recommendation and will continue to explore whether feasible options exist for permanent changes to facility infrastructure that would allow for better implementation of social distancing and other infection control measures within the confines of correctional safety and security requirements.

**Recommendation 5:** Assess methods to engage with staff during public health emergencies to ensure that the BOP provides sufficient staff support and clearly communicates support options available to staff.

**BOP Response:** The BOP concurs with this recommendation and will assess methods to engage with employees during public health emergencies to ensure that the BOP provides sufficient employee support and clearly communicates support options available to employees.

OIG Formal Draft Report response: Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic,
Assignment Number A-2020-011
March 10, 2023
Page 3 of 4

**Recommendation 6:** Immediately update guidance regarding (1) when staff should notify
the families of inmates who become seriously ill or die, including a specific timeframe, and
(2) uniform criteria for what constitutes a serious illness.

**BOP Response:** The BOP concurs with this recommendation and notes that to the extent
OIG recommends policy be changed, BOP must abide by the terms of its policy development
process. Additionally, BOP will need to assess whether and how to capture what constitutes
a serious illness due to the variety of situations that can unfold. BOP also notes that it
already provides clear expectations to employees regarding next of kin notifications
following a death.

**Recommendation 7:** Ensure that inmate family information, or the inmate emergency
contact form, is updated according to policy and readily available for BOP staff who need to
notify next of kin in cases of inmate serious illness or death.

**BOP Response:** The BOP concurs with this recommendation and will address the need to
ensure adult in custody emergency contact forms are updated according to policy. As part of
its training, BOP will also address the need to ensure that such forms are readily available.

**Recommendation 8:** Implement processes to ensure timely crime victim notifications, even
under emergency conditions such as during a pandemic.

**BOP Response:** The BOP concurs with this recommendation and as part of its training
program, will address the need to ensure timely crime victim notifications even under
emergency conditions such as a pandemic.

**Recommendation 9:** Determine how the Centralized Fill and Distribution Center and
regional logistics sites model could support distribution efficiency beyond the current
pandemic.

**BOP Response:** The BOP concurs with this recommendation and will determine how the
Centralized Fill and Distribution ("CFAD") Center and regional logistics sites model could
support distribution efficiency beyond the current pandemic. The original CFAD model was
developed and approved by BOP leadership in 2009. As a result of this approval, CFAD 1
was implemented on the grounds of the Federal Correctional Complex, Pollock and remains
in operation today, pending funding approval for additional CFAD operations in the future.
With the implementation of additional CFAD operations across the BOP, this would model
the current CFAD operations along with the regional logistic sites. Funding for CFAD 2
operations was requested in the FY23 Budget Call and remains pending approval.

**Recommendation 10:** Assess how to improve staff and inmate compliance with healthcare
protective equipment measures at its facilities and issue clear guidance to facilities about the
importance of compliance.

OIG Formal Draft Report response: Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic,
Assignment Number A-2020-011
March 10, 2023
Page 4 of 4

**BOP Response:**  The BOP concurs with this recommendation and will conduct an
assessment regarding how to improve employee and adult in custody compliance with

healthcare protective equipment measures at its facilities and issue guidance to facilities
regarding the importance of compliance.  BOP notes that its health services team has already
issued guidance regarding appropriate healthcare protective equipment measures through
multiple channels including via memoranda, email correspondence, and COVID-19
Pandemic modules that have been widely disseminated to all employees and made available
on its intranet.

# Appendix 9:  OIG Analysis of the BOP's Response

The OIG provided a draft of this report to the BOP for its comment.  The BOP's response is included in Appendix 8 to this report.  The OIG's analysis of the BOP's response and the actions necessary to close the recommendations are discussed below.

## Recommendation 1

Conduct a thorough assessment of single-celling policies and processes, including those applicable to inmates housed in quarantine and medical isolation units and to inmates vulnerable to suicide.

**Status:**  Resolved.

**BOP Response:**  The BOP stated that single-celling in the context of medical isolation and quarantine is not restrictive housing and that guidance concerning this topic is separately addressed through relevant Health Services Division materials previously provided to the OIG, including the BOP's COVID-19 Pandemic Response Plan Module Four.  The BOP stated that, as acknowledged in the OIG's formal draft report, in May 2021 the BOP established a Single Cell Task Force that reviewed single-celling practices and provided recommendations.  In response to the OIG's recommendation, the BOP stated that it will assess the task force's work to ensure that single-celling policies and processes, including those applicable to adults in custody housed in quarantine and medical isolation units and to adults in custody vulnerable to suicide, are addressed.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  The OIG recognizes that the BOP does not consider single-celling in the context of medical isolation and quarantine to be restrictive housing.  However, the guidance that the BOP referenced in its COVID-19 Pandemic Response Plan Module Four includes direction to consult Psychology Services staff for inmates proposed for single-celling, which is similar to guidance in the BOP's March 13, 2020 Reentry Services Division memorandum described in this OIG report.  As explained in this report, we identified serious failures by BOP facilities in their compliance with the BOP's March 2020 guidance and in their handling of inmates vulnerable to suicide while quarantined due to COVID-19.  Further, this report notes that the BOP failed to follow its own guidance that recognized that single-celling of inmates generally should not occur for quarantine purposes.  By June 23, 2023, please provide documentation evincing that the BOP, either through the work of the Single Cell Task Force or other mechanisms, has thoroughly assessed its single-cell policies and processes, including those applicable to inmates housed in quarantine and medical isolation units and to inmates vulnerable to suicide.

## Recommendation 2

Ensure that actions, including any policy revisions, the BOP takes to close the two open recommendations from our 2017 restrictive housing report that reference single-celling also apply to single-celling during quarantine and medical isolation.

**Status:**  Resolved.

**BOP Response:**  The BOP stated that, to the extent medical isolation or quarantine occurs in a restrictive housing environment, it will ensure that the protections applicable to those settings are utilized.  The BOP reiterated that single-celling in the context of medical isolation and quarantine is not restrictive housing and referenced its COVID-19 Pandemic Response Plan Module Four guidance, which states, "If medical isolation in single cells is necessary…Psychology Services staff should be consulted to ensure inmates proposed for single celling are not particularly vulnerable individuals and/or to make recommendations."  The BOP added that it currently reviews all single-cell placements in restrictive housing, stating that, when a BOP facility needs to place an adult in custody in a single cell, employees seek concurrence from Psychology, Medical, Unit Team, and the Captain prior to requesting the Warden's approval for placement.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  The OIG recognizes that the BOP does not consider single-celling in the context of medical isolation and quarantine to be restrictive housing and that the BOP's COVID-19 Pandemic Response Plan Module Four states that "medical isolation for COVID-19 should be distinct in name and practice from the use of restrictive housing for disciplinary or administrative reasons—even though limited housing availability may require the use of cells normally used for restrictive housing."  However, the guidance that the BOP referenced in its COVID-19 Pandemic Response Plan Module Four includes direction to consult Psychology Services staff for inmates proposed for single-celling, which is similar to guidance in the BOP's March 13, 2020 Reentry Services Division memorandum described in the OIG's report.  As explained in this report, we identified serious failures by BOP facilities in their compliance with the BOP's March 2020 guidance and in their handling of inmates vulnerable to suicide while quarantined due to COVID-19.  Further, this report notes that the BOP failed to follow its own guidance that recognized that single-celling of inmates generally should not occur for quarantine purposes and that inmates should be assessed for possible vulnerability to suicide before being single-celled.  By June 23, 2023, please provide documentation evincing that any actions the BOP takes in response to the two open recommendations that reference single-celling from the OIG's 2017 restrictive housing report, including any policy revisions, would also apply to single-celling during quarantine and medical isolation that may occur in a restrictive housing environment.

## Recommendation 3

Compile and regularly update best practices for addressing space limitations to meet social distancing, quarantine, and medical isolation needs.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will continue to compile and regularly update best practices for addressing space limitations to meet social distancing, quarantine, and medical isolation needs.  The BOP stated that current best practices include but are not limited to the following:  (1) separating those in medical isolation should always take priority; (2) when identifying spaces for isolation, quarantine, or movement observation, it is preferable to have these areas in separate units; (3) if it becomes necessary to house these types of adults in custody in different ranges or floors within the same unit, providing at least a 6-foot distance between the different groups is optimal (e.g., empty cell between cohorts with clear signage); (4) consider spaces not being utilized such as those used for education, religious services, visiting, recreation, or facilities; and (5) tents, shower stations, and mobile hand hygiene stations may need to be obtained to create separate spaces at some facilities.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By June 23, 2023, please describe the BOP's efforts to compile and regularly update best practices for addressing space limitations to meet social distancing, quarantine, and medical isolation needs.  Please include supporting documentation that details any updates to these best practices.

## Recommendation 4

Explore options for permanent changes to facility infrastructures that would allow for better implementation of social distancing and other infection control measures.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will continue to explore whether feasible options exist for permanent changes to facility infrastructure that would allow for better implementation of social distancing and other infection control measures within the confines of correctional safety and security requirements.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By June 23, 2023, please describe how the BOP has explored options for permanent changes to facility infrastructures that would allow for better implementation of social distancing and other infection control measures.  Please include supporting documentation or plans that describe the BOP's consideration of such options.

## Recommendation 5

Assess methods to engage with staff during public health emergencies to ensure that the BOP provides sufficient staff support and clearly communicates support options available to staff.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will assess methods to engage with employees during public health emergencies to ensure that it provides sufficient employee support and clearly communicates support options available to employees.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By June 23, 2023, please provide the OIG with information and documentation evincing that the BOP has assessed methods to engage with employees during public health emergencies to ensure that it provides sufficient employee support and clearly communicates support options available to employees.

## Recommendation 6

Immediately update guidance regarding (1) when staff should notify the families of inmates who become seriously ill or die, including a specific timeframe, and (2) uniform criteria for what constitutes a serious illness.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that, to the extent the OIG recommends that policy be changed, the BOP must abide by the terms of its policy development process. The BOP stated that it will need to assess whether and how to capture what constitutes a serious illness due to the variety of situations that can unfold.  The BOP stated that it already provides clear expectations to employees regarding next-of-kin notifications following a death.

**OIG Analysis:**  The BOP's planned actions are sufficiently responsive to the recommendation.  While the OIG recognizes that any policy changes must abide by the terms of the BOP's policy development process and that the BOP will need to assess how to capture what constitutes a serious illness, given the nature of the issue and the failures we identified, we believe the BOP must move expeditiously to address this issue. Similarly, in light of the examples in the OIG report of inconsistent staff notification to inmates' families regarding inmates' serious illnesses prior to their deaths, it is not apparent to us that BOP staff have clear expectations and understandings regarding next-of-kin notifications following an inmate death.  To address the issues described in this report, the BOP should update its guidance in this area, either through policy changes or other guidance it provides to staff.  By June 23, 2023, please provide copies of updated guidance regarding when staff should notify the families of inmates who become seriously ill or die, including a specific timeframe, and uniform criteria for what constitutes a serious illness.  Also, please provide copies of guidance that the BOP has already provided to its staff that detail clear expectations regarding next-of-kin notifications following an inmate death.

## Recommendation 7

Ensure that inmate family information, or the inmate emergency contact form, is updated according to policy and readily available for BOP staff who need to notify next of kin in cases of inmate serious illness or death.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will address the need to ensure that adult-in-custody emergency contact forms are updated according to policy.  The BOP stated that, as part of its training, it will also address the need to ensure that such forms are readily available.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By June 23, 2023, please describe actions the BOP has taken to ensure that inmate family information, or the inmate emergency contact form, is updated according to policy and readily available for BOP staff who need to notify next of kin in cases of serious illness or death and provide supporting documentation evincing these efforts.

## Recommendation 8

Implement processes to ensure timely crime victim notifications, even under emergency conditions such as during a pandemic.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that, as part of its training program, it will address the need to ensure timely crime victim notifications even under emergency conditions such as a pandemic.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By June 23, 2023, please describe how the BOP has implemented processes to ensure timely crime victim notifications, even under emergency conditions such as during a pandemic.  Also, please provide supporting documentation evincing the implementation of processes to ensure timely crime victim notifications.

## Recommendation 9

Determine how the Centralized Fill and Distribution Center and regional logistics sites model could support distribution efficiency beyond the current pandemic.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will determine how the Centralized Fill and Distribution Center and regional logistics sites model could support distribution efficiency beyond the current pandemic.  The BOP stated that the original Centralized Fill and Distribution Center model was developed and proved by BOP leadership in 2009.  The BOP stated that, as a result of this approval, Centralized Fill and Distribution Center 1 was implemented on the grounds of Federal Correctional Complex Pollock and remains in operation today, pending funding approval for additional Centralized Fill and Distribution Center operations in the future.  The BOP stated that, with the implementation of additional Centralized Fill and Distribution Center operations across the BOP, this would model the current Centralized Fill and Distribution Center operations along with the regional logistics sites.  The BOP stated that funding for Centralized Fill and Distribution Center 2 operations was requested in the fiscal year 2023 budget call and remains pending approval.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By June 23, 2023, please describe the BOP's efforts to determine how the Centralized Fill and Distribution Center and regional logistics sites model could support distribution efficiency beyond the current pandemic.  Please include supporting documentation evincing these efforts.

## Recommendation 10

Assess how to improve staff and inmate compliance with healthcare protective equipment measures at its facilities and issue clear guidance to facilities about the importance of compliance.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will conduct an assessment regarding how to improve employee and adult in custody compliance with healthcare protective equipment measures at its facilities and issue guidance to facilities regarding the importance of compliance.  The BOP noted that its Health Services team has already issued guidance regarding appropriate healthcare protective equipment measures through multiple channels including memoranda,

email correspondence, and COVID-19 Pandemic Response Plan modules that have been widely disseminated to all employees and made available on its intranet.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By June 23, 2023, please describe and provide supporting documentation evincing the BOP's assessment of how to improve staff and inmate compliance with healthcare protective equipment measures at its facilities.  Also, please provide copies of guidance available to facilities about the importance of compliance with these measures.

# EXHIBIT D









# Review of Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic

September 2023

PANDEMIC RESPONSE
ACCOUNTABILITY COMMITTEE



# Message from the Pandemic Response Accountability Committee

While personnel shortages existed in the health care community before the pandemic, the pandemic exacerbated these shortages. Maintaining an appropriate level of personnel in health care facilities is essential to providing a safe work environment for health care personnel and quality care to patients. The Pandemic Response Accountability Committee's (PRAC) Health Care Subgroup developed this report to share insights into personnel shortages across four select federal health care programs, or the providers they reimburse (hereinafter referred to as "federal health care programs"). Together, these four programs provide health care services to approximately 20 million individuals.

This report provides Congress, federal and state agencies, health care organizations, and other policymakers with information to inform and raise awareness on health care shortages across the four federal health care programs. Specifically, this report summarizes the types of personnel shortages most commonly reported; factors that contributed to personnel shortages; impacts most commonly encountered; and the incentives and strategies used to recruit and retain personnel, and minimize burnout for existing personnel across the four federal health care programs.

OIGs identified the following key insights across the four federal health care programs reviewed.

- Nurses and medical officers were the most commonly reported positions that experienced shortages during the pandemic.[1]

- A limited labor pool, noncompetitive pay, COVID-19 requirements, and a challenging hiring process were the most commonly reported factors that contributed to personnel shortages.

- A decrease in patient access to care and patient satisfaction; and an increase in health care personnel work hours and responsibilities were the most commonly reported impacts resulting from personnel shortages.

- Monetary incentives were the most commonly reported strategy to recruit and retain personnel.

The four Departments and facilities reviewed include:

1. **Department of Defense**
   Medical Treatment Facilities

2. **Department of Justice**
   Federal Bureau of Prisons

3. **Department of Veterans Affairs**
   Veterans Health Administration Facilities

4. **Department of Health and Human Services**
   Medicare– and Medicaid–Certified Nursing Homes[a]

Source: Scope of the four federal health care programs.

a. Medicare– and Medicaid–certified nursing homes are not federally operated, but rather receive reimbursement for services they provide to enrollees in Medicare and Medicaid programs.

Even though the federal health care programs have incentives and strategies to attract and retain health care personnel, the programs still experienced personnel shortages throughout the pandemic. Consequently, additional action is necessary to staff normal operations and to strategically plan for future surges in personnel needed to respond to pandemics and other health care emergencies. The PRAC encourages policymakers to further explore the impacts of personnel shortages within the federal health care programs for possible strategies to mitigate staffing shortages and help ensure high quality, safe, and timely health care is provided to the individuals the programs serve.

## About the PRAC and its Health Care Subgroup

The CARES Act created the PRAC to coordinate oversight of the federal government's pandemic response and its historic level of emergency spending. The PRAC's Health Care Subgroup consists of OIGs that oversee the federal agencies that provide or reimburse for health care services. By working together and sharing data, the Health Care Subgroup provides coordinated oversight across agencies and programs.

Michael E. Horowitz
Chair, PRAC
Inspector General, U.S. Department of Justice

Robert P. Storch
Inspector General, U.S. Department
of Defense

Christi A. Grimm
Chair, PRAC Health Care Subgroup
Inspector General, U.S. Department of Health
and Human Services

Michael J. Missal
Inspector General, U.S. Department
of Veterans Affairs

# Contents

Message from the Pandemic Response Accountability Committee    i

Insights on Shortages of Personnel Across Four Federal
Health Care Programs    1

Agency Details    18

   U.S. Department of Defense (DOD)    18

   U.S. Department of Justice (DOJ)    38

   U.S.  Department of Veterans Affairs (VA)    56

   U.S. Department of Health and Human Services (HHS)    67

   Appendix A: DOD    83

   Appendix B: DOJ    87

   Appendix C: VA    89

   Appendix D: HHS    92

   Appendix E: Shortages Reported by VHA Facilities    95

# Insights on Shortages of Personnel Across Four Federal Health Care Programs

As the nation's health care workforce has responded to the coronavirus disease–2019 (COVID-19) pandemic (hereinafter referred to as the "pandemic"), maintaining a sufficient level of personnel in health care facilities has been essential to providing a safe work environment for health care providers and safe and effective patient care. While personnel shortages existed in the health care community before the pandemic, the pandemic exacerbated these shortages. As the pandemic progressed, personnel illnesses, exposures to COVID-19, or the need to care for family members caused additional staffing shortages. Moreover, one of the federal departments reviewed provided personnel to assist in the National response to the pandemic, exacerbating shortages within its health care program.

This report provides Congress, federal and state agencies, health care organizations, and other policymakers with information on health care shortages across four federal health care programs, discussed in detail below. Specifically, the report provides insights into shortages in personnel positions most commonly reported; factors contributing to personnel shortages reported by facility officials; impacts to the health care personnel, the patients, and health care services provided by the federal health care programs; and strategies to mitigate personnel shortages caused by or exacerbated by the pandemic. These insights can help policymakers understand the challenges that federal health care programs experienced throughout the pandemic and determine the actions necessary to ensure sufficient staffing for ongoing health care needs and future pandemic response efforts.

## How We Conducted This Review

Four of the Offices of Inspectors General (OIG) in the PRAC Health Care Subgroup participated in this review—the Department of Defense (DOD), the Department of Justice (DOJ), the Department of Veterans Affairs (VA), and the Department of Health and Human Services (HHS). The DOD, DOJ, and VA OIGs reviewed staffing within their internal health care programs while the HHS OIG reviewed staffing within Medicare– and Medicaid–certified nursing homes. Each OIG reviewed personnel in the facilities identified below, including clinical positions that deliver patient care and nonclinical positions such as administrative, logistical, or clerical positions that support patient care. See Exhibit 1 for more information about the scope of our review.

Personnel Shortages in Federal Health Care
Programs During the COVID-19 Pandemic

**Exhibit 1: Scope of Review[a]**

| | DOD | DOJ | VA | HHS |
|---|---|---|---|---|
| **Facilities Reviewed** | Medical Treatment Facilities (MTF) | Federal Bureau of Prisons (BOP) Institutions | Veterans Health Administration (VHA) Facilities | Medicare– and Medicaid–Certified Nursing Homes |
| **Number of Health Care Staff** | More than 128,000 Service members and civilian employees[b] | Approximately 3,000 BOP employees and U.S. Public Health Service officers[c] | More than 371,000 health care professionals | More than 686,000 direct care staff[d] |
| **Population Served** | 9.6 million active military members and their families, military retirees and their families, dependent survivors, and certain eligible Reserve Component members and their families | Approximately 134,000 federal inmates and detainees housed in BOP institutions | More than 9 million enrolled veterans; qualifying family members, dependents, and survivors of veterans; and eligible active military and Reserve Component members | 1.2 million Medicare and Medicaid enrollees who reside in nursing homes |
| **Number of Facilities Within the Health Care Program** | 45 hospitals, 525 outpatient clinics, and 138 dental clinics | 97 facilities encompassing 121 BOP institutions | 140 facilities, encompassing over 1,200 sites of care including VA Medical Centers and outpatient settings | 15,178 Medicare– and Medicaid– certified nursing homes nationwide |
| **Number of Facilities Nonstatistically Sampled for this Review** | 24 hospitals | 97 facilities encompassing 121 BOP institutions | 139 facilities | 50 nursing homes |

Source: Analysis of data from the four federal health care programs.

a.  2022 Data; Health care program information detailed above includes only the portions of the programs reviewed for this report.

b.  The Military Health System (MHS) also used contractors, tracked at the MTF or regional level not MHS-wide, and are not included in the total. See the section on the U.S. Department of Defense for more information about the MHS.

c.  The BOP also employs contract medical staff at some institutions who are not included in the total.

d.  Direct care staff include nursing home employees and staff hired under contract or through staffing agencies.

The data and insights are limited to the federal health care programs and the health care personnel that each OIG chose to review. Personnel data varied across the federal health care programs; therefore, OIGs collected and reported shortages of personnel based on the data available. The information provided includes what the federal health care programs experienced, such as experiences of existing health care personnel and their perceptions of former health care personnel experiences, during the period of review. The General Methodology section in this report and the more detailed methodologies in the appendices contain additional information on how each OIG conducted its analysis.

## Shortages of Personnel

### INSIGHT: The four federal health care programs each experienced shortages in personnel before and during the pandemic

The four federal health care programs experienced personnel shortages before and during the pandemic. According to data provided from or interviews with program officials, the pandemic exacerbated shortages for the health care programs. For example, officials from Medicare– and Medicaid–certified nursing homes reported shortages of nurses at 29 of the 50 nursing homes before the pandemic, compared to 47 nursing homes during the pandemic. Additionally, according to MTF officials, health care personnel shortages increased during the height of the pandemic and at the time of the MTF interviews the MTFs had not been able to fill many of the positions. The four federal health care programs we reviewed experienced shortages in some common positions during the pandemic.

**Nursing positions and medical officers constituted the most commonly reported personnel shortages during the pandemic**

Nursing was one of the most commonly reported positions that experienced shortages in the four federal health care programs reviewed. Exhibit 2 shows the percentage of sampled facilities in each federal health care program that reported a nursing shortage during the pandemic.

**Exhibit 2: Percentage of Sampled Facilities by Federal Health Care Program that Reported a Nursing Shortage During the Pandemic**



Source: Analysis of nursing shortages reported by facilities in the four federal health care programs.
Notes: Percentages in the chart were calculated using the number of nonstatistically sampled facilities identified in Exhibit 1.
Each OIG accounted for shortages in different ways based on the federal agency's available data; see each agency's appendix on how they reported nursing shortages.
VHA facility percentage is based off responses from the VA OIG's FY 2022 survey.

Three of the federal health care programs (BOP, MTFs, and VHA facilities) also reported shortages of medical officers during the pandemic. According to BOP staffing data, 13 of 96 BOP facilities did not have a medical officer on staff as of March 2022.[2] Additionally, officials at 12 of 24 MTFs interviewed reported medical officers as one of their highest positions in demand. Further, officials at 121 of 139 VHA facilities reported a shortage in the medical officer series.

In addition to nurses and medical officers, the health care programs experienced shortages in a variety of other positions that varied by each federal health care program. See Exhibit 3 for the most commonly reported positions with shortages by facility type.

**Exhibit 3: Top Reported Positions with Shortages**

| Department | Facility Type | Top Reported Positions with Shortages |
|---|---|---|
| DOD | Medical Treatment Facilities | Nurses, Medical Officers, Behavioral Health personnel, Imaging Technicians, Laboratory Technicians, Medical Support Assistance personnel |
| DOJ | Bureau of Prisons Institutions | Nurses, Medical Officers, and Mid-level practitioners (such as Nurse Practitioners and Physician Assistants) |
| VA | Veterans Health Administration Facilities | Nurses, Medical Officers, Custodial Workers, Medical Support Assistance, Psychiatry (medical officer specialty), and Psychology |
| HHS | Medicare– and Medicaid– Certified Nursing Homes | Nurses and Aides |

Source: Analysis of data from the four federal health care programs, April 2019 through January 2023.

# Contributing Factors of Personnel Shortages

**INSIGHT: The four federal health care programs faced challenges exacerbated by or caused by the pandemic that contributed to shortages of personnel**

The four federal health care programs we reviewed faced various challenges that contributed to personnel shortages.

**A limited labor pool, noncompetitive pay, COVID-19 requirements, and a challenging hiring process were the most commonly reported factors that contributed to personnel shortages**

Officials from the four federal health care programs reported that the shortages stemmed from a limited labor pool of health care personnel such as doctors and nurses. The four federal health care programs also reported that noncompetitive pay compared to other health care facilities contributed to personnel shortages. According to BOP, MTF, and nursing home officials we interviewed, the facilities had difficulties recruiting or retaining their personnel because other health care facilities offered higher pay. For example, in an announcement obtained in January 2023, a private health care company posted a job paying $81,120 annually for a vocational nurse, which was $33,504 more than a vocational nurse position posted for an MTF at a location 7 miles away.[3] Additionally, nursing home officials we interviewed stated that their facilities lost health care personnel during the pandemic to higher paying jobs in other industries.

Officials from two of the four federal health care programs (BOP and MTFs) also identified noncompetitive pay compared to other federal agencies as a contributing factor that led to personnel shortages. In 1975, Congress first authorized VA to offer higher salaries to physicians and dentists using title 38 authority. Since then, Congress has expanded the authority to offer higher salaries to other health care positions such as physician assistants, podiatrists, and nurses.[4] The Office of Personnel Management (OPM) extended title 38 authority to the DOD and DOJ in 2012 and 2014, respectively; however, since then the Departments have applied title 38 authority to only a few medical positions.[5] Both the BOP and MTFs have used title 38 authority to hire physicians and dentists. Additionally, the BOP has used the authority to hire psychiatrists. Officials at 13 MTFs stated that they had personnel shortages during the pandemic because the MTFs could not compete with nearby VHA facilities. Specifically, MTFs could not compete with VHA facilities that offered higher salaries for positions that the MTFs have not applied title 38 authority.

Officials from three of the federal health care programs (MTFs, BOP, and Medicare– and Medicaid–certified nursing homes) reported factors caused by the pandemic that contributed to personnel shortages, such as increased job requirements and COVID-19 quarantine. According to MTF officials, pulling health care personnel from their duties at the MTF to support pandemic requirements such as COVID-19 testing, vaccinations, and contact tracing, coupled with quarantine protocols and travel restrictions contributed to shortages of personnel in the MTFs. Additionally, according to officials from 26 of the sampled nursing homes, the requirement to quarantine personnel who contracted or were exposed to COVID-19 left nursing homes short-staffed during those periods. Nursing home officials also reported that some personnel were not able to work because they had to take care of family members that contracted COVID-19, or they quit their job after they contracted COVID-19. Finally, the BOP also experienced personnel shortages due to staff illness with COVID-19, with one of its institutions reporting that 75 percent of its health services unit had to take sick leave to recover from a COVID-19 outbreak.

Officials from three of the four federal health care programs (MTFs, BOP, and VHA) also reported that a challenging hiring process, made worse by the pandemic, contributed to personnel shortages. MTF officials stated that the hiring process sometimes took up to 6 months, with officials from one MTF stating that it took up to 24 months to hire personnel. Officials from other MTFs stated that they lost multiple applicants or had delays in the onboarding process because of the time it took for security and credentialing checks, as well as delays in obtaining common access cards because no one was working in-person at the identification card office during the height of the pandemic. According to BOP officials, the process to hire personnel to work for the federal government is different from the process that private sector health care professionals are accustomed to, taking more time, and involving nuances in the job postings and application process that may prevent applicants from applying to or being selected for available job opportunities. Officials from VHA facilities also reported recruitment challenges, including the hiring process, as a contributing factor for personnel shortages.

See Exhibit 4 for contributing factors reported by personnel from at least three of the four federal health care programs.

**Exhibit 4: Most Commonly Reported Factors That Contributed to Personnel Shortages**

| Contributing Factor | DOD MTFs | BOP Institutions | VHA Facilities | Medicare– and Medicaid–Certified Nursing Homes |
|---|---|---|---|---|
| Limited Labor Pool | ● | ● | ● | ● |
| Noncompetitive Pay | ● | ● | ● | ● |
| COVID-19 Requirements | ● | ● | | ● |
| Challenging Hiring Process | ● | ● | ● | |

Source: OIGs' interviews with or surveys of facility officials.

In addition, officials reported other factors contributing to personnel shortages unique to their federal health care program. For example, MTF officials reported that active duty health care personnel were pulled from the MTFs to provide support for the Nation's pandemic response and other worldwide missions, creating additional shortages of health care personnel. BOP officials reported that providing health care to prisoners included requirements that private sector nurses do not have to deal with such as wearing a stab vest, carrying handfuls of keys, and carrying pepper spray. Additionally, officials at Medicare– and Medicaid–certified nursing homes reported that personnel quit their jobs because of their fear of COVID-19 infection while caring for nursing home residents.

## Impacts of Personnel Shortages

**INSIGHT: The four federal health care programs experienced a decrease in patient access to care and patient satisfaction, coupled with an increase in work hours and responsibilities as a result of personnel shortages**

**Patient Impacts**. Officials from the four federal health care programs we reviewed reported personnel shortages that impacted patients. Officials from all 24 MTFs interviewed cited decreased patient access to care, decreased patient satisfaction, and reduced preventative screenings because of shortages of health care personnel. According to an April 2021 survey on federal inmates' experiences during the pandemic, an estimated 80 percent of inmates rated BOP's provision of medical care as poor during pandemic lockdowns, compared to an

**Exhibit 5: Examples of Patient Impacts Reported**
- Decreased access to care
- Decreased patient satisfaction
- Decreased face-to-face interactions with providers
- Delay of patient admissions or transfers from hospitals to nursing homes
- Overall decline in patient physical and mental health

Source: Analysis of data from the four federal health care programs.

estimated 41 percent of inmates who described the provision of medical care as "poor" before the pandemic. The VHA reported shortages in occupations considered essential to delivering safe care, meeting the growing demand for mental health care, and supporting the expansion of telehealth. Officials from 26 of the 50 Medicare– and Medicaid–certified nursing homes reported an overall decline in resident's physical and mental health because of shortages of health care personnel and lower levels of care. Specifically, officials stated that the nursing homes had to adjust the level of care provided to residents, including reducing or stopping restorative care and physical rehabilitation services, and sending residents who needed wound care to the hospital.

**Health Care Personnel Impacts**. Officials from the four federal health care programs reported impacts to their personnel because of personnel shortages. Officials from all 24 MTFs sampled stated that shortages of health care personnel resulted in increased duties and work hours for the remaining personnel, decreased morale, and decreased access to medical cases that are necessary for providers to gain or maintain their medical skills. BOP officials reported an increase in workload for health care personnel at BOP institutions because they handled large numbers of inmate illnesses due to COVID-19, as well as taking on new responsibilities, such as screening and testing for COVID-19 and monitoring quarantine and isolation units. Officials from Medicare– and Medicaid–certified nursing homes stated that the personnel shortages resulted in: (1) personnel increasing their workloads, often working longer shifts and covering the shifts of other personnel, and (2) more staff calling out of work to avoid increased workloads. Officials also stated that these conditions led to burnout and increased levels of stress, anxiety, and depression. Directors from the VHA's Veterans Integrated Service Networks reported burnout among human resources personnel because of the unanticipated workload associated with the hiring surge to address personnel shortages caused by the pandemic.

> **Exhibit 6: Examples of Personnel Impacts Reported**
> - Increased responsibilities
> - Increased hours worked
> - Decreased morale
> - Increased burnout
> - Increased risk of mental health illnesses
>
> Source: Analysis of data from the four federal health care programs.

**Financial Impacts**. Three of the four health care programs (BOP, MTFs, and Medicare– and Medicaid–certified nursing homes) experienced financial impacts because of health care personnel shortages. The DOJ OIG assessed BOP's overtime spending and found that BOP health services personnel worked more than 314,000 overtime hours during the first year of the pandemic, at a cost of $15 million, an increase of 56 percent and 64 percent, respectively, compared to the overtime hours worked and costs expended in the year before the pandemic. Similarly, reports from one MTF show that overtime hours for its civilian employees increased almost 50 percent from 2019 to 2020 when the pandemic began, increasing from 1,200 hours in 2019 to 1,800 hours in 2020. Finally, officials from all 50 Medicare– and Medicaid–certified nursing homes that HHS OIG interviewed stated that they incurred higher costs for employee bonuses, overtime, and contracted agency staff.

> **Exhibit 7: Examples of Financial Impacts Reported**
> - Increased costs for overtime
> - Increased costs for bonuses
> - Increased costs for contracted agency staff
>
> Source: Analysis of data from the four federal health care programs.

# Strategies to Mitigate Personnel Shortages

## INSIGHT: The four federal health care programs used incentives and other strategies to recruit new staff, retain existing staff, and minimize health care personnel burnout

The four federal health care programs we reviewed used incentives and other strategies to reduce personnel shortages and minimize personnel burnout. Many of these strategies existed prior to the pandemic and were similar across the four programs. Mitigation strategies implemented during the pandemic included awarding contracts with higher wages and implementing waivers to the onboarding process to hire personnel more quickly.

**Monetary incentives were the most commonly reported recruiting and retention strategy used by the health care programs, followed by unique efforts developed by individual facilities, and increased work flexibilities**

The four federal health care programs used monetary incentives, including bonuses and other programs to increase base pay, to recruit and retain health care personnel during the pandemic. Three of the four federal health care programs (BOP, MTFs, and VHA facilities) were authorized to use portions of title 38 for increased salaries and added flexibilities in hiring to recruit and retain employees in certain health care occupations; however, the MTFs and the BOP applied title 38 authority to two (physicians and dentists) and three occupations (physicians, dentists, and psychiatrists), respectively. Additionally, the BOP and Medicare– and Medicaid–certified nursing homes increased starting salaries for health care personnel and VHA facilities increased the maximum pay cap for nurses in accordance with Congressional legislation. The MTFs also used contracts offering higher pay to bring in additional personnel. Several BOP officials stated that the most effective recruitment incentive involved monetary compensation. However, BOP officials also stated that low pay was the main driver of turnover in their health care personnel. Similarly, the MTF officials stated that even with monetary incentives, DOD compensation still could not compete with the private sector or other federal agencies.

The four federal health care programs used student loan repayment or tuition assistance to encourage health care personnel to work for their programs. Additionally, three federal health care programs offered flexibility with work schedules and locations as a strategy to reduce personnel shortages. Personnel at Medicare– and Medicaid–certified nursing homes were offered flexible hours. Officials at BOP institutions approved compressed work schedules to allow employees additional flexibilities. Lastly, officials at the MTFs stated that they offered telework, virtual telehealth, remote opportunities, and alternative work schedules, when available, and provided personnel with scheduling flexibility so they could balance their patient workload with administrative tasks.

**Strategies to minimize burnout varied across the federal health care programs**

The four federal health care programs made efforts to retain existing staff and minimize personnel burnout. MTF officials stated that they encouraged employees to use leave, and stated that they recognized employees with time-off awards, command recognition, letters of appreciation, and early releases from work on special occasions, such as federal holidays. BOP officials stated that they encouraged personnel to access the BOP's Employee Assistance Program and encouraged management to monitor and support staff well-being. VHA established the Reduce Employee Burnout and Optimizing Organizational Thriving (REBOOT) Task Force to address drivers of burnout including unmanageable workload, perceived lack of fairness, lack of job control, low recognition or organizational support, interpersonal conflict, and mismatched values. At Medicare– and Medicaid– certified nursing homes, leadership tried to reduce provider burnout by reducing the number of new resident admissions, delaying new admissions, or admitting only residents who required less frequent or less intensive care. Additionally, the nursing home leadership created staff sharing agreements with facilities under the same corporate ownership and honored time-off requests when possible to reduce provider burnout.

# Conclusion

The reported impacts to patients and health care personnel during the pandemic highlight the importance of identifying and understanding personnel shortages within federal health care programs. This report summarizes the most commonly reported positions with shortages, factors contributing to shortages, impacts most commonly encountered, and the incentives and other strategies used to recruit new personnel, and retain and minimize burnout for existing personnel across the four federal health care programs. Although this report does not represent a comprehensive review of personnel shortages in all federal health care programs, it could provide insights on similar circumstances across other federal health care programs in addition to the four federal health care programs reviewed.

The insights summarized below are intended to help Congress, federal and state agencies, health care organizations, and other policymakers—understand the most commonly reported positions with shortages, what contributed to those shortages, and how the shortages affected the programs' patients and health care personnel. OIGs identified the following key insights across the four federal health care programs reviewed.

- Nurses and medical officers were the most commonly reported positions that experienced shortages during the pandemic.[6]

- A limited labor pool, noncompetitive pay, COVID-19 requirements, and a challenging hiring process were the most commonly reported factors that contributed to personnel shortages.

- A decrease in patient access to care and patient satisfaction and an increase in health care personnel work hours and responsibilities were the most commonly reported impacts resulting from personnel shortages.

- Monetary incentives were the most commonly reported strategy to recruit and retain personnel.

These insights highlight that actions are necessary to ensure the federal health care programs are staffed sufficiently to continue normal operations, as well as strategically plan for surges of health care personnel needed to respond to future pandemics and other health care emergencies. The PRAC encourages policymakers to further explore the impacts of personnel shortages within the federal health care programs to develop strategies to mitigate staffing shortages and help ensure quality, safe, and timely health care is provided to the individuals the programs serve.

# General Methodology

Each of the four participating OIGs selected a health care program within its Department, or providers it reimburses, to review staffing shortages before the pandemic (January 1, 2019 - February 29, 2020), and during the pandemic (March 1, 2020 – January 2023).

## Data Collection and Analysis

Each OIG collected staffing shortage data from health care providers and administrators for their respective health care program to answer the following questions.

1. Does the federal health care program, or providers it reimburses, have shortages of health care personnel?

2. If there are health care personnel shortages, what were the causes of the shortages?

3. What were the impacts of the health care staffing shortages?

4. What strategies did the health care program, or providers it reimburses, have to attract new health care personnel, and retain and minimize burnout for existing health care personnel?

**Data Collection**

To ensure a level of standardization and consistency, the DOD OIG, in collaboration with the other participating OIGs and the PRAC, developed a framework to guide data collection and analysis. Because the federal health care programs vary, each OIG determined which data sources to use in its analyses and coordinated, as necessary, with officials from its federal health care program to obtain this data. OIGs collected data about health care personnel levels and shortages, specialties or positions most affected by shortages, causes and impacts of shortages, and actions health care programs are taking to mitigate shortages.

**Data Analysis**

Each OIG analyzed health care personnel shortages, causes, impacts, and mitigating strategies for its federal health care program and provided the DOD OIG with the results of its analysis. The DOD OIG then reviewed the findings from the four federal health care programs to provide broader insights and shared the insights with the other OIGs for review of information related to their respective section. For agency-specific details about the data and analysis, refer to the methodology section in the appendix.

**Data Reviewed for Each of the Federal Health Care Programs**

**MTF**. The results reported in this review include the expertise and experiences of officials from 24 nonstatistically selected MTFs, as well as officials from the Defense Health Agency (DHA), office of

the Assistant Secretary of Defense (Health Affairs), and Service medical commands. Information and examples were collected during interviews with the MTF officials, such as the MTF directors, hiring officials, manpower personnel, and others. Sources of data used to corroborate statements made are cited throughout the report. Our scope included active duty Service members, civilians, and contractors in the MTFs, or DOD direct care; however, staffing data provided for authorized and filled positions is only for civilian personnel under the DHA as of January 2023, and does not include active duty Service members or contractors employed at the MTFs, or civilians employed by the Military Departments.

**BOP Health Care Services**. The health care personnel data discussed in this review include information about BOP civil service employees and commissioned officers of the U.S. Public Health Service who work in the health services units at BOP's institutions; however, it does not include the BOP's psychology services staff, who are considered separate from health services in the BOP's organizational structure. This review does not include information about contract health care providers who deliver specialized care to BOP inmates at community facilities or on-site at BOP institutions or who are hired on a short-term basis to fill vacancies. Although there are 121 BOP-managed institutions, BOP considers the federal correctional complexes, in which multiple institutions are co-located, to be a single facility when reporting staffing data. Therefore, the total number of facilities described in the staffing data and this review is 97. When examining only clinical staffing, the total facilities decreases to 96 because FCC Beaumont uses only contract clinical staff.

**VHA**. The health care personnel shortages discussed in this review include only occupations employed by VHA. This review summarizes information on shortages in health care personnel at 139 VHA facilities for FYs 2020-2022, including data gathered through an annual VA OIG survey.

**Nursing Homes**. This review includes the experiences of staff who were employed or contracted by Medicare– and Medicaid–certified nursing homes. Information obtained for this review included data on:

- staffing shortages that nursing homes reported to the Centers for Disease Control and Prevention's (CDC's) National Healthcare Safety Network (NHSN) for the weeks ended May 24, 2020, through September 11, 2022;

- nursing home staffing information based on payroll and other verifiable and auditable data that nursing homes reported in the Centers for Medicare & Medicaid Services' (CMS's) Payroll-Based Journal (PBJ) system for the quarters ended June 30, 2019, through June 30, 2022; and

- interviews with officials from 50 selected nursing homes about their experiences with staffing shortages both before and during the pandemic.[7]

## Limitations

This report does not present a comprehensive review of health care personnel shortages before and during the pandemic across all health care programs either provided through or administered by the Federal Government. The data and insights are limited to the federal health care programs and the types of health care personnel that each OIG chose to review. Personnel data varied across the federal health care programs; therefore, OIGs collected and reported shortages of health care personnel based on the data available to them. The information provided reflects the experiences of existing health care personnel and their perceptions of former health care personnel experiences, during the period of review. Therefore, officials may not have captured all reasons for shortages in health care personnel, the impacts of the shortages, or their efforts to attract and retain staff, or minimize staff burnout. Additionally, OIGs did not verify the accuracy of the contributing factors, impacts, or efforts with shortages in health care personnel that were shared by officials during interviews. For agency-specific limitations, see each OIG's detailed methodology in the corresponding appendix.

## Standards

The DOD OIG and HHS OIG conducted their work in accordance with the generally accepted government auditing standards (GAGAS) issued by the U.S. Government Accountability Office, and the DOJ OIG and VA OIG conducted their work in accordance with the Quality Standards of Inspection and Evaluation issued by the Council of the Inspectors General on Integrity and Efficiency (CIGIE). Each OIG followed its own processes to ensure that its contributions to this report met GAGAS or CIGIE standards, and they provided an attestation to the PRAC stating that it met those standards. This review was conducted under CIGIE's Quality Standards of Inspection and Evaluation.

# Glossary

**Alternative work schedule**: Both flexible work schedules and compressed work schedules.

**Augmentation**: The practice of assigning non-custody staff, such as teachers or health care professionals, to temporarily assume the duties of a correctional officer. BOP staff are considered correctional workers first, regardless of their occupation.

**Authorized position**: Billet or position for which the quality of the requirement has been validated and authorized to perform the billet functions.

**Billet**: A specific military or civilian manpower space, which is assigned qualifiers that define the duties, tasks, and functions to be performed and the specific skills and skill level required to perform the delineated functions.

**Bureau of Prisons (BOP) facilities**: Federal correctional institutions, detention centers, U.S. penitentiaries, and correctional complexes that house federal inmates and pre-trial detainees. Federal correctional complexes are facilities in which multiple institutions of varying security level are co-located.

**Burnout**: A result of chronic workplace stress characterized by feelings of energy depletion or exhaustion, increased mental distance from one's job or feelings of negativism or cynicism, and a sense of ineffectiveness.

**Clinical staff/personnel**: Clinical staff are health care personnel who deliver patient care.

**Contact tracing**: A process to identify people that came in close contact with a person infected by COVID-19.

**Compressed work schedule**: A fixed work schedule that enables a full-time employee to complete an 80-hour biweekly basic work requirement in less than 10 workdays.

**Department of Defense medical treatment facilities**: Military hospitals or clinics that provide direct care for beneficiaries.

**Direct hire authority**: The authority to make noncompetitive appointments based on a determination by OPM or the Secretary of that Department that a severe occupational shortage of highly qualified candidates exist for applicable occupations.

**Filled position**: Occupied billet or position performing the functions of the authorized position; the number of staff onboard.

**Flexible work schedule**: A flexible work schedule allows an employee with an 80-hour biweekly basic work requirement to determine their own schedule within the limits set by the agency.

**General schedule**: The general schedule (GS) pay system covers the majority of civilian white-collar federal employees in professional, technical, administrative, and clerical positions, with grades ranging from GS-1 (lowest) to GS-15 (highest).

**Health care personnel**: Personnel that provide clinical or nonclinical services in a health care setting.

**Lockdown**: In BOP institutions, periods of time during which inmate movement is restricted, generally to their cells or housing units, to address safety and security issues within the facilities. During the COVID-19 pandemic, the BOP imposed inmate movement restrictions, sometimes called "Shelter in Place" or "modified lockdown" as a strategy to mitigate exposure to and spread of COVID-19.

**Medical officer**: Positions with duties that advise on, administer, supervise or perform professional and scientific work in one or more fields of medicine, and when the degree of Doctor of Medicine or Doctor of Osteopathy is a fundamental requirement.

**Medicare– and Medicaid–certified nursing homes**: Nursing homes that are required to comply with health and safety requirements in federal regulations (42 C.F.R. part 483, subpart b) to participate in the Medicare and Medicaid programs.

**Nonclinical staff/personnel**: Health care personnel whose responsibilities are administrative, logistical, or clerical in nature to support clinical staff who provide care or medical treatment to patients.

**Nursing homes**: Facilities that provide services to individuals whose capacity for self-care is limited because of a chronic illness; injury; physical, cognitive, or mental disability; or other health-related conditions.

**Occupational Series Code**: OPM codes used to group positions with a similar specialized line of work and qualification requirements. For example, GS-0610 is the Nursing Series.

**Regional health services administrators**: Regional Health Systems Administrators (HSA) serve as principal advisors to the Regional Director and Deputy Regional Director in all matters related to health care delivery.  The primary responsibilities of the regional HSAs include developing suggestions for policy revisions, perform management assessments, and responding to health care problems at all institutions within the region (including Residential Reentry Centers). There are six regional HSAs positions corresponding with the BOP's six regions.

**Shortages**: Positions with vacancies or positions that are difficult to fill, to meet a desired or statutory level, which may or may not impact the level of care provided.

**Sick call**: Within the BOP, the process by which inmates request and receive routine or preventative medical care.

**Title 38 authority**: Personnel authorities for health care occupations primarily available to VA, with some personnel authorities delegated by OPM for discretionary use by other federal agencies.

**Veterans Health Administration facilities**: Sites of care including VA Medical Centers and outpatient settings that provide services to veterans; qualifying family members, dependents, and survivors of veterans; and eligible active military and Reserve Component members.

# U.S. Department of Defense (DOD)



According to the DHA, the Military Health System (MHS) is the most comprehensive military health care enterprise in the world. The MHS provides direction, resources, health care providers, and other means necessary to foster, protect, sustain, and restore health to over 9.6 million active duty Service members, military retirees, and their families. Health care services are delivered through two systems—the direct care system consisting of the DOD's MTFs, located worldwide, and the purchased care system consisting of partnerships with civilian health care provider facilities operated through TRICARE regional contracts (referred to as the "civilian network" throughout this review).[8]

## Medical Treatment Facility Personnel

The MTFs, or military hospitals and clinics, are critical to military medicine, where military, civilian, and contract personnel provide direct care for beneficiaries and gain the skills and training to support operational units. As of December 2, 2022, the DOD's direct care system consisted of 45 military hospitals, 525 outpatient and occupational health clinics, and 138 dental clinics. The MTFs are led by an MTF Director or Commander, and include personnel in areas such as administration, medical delivery, and ancillary support. The MTFs vary in size and offer different services; therefore, personnel staffing these facilities range from primary care providers to a wide range of specialists, including providers for mental health, obstetrics, urology, and dermatology.

## Military Health System Transition

According to the DHA FY 2022-2026 campaign plan, by 2026, the DHA will be a joint operational headquarters responsible for managing, executing, and delivering high-quality health care, medical education and training, military medical research and development, and public health support to the MHS' beneficiaries and the Services. Section 702 of the FY 2017 National Defense Authorization Act (NDAA) and sections 711 and 712 of the FY 2019 NDAA required that the Military Departments transition the administration of all the MTFs to the DHA for the purpose of implementing an integrated system of readiness and health.[9]

The Deputy Secretary of Defense paused the MHS transition from April 2, 2020, through November 9, 2020, to realign personnel and resources to support the pandemic mission. The transition resumed after the pause and in a February 24, 2022, memorandum, the Deputy Secretary of

Defense directed the continued implementation of the MHS organizational reform by directing the DHA to assume authority, control, and direction of military hospitals, clinics, and dental treatment facilities, to include the MTFs located overseas. At the time of our interviews, the MTFs transitioned or were in the process of transitioning their civilian personnel to the DHA. According to officials in the Human Capital Division at the DHA, the DHA completed the transition of the MTFs on October 23, 2022. The last milestone of the MTF transfer included transferring the MTF civilian personnel from the Military Departments to the DHA. However, active duty Service members working in the MTFs will remain the responsibility of their respective Military Departments.

## COVID-19's Impact on the Military Health System

The pandemic had a major impact on the DOD and the MHS. Early in the pandemic, the MTF officials reported facing challenges delivering health care at the MTFs with inadequate amounts of COVID-19 testing supplies and personal protective equipment while also having to adapt to delivering health care virtually for many patients. As the pandemic progressed and the Nation experienced shortages of health care personnel, DOD officials confirmed that the MTFs were experiencing shortages as well.

On January 12, 2022, the Under Secretary of Defense for Personnel and Readiness submitted a report to Congress addressing the shortage of behavioral health providers in the DOD, using data available from before the pandemic.[10] The report identified recruitment challenges facing the direct care network including active duty authorizations, dedicated funding and personnel for recruitment, salary caps, lengthy hiring processes, insufficient compensation packages for remote locations, and national behavioral health provider shortages. The report identified that the law limits compensation for civilians and active duty providers, making recruitment and retention difficult. Although the report to Congress supported recruitment challenges prior to the pandemic, the MTF officials reported that recruiting behavioral health providers was even more difficult during the pandemic.

Additionally, in April 2022, the DOD OIG highlighted shortages of health care personnel in the direct care network, citing that officials at 26 of 30 MTFs reported staffing shortages as the most serious challenge encountered by medical personnel during the pandemic. The MTF officials reported that while the staffing shortages, in part, were not a direct result of the pandemic, the additional requirements that accumulated over the course of the pandemic, with decreased staff for pandemic response, resulted in health care providers and clinical personnel being overworked and feeling burned out.[11]

## Scope of DOD OIG Review

This review provides information on shortages of active duty, civilian, and contractor health care personnel at 24 of the DOD's 45 hospitals and their associated clinics in the direct care system, as of December 2022. We conducted interviews with key MTF officials on clinical and nonclinical personnel working at the MTFs.[12] Our review includes data on health care personnel in the direct care system before the pandemic, March 1, 2019, to February 29, 2020, and during the pandemic, March 1, 2020, to January 2023.

This review does not include shortages of health care personnel in the purchased care, or civilian network of providers that provide health care services beyond the MTFs. Additionally, the DHA provided staffing data for authorized and filled positions for only civilian personnel under the DHA's authority, direction, and control, as of January 2023. The data does not include active duty Service members or contractors employed at the MTFs, or civilians employed by the Military Departments. See Appendix A: DOD for the DOD OIG's methodology.

DOD            DOJ            VHA            HHS

# Health Care Personnel Shortages Before and During the Pandemic

The MTFs experienced shortages of health care personnel before and during the pandemic. In April 2022, we reported that officials from 26 of 30 MTFs sampled indicated staffing challenges and shortages were the most serious challenges encountered by medical personnel working at the MTFs during the pandemic.[13] Additionally, we reported that officials from 11 of the 30 MTFs indicated staff burnout and fatigue were the most serious concern that they would encounter in the future. During that effort, we conducted interviews with the MTF officials from September 9, 2021, through October 4, 2021, where the MTF responses reflected a point in time with personnel in place at the MTF before or during the height of the pandemic. To determine whether shortages of health care personnel were still a concern for this review in support of the PRAC, we obtained data and conducted interviews with officials working at 24 of the MTFs that previously reported, as part of the April 2022 report, staffing shortages or burnout as the most serious challenge or future concern.

The MTFs did not provide consistent data to compare authorized and filled positions, before and during the pandemic, across our sample. However, the DHA provided personnel data as of January 2023 for the civilians under the DHA's management and administration. These personnel accounted for only a portion of health care personnel within the MTFs, and they did not include active duty Service members, contractors, or civilians under the Military Departments' management and control. Generally, the MTFs outside the continental United States employ more active duty Service members, as it is more challenging to hire civilians in those facilities. Therefore, the vacant civilian billets and percentages unfilled reported in Exhibit 1 represent only a portion of the MTF workforce.

Based on the DHA staffing data, there were over 6,000 civilian positions across the MTFs we sampled that were vacant as of January 2023. The data provided was not broken down by position to determine what civilian health care personnel positions had the largest shortages. However, over 80 percent of the civilian vacancies were positions within medical centers, which are the DOD's largest MTFs that provide a range of specialty and subspecialty care, serve as trauma centers for the Military and the community, and usually participate in General Medical Education and medical research programs. Additionally, many of the vacancies were at hospitals located in or near large metropolitan areas, such as Seattle, Washington; Washington, DC; and San Diego, California. See Exhibit 1 for the DHA civilian billets that were filled and vacant, as of January 2023, for the 24 MTFs we sampled.

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 202 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Defense**

**Exhibit 1: January 2023 DHA Civilian Billets Authorized and Vacant for the 24 Sampled MTFs**



| MTF | Vacant | % |
|---|---|---|
| Madigan Army Medical Center | 1,615 | 38% |
| 88th Medical Group (Wright-Patterson Air Force Base) | 168 | 36% |
| 51st Medical Group (Osan Air Base) | 3 | 33% |
| Blanchfield Army Community Hospital | 524 | 29% |
| Naval Medical Center Portsmouth | 473 | 28% |
| 673d Medical Group (Joint Base Elmendorf-Richardson) | 45 | 27% |
| Naval Medical Center San Diego | 499 | 25% |
| Landstuhl Regional Medical Center | 248 | 25% |
| Walter Reed National Military Medical Center | 770 | 24% |
| Naval Hospital Twentynine Palms | 21 | 22% |
| Naval Hospital Bremerton | 68 | 22% |
| Weed Army Community Hospital | 51 | 22% |
| 60th Medical Group (Travis Air Force Base) | 71 | 22% |
| Naval Medical Center Camp Lejeune | 175 | 21% |
| Naval Hospital Guam | 27 | 21% |
| William Beaumont Army Medical Center | 456 | 20% |
| Naval Hospital Camp Pendleton | 145 | 19% |
| Naval Hospital Jacksonville | 98 | 18% |
| Martin Army Community Hospital | 238 | 16% |
| Naval Hospital Sigonella | 3 | 15% |
| 48th Medical Group (Royal Air Force Lakenheath) | 9 | 15% |
| Womack Army Medical Center | 446 | 14% |
| Naval Hospital Rota | 2 | 10% |
| Tripler Army Medical Center | 87 | 5% |

■ Civilian billets filled   ■ Civilian billets vacant

Source: Data provided by the DHA from the Defense Civilian Personnel Data system and the DHA's Joint Table of Distribution, January 2023.

There were eight MTFs that had 25 percent or more of their DHA civilian positions vacant. These MTFs were generally located in or near large metropolitan areas or located in areas outside of the continental United States. Table 1 lists the MTFs that had 25 percent or more of their DHA civilian positions vacant.

**DOD**      DOJ      VHA      HHS

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 203 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Defense**

**Table 1: The MTFs That Had 25 Percent or More of Their DHA Civilian Positions Vacant**

| MTF | % of DHA Civilian Billets Unfilled |
| --- | --- |
| Madigan Army Medical Center | 38 |
| 88th Medical Group (Wright-Patterson Air Force Base) | 36 |
| 51st Medical Group (Osan Air Base) | 33 |
| Blanchfield Army Community Hospital | 29 |
| Naval Medical Center Portsmouth | 28 |
| 673d Medical Group (Joint Base Elmendorf-Richardson) | 27 |
| Naval Medical Center San Diego | 25 |
| Landstuhl Regional Medical Center | 25 |

Source: DOD OIG analysis of data provided by the DHA from the Defense Civilian Personnel Data system and the DHA's Joint Table of Distribution, January 2023.
Note: Percentages are rounded.

We interviewed 220 officials at the 24 MTFs to obtain their input and obtain documentation to determine the health care positions that the MTFs were experiencing the largest shortages. Officials we interviewed at all 24 MTFs reported that as of September 2022 their MTFs were experiencing shortages of health care personnel. The MTF officials stated that nurses, medical officers, behavioral health personnel, imaging technicians, laboratory technicians, and medical support assistants were in highest demand.[14] According to the MTF officials, health care personnel shortages increased during the height of the pandemic and at the time of the MTF interviews, held between August and September 2022, the MTFs had not been able to fill many of the positions. See Exhibit 2 for the highest reported shortages by position type for the 24 MTFs interviewed.

Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic

**U.S. Department of Defense**

**Exhibit 2: Number of MTFs That Reported Staffing Shortages Before or During the Pandemic, by Position**



Source: DOD OIG interviews with officials from sample of MTFs, August through September 2022.

Note: The totals represent the number of MTFs out of 24 that officials reported the position types. Officials interviewed did not always indicate whether the positions were short before or during the pandemic, so they are not specified in this figure.

# Contributing Factors That Led to Shortages of Health Care Personnel

DOD officials from the 24 MTFs we interviewed identified various contributing factors for shortages of health care personnel during the pandemic. See Exhibit 3 for the most commonly reported contributing factors of health care personnel shortages reported by the MTF officials.

**Exhibit 3: Number of MTFs That Reported the Top Contributing Factors That Led to Personnel Shortages**



Source: DOD OIG interviews with officials from sample of the MTFs, August through September 2022.
Note: The totals represent the number of the MTFs out of 24 that officials reported the cause.

## Noncompetitive Pay

The MTF officials reported that pay offered by the DOD was not competitive with pay provided by the private sector and VHA facilities, which was exacerbated by the pandemic, resulting in health care personnel shortages.

**Private Sector Competition |** Officials at 19 MTFs stated they lost personnel, such as physicians, nurse practitioners, physicians' assistants, nurses, technicians, and even housekeepers to civilian hospitals in the area for higher pay. For example, one MTF provided salary data for housekeepers in their area, quoting that a corporate hotel offered pay of $33,408 to $73,080 annually, a civilian hospital could offer $64,728 to $68,904 annually, and the MTF could only offer $32,635 to $38,544 annually.



DOD          DOJ          VHA          HHS

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 206 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Defense**

Officials at another MTF stated that civilian hospitals in the network were paying nurses $71 an hour in an inpatient unit, while an inpatient nurse at their MTF made $43 to $44 an hour as a GS-11 civilian position, which resulted in a significant pay gap. Furthermore, an MTF job announcement obtained in January 2023 for a vocational nurse offered $47,616 annually as a GS-6, while a private sector facility that was seven miles away, offered $81,120 annually, or $33,504 more than the DOD position. Additionally, the Director of Medical Services at one MTF stated that a trauma surgeon could make $1 million dollars a year in the public sector. However, DOD and federal requirements prohibit personnel in the Federal Government from making more than the President's salary of $400,000 a year.[15] The MTF officials at one location stated that the cost of living in their area had increased dramatically during the pandemic and the stagnant pay scales within the DOD could not compete with the private sector. The Deputy Commander for Clinical Services for one MTF stated that they received job offer letters every day from civilian hospitals offering less work for more pay.

The MTFs attempted to recruit additional temporary staff during the pandemic to assist with personnel shortages and the additional workload requirements added by the pandemic by using surge contracts. However, according to the MTF officials, the surge contracts that offered higher pay still could not compete with the pay offered in the public sector. Further, an official from one MTF stated that there was nothing in the surge contracts to prevent the existing contract staff from applying. Therefore, the contract staff that already worked in the MTF moved to the surge contract to obtain higher wages, which did not help the MTF with hiring during the pandemic.

**VHA Facility Competition |** Officials at 13 MTFs stated that they had personnel shortages during the pandemic because the MTFs could not compete with nearby VHA facilities. Specifically, according to the MTF manpower personnel, the VHA can offer positions with pay one grade higher than the MTFs based on the use of title 38 authority.[16] For example, an official from one MTF stated that they lost licensed practical nurses to the VHA because the VHA could offer them a position at a higher grade, resulting in a higher salary. An official from another MTF stated that they lost eight primary care providers to the VHA because of the differences in pay. While the DOD currently has title 38 authorities for pay for physicians and dentists, it cannot compete with title 38 salaries offered for other disciplines because the DOD has not fully taken advantage of its title 38 authorities.

## Pandemic Requirements

The MTF officials stated that pulling health care personnel from their duties at the MTF to support pandemic requirements such as COVID-19 vaccinations, testing, and contact tracing, as well as protocols for quarantine and travel restrictions contributed to shortages of personnel in the MTFs. According to the MTF officials, the MTFs lacked staff to perform the additional responsibilities created by the pandemic, such as COVID-19 testing and vaccinations, resulting in the use of existing staff to perform these duties. An official from one MTF stated that COVID-19 testing required the

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 207 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Defense**

MTF lab staff, patient administration staff, and providers to work 12-hour shifts to enable 24-hour operations.

An official from another MTF stated that the MTF used 24 personnel to staff a COVID-19 testing and vaccination tent from September 1, 2020, through July 31, 2022, which pulled their personnel away from their normal duties for a total of 16,776 personnel days. The MTF officials also cited contact tracing, a process to identify people that came in close contact with a person infected by COVID-19, as a task that removed the MTF personnel from their normal duties. The MTF officials stated it was a significant administrative burden during the pandemic because contact tracing was not the MTF's responsibility before the pandemic.

Further, an MTF official stated COVID-19 protocols such as quarantining and travel restrictions prevented personnel from reporting to work, resulting in shortages of health care personnel. For example, the MTF official stated that at one point during the pandemic, 25 nurses could not report to work because of COVID-19 exposure and that the MTF had to follow travel policies requiring staff to quarantine for 14 days on both the beginning and end of leave.

## Hiring Timelines

The MTF officials reported that the hiring process was very long, taking 6 months or longer because of security and credential checks, time to obtain an identification badge, or overseas screening requirements, which was made worse by the pandemic.[17] In April 2022, the DOD OIG reported that at one MTF, the earliest it could complete a hiring action before the pandemic was 7 months, but during the pandemic it took 12 months.[18] An official from another MTF stated that during the pandemic it took the MTF 24 months to hire a medical technician and an official at another MTF stated that they lost multiple nursing applicants because of the amount of time it took for credentialing checks. An MTF official at an MTF located overseas stated they had at least six candidates in FY 2022 that withdrew from the process because of the length of the security clearance process. Additionally, officials at one MTF stated that no one was working in-person at the identification card office to process common access cards during the height of the pandemic, delaying the onboarding process for new personnel.

The Acting Deputy Commander of Quality and Safety from one MTF explained that they worked in the private sector for 19 years and could hire nurses and have them on board, on average, within two weeks. They explained that the MTF had four people at its last orientation, and it took the MTF 6 months to get each candidate on board after they were selected for their positions.

## Limited Labor Pool

The MTF officials stated that there are shortages of health care personnel because there is a limited labor pool to recruit from because of worldwide shortages of health care providers. Officials from one MTF stated the ability of the contractor to provide staff was affected by a depleted pool

of personnel who were taking advantage of travel opportunities for more money in other parts of the country, while officials from another MTF stated that there was a limited number of qualified applicants in their remote area.

At another MTF, a contractor responded to a contract discrepancy report stating that because the contract was written before the pandemic, the contractor would not be able to fill the contracted positions without a pay rate increase.[19] According to the contractor, the mental health workers were demanding higher salaries because there was a shortage of mental health workers, which was worsened by the pandemic.

## Mission Support

The MTF officials supported various COVID-19 and worldwide missions, such as Operation Allies Welcome, and providing support for additional personnel in support of Ukraine, during the pandemic, which the MTF officials stated created additional personnel shortages.[20] For example, the Federal Emergency Management Agency requested assistance for the civilian hospitals throughout the United States, and the Government provided support through the Defense Support of Civil Authorities missions. These missions assigned health care personnel from the MTFs to assist civilian facilities in support of the nation's pandemic response efforts. For example, an official from one MTF stated that 300 military personnel from their MTF left on the U.S. Naval Ship Mercy in support of the Defense Support of Civil Authorities mission, which provided medical support in Los Angeles, CA, which was significantly affected by the pandemic. According to the MTF officials, this required the remaining providers to perform additional work and work additional hours.

An official at another MTF stated that the MTF's intensive care unit and medical surgical unit was significantly impacted when the MTF needed to send 43 of its nurses to support the U.S. Naval Ship Comfort. Additionally, because of the increased operations with Ukraine and Russia, an official from one overseas MTF stated that the MTF personnel provided audiology, optometry, and dental services at the pier to support the ships and other operational forces who were not enrolled beneficiaries in their area.

The MTF officials have the ability to request temporary backfills from the Service Medical Commands or the DHA when there are personnel shortages or personnel are pulled to support missions outside the MTF. However, according to the MTF and Service Medical Command personnel, the MTFs received very few to no replacements for the Service members supporting the Defense Support of Civil Authorities and worldwide missions because all of the MTFs and Services were strained during the pandemic. An official from one Service Medical Command stated that although their Services could provide the MTFs with replacement Service members for 2 months, the Services were less prone to approve a support request if it would create a shortage problem at another site.

## Federal and DOD-Imposed Restrictions

The MTF officials reported that federal and DOD-imposed restrictions contributed to shortages of health care personnel at the MTFs during the pandemic. The MTF officials explained that experience requirements for registered nurses (RN) hindered the MTFs' ability to hire. The DOD uses OPM's requirements that require the MTFs to hire an RN at the GS-5 level if the applicant has a bachelor's degree with no nursing experience or has a diploma or associate degree in professional nursing with 1 year of professional nursing experience. However, while RNs can be hired without 1 year of experience at the GS-5 level, an official at one MTF commented that it was an ineffective and nonsensical process because an RN with 1 year of experience or more, can be hired at the MTF as a GS-11, or six grades above what the DOD offers RNs that do not meet the experience requirement. Further, an MTF official stated that a licensed practical nurse, a position that requires less education than an RN, are rated at the MTF as a GS-6, or one level above the grade that the DOD hires its RNs who do not meet the 1-year experience requirement. The DOD MHS is noncompetitive because of the low pay, hindering DOD's ability to compete for nursing candidates.

The MTF officials also mentioned that active duty members retiring from Service must wait 180 days before beginning work in a civilian position at the MTFs. Specifically, section 3326, title 5, United States Code, requires Service members to wait 180 days before being appointed to a civilian position, even though the Service member is already familiar with the MTF's policies and systems and would not require as much training as someone newly-hired to the MTF. An MTF official stated that they would prefer to continue working as a civilian; however, they could not wait 180 days to be considered for employment and, therefore, would leave the MTF to work for the private sector after retirement where they can find a job more quickly. Although there is a waiver process to exempt retired Service members from the 180-day waiting period, an MTF official reported that the process to obtain a waiver and be onboarded was still over 120 days.

Officials at two MTFs located outside the continental United States stated that civilian employees are limited in how long they can work in overseas assignments, affecting their ability to hire and retain health care personnel. The MTF officials stated that civilian personnel would like the option to extend beyond 5 years at overseas locations. DOD Instruction 1400.25 limits civilian employment in foreign areas to five continuous years but allows the Head of the DOD component to grant extensions in 2-year increments, with the support of a documented business case analysis.[21] However, an MTF official explained that the process to extend civilian assignments takes too long because the MTF must demonstrate it has actively recruited for the position with no successful hires before the end of the individual's 5-year appointment.

The DOD OIG plans to further address the causes above with recommendations in a separate DOD OIG report.

# Impacts of Shortages of Health Care Personnel

The MTF officials from the 24 MTFs we interviewed reported impacts to the MTF's patients, the availability of specialty care, the health care personnel, and Military readiness because of health care personnel shortages during the pandemic. See Exhibit 4 for the number of MTFs that had personnel report that they experienced these impacts.

**Exhibit 4: Number of MTFs That Reported the Top Impacts of Health Care Personnel Shortages**



Source: DOD OIG interviews with officials from sample of MTFs, August through September 2022.
Note: Totals represent the number of MTFs out of 24 that had officials reporting the impact.

## Patient Impacts

Officials from all 24 MTFs cited impacts to patient care because of health care personnel shortages, such as decreased patient access to care, satisfaction, and preventative screenings or routine maintenance care for patients. For access to care, an official from one MTF explained that a patient's ability to get an appointment in the MTF during the pandemic decreased anywhere from 10 to 50 percent, which lengthened the time for beneficiaries to receive care. According to the MHS website, the access to care metrics for another MTF, with a benchmark of 7 days for routine appointments, jumped from 2.6 days in November 2020 to 10.2 days in November 2022.

Health care personnel vacancies at the MTFs outside the continental United States can lead to reduced or no specialty services for beneficiaries, where the civilian network is already limited or nonexistent. For example, an official at one overseas MTF stated that there are no behavioral health civilian network services for children in their area. The Child and Family Behavioral Health Service

**DOD**          DOJ          VHA          HHS

at the MTF closed in March 2022 because the MTF had difficulty hiring behavioral health personnel and lost behavioral health personnel whose extension requests were denied, as well as usage of behavioral health care increased. Additionally, all of the licensed clinical social workers were pulled from the behavioral health program to support the active duty clinic, resulting in no behavioral health services for children. The MTF official further stated that continued closure of the behavioral health network services for beneficiaries would increase the number of denials for the Exceptional Family Member Program, which would decrease the number of Service members eligible to be assigned to locations outside of the continental United States.[22]

The MTF officials also stated that patient satisfaction decreased during the pandemic. According to one MTF's patient satisfaction report, the scores declined during the pandemic, every year from 2020 through 2022. Specifically, in 2020, patients rated the ease of making an appointment at one MTF at 70.7, with a MHS benchmark of 74.0.[23] However, in 2022, patients rated that same category for the MTF approximately 14 percent lower at 56.3, well below the MHS benchmark of 78.2 for that year.

Officials from another MTF stated they had both sentinel and adverse events that were reported to the DHA Patient Safety Office due to low staffing or increased workload for staff.[24] Based on a comprehensive systematic analysis provided by the Patient Safety Program Manager, a pediatric patient had significant delays with diagnosis because of personnel shortages. Specifically, during the patient's need for care, four of five pediatricians from the MTF were deployed for missions in support of the pandemic, leaving one dedicated pediatrician and one family medicine provider with pediatric training to oversee the entire child dependent population at the MTF. As a result, pediatric operations were limited for 2 months, including deferred wellness visits, and the patient was seen virtually, which led to a delay in diagnosis and treatment for a metastasized tumor.

Additionally, the Patient Safety Program Manager provided an example of a patient that committed suicide within 72 hours of being seen in the emergency department that, according to the MTF officials, had low staffing. The MTF officials explained that the patient was seen by a provider who was unaware of the patient's history because the provider was temporarily assisting while the MTF was experiencing personnel shortages. The MTF officials also stated that psychiatrists were not evaluating patients in-person in the emergency department at that time because of pandemic protocols. According to the comprehensive systematic analysis, the sentinel event was attributed to various root causes, including task oversaturation for providers.

# Health Care Personnel Impacts

Officials from all 24 MTFs stated that shortages of health care personnel during the pandemic impacted the personnel remaining at the MTF, including increased work hours, decreased morale, increased duties, and decreased access to medical cases that are necessary for providers to gain or maintain skills. The MTF officials explained that because the DOD tasked health care personnel for other missions or because the MTF had long-standing vacancies, the personnel left to work in the MTF were required to work significantly more hours than normal. For example, an official at one MTF stated that Service members were working between 80 to 100 hours per week and, as a result, some providers were treated for mental health issues because of burnout. An official at another MTF stated that health care personnel were tasked for Defense Support of Civil Authorities missions resulting in the remaining personnel working up to 120 hours in a 2-week period.

According to an overtime report for civilian personnel working at one MTF, overtime hours increased almost 50 percent from 2019 through 2020 when the pandemic first began, increasing from 1,233 hours in 2019 to 1,816 hours in 2020. The MTF officials also stated that pay for increased overtime hours comes from their budget and limits their ability to hire additional personnel. Further, the MTF officials reported an increased use of behavioral health providers to treat the health care providers who were seeking care for their own mental health because of burnout.

Additionally, the MTF officials stated that performing duties outside of their normal job function was required because of shortages in health care personnel. For example, the MTF officials stated that providers checked patients in, recorded patient vitals, and cleaned their own areas because of shortages in support personnel, such as medical support assistance and housekeeping personnel. An official at another MTF stated that an enlisted pharmacy technician performed the MTF's emergency management functions, a role normally performed by a GS-13 civilian position, in addition to their pharmacy duties.

The MTF officials also discussed how shortages in health care personnel and reduced elective procedures decreased their ability to gain and maintain experience and skills. Specifically, personnel were not able to get the experience they needed to maintain their knowledge, skills, and abilities because the MTFs were not able to bring in a high volume of medical cases to learn from, and personnel were tasked to conduct tasks, such as overseas screening assignments or periodic health assessments as a result of the pandemic and health care personnel shortages. The MTF officials explained that they had to send some providers to civilian hospitals to maintain their knowledge, skills, and abilities.

The MTF officials also had concerns with tasking faculty who oversee the graduate medical education program to provide mission support. According to the MTF officials, a majority of the MTF's inpatients were cared for by the graduate medical education students who were medical residents under the supervision of the MTF faculty that have specific qualifications. Because faculty-to-student ratios must be maintained for the graduate medical education students to provide care, when the supervising faculty were tasked to support missions outside of the MTF, the MTF had to

reduce the number of patients who could be admitted and cared for safely, which also reduced the number of cases from which the residents could learn.

## The MTF and Product Service Impacts

Officials from all 24 MTFs stated that health care personnel shortages impacted health care services that were available in the MTF. Specifically, the MTF officials reported that their MTFs had to:

- reduce or suspend some specialty services and defer patients to the civilian network,

- decrease the number of patient visits, and

- reduce the capacity of inpatients because of the decreased health care personnel available during the pandemic.

For example, an official from one MTF stated that because of staffing shortages the MTF's inpatient "bed space" (capacity) decreased by 30 percent, outpatient access to care decreased by 50 percent, and the emergency room unit was downgraded to an emergent care clinic. The MTF officials stated that "shutting off" (suspending) or reducing services because of staffing issues resulted in diverting more health care services to the civilian network. For example, an official from one MTF stated that demand for mental health increased dramatically during the pandemic, and that because of staffing issues, most referrals were diverted to the civilian network. The MTF official provided data from the Composite Health Care System and MHS GENESIS showing that in 2020, the MTF had 2,600 mental health referrals, and the MTF was able to treat approximately 2,500 (95 percent) patients, only diverting less than 125 patients to the civilian network. However, in 2021 and 2022, mental health referrals increased significantly to 6,240 and 8,576, respectively, and because of the pandemic and staffing losses, the MTF was only able to treat approximately 1,200 (less than 20 percent) of the referred patients, diverting the remaining 80 to 85 percent of patients to the civilian network.

An official from another MTF stated that their MTF was authorized 41 enlisted laboratory technicians but explained that they would be down to only 4 technicians in February 2023. The official stated that pharmacy and laboratory operations were staffed 50 percent lower than they were 4 years ago so the MTF had to reduce laboratory and pharmacy services. The MTF officials also expressed concerns for increased risks to patient safety in the MTF. For example, one MTF official stated that not having experienced nurses to train new nurses led to safety concerns for patients. The senior enlisted leader at another MTF stated that the enlisted health care personnel and providers were exhausted from all of the work because of the shortages of personnel, and they were worried that it was only a matter of time before a provider would "miss something."

## Military Readiness Impacts

Officials from 13 MTFs reported operational force readiness and deployment delays because of health care personnel shortages. According to an official from one MTF, an MTF lab processed COVID-19 testing requirements in direct support of their operational forces. However, because of the limited availability of personnel in the MTF lab and the limited availability of lab services in the network to meet COVID-19 testing requirements, the operational force did not deploy as scheduled.

An official at another MTF stated that because of shortages in civilian lab technicians, active duty lab technicians had to work 12-hour shifts, 6 days per week, to test Service members in basic training for COVID-19. According to the Deputy Commander for Clinical Services, the laboratory technicians became burnt out and were provided mental health treatment because of stress. An MTF official stated that the MTF Commander cut back on testing and informed the operational commanders that the MTF would not be able to turn testing around fast enough for their Service members to deploy for their missions.

# Efforts to Recruit New Staff, Retain Existing Staff, and Minimize Personnel Burnout During the Pandemic

The DOD has several monetary programs to recruit and retain health care personnel; however, the MTF officials stated that even with monetary incentives, DOD compensation still could not compete with the private sector and other federal agencies. Based on interviews, efforts to minimize burnout varied by the MTF.

## Recruitment Incentives

The DOD has several monetary programs to recruit health care personnel. See Table 2 for a list of DOD recruitment incentives.

**Table 2: DOD Recruitment Incentives**

| | |
|---|---|
| **Surge Contracts** | Contracts awarded by the MTFs with higher hourly wages to recruit personnel to temporarily assist the MTFs during the height of the pandemic. |
| **Direct Hire Authority** | DOD's ability to recruit and appoint qualified persons directly, without competitive procedures, for occupations designated by the Secretary of Defense as a shortage category, or critical need occupation, including psychologists, physicians, and nurses.[a] This authority was delegated to the Secretaries of the Military Departments, Directors of the Defense agencies, and Directors of DOD field activities. |
| **Loan Repayment** | The federal student loan repayment program permits the DHA to repay federally insured student loans. Active Duty Health Professions Loan Repayment Program (ADHPLRP) pays for the degrees of commissioned officers qualified in health professions. |
| **Monetary Bonus** | The DHA may pay a recruitment incentive if an employee is newly appointed to a position that is difficult to fill, and the employee is not receiving incentive payments from a service agreement required for another incentive during the period of employment. Medical officers are entitled to a signing bonus if they have graduated from an accredited school in a health care profession, are qualified for appointment as a commissioned officer, and have been honorably discharged for at least 24 months, if a former health professions officer.[b] |

Source: DOD OIG review of the USD (P&R) Memorandums, DOD Instructions, DHA Instructions, and interviews with officials from sample of the MTFs.

a.  USD (P&R) Memorandum, Expansion of Direct Hire Authority for Certain Personnel of the Department of Defense, October 15, 2021.

b.  A health care professional officer is an officer designated as a medical officer, dental officer, veterinary officer, medical service officer or biomedical sciences officer, medical specialist, or a nurse.

**DOD**        DOJ        VHA        HHS

# Retention Incentives

The DOD has several incentives to retain health care personnel. See Table 3 for a list of DOD retention incentives.

**Table 3: DOD Retention Incentives**

| | |
|---|---|
| **Monetary Bonus** | Authorized if the position is difficult to fill or the employee has unique qualifications, there is a high risk that the employee would leave the federal Service; the employee is rated at least "Fully Successful," and the employee is a GS employee for at least 1 year. The bonus is up to 25 percent of the employee's salary and is paid from the MTF's budget. Medical officers are entitled to a multi-year retention bonus if they remain on active duty for 2 years or more after any other commitment. |
| **Student Loan Repayment** | The federal student loan repayment program permits the DHA to repay federally insured student loans. |
| **Special Salary Pay Tables** | The MTFs can submit a packet through the DHA to the OPM to request a special salary rate to combat pay inequities. Physicians and dentists are on a "GP" pay scale and can receive title 38 market pay instead of locality pay.[a] Medical officers are entitled to a special rate based on rank and experience, including board certification. |
| **Recognition** | Set aside time for employee appreciation, appraisal bonuses, time-off awards, early departure, command coins, contractor letters of appreciation. |
| **Flexibility** | Offer telework, virtual telehealth, remote opportunities, and alternative work schedules where available. |

Source: The DOD OIG review of the DHA Instructions and interviews with officials from sample of the MTFs.

a. GP is a pay plan code under the General Schedule pay system and includes physicians and dentists who receive title 38 market pay instead of locality pay.

## Efforts to Minimize Burnout

The MTFs and the DHA have developed ways to address and avoid staff burnout. See Table 4 for a list of efforts used by the MTFs to minimize burnout.

**Table 4: MTF Efforts to Minimize Burnout**

| | |
|---|---|
| **Mental Health** | Making counseling and behavior health sessions, meditation spaces, and chaplain services available to health care personnel. |
| **Time-off** | Encouraging the use of leave (except during the height of the pandemic when leave was denied because of mission requirements). |
| **Leadership Efforts** | Leadership providing flexibility for providers with their patient scheduling, including administrative time or down time for providers to catch up on their workload. |
| **Resiliency Training** | Training to help staff learn ways to relax and deal with burnout. |
| **Ready, Reliable Care[a]** | The DHA's campaign to leverage the entire workforce. Whether personnel are in clinical or administrative roles, all personnel are responsible for helping. |

Source: DOD OIG review of the DHA Instructions and interviews with officials from sample of the MTFs.

a.  Ready, Reliable Care is guidance that is not yet finalized or published, but is a DHA initiative to standardize care across the MHS to help reduce burnout.

# U.S. Department of Justice (DOJ)



The Federal Bureau of Prisons (BOP) is responsible for the safekeeping, care, and subsistence of federal offenders.  As part of this mission, the BOP provides medical care to the over 134,000 federal inmates and pre-trial detainees housed in BOP-managed institutions.[25] According to the BOP, it aims to effectively deliver medically necessary health care to inmates in accordance with proven standards of care without compromising public safety concerns inherent to the BOP's overall mission. The BOP uses a medical care level classification system to help match inmate health needs with institutions that can meet those needs. The classifications range from Care Level 1 for generally healthy inmates to Care Level 4 for inmates who require enhanced medical services or limited inpatient care. Institution care levels are based on the clinical capabilities and resources of the institution and the surrounding community.

Each of the BOP's 121 institutions operates an on-site health services unit that provides urgent and routine health care services. Additionally, each institution has procedures to handle medical emergencies during hours that health care providers are not on site. Seven of the BOP's 121 institutions are medical centers, which offer 24-hour inpatient care units and a variety of specialized services, such as dialysis, oncology, prosthetics and orthotics, and dementia care.

As of March 2022, a total of 2,998 personnel, worked in BOP's institution health services units, including 2,478 BOP-employed civil service employees and 520 commissioned officers of the U.S. Public Health Service.[26] The number and type of health services positions authorized at an institution vary based on the institution care level, population size, and special medical missions of the institution. In Table 1 below we present the nine most common health services positions at BOP institutions. Together, these position types account for about 84 percent of all institution-based health services positions within the BOP.[27] Registered nurse positions make up almost one-third of all institution health services positions.

DOD          **DOJ**          VHA          HHS

## Table 1: Most Common Health Services Positions at BOP Institutions

| Position Type | General Description of Responsibilities | % of Health Services Positions[a] |
|---|---|---|
| **Clinical** | | |
| Registered Nurse | Delivers physician-ordered care, performs nursing assessments and procedures, administers medications at designated pill lines, conducts triage and clinics, performs intake screening of newly admitted inmates, and delivers emergency nursing care. | 32% |
| Mid-level Practitioner | Certified nurse practitioners, certified physician assistants, and international medical graduates who assess, diagnose, and treat medical conditions under the license of a physician. Conducts physical examinations, emergency care, chronic care clinic evaluations, and preventive health care. | 12% |
| Medical Officer | Physicians with the authority to assess, diagnose, treat, and educate patients and to and prescribe medications. Performs physical examinations, orders diagnostic testing, provides treatment and prescribes medications as required, and refers patients to consultant specialists or community hospitals when necessary. Provides clinical oversight for mid-level practitioners and other clinical personnel. | 8% |
| Health Aid and Technician | Includes paramedic positions (manages emergencies and injuries, administers medications at designated pill lines, and performs intake screening and clinic duties during off-shifts) and medication technician positions (administers medications at pill lines, prepares medications, assists with pharmacy inventory.) | 7% |
| Pharmacist | Adjudicates medication orders, dispenses medication, counsels and educates staff and patients, and monitors the safe and appropriate use of medications. | 6% |
| Dental Officer | Responsible for the full range of dental care provided to inmates, including prevention, diagnosis and treatment of diseases, injury, and deformities of the mouth. | 5% |
| **Nonclinical** | | |
| Health Services Administrator | Functions as the department head for the health services units. Plans, directs, and manages the health services unit operations. | 6% |
| Health Information Specialist | Manages electronic and paper medical records and collects, stores, retrieves, and protects the confidentiality of health information. | 5% |
| Health Services Assistant | Schedules appointments; coordinates external medical trips; files medical information; manages correspondence, reports, and purchase cards. | 5% |

Source: DOJ OIG summary of BOP guidance and data.

a.  Total does not equal the 84 percent reported above because of rounding.

DOD    **DOJ**    VHA    HHS

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 220 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Justice**

## Impact of COVID-19 on the BOP

There have been over 60,000 inmate cases of COVID-19 since March 2020, according to the BOP's 2023 Congressional Budget Submission. The pandemic created challenges for the BOP as it worked to prevent and manage the spread of the disease in its institutions. The CDC noted that, due to the congregate nature of correctional environments, "the risk of COVID-19 transmission is higher in these settings compared with the general population." The BOP implemented a series of modified operations intended to help mitigate the spread of COVID-19 inside BOP facilities, including movement restrictions, limiting capacity for group activities, suspending in-person social visiting, and enhanced cleaning procedures.

The pandemic increased the workload for BOP institution health services personnel.  COVID-19 symptom screening, testing, and monitoring and caring for inmates in quarantine and medical isolation added significant responsibilities to the BOP's health services units. Modified operations put in place to help manage the pandemic also increased workloads. For example, as a result of restrictions on inmate movement, some institutions conducted sick calls, that is the process by which inmates request and receive routine or preventative medical care, and delivered medication in multiple discrete housing units that are located across large compounds. This is in contrast to the standard practice wherein large numbers of inmates from multiple housing units could report to a single, centralized location to receive those services.

Further, some modified operations directly affected health care delivery during the pandemic. For example, at some institutions where operations were severely disrupted due to the pandemic the BOP postponed routine services in order to focus on urgent health care needs, postponed routine and elective external medical trips, and suspended routine dental care at institutions where there was widespread COVID-19 transmission.

## Scope of DOJ OIG Review

This review provides information on BOP civil service employees and commissioned officers of the U.S. Public Health Service who work in the health services units at BOP institutions. Although there are 121 BOP-managed institutions, the BOP considers the federal correctional complexes, in which multiple institutions are co-located, to be a single institution when reporting staffing data instead of counting each constituent facility separately. Therefore, the total number of facilities described in the March 2022 BOP staffing data used in this review is 97. When looking at only clinical positions, the total facilities decreases to 96 because the 97th facility, FCC Beaumont uses only contract clinical staff.

This review does not include BOP's psychology staff because they are not part of the BOP's health services units. Additionally, this review does not include information about contract health care providers who may provide specialized on-site care at BOP institutions, cover institution vacancies

DOD          **DOJ**          VHA          HHS

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 221 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
U.S. Department of Justice

on a short-term basis, or deliver care to BOP inmates at community facilities not operated by the BOP. (See Appendix B: BOP for DOJ OIG's methodology.)

# Health Care Personnel Shortages Before and During the Pandemic

Health services personnel shortages have been a long-standing challenge for the BOP.  As of September 2014, health services positions at BOP institutions were only 83 percent filled overall, according to a DOJ OIG report on the BOP's medical staffing challenges, published in March 2016.[28] As shown in Exhibit 1 below, from March 2019 through March 2022, the BOP experienced similar fill rates for health services personnel positions, both before and during the pandemic. Although the number of authorized health services positions, or total positions BOP could fill, varies by year, the BOP has consistently struggled to fill health services positions at its institutions.

**Exhibit 1: Percent of Institution Health Services Positions Filled**



Source: DOJ OIG analysis of BOP data.

From mid-2019 through mid-2021, the BOP made progress toward addressing its shortages of health services personnel. Despite the pandemic, the BOP increased the number of filled health services positions during this time, as shown in Exhibit 2 below. However, based on available data, the overall fill rate for institution health services positions never exceeded 85 percent, and the fill rate declined from August 2021 through at least July 2022. The decrease in health services staff appears to be driven both by a decrease in hiring and an increase in resignations.

DOD     DOJ     VHA     HHS

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 222 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Justice**

**Exhibit 2: Net Increases and Decreases in Health Services Staffing, by Pay Period, January 2019 Through July 2022**



Source: DOJ OIG analysis of BOP data.
Note: Each rectangle represents the net increase or decrease in staffing for the pay period. There are 26 pay periods each calendar year.

During this period, the staffing levels of individual institutions ranged from fully staffed down to only 37 percent staffed. Regional Health Services Administrators (HSA) generally identified a fill rate of 80 to 85 percent for health services positions as a threshold of concern, although some emphasized that even institutions with a higher overall filled percentage could still have specific critical vacancies that drastically hinder health services operations. There are often only one to two authorized positions for each type of position, especially at smaller institutions, which means that a single dental officer vacancy, for example, could render an institution unable to offer on-site dental care. Further, clinical staff who provide direct inmate care often have specialized roles and licensing requirements so other health service staff often cannot cover the responsibilities of those vacant positions. While clinical staff can cover administrative tasks, nonclinical staff cannot assist with tasks such as medication delivery. As shown in Exhibit 3 below, BOP health care staffing has been consistently lower on the clinical side.

DOD     **DOJ**     VHA     HHS

Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic

**U.S. Department of Justice**

**Exhibit 3: Fill Rates for Clinical and Nonclinical Health Services Positions**



Source: DOJ OIG analysis of BOP data.

Regional HSAs we interviewed also identified specific clinical positions that they have found to be particularly challenging to fill, including medical officers (physicians), mid-level practitioners (such as nurse practitioners and physician assistants), and nurses. (See Table 1 above for descriptions of these roles.) These challenges are apparent in our analysis of BOP's staffing data for March 2022. As shown in Exhibit 4 below, 85 of the 96 (89 percent) BOP facilities had one or more clinical position vacancies. These shortages are especially concerning for the 13 facilities that did not have a medical officer on staff as of March 2022. The responsibilities of medical officers (physicians) generally include diagnosing and treating patients, prescribing medications, referring patients for specialist care, and overseeing other clinicians. Although direct patient care responsibilities can be covered by mid-level practitioners, these types of critical vacancies may require the BOP to bring in staff from other locations on temporary duty assignments, or to use short term emergency contracts to fill the gaps.

DOD     **DOJ**     VHA     HHS

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 224 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Justice**

**Exhibit 4: Number of Facilities with Vacancies in Select Clinical Positions, March 2022**



Source: DOJ OIG analysis of BOP data.

Note: There are 96 facilities represented in this data because the BOP's staffing data considers all institutions within a federal correctional complex together. The 97th facility, FCC Beaumont, is not included in this data because it relies solely on contracted clinical staff. The facility total for mid-level practitioners is 94 because there were two additional facilities without authorized mid-level practitioner positions in March 2022.

Additional analysis of the positions that regional HSAs identified as hard to fill reveals that despite an increase in staffing between 2020 and 2021, staffing fill rates for nurses and mid-level practitioners decreased between 2021 and 2022. See Table 2 below. In particular, in March 2022, the filled rate for nurses fell below early pandemic levels. At that time, 69 percent (66 of 96 facilities) had vacant nurse positions, as shown in Exhibit 4. With respect to filled medical officer positions across BOP institutions, the percentage remained critically low during the pandemic. On top of these shortages, the current number of authorized clinical positions may not reflect the actual health services staffing needs at institutions, according to several Regional Health Services Administrators (HSA). One Regional HSA we interviewed said that the number of nurses authorized for his region is not sufficient to meet inmate health care demand.  Therefore, BOP position shortages may be even more critical than the data shows.

**Table 2: Fill Rates for the BOP's 3 Most Common Clinical Positions During the Pandemic**

| Position | March 2020 | March 2021 | March 2022 |
|---|---|---|---|
| **Medical Officers** | 68% | 69% | 69% |
| **Mid-Level Practitioners** | 76% | 82% | 80% |
| **Nurses** | 84% | 87% | 82% |

Source: DOJ OIG analysis of BOP data.

DOD          **DOJ**          VHA          HHS

# Contributing Factors That Led to Shortages of Health Care Personnel

Although it is not reflected in the overall staffing data, staff illnesses contributed to health services staffing shortages during the pandemic as health services personnel contracted COVID-19 and needed to take sick leave to recover. For example, FCI Milan reported that 50 percent of its medical staff contracted COVID-19 and had to take sick leave in the first week of its first COVID-19 outbreak in April 2020.[29] Overall, FCI Milan reported that 75 percent of its health services staff contracted COVID-19 and had to take sick leave at some point during that outbreak. As a result, one Mid-level Practitioner reported that they and another clinical staff member worked alone for weeks, taking on the responsibilities of the other staff on sick leave.

Additionally, we identified numerous factors that impair the BOP's ability to recruit and retain health services personnel, including several challenges the BOP has reported as longstanding issues, as well as additional reasons identified by regional HSA and human resources staff we interviewed:

**Limited labor pool:** The BOP needs mostly primary care physicians, but medical school graduates increasingly pursue medical specialty fields over primary care medicine.

**Location:** Many BOP institutions are located in rural areas, and the BOP has found it challenging to recruit health care professionals in these areas because of limited availability locally and difficulty recruiting these professionals from outside the area. Conversely, in urban areas, the BOP faces competition with other health care employers.

**Noncompetitive pay:** In addition to the location-driven challenges described above, interviewees identified further hiring and retention issues in urban locations due to higher cost of living in urban areas for which BOP salaries may not be commensurate (equal or adequate).

Some federal agencies have title 38 authority, which allows them to offer higher salaries across all licensed medical disciplines. While the BOP currently has title 38 authorities for three disciplines – psychiatrists, physicians, and dentists – it cannot compete with title 38 salaries offered for other disciplines.

During the pandemic, health care professionals, especially nurses, were in high demand and often were offered higher-than-usual pay rates that the BOP could not match.

**Hiring process:** Aspects of the hiring process can be challenging for health care recruiting. Specifically, the federal hiring process is different than what health care professionals may be used to in the private sector, and it can be time consuming for both applicants and the BOP. Nuances in the job postings and application process may prevent applicants from applying to or

being selected for available job opportunities. Additionally, not filling vacancies fast enough can lead to a "domino effect" of resignations as workloads are distributed to remaining staff.

**Limited promotion opportunities:**  Limited opportunities for career advancement in some health services positions can result in clinical personnel moving into nonclinical supervisory roles and experienced nonclinical personnel leaving to take other opportunities that would allow them to qualify for supervisory roles in the future.

**Challenges of the job:** Working in the correctional health care setting may not be a preferred workplace for everyone. The correctional setting has additional stressors and responsibilities that health care workers do not have to contend with in other settings.  For example, a regional HSA stated that nurses in the community did not have the same requirements as employees who work in correctional facilities, such as requirements to wear stab vests, carry a "big wad of keys," or carry oleoresin capsicum (pepper) spray. Because of these added challenges, one interviewee stated that the BOP's total compensation may need to exceed what other employers are offering to attract and retain health care staff.

**Available schedules:** 40 health services exit survey respondents mentioned that having a different schedule would have allowed them to stay with the BOP, including compressed schedules, part-time options, and telework.

# Impacts of Shortages of Health Care Personnel

Shortages of health care personnel had effects on inmate care, as well as personal and professional effects on health care staff during the pandemic.  Staffing shortages also had financial impacts on the BOP, as staff worked overtime to manage increased workloads.

## Patient Impacts

**Decreased Patient Satisfaction**

According to an April 2021 survey on federal inmates' experiences during the pandemic, inmates generally perceived that the quality of health care made available to them decreased during the pandemic, particularly during restrictions of inmate movement through lockdowns that the BOP implemented to prevent the spread of COVID-19.[30] Specifically, an estimated 80 percent of inmates rated BOP's provision of medical care as poor during pandemic lockdowns, compared to an estimated 41 percent of inmates who described the provision of medical care as poor before the pandemic.

DOD             DOJ             VHA             HHS

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 227 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Justice**

**Delays in Routine and Preventative Care**

As COVID-19 outbreaks disrupted normal operations at BOP institutions, health services units also had to adjust their operations. BOP's pandemic response plan recommended that, depending on the COVID-19 level in the institution and the community, BOP institutions reduce or postpone preventative health care services, postpone care for low priority health problems, and focus on life-saving care.

At some institutions, health care staffing shortages affected the BOP's ability to provide routine medical care. For example, staff at the Metropolitan Detention Center Brooklyn reported that severe staffing shortages resulted in challenges responding to sick call requests. Sick call wait-times increased significantly as the institution received a much higher number of sick-calls due to COVID-19. An official from the Metropolitan Detention Center Brooklyn reported that in late September 2020, there were 160 inmate sick call requests dating back to early July 2020 that had not been scheduled or completed. One regional HSA we interviewed reported that the region had observed a backlog of nursing tasks during the pandemic; for instance, one of the institutions in their region had a backlog of 170 electrocardiograms.

**Increase in Telehealth Use**

During the first year of the pandemic, the BOP expanded access to telehealth services, which can help promote access to medical care generally, while also mitigating the risk of COVID-19 transmission. The proportion of inmates in BOP-operated institutions using telehealth more than doubled compared to the prior year. Telehealth services were used for both external visits delivered by outside providers, as well as clinical encounters with internal providers. Psychiatry visits with internal BOP providers were the leading type of telehealth visit for specialty care, accounting for 41 percent of specialty care visits.  For more information on the BOP's use of telehealth during the pandemic see the PRAC report Insights on Telehealth Use and Program Integrity Risks Across Selected Health Care Programs During the Pandemic.

DOD          DOJ          VHA          HHS

# Health Care Personnel Impacts

**Increased Workloads**

The pandemic increased health services staff workloads as they handled large numbers of inmate illnesses due to COVID-19, as well as took on new responsibilities including screening and testing for COVID-19 and monitoring of quarantine and isolation units. Two regional HSAs noted that mass-testing initiatives, in which entire housing units had to be tested for COVID-19, were extremely labor intensive for health services staff.

In addition to the pandemic, health service staff workloads are also routinely increased due to augmentation, which is the practice of assigning non-custody staff, such as teachers or health care professionals, to temporarily assume the duties of a correctional officer. Regional HSAs that we interviewed stated that clinical providers were often exempt from augmentation based on institution-level agreements. However, one regional HSA emphasized that augmenting staff from any health services role can cause work to accumulate.

We assessed augmentation hours and found that that BOP health services personnel worked over 11,300 augmentation hours during the first year of the pandemic. In Table 3 below, we provide the augmentation hours for BOP's health services personnel by pandemic year. Although total augmentation hours for health services personnel were lower in the first year of the pandemic than in other years, the practice still increased health services staff workloads during the pandemic, as staff either needed to delay the completion of their regular responsibilities, or transfer them to other health services staff, when asked to take on temporary correctional officer duties. The use of augmentation was accompanied by a 56 percent increase in overtime hours, which we discuss below.

**Table 3: BOP Health Services Personnel Augmentation Hours by Pandemic Year**

| Pandemic Year | Augmentation Hours | Number of Employees |
|---|---|---|
| Before Pandemic (March 2019 - February 2020) | 15,636 | 416 |
| First Year of Pandemic (March 2020 - February 2021) | 11,386 | 296 |
| Second Year of Pandemic (March 2021 - February 2022) | 11,877 | 315 |
| Third Year of Pandemic (March 2022 – August 2022) | 11,486[a] | 307 |
| **Total** | **50,386**[b] | **659** |

Source: DOJ OIG analysis of BOP augmentation hours.

a.   This sum represents a partial year. At the time of our data request, the last date available for overtime data was August 2022.

b.   Total does not equal the actual sum because of rounding.

Additionally, we found that augmentation is not standardized across the health services occupational series at the BOP. Of the 50,386 augmentation hours worked by health services staff from March 2019 through August 2022, 38 percent of those hours were performed by medical records technicians, 10 percent by health technicians, and 6 percent by assistant health service administrators.

**Well-Being**

Regional HSAs we interviewed described the experience of health services personnel during the pandemic a variety of ways, including "arduous" and "stressful." They also said that health services personnel were "severely overworked" and often "scared" and "exhausted." In response to a 2021 survey of institution staff, 75 percent of health services personnel respondents (583 of 775) reported experiencing increased stress or anxiety at work because of the pandemic, and 34 percent of respondents (262 of 775) reported considering leaving the BOP because of the pandemic.[31]

DOD        **DOJ**        VHA        HHS

# Financial Impacts

**Overtime Costs**

One of the tools that the BOP uses to supplement shortages of personnel is authorizing BOP employees to work overtime. We assessed BOP's overtime spending and found that that BOP health services personnel worked over 314,000 overtime hours during the first year of the pandemic, at a cost of $15 million, which represented an increase of 56 percent and 64 percent, respectively, compared with the overtime hours and costs in the year before the pandemic. In Table 4 below, we provide the overtime hours and costs for BOP's health services personnel by year of the pandemic.

**Table 4: BOP Health Services Personnel Overtime Hours and Costs by Pandemic Year**

| Pandemic Year | Overtime Hours | Overtime Costs |
|---|---|---|
| Before Pandemic (March 2019 - February 2020) | 201,007 | $9,164,471 |
| First Year of Pandemic (March 2020 - February 2021) | 314,498 | $15,044,010 |
| Second Year of Pandemic (March 2021 - February 2022) | 198,299 | $9,419,537 |
| Third Year of Pandemic (March 2022 - October 2022)[a] | 136,245 | $6,577,194 |
| **Total** | **850,049** | **$40,205,212** |

Source: DOJ OIG analysis of BOP overtime data.

a.   At the time of our data request, the last date available for overtime data was October 2022.

In addition, we found that overtime is not standardized across occupational series at the BOP; rather, a small number of position types account for a large percentage of health services overtime. For example, nurses accounted for nearly 55 percent of all overtime hours worked by BOP health services personnel from March 2019 through October 2022, which we calculated to be the equivalent of approximately 61 full time positions per year.

# Efforts to Recruit New Staff, Retain Existing Staff, and Minimize Personnel Burnout During the Pandemic

From January 1, 2019, through December 31, 2021, the BOP spent about $27.8 million in incentive payments to over 1,300 health services employees in an effort to attract and retain its medical personnel.  For several decades, BOP policy has authorized the use of recruitment, relocation, and retention incentives either to encourage prospective employees to accept a position or retain current employees with high or unique qualifications who would likely leave BOP without an additional incentive to stay. The BOP increased its use of incentive payments in 2020, during the pandemic.

## Recruitment Initiative

From April 2020 through January 2021, the BOP ran an advertising and marketing campaign to hire health services staff through expanded recruitment efforts. This hiring campaign represented an attempt to rebrand and market the BOP for new recruits and included the use of online recruiting, social media, and web analytics. For example, the BOP held live social media events geared toward the recruitment of nurses to reach wider audiences and drive applicants to the BOP application portal. Data on incoming BOP employees indicates that the BOP hired more new health service staff in 2020 than it did in either 2019 or 2021.

## Recruitment Incentives

The BOP can offer monetary and non-monetary incentives, which can help recruit health care personnel. Several of BOP's regional HSAs and regional human resources administrators stated that the most effective recruitment incentives involved monetary compensation. Specific incentives they listed included recruitment bonuses, relocation incentives, student loan repayments, salary above the minimum step of the candidates qualifying grade, and use of title 38 pay. In Table 5 below, we provide additional detail on these five monetary recruitment incentives.

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 232 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Justice**

**Table 5: Monetary Recruitment Incentives for BOP Health Care Personnel**

| Incentive | Description | Service Agreement |
|---|---|---|
| **Monetary Bonus** | Lump-sum payment, up to 25 percent of pay, to a newly appointed employee in a position that is difficult to fill with a high-quality candidate. | 24 months |
| **Relocation** | Lump-sum payment, up to 25 percent of pay, to current BOP employees who relocate to a designated hard-to-fill location. | 24 months |
| **Student Loan Repayment** | Up to $10,000 per calendar year for up to six years, not to exceed a maximum amount of $60,000. | 36 months |
| **Starting Pay** | Appointed at a salary rate above the minimum step of a candidate's qualifying grade, based on superior qualifications for non-attorney positions. | None |
| **Title 38** | Special pay authority for all BOP physicians, dentists, and psychiatrists. | None |

Source: BOP, Program Statement 3530.02: Compensation.

Our analysis showed that from January 1, 2019, through December 31, 2021, BOP paid $8.45 million in recruitment bonuses, relocation incentives, and student loan repayments. Table 6 summarizes the number of employees and amounts paid for each of these three types of incentives by calendar year.

**Table 6: Number of Employees and Dollar Amounts of BOP Recruitment Incentive Payments for Calendar Years 2019 Through 2021**

| | Recruitment Bonus | | Relocation Incentives | | Student Loan Repayment | |
|---|---|---|---|---|---|---|
| *Calendar Year* | *Number of Employees* | *Amount Paid* | *Number of Employees* | *Amount Paid* | *Number of Employees* | *Amount Paid* |
| **2019** | 89 | $1,556,658 | 6 | $74,432 | 148 | $1,378,111 |
| **2020** | 95 | $1,901,926 | 5 | $98,412 | 126 | $1,207,059 |
| **2021** | 39 | $707,014 | 5 | $71,432 | 158 | $1,463,735 |
| **Total** | **223** | **$4,165,599[a]** | **16** | **$244,276** | **278[b]** | **$4,048,905** |

Source: DOJ OIG analysis of BOP data.

a.  Total does not equal the actual sum because of rounding.

b.  Employees may receive student loan incentive payments over several years and increments. As a result, the total amount depicted in the Table represents a unique count of any employee receiving student loan repayment from 2019 to 2021, as opposed to a cumulative total of the employee count for each year.

Additionally, the BOP used its title 38 personnel authorities to hire 34 medical officers and 20 dental officers between January 1, 2019, and December 31, 2021. A regional HSA stated that expanding title 38 authorities from psychiatrists to physicians and dentists in 2019 was a "significant improvement" that helped the BOP to compete with the private sector and other governmental agencies. Finally, BOP officials cited a pay-setting authority known as above the minimum rate (AMRs) that helped hire health care personnel. Based on our analysis of AMR incentives for health care personnel, we found that the BOP used this authority 540 times to attract candidates from outside government service between January 1, 2019, and December 31, 2021. Further, 385 of 540 (71 percent) of all AMR incentives applied to health care personnel were given to nurses.

In addition to the above monetary incentives, BOP officials cited both direct hire authority and the negotiation of annual leave credits as helpful, non-monetary recruitment tools. Through authority granted by the OPM, the BOP can leverage government-wide direct hire authorities for five types of health services positions at all its institutions.[32] However, a senior BOP human resources official stated that the BOP did not have the human resources staff with the necessary skills to leverage this authority enterprise-wide. Our analysis revealed that from 2019 to 2021, the BOP only used direct hire authorities for health services personnel at three of its institutions, all medical centers, for a total of 71 health care direct hires.

# Retention Incentives

BOP officials reported that one of the main factors contributing to turnover in health services personnel was BOP's low compensation compared to other federal agencies and the private sector. Our analysis of exit surveys for health services staff from FY 2019 through FY 2022 found that pay was the most frequently cited factor for why employees were leaving. To improve health services retention, BOP spent $19.39 million in retention incentives to over 1,100 health care employees from January 1, 2019, through December 31, 2021. Table 7 summarizes the number of employees and amounts paid for retention incentives, by calendar year.

**Table 7: Number of Employees and Dollar Amounts of BOP Retention Incentive Payments for Calendar Years 2019 Through 2021**

| Calendar Year | Number of Employees | Amount Paid |
|---|---|---|
| 2019 | 469 | $6,311,308 |
| 2020 | 461 | $6,918,848 |
| 2021 | 420 | $6,162,232 |
| **Total** | **1,107**[a] | **$19,392,388** |

Source: DOJ OIG analysis of BOP data.

a.  Employees may receive retention incentives for multiple years. As a result, the columns showing the total number of employees receiving retention incentives by year and the cumulative total number of employees who received retention incentive payments over the 3 years do not total.

In addition to monetary incentives, BOP officials reported the following efforts to retain existing health care personnel.

- Approving compressed work schedules

- Awarding time-off incentives

- Granting permission for outside employment

- Emphasizing the ability to retire with law enforcement benefits after 20 years of service at age 50

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 235 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Justice**

## Efforts to Minimize Burnout

According to both BOP officials we interviewed and exit surveys from separated health services employees, numerous staff left the BOP because of the increased workload resulting from the pandemic and lower staffing levels. One regional HSA stated that BOP's health services personnel worked very hard during the pandemic and experienced burnout, which in turn caused a lot of turnover.

To reduce health care personnel burnout, BOP officials stated that they encouraged personnel to access the BOP's Employee Assistance Program and encouraged management to monitor and support staff well-being. During the pandemic, BOP institutions also activated Correctional Support Teams, previously called Crisis Support Teams, which provided peer support to staff in response to critical incidents. However, the Correctional Support Team model, which entailed peer support staff walking throughout facilities and talking to staff members, were limited because of the pandemic modifications, such as social distancing and staff movement restrictions.

# U.S. Department of Veterans Affairs (VA)



The Veterans Health Administration (VHA) runs the largest integrated health care network in the United States, providing services through 140 facilities encompassing over 1,200 sites of care, including VA Medical Centers and outpatient settings. More than 371,000 health care professionals provide comprehensive health services, including telehealth.[33] As of September 2022, over 9 million veterans were enrolled. In addition to caring for veterans, VHA also serves qualifying family members, dependents, and survivors of veterans; and eligible active military and Reserve Component members.

## COVID-19's Impact to the VHA

The COVID-19 pandemic altered the delivery of health care in the VHA in several ways. For example, VHA facilities began shifting care from in-person to telehealth to limit face-to-face interaction. The demand for inpatient care also increased as COVID-19 hospitalizations grew, whereas the demand for elective and outpatient care decreased. In addition to facing these alterations in the delivery of health care during the pandemic, VA serves as the nation's support system during times of emergencies.[34]

## Scope of VA OIG Review

This review summarizes information on shortages at 139 of 140 VHA facilities for FYs 2020-2022, including data gathered through an annual VA OIG survey. The Manila facility was excluded because its staff were foreign nationals employed by the State Department. For the survey, VHA-identified facility points of contact reported severe occupational shortages among both clinical and nonclinical occupations employed by VHA. Severe occupational shortages should not be confused with vacancies. A severe occupational shortage refers to particular occupations that are difficult to fill, and a shortage exists when criteria set forth in 5 C.F.R. § 337.204, Severe Shortage of Candidates, are applied. Vacancy refers to an unoccupied position and is distinct from the designation of a severe occupational shortage. For example, a facility could identify an occupation as a severe occupational shortage, which could have no vacant positions or 100 vacant positions. (See Appendix C: VA OIG methodology and Appendix E: Shortages Reported by at least 20 percent of VHA Facilities)

DOD          DOJ          **VHA**          HHS

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 237 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**Veterans Health Administration**

# Health Care Personnel Shortages Before and During the Pandemic

In response to VA OIG concerns related to access to VHA care, scheduling practices, and excessive wait times at the Phoenix Health Care System, Congress passed the Veterans Access, Choice, and Accountability Act (VACAA) of 2014.[35] VACAA and the subsequent VA Choice and Quality Employment Act (VCQEA) of 2017 required the VA OIG to provide annual determinations of VHA occupations with the largest shortages.[36] VACAA and VCQEA also established authority for the Secretary of Veterans Affairs to directly recruit and appoint qualified personnel to occupations determined to have staffing shortages by the VA OIG. For each of the time periods discussed in this review, the VA OIG found widespread shortages across VHA facilities.[37]

## Severe Occupational Shortages from FY 2020 Through FY 2022

All 139 VHA facilities reported at least one severe occupational shortage in FY 2022, a departure from the FYs 2020–2021 VA OIG reports in which several facilities reported no severe occupational shortages.[38] The total number of severe occupational shortages reported by facilities in FY 2022 survey responses increased comparatively as seen in Table 1. For the first time since reporting to the facility level, there was a net increase in severe occupational shortages suggesting it was more difficult to fill positions in VHA. Additionally, 22 occupations were identified as a severe occupational shortage by at least 20 percent of facilities in FY 2022. This was an increase of occupations from 19 in FY 2021 and 17 in FY 2020. See Appendix E for shortages reported by at least 20 percent of facilities from FYs 2020-2022.

**Table 1: Changes in Total VHA Facility-Designated Severe Occupational Shortages from the Prior Fiscal Year**

| Fiscal Year | Number of Severe Occupational Shortages | Net Change from Prior Fiscal Year | |
| --- | --- | --- | --- |
| | | Number | Percent |
| 2020 | 2,430 | -255 | -9.5 |
| 2021 | 2,152 | -278 | -11.4 |
| 2022 | 2,622 | 470 | 21.8 |

Source: VA OIG analysis of VHA facilities' responses to the VA OIG's FYs 2019 through 2022 staffing surveys.

DOD          DOJ          **VHA**          HHS

# Most Frequently Reported Severe Occupational Shortages

**Medical Officer and Nurse Severe Occupational Shortages**

Medical officer and nurse occupational series were analyzed separately from the other occupations, because VHA uses assignment codes to designate specialties within the two OPM occupational series. VA OIG derived medical officer and nurse severe occupational shortages for the series if the facility indicated either the OPM occupational series or any of its related VHA assignment codes as shortages.

In FY 2022, 87 percent of facilities reported the medical officer OPM occupational series or a related VHA assignment code as a severe occupational shortage. This shortage was a decrease from FY 2021, when 90 percent of facilities listed a shortage for the occupation.  In FY 2020, 87 percent of facilities listed the medical officer OPM occupational series or a related VHA assignment code as a severe occupational shortage.

In FY 2022, 91 percent of facilities reported the nurse OPM occupational series or a related VHA assignment code as a severe occupational shortage. This was up from FY 2021, when 73 percent of facilities listed the nurse occupation as a shortage. In FY 2020, the nurse OPM occupational series or a related VHA assignment code was reported as a severe occupational shortage by 72 percent of facilities.

**Exhibit 1: Percent of VHA Facilities Reporting Shortages for Medical Officer and Nurse Occupations, FYs 2020-2022**



Source: VA OIG analysis of VHA facilities' responses to the VA OIG's FYs 2020, 2021, and 2022 staffing surveys.

VA OIG also assessed severe occupational shortages at the assignment code level to assess severe shortages for the medical officer and nurse series in more detail as compared to other occupations.

DOD          DOJ          **VHA**          HHS

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 239 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**Veterans Health Administration**

**Shortages in Clinical Occupations**

For all three FYs in the review period, the same five occupations were reported as the top five clinical shortages. For FY 2022, the practical nurse clinical occupation was the most frequently reported clinical occupation, with 62 percent of VHA facilities reporting it as a shortage. For the FY 2021 annual determination of shortages, the VA OIG found that 50 percent of facilities designated the psychiatry specialty assignment code in the medical officer series as a severe occupational shortage, making it the most frequently cited clinical occupation shortage. For the FY 2020 annual determination of shortages, the VA OIG found that 60 percent of facilities designated the psychiatry specialty assignment code in the medical officer series as a severe occupational shortage, making it the most frequently cited clinical occupation shortage. See Exhibit 2 below.

**Exhibit 2: Percent of Facilities Reporting Top Five Clinical Occupational Shortages, FYs 2020-2022**



Source: VA OIG analysis of VHA facilities' responses to the VA OIG's FYs 2020, 2021, and 2022 staffing surveys.

a.   Assignment codes within the Medical Officer occupational series.

DOD         DOJ         **VHA**         HHS

## Shortages in Nonclinical Occupations

As with the top five clinical occupations, the same five occupations were listed as the top nonclinical shortages for all three FYs in the review period. In FY 2022, for the first time since the VA OIG began reporting both the top five clinical and nonclinical occupational shortages in 2018, nonclinical occupations represented the top two severe occupational shortages. In FY 2021, medical support assistance was the most frequently reported nonclinical shortage occupation, which 45 percent of facilities designated as a severe occupational shortage. Custodial worker was the most frequently reported nonclinical shortage occupation in FY 2020, with 47 percent of facilities designated as a severe occupational shortage. See Exhibit 3 below.

**Exhibit 3: Percent of VHA Facilities Reporting Top Five Nonclinical Occupational Shortages, FYs 2020-2022**



Source: VA OIG analysis of VHA facilities' responses to the VA OIG's FYs 2020, 2021, and 2022 staffing surveys.

DOD          DOJ          **VHA**          HHS

# Contributing Factors that Led to Shortages of Health Care Personnel

As part of the FY 2020 occupational shortage survey, the VA OIG asked VHA facilities to provide a reason for each designated shortage. The VA OIG identified themes among free text responses to summarize the most common reasons for shortages. The most frequently cited reasons for severe occupational shortages among the top five clinical and top five nonclinical occupations were: (1) lack of qualified applicants, (2) noncompetitive compensation, (3) staff turnover, (4) recruitment challenges, and (5) geographical recruitment challenges.[39] The lack of qualified applicants theme was used to identify those responses that referred to a limited number of applicants, a lack of applicants, as well as a limited number of qualified applicants. The noncompetitive compensation theme was used to identify responses that referred to noncompetitive salaries, benefits, and incentives. The staff turnover theme was used to identify responses that mentioned turnover of staff and included references to retention, retirement, and promotion. The recruitment challenges theme was used to identify responses that referred to recruitment difficulties, hard to fill positions, and extended time to fill positions. The geographic recruitment challenges theme was used to identify responses that referred to recruitment difficulties driven by a facility's location.

**Exhibit 4: Percentage of Top Reasons Reported by VHA Facilities for Shortages in Top Five Clinical and Top Five Nonclinical Shortage Occupations in FY 2020[40]**



| Reason | Percentage |
|---|---|
| Lack of Qualified Applicants | 37% |
| Noncompetitive Compensation | 34% |
| Staff Turnover | 32% |
| Recruitment Challenges | 26% |
| Geographical Recruitment Challenges | 23% |

Source: OIG analysis of VHA facilities' responses to the FY 2020 Staffing Determination and Staffing Model survey.

DOD          DOJ          **VHA**          HHS

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 242 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**Veterans Health Administration**

# Impacts of Shortages of Health Care Personnel

Examples of impacts identified by VHA officials are listed below. While these examples are attributed to staffing shortages, they may also be associated with additional factors related to changes in the delivery of health care as part of the response to COVID-19.

## Health Care Personnel Impacts

For FY 2020, human resources management was reported as a shortage by 22 percent of VHA facilities. While the human resources occupational series were not reported as severe occupational shortages by more than 20 percent of facilities in FYs 2021 and 2022, those occupations were consolidated from the facility to the Veterans Integrated Service Network (VISN) level as part of VHA's HR Modernization effort.[41] When asked about impacts of a hiring surge to address shortages related to COVID-19, VISN directors reported the unanticipated workload compounded existing shortages and burnout among human resources personnel.

VHA's Reduce Employee Burnout and Optimizing Organizational Thriving (REBOOT) Task Force, established in Fall 2021, found that staffing challenges were reported by employees as the top contributor to burnout, followed by COVID-19 and pay issues.

## Patient Impacts

In each of the VA OIG's annual shortages reports during the time periods for this review, the VHA identified severe occupational shortages in medical officer and nurse occupations. These two occupations are key to the delivery of health care and have been the most commonly cited shortages since 2014.[42] A 2022 report by ECRI summarized research identifying health care personnel shortages as the top patient safety concern, showing such shortages caused for longer waits for care, including in life-threatening situations.[43] Similarly, CDC guidance used by VHA for mitigating personnel shortages during the COVID-19 pandemic indicates that appropriate staffing is essential for safe patient care.[44]

Psychiatry and psychology were both in the top five clinical occupations reported by VHA facilities in VA OIG staffing shortage reports for FYs 2020 through 2022. These two occupations are key to the delivery of mental health services for patients, including in VHA's Primary Care Mental Health Integration (PCMHI) model of care.  A December 2022 GAO report reviewed annual VHA surveys and found that 43 percent of facilities reported staffing as the most significant challenge to implementing PCMHI programs in 2022.[45] The GAO concluded that a "full complement of mental health professionals is imperative for VA to be able to meet the rapid growth in demand for VA Mental Health services" and recommended a comprehensive evaluation and implementation of strategies to mitigate PCMHI staffing challenges.

Nearly twice as many facilities reported medical support assistance as a severe occupational personnel shortage in FY 2021 than in FY 2020 (62 versus 36, respectively). More facilities may have reported medical support assistance as a severe occupational shortage in FY 2021 as a result of the pandemic. During the first year of the pandemic, VHA doubled the number of patients utilizing telehealth and other virtual modalities, compared to the prior year, relying heavily on medical support assistance to cancel, reschedule, and facilitate virtual appointments between patients and providers.[46] VHA providers reported that availability of medical support assistance led to more success in completing telehealth appointments.[47] Other VA OIG work identified that about 7.3 million VHA appointments were canceled early in the pandemic from March 15 through May 1, 2020.[48] The VA OIG concluded that schedulers would likely be in demand as VHA worked to reschedule the canceled appointments.

## Operational Impacts

As part of the pandemic response, VHA also used the medical support assistance occupation in outpatient administrative positions for screening protocols, adding additional impact of any shortages in the occupation. Custodial worker was the most cited nonclinical severe occupational shortage in FYs 2020 and 2022, and among the top five most frequently reported shortages overall for FYs 2020 through 2022.  In FY 2020, VHA's COVID-19 Response Plan required both routine cleaning, as well as additional cleaning and disinfection, if someone presented with COVID-19 symptoms or is exposed, making an already vital occupation more important during a pandemic.[49]

# Efforts to Recruit New Staff, Retain Existing Staff, and Minimize Burnout During the Pandemic

Widespread occupational shortages across VHA predate the pandemic, and so do efforts and approaches aimed at reducing those shortages. Such efforts include the use of direct hire authority available to VA with OPM approval, as well as VA-specific direct hire authority based in part on VA OIG annual shortage determinations.[50] VHA also gained resources and flexibilities created in direct response to the pandemic. Additionally, VHA received legislative relief and made use of other approaches to reduce shortages not necessarily tied to the pandemic. In October 2022, the Under Secretary for Health announced hiring faster and more competitively as one of VHA's six priorities. The examples provided below should not be considered an all-inclusive list of the VHA efforts to mitigate shortages of health care personnel.

DOD            DOJ            **VHA**            HHS

# Recruitment and Retention Incentives

### Direct Hire Authority

VA has authority to make noncompetitive appointments based on a determination by OPM that a severe occupational shortage of highly qualified candidates exists for applicable occupations.[51] The VA Secretary also has the authority to directly recruit and appoint qualified individuals to applicable occupations based upon a determination of occupations with the largest shortages by the VA OIG.[52]

After the Worldwide Health Organization declared COVID-19 a worldwide pandemic, VA sought and obtained direct hire authority for several occupations from OPM beginning on March 23, 2020. OPM subsequently extended the direct hire authority for occupations covered by those requests through the end of the pandemic.

### Onboarding Processes

To expedite hiring of new staff during the pandemic, VHA implemented changes and waivers in the onboarding process. These changes included delaying fingerprinting, physical exams, drug testing, and portions of the credentialing processes until after employees began work. VHA also began starting employment for new employees throughout the pay period, rather than waiting for the next two-week pay period to begin.

### Pandemic Staffing Strategies

VHA's COVID-19 Operational Plan uses CDC guidance providing for conventional, contingency, and crisis capacity staffing strategies. These strategies are implemented on the authority of facility leadership "in a targeted fashion," such as for a single clinic critical to supporting the facility.[53] Contingency staffing includes targeted implementation of recruitment and retention flexibilities or strategies, along with the activation of Clinical Deployment Teams (CDT).[54] Crisis staffing includes implementing all recruitment and retention flexibilities or strategies, contracting for additional staff, activating CDT, and activating the Disaster Emergency Management Personnel System (DEMPS).[55] Additionally, VHA responded to changes in workload and personnel demands associated with COVID-19 in various ways such as training outpatient doctors and elective procedure nurses in competencies necessary to deliver care in inpatient settings.

### CARES Act

Through the Coronavirus Aid, Relief, and Economic Security Act, Congress appropriated money for VA to increase staffing levels.[56] In an April 2020 press release, the VA's Office of Public and Intergovernmental Affairs noted that VA was moving "aggressively" to hire staff who could provide care for the rising number of patients as a result of the pandemic.

### VA Nurse and Physician Assistant RAISE Act of 2022

As part of the Consolidated Appropriations Act, 2022, the Department of Veterans Affairs Nurse and Physician Assistant Retention and Income Security Enhancement Act, also known as the VA

DOD                    DOJ                    **VHA**                    HHS

Nurse and Physician Assistant RAISE Act. The Act increased pay caps for certain Registered Nurses (RN) by $27,400 and Advanced Practice Registered Nurses (APRN) and Physician Assistants (PA) by $50,000.[57]

### Honoring Our PACT Act of 2022

The Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022, or the Honoring our PACT Act of 2022, contained various provisions for the improvement of the VA workforce. Some of these enhancements include:

- buying out non-VA service contracts of certain health care professionals in rural settings;

- increasing pay caps and waiving annual pay limitations for certain VHA employees;

- removing preference eligible requirements for housekeeping aid positions; and

- providing additional authorities to provide bonuses, awards, incentives, and student loan repayments.[58]

### Loan Forgiveness and Employee Educational Resources

VA provides several of its own loan forgiveness and reduction programs in addition to the Public Service Loan Forgiveness Program, as well as scholarship opportunities to recruit and retain employees.

**Table 2. VA Loan Forgiveness and Employee Educational Resources**

| | |
|---|---|
| Education Debt Reduction Program | Provides student loan reduction to employees who provide direct patient care. |
| Student Loan Repayment Program | Provides loan repayments to highly qualified candidates who enter into a service obligation. |
| Employee Incentive Scholarship Program | Provides scholarships for permanent employees who agree to a service obligation to obtain education that would qualify them for certain occupations. |
| National Nursing Education Initiative | Funds education for nurses who agree to a service obligation to obtain a bachelor's or advanced degree in nursing. |
| VA National Education for Employees Program | Covers education expenses for permanent employees who agree to a service obligation to obtain education that would qualify them for certain occupations. |

Source: VA OIG Review of VA Loan Forgiveness and Employee Educational Resources

DOD          DOJ          **VHA**          HHS

## Addressing Burnout

The VHA Reduce Employee Burnout and Optimizing Organizational Thriving (REBOOT) Task Force was established in fall of 2021. Its goal is to implement actions in response to issues identified by VHA employees, including "staffing concerns, impacts of COVID-19, pay, recruitment, time off, scheduling flexibilities, the ability to work part time and other challenges."  The initiative is structured into workgroups to address drivers of burnout including unmanageable workload, perceived lack of fairness, lack of job control, low recognition or organizational support, interpersonal conflict, and mismatched values.[59] To address unmanageable workload, one of REBOOT's main objectives is to maximize use of hiring policies and flexibilities including incentives for recruitment, retention, and relocation of personnel for shortage occupations.

# U.S. Department of Health and Human Services (HHS)



HHS's CMS administers the Medicare and Medicaid programs.[60] The Medicare program provides health care coverage to people aged 65 and older, people with disabilities, and people with end-stage renal disease (permanent kidney failure). Medicare covers short-term skilled nursing and rehabilitative care for Medicare enrollees in a nursing home after a hospital stay. The Medicaid program provides health care coverage to individuals who have limited income and resources, regardless of their age. Medicaid covers skilled, rehabilitation, and long-term care services in a nursing home when other payment options are not available and when the individual is eligible for Medicaid.

## Nursing Homes

Nursing homes provide services to individuals whose capacity for self-care is limited because of a chronic illness; injury; physical, cognitive, or mental disability; or other health-related conditions. Services are provided to help individuals improve or maintain an optimal level of physical functioning and quality of life. Services can include skilled rehabilitation, including physical, occupational, and speech therapy, and assistance with daily tasks, such as dressing, bathing, eating, medication management, and health maintenance tasks. As of July 1, 2022, there were 15,178 Medicare– and Medicaid–certified nursing homes nationwide, with 1.6 million beds and 1.2 million residents.[61]

## COVID-19's Impact on Nursing Homes

The pandemic has had a significant impact on nursing homes. As of the week ended September 11, 2022, nursing home residents had accounted for more than 1.2 million confirmed COVID-19 cases and more than 156,000 COVID-19-related deaths, and nursing home staff had accounted for more than 1.3 million confirmed cases and more than 2,600 deaths.[62]

The Assistant Secretary for Planning and Evaluation (ASPE) for HHS wrote in an October 2020 report that the pandemic imposed high demands on nursing homes because they had to respond quickly to suppress the threat and transmission of COVID-19, make rapid changes in how they delivered care to residents, and implement new guidelines and measures to safeguard residents and nursing home staff. According to the ASPE, during the pandemic, nursing homes grappled with how to retain adequate staffing while rapidly making operational changes to ensure the safety of

DOD          DOJ          VHA          **HHS**

residents and staff. At the same time, according to the ASPE, staff have balanced concerns about their own safety, the well-being of the residents under their care, and their own financial stability.[63]

# Nursing Home Staff

Nursing home staff include staff who provide direct care to nursing home residents, as well as staff who manage and maintain the nursing home. These staff can be employees of the nursing home or hired under contract or through a staffing agency. According to the staffing categories that nursing homes use to report staffing shortage data to the NHSN, nursing home staff consist of nurses, clinical staff (such as physicians), aides, and other staff (such as social workers and housekeeping staff).

### Nurses

Nurses include RNs and licensed nurses. RNs are responsible for overseeing the care provided to nursing home residents by other staff, such as licensed nurses and aides. An RN's duties can include initiating resident treatment plans, ensuring that residents are receiving proper care, preparing intravenous lines, administering medications through injections, and interacting with residents' families. Licensed nurses also provide direct care and are typically responsible for residents' day-to-day care and personal hygiene. A licensed nurse's duties can include taking resident vital signs (such as blood pressure and body temperature), administering medications, inserting catheters, and recording any changes in residents' health or vital signs.

### Clinical Staff

Clinical staff include physicians, physician assistants, and advanced practice RNs. A physician is responsible for examining residents; taking resident medical histories; prescribing medications; and ordering, performing, and interpreting diagnostic tests. A physician assistant typically provides the same services as a physician but performs these services under the supervision of a physician. An advanced practice RN can provide direct care to residents and often serves in leadership roles and may educate and advise other nursing staff.

### Aides

Aides include certified nurse assistants (CNAs), nurse aides, medication aides, and medication technicians. Aides provide or assist residents with basic care and support under the direction of onsite licensed nursing staff. An aide's duties can include feeding, bathing, dressing, and grooming residents; assisting residents with walking; and performing any other tasks that an RN or a licensed nurse assigns to the aide. Aides in some states, in accordance with state law, can also administer medications to residents.

**Other Staff**

Other staff include nursing home staff who are not included in the prior three categories, such as respiratory therapists, occupational and physical therapists, social workers, feeding assistants, and staff responsible for a nursing home's administration, housekeeping, and maintenance.

## Federal Reporting Requirements Related to Nursing Home Staffing

In response to the pandemic, CMS required nursing homes to report whether they had a staffing shortage for each type of staff position to CDC's NHSN on a weekly basis from May 11, 2020, through December 31, 2024.[64]

Federal regulations require nursing homes to report staffing information in CMS's PBJ system quarterly, such as the number of staff who provide direct care and services to residents, including information for contract and agency staff. The reported information is based on payroll and other verifiable and auditable data and must include the category of work for each person who provides direct care and services to residents, and information on hours of care provided by each category of staff per resident, per day.[65] The data must also include the number of hours that each staff member was paid to work each day within the quarter.[66]

## Scope of HHS OIG Review

To understand nursing homes' staffing experiences before and during the pandemic, the HHS OIG interviewed officials from 50 nonstatistically selected nursing homes in 44 states. To provide information on nursing homes' staffing experiences during the pandemic, the HHS OIG analyzed staffing shortage data from the NHSN that were available from the week ended May 24, 2020, through the week ended September 11, 2022. Although CMS initially required nursing homes to report staffing shortage data beginning the week ended May 17, 2020, CMS allowed nursing homes to submit their first set of staffing shortage data beginning with the week ended May 24, 2020. The HHS OIG also analyzed nursing home staffing data from the PBJ that were available for the quarters ended June 30, 2019, through June 30, 2022, which encompassed periods before and during the pandemic. For HHS OIG's methodology, see Appendix D: HHS.

DOD          DOJ          VHA          **HHS**

# Nursing Home Staffing Shortages Before and During the Pandemic

For the 50 nonstatistically selected nursing homes, officials from 35 nursing homes stated that their nursing homes had a staffing shortage at some point before the pandemic. In addition, officials from all 50 nursing homes stated that their nursing homes had a staffing shortage at some point during the pandemic.

Nationwide staffing shortage data for the weeks ended May 24, 2020, through September 11, 2022, showed that 12,500 nursing homes, or 80 percent of all nursing homes, reported a staffing shortage at some point during the pandemic. Overall, there was an increase in the number of nursing homes that reported a shortage for the weeks ended May 24, 2020 (3,157 nursing homes) through September 11, 2022 (3,503 nursing homes). The number of nursing homes that reported a shortage ranged from a low of 2,798 for the week ended March 21, 2021, to a high of 5,027 for the week ended January 23, 2022. Exhibit 1 shows the number of nursing homes that reported a staffing shortage anytime during the weeks ended May 24, 2020, through September 11, 2022.

**Exhibit 1: Number of Nursing Homes Nationwide That Reported a Staffing Shortage During the Pandemic**



Source: HHS OIG analysis of nursing home staffing shortage data reported to the NHSN.

DOD            DOJ            VHA            **HHS**

## Staffing Shortage Data by State

Nationwide staffing shortage data for the weeks ended May 24, 2020, through September 11, 2022, showed that the percentage of nursing homes that reported staffing shortages during the pandemic varied by state. Across all states, the average percentage of nursing homes that reported a shortage during the pandemic increased from 22 percent to 28 percent. For the week ended May 24, 2020, the percentage of nursing homes in each state that reported a shortage ranged from 3 percent to 44 percent, including 8 states in which at least 30 percent of nursing homes reported a shortage. For the week ended September 11, 2022, the percentage of nursing homes in each state that reported a shortage ranged from 1 percent to 60 percent, including 11 states in which at least 40 percent of nursing homes reported a shortage. Exhibit 2 shows maps that indicate the percentage of nursing homes in each state that reported a staffing shortage for the weeks ended May 24, 2020, and September 11, 2022.

**Exhibit 2: Percentage of Nursing Homes in Each State That Reported a Staffing Shortage for the Weeks Ended May 24, 2020, and September 11, 2022**



Source: HHS OIG analysis of nursing home staffing shortage data reported to the NHSN.

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 252 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Health and Human Services**

# Positions Most Affected by Nursing Home Staffing Shortages

Aides and nurses were the two positions most affected by staffing shortages, both before and during the pandemic. Exhibit 3 shows, by position, how many of the nonstatistically selected 50 nursing homes reported staffing shortages before and during the pandemic.

**Exhibit 3: Number of the 50 Nonstatistically Selected Nursing Homes That Reported Staffing Shortages Before and During the Pandemic, by Position**



Source: HHS OIG interviews of officials from 50 nonstatistically selected nursing homes.
Note: Nursing home officials did not indicate whether they experienced a shortage of clinical staff before or during the pandemic.

Nationwide staffing shortage data for the weeks ended May 24, 2020, through September 11, 2022, showed that the number of nursing homes that reported shortages of aides and nurses varied weekly and increased overall during the pandemic. For aides, the number of nursing homes that reported a shortage was lowest at 2,410 during the week ended March 14, 2021 and highest at 4,544 during the week ended January 23, 2022. For nurses, the number of nursing homes that reported a shortage was lowest at 2,162 during the week of June 21, 2020 and highest at 4,301 during the week ended January 23, 2022. Exhibit 4 shows the number of nursing homes nationally that reported a shortage of aides and nurses during the weeks ended May 24, 2020, through September 11, 2022.

**Exhibit 4: Number of Nursing Homes Nationwide That Reported a Shortage of Aides and Nurses**



Source: HHS OIG analysis of nursing home staffing shortage data reported to the NHSN.

## Number of Hours Worked by Nursing Home Staff

Staffing data from the PBJ for the quarters ended June 30, 2019, through June 30, 2022, showed a decrease in the average daily number of hours worked by nursing home staff per nursing home. Specifically, the average daily number of hours worked by aides decreased the most of any staff, by 27 hours (13.8 percent). Additionally, the average daily number of hours worked by nurses and other staff each decreased by 14 hours (10.9 percent and 18.4 percent, respectively). For clinical staff, the decrease in the average daily number of hours worked per nursing home was not material.[67] Exhibit 5 shows the changes in the average daily number of hours worked by aides, nurses, and other staff for the quarters ended June 30, 2019, through June 30, 2022.

**Exhibit 5: Average Daily Number of Hours Worked Per Nursing Home, by Position**



Source: HHS OIG analysis of nursing home staffing data reported in the PBJ system.

a.   Hours for other staff does not include hours that nursing homes' housekeeping and maintenance staff worked.

Note: The decrease in the average daily number of hours that clinical staff worked was not material and is not presented in this exhibit.

# Contributing Factors That Led to Shortages of Nursing Home Staff During the Pandemic

Officials from the 50 nonstatistically selected nursing homes identified various reasons for shortages of nursing home staff during the pandemic. See Exhibit 6 for the top six reasons for staffing shortages that these nursing homes identified and the number of nursing homes that reported each reason.

**Exhibit 6: Top 6 Reasons for Staffing Shortages That 50 Nonstatistically Selected Nursing Homes Identified**



Source: HHS OIG interviews with officials from 50 nonstatistically selected nursing homes.

## Increased Job Demands

Officials from 48 nursing homes stated that increased job demands contributed to staffing shortages during the pandemic. Specifically, the officials commented that nursing homes are high-stress and high-risk work environments, even with mitigation efforts in place. Staffing shortages resulted in staff having less flexibility in their work schedules and having to work longer hours, work extra shifts, and perform tasks that were not part of their regular duties. For example, administrative staff, who were also licensed or certified as nurses or aides, assisted with resident care or helped with laundry or janitorial duties. The increased demands led to staff burnout and greater staffing shortages. The officials also commented that staff would rather work in jobs that are less physically and mentally demanding for the same or similar pay rather than work extra hours or carry excess workloads in a nursing home.

## Noncompetitive Pay

Officials from 44 nursing homes commented that noncompetitive pay contributed to staffing shortages during the pandemic. Officials from 40 of these 44 nursing homes stated that some of their staff left their nursing home to take jobs with nurse staffing agencies, hospitals, other health care providers, or other industries for higher pay. In addition, officials from 16 of the 44 nursing homes commented that some of their staff chose to stop working after stimulus payments and unemployment benefits were made available or were increased.

## Fear of COVID-19

Officials from 33 nursing homes stated that some staff quit their jobs or refused to work because of their fear of COVID-19 infection. Specifically, the officials commented that some staff had underlying health conditions and were afraid of getting sick themselves or spreading COVID-19 to family members. Additionally, officials stated that other staff did not want to work directly with residents who had contracted COVID-19 or work if cases of COVID-19 were reported in the building.

## Increased COVID-19 Protocols

Officials from 32 nursing homes stated that the pandemic regulations and protocols contributed to staffing shortages during the pandemic. Specifically, the officials commented that the increased use of personal protective equipment, such as masks, regular COVID-19 testing, and COVID-19 vaccination requirements for health care workers caused some nursing home staff to leave their jobs and seek employment at companies that did not have the same protocols and requirements.

## Limited Labor Pool

Officials from 27 nursing homes stated that a limited labor pool had contributed to staffing shortages. Officials from 23 of the 27 nursing homes commented that they had fewer applicants for open positions and attributed the cause to fewer people wanting to work in nursing homes or having a limited number of qualified applicants in their geographical area from which to recruit and hire.

## Exposure to COVID-19

Officials from 26 nursing homes stated that staff exposure to COVID-19 led to staffing shortages. Specifically, the officials commented that staff who contracted or were exposed to COVID-19 were required to quarantine for a period of time, which left nursing homes short-staffed during those periods. Additionally, officials from 4 of the 26 nursing homes stated that some staff were not able to work because they had to take care of a family member who had contracted COVID-19. Also, officials from 3 of the 26 nursing homes stated that some staff quit their nursing home jobs after contracting COVID-19.

Case 3:20-cr-00365-MMC    Document 137-1    Filed 12/01/23    Page 257 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Health and Human Services**

# Impacts of Shortages of Nursing Home Staff During the Pandemic

Officials from the 50 nonstatistically selected nursing homes stated that staffing shortages had an impact on remaining nursing home staff, nursing home operations, and nursing home residents during the pandemic. Exhibit 7 shows the number of nursing homes from which officials stated they had experienced these impacts.

**Exhibit 7: Number of 50 Nonstatistically Selected Nursing Homes That Experienced the Impacts of Staffing Shortages**



Source: HHS OIG interviews with officials from nonstatistically selected nursing homes.

## Impacts on Nursing Home Staff

Officials from all 50 nursing homes reported impacts on nursing home staff. Nursing home officials stated that the staffing shortages resulted in: (1) staff increasing their workloads, often working longer shifts and covering the shifts of other staff, and (2) more staff calling out of work to avoid increased workloads. The officials also stated that these conditions led to burnout and increased levels of stress, anxiety, and depression. Officials further stated that, although nurse staffing agencies played a crucial role in helping fill aide and nursing shortages, the use of agency staff caused employee morale to decline among the nursing homes' own staff because they worked alongside agency staff who were paid more for the same work.

## Impacts on Nursing Home Operations

Officials from all 50 nursing homes stated that staffing shortages had an impact on nursing home operations, specifically on resident admissions and nursing home finances. The officials commented that the shortages caused the nursing homes to reduce the overall number of new

DOD          DOJ          VHA          **HHS**

resident admissions, delay new admissions or transfers from hospitals for residents needing rehabilitative care, and admit only residents who required less frequent or less intensive care.

Staffing shortages also caused nursing homes to incur higher costs for overtime pay and bonuses for nursing home staff, as well as for agency staff whose wages were much higher than nursing home staff. Officials stated that they also incurred costs for agency staff for "COVID pay" (additional pay for working with COVID-19-positive residents), weekend hours, travel reimbursement, and housing expenses.

## Impacts on Nursing Home Residents

Officials from 26 nursing homes stated that staffing shortages had an impact on nursing home residents. The officials commented that the shortages caused nursing homes to adjust the level of care provided to residents. Adjustments included reducing or stopping restorative care, such as bedside strength building and endurance activities that aides could provide without the expertise of a licensed physical therapist, reducing physical rehabilitation services, and sending residents who needed wound care to the hospital.

Nursing home officials stated that there was an overall decline in residents' physical and mental health because of staffing shortages and lower levels of care. The officials also stated that there was an increase in the number of falls when residents attempted to stand on their own, an increased number of pressure ulcers and infections, and longer wait times when residents called for assistance.

Residents' schedules and routines were also changed because of staffing shortages. According to officials, having fewer staff resulted in residents receiving sponge baths in place of full showers or baths, receiving necessary medications and getting put to bed at times different from their normal schedules, and waiting longer for meals. In addition, officials stated that residents experienced frustration and anxiety from having to interact with staff who were not familiar with their medical histories or personalities.

# Efforts To Recruit New Staff, Retain Existing Staff, and Minimize Staff Burnout During the Pandemic

Officials from the 50 nonstatistically selected nursing homes identified a variety of actions they took to recruit and retain staff and minimize staff burnout during the pandemic. In addition, CMS helped nursing homes respond to staffing shortages by waiving and modifying certain regulatory requirements so that nursing homes could focus on resident care.

## Recruitment Incentives

Nursing home officials commented that they took a variety of actions to recruit new staff. Officials stated that they expanded their recruitment efforts by posting job openings on job recruiting websites, in local newspapers, and on social media; attending job fairs; and working with local colleges, local Chambers of Commerce, and health care associations to attract potential applicants for positions. In addition to broadening their recruitment efforts, nursing homes provided incentives to attract potential applicants. Table 1 shows examples of recruitment incentives offered by nursing homes.

**Table 1: Recruitment Incentives**

| | |
|---|---|
| Monetary Bonus | Offered sign-on and recruitment bonuses |
| Starting Pay | Offered increased starting wages |
| Continuing Education | Offered tuition assistance or reimbursement for education and certification programs, such as nursing degrees, CNA certification, and classes for those seeking the CNA certification |
| Training Programs | Implemented temporary nurse-aide training programs for staff who had not met the CNA training and certification requirements |
| Flexible Schedules | Offered flexible hours |
| Restructured Compensation Packages | Offered restructured compensation packages with higher pay and fewer fringe benefits and the option to receive daily pay |

Source: HHS OIG interviews with officials from nonstatistically selected nursing homes.

DOD            DOJ            VHA            **HHS**

# Retention Incentives

Nursing home officials stated that they took various actions to retain existing staff. Table 2 shows examples of retention incentives offered by nursing homes.

**Table 2: Retention Incentives**

| | |
|---|---|
| Monetary Bonus | Offered retention bonuses and other bonuses to staff who worked with residents who had COVID-19 or worked extra shifts |
| Increased Pay | Increased wages, including wages for those who worked night shifts and weekends |
| Recognition | Showed employees more appreciation by providing free meals, gift cards, and employee recognition events |
| Continuing Education | Offered tuition assistance or reimbursement for education and certification programs, such as nursing degrees and CNA certification |
| Flexible Schedules | Offered flexible schedules when possible and reduced the number of hours that staff were required to work to qualify for full-time benefits |
| Restructured Compensation Packages | Offered restructured compensation packages with higher pay and fewer fringe benefits, and the option to receive daily pay |

Source: HHS OIG interviews with officials from nonstatistically selected nursing homes.

# Efforts To Minimize Burnout

Nursing home officials stated that they took various actions to minimize burnout. Table 3 shows examples of efforts to minimize burnout by nursing homes:

DOD          DOJ          VHA          **HHS**

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 261 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**U.S. Department of Health and Human Services**

**Table 3: Efforts to Minimize Burnout**

| | |
|---|---|
| Contract Staff | Increased the use of nurse staffing agencies to fill shortages |
| Cross-Training | Employed an "all-hands-on-deck" approach, in which staff from various departments in the nursing home stepped in to help departments with staffing shortages, and cross-trained staff to perform other duties |
| Resident Admissions | Reduced the number of new resident admissions, delayed new admissions, or admitted only residents who required less frequent or less intensive care |
| Flexible Schedules | Offered flexible and compressed work schedules |
| Time-off | Tried to honor requests for time off |
| Staff Sharing Agreements | Made staff-sharing agreements with facilities under the same corporate ownership or with contracted facilities that were short-staffed during COVID-19 breakouts and when staffing shortages peaked |
| Mental Health | Offered psychological support onsite through health insurance or through the local health department |

Source: HHS OIG interviews with officials from nonstatistically selected nursing homes.

## CMS's Efforts to Help Nursing Homes Respond to Staffing Shortages

During the pandemic, CMS enacted a number of temporary emergency waivers to requirements for nursing homes related to staff training, the performance of specific tasks, and administrative reporting requirements, among others. These waivers provided nursing homes with extra flexibilities as they responded to the challenges of the pandemic, and helped nursing homes respond to staffing shortages.[68] Table 4 shows examples of efforts implemented by CMS.

DOD            DOJ            VHA            **HHS**

**Table 4: Examples of CMS's Efforts to Help Nursing Homes Respond to Staffing Shortages**

| | |
|---|---|
| Waived Nurse Aide Employment Requirements | CMS waived the requirement that a nursing home may not employ anyone for longer than 4 months unless the individual has met the training and certification requirements of 42 C.F.R § 483.35(d). The waiver allowed nursing homes to employ an individual in a nurse aide role for longer than 4 months even if the individual had not completed a state-approved Nurse Aide Training and Competency Evaluation Program. The nurse aide could continue to work as long as the nursing home ensured that the individual could demonstrate competency in skills and techniques needed to care for residents. |
| Postponed Training Deadlines | CMS modified the nurse aide training requirements that required nursing assistants to receive at least 12 hours of in-service training annually by postponing the deadline for completing the training requirement. |
| Allowed Physicians to Delegate Tasks | CMS waived the requirement that prevents a physician from delegating certain tasks that are otherwise required to be performed specifically by the physician. The waiver allowed a physician to delegate certain tasks to a physician assistant, nurse practitioner, or clinical nurse specialist, but it specified that the delegated task must continue to be under the supervision of the physician. |
| Reduced Required Training Hours | CMS reduced the training requirements for paid feeding assistants from a minimum of 8 hours to a minimum of 1 hour. |

Source: HHS OIG analysis of temporary COVID-19 emergency waivers enacted by CMS.

DOD            DOJ            VHA            **HHS**

# APPENDIX A:

# Department of Defense



## Section 1: Methodology

**Scope**. As of December 2022, the DOD had 45 military hospitals. The DOD OIG's review focused on shortages of health care personnel at 24 nonstatistically selected MTFs, or DOD hospitals. Our review focuses on the MTF personnel experiences from March 1, 2019, through September 30, 2022.

The DOD OIG conducted this audit from July 2022 to May 2023.

**Data Sources**. The DOD OIG review used multiple sources of data, including the following.

- Interviews with officials from the 24 DOD medical treatment facilities that we selected for review, the DHA, office of the Assistant Secretary of Defense for Health Affairs, and Service medical commands.

- Manpower and recruiting data, where available, to corroborate interview statements. The DHA provided personnel data for the civilians under its authority, direction, and control as of January 2023 from the Defense Civilian Personnel Data system and the DHA Joint Table of Distribution. The MTFs provided personnel data for military, civilians, and contractors under their authority, direction, and control before the DHA transition from the Defense Medical Human Resources System – internet; Activity Manpower Documents for Navy facilities extracted by the MTFs from the Navy's Total Force Manpower Management System; unit manpower documents from the Air Force's Manpower Programming & Execution System and Medical Planning and Programming Tool; the MTF generated gain-loss rosters; recruitment personnel actions; and staffing tables of distribution and allowances maintained by the MTFs and extracted from each service's databases, such as the Fourth Estate Manpower Tracking System.

- Additional data, such as deployment trackers, staffing assist requests, civilian sector pay surveys, and government and civilian sector job postings, to report reasons for shortages in health care personnel.

- Additional data, such as access to care reports, premium hour reports, patient satisfactory surveys, comprehensive systematic analyses, requests for personnel actions, and others, to report examples of impacts of health care personnel shortages.

- The DOD and the DHA guidance to identify mitigation strategies used by the DHA to recruit and retain providers within the DOD.

**Methodology**. The DOD OIG selected a nonstatistical sample from the 26 MTFs that the DOD OIG reported as a result of the MTF interviews that had "staffing and manpower shortages" as a serious challenge in DOD OIG Report No. DODIG-2022-081, "Evaluation of Department of Defense Military Medical Treatment Facility Challenges During the Coronavirus Disease–2019 (COVID-19) Pandemic in Fiscal Year 2021," April 5, 2022. To compare like facility types, we excluded three MTFs that were not an inpatient hospital or medical center. We also added one additional MTF that identified staffing and manpower as a serious future concern, for a total of 24 MTFs to determine if they were still experiencing shortages of health care personnel. See Table 1 for the locations of the 24 MTFs we nonstatistically sampled.

**Table 1: Names and Locations of the 24 Nonstatistically Selected MTFs**

| | |
|---|---|
| 673d Medical Group - Joint Base Elmendorf-Richardson | Elmendorf Air Force Base, Alaska |
| 60th Medical Group - Travis Air Force Base | Travis Air Force Base, California |
| Naval Hospital Camp Pendleton | Camp Pendleton, California |
| Naval Medical Center San Diego | San Diego, California |
| Naval Hospital Twentynine Palms | Twentynine Palms, California |
| Naval Hospital Jacksonville | Jacksonville, Florida |
| Martin Army Community Hospital | Fort Benning, Georgia |
| Tripler Army Medical Center | Honolulu, Hawaii |
| Blanchfield Army Community Hospital | Fort Campbell, Kentucky |
| Walter Reed National Military Medical Center | Bethesda, Maryland |
| Womack Army Medical Center | Fort Bragg, North Carolina |
| Naval Medical Center Camp Lejeune | Camp Lejeune, North Carolina |
| 88th Medical Group - Wright-Patterson Air Force Base | Wright-Patterson AFB, Ohio |
| William Beaumont Army Medical Center - Fort Bliss | Fort Bliss, Texas |
| Naval Medical Center Portsmouth | Portsmouth, Virginia |
| Madigan Army Medical Center | Tacoma, Washington |
| Naval Hospital Bremerton | Bremerton, Washington |

| | |
|---|---|
| Army Community Hospital Weed-Irwin | Fort Irwin, California |
| Landstuhl Regional Medical Center | Landstuhl, Germany |
| Naval Hospital Rota | Rota, Spain |
| Naval Hospital Guam | Agana, Guam |
| Navy Medicine Readiness & Training Command Sigonella, Italy | Sigonella, Italy |
| 48th Medical Group – Royal Air Force Lakenheath | RAF Lakenheath, United Kingdom |
| 51st Medical Group - Osan Air Base | Osan Air Base, South Korea |

Source: The DOD OIG.

We conducted virtual interviews with officials from the MTFs, the DHA, Office of the Assistant Secretary of Defense for Health Affairs, and Service medical commands between August 11, 2022, and March 17, 2023. We did not require specific personnel to participate in our interviews, but rather requested that the MTF officials identify personnel they thought would offer the best insights into staffing challenges, impacts, and mitigation strategies. Participants included individuals such as the MTF commanders, public health emergency officers, hiring authorities, leaders for the MTF administration and nursing, logisticians, among others. We asked open-ended questions about the specialties or positions most affected by shortages of health care personnel; the causes of the shortages; the impacts of the shortages; and any mitigating strategies used by the MTFs, the DHA, or Services to recruit new personnel, retain existing personnel, and reduce burnout in health care personnel.

We did not verify or confirm interview responses but requested, where available, that the DHA and the MTF officials provide documentation to support their statements. If data provided by the MTFs indicated shortages in a specific position, we included that position in our shortages analysis, even if it was not mentioned by the MTF officials during our interviews. Following our interviews and analysis of documentation, we counted the number of the MTFs that shared each health care position shortage, cause, or impact.

## Section 2: Limitations

The MTFs did not provide consistent, complete data to allow a comparison of authorized and filled positions across our sample. However, the DHA provided personnel data for its civilians as of January 2023. These personnel accounted for only a portion of health care personnel within the MTFs, and did not include active duty Service members, contractors, or civilians working for the Military Departments. Where available, we used the data that the MTF officials provided from different systems and tracking mechanisms available to them to support statements or examples they provided during interviews. Therefore, we may have underreported the number of the MTFs encountering each position shortage, cause, or impact included in the report. We did not review

incentives or strategies used to recruit or retain staff hired under contracts, as those incentives or strategies would be developed by each contractor and not under the purview of the DOD.

At the time of our interviews, the MTFs transitioned or were in the process of transitioning their civilian personnel to the DHA in line with section 702 of the FY 2017 National Defense Authorization Act (NDAA) and sections 711 and 712 of the FY 2019 NDAA that required the Military Departments transition the administration of all the MTFs to the DHA for the purpose of implementing an integrated system of readiness and health.[69] Additionally, some officials within the MTFs we interviewed may not have been located at the MTF we interviewed them at in earlier periods of the pandemic because Service members move regularly for training or job assignments, with most rotations lasting 2 to 4 years. The information provided reflects the experiences of existing health care personnel and their perceptions of former health care personnel experiences. Therefore, officials may not have captured all reasons for shortages in health care personnel, the impacts of the shortages, or efforts to recruit and retain health care personnel or minimize staff burnout.

## Section 3: Standards

We conducted this review in accordance with generally accepted government auditing standards issued by the Government Accountability Office. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives. We relied on the testimonies of the MTF personnel to form our overall findings and conclusions. We did not test or rely on the validity of computer-processed data provided but, rather used the data to corroborate the personnel shortages that were stated during the interviews.  We assessed internal controls and compliance with laws and regulations necessary to satisfy the audit objective.

# APPENDIX B:
# Department of Justice



## Section 1: Methodology

**Scope**. The review describes staffing levels of BOP civil service employees and commissioned officers of the U.S. Public Health Service who worked in the health services units at BOP institutions from January 2019 to July 2022. This review does not include the BOP's psychology staff because they are not part of BOP's health services units. Additionally, this review does not include information about contract health care providers who may provide specialized on-site care at BOP institutions, cover institution vacancies on a short-term basis, or deliver care to BOP inmates at community facilities not operated by the BOP.

We conducted fieldwork for this review from August 2022 through January 2023.

**Data Sources**. The DOJ OIG's review included multiple data sources, including BOP policies, guidance, and memorandums; BOP waivers; BOP documentation and written responses to OIG requests; statutes related to recruitment and retention incentives; interviews with BOP central office staff, BOP regional office staff, and BOP institution staff; the BOP's human resources information system for staffing data; BOP exit surveys; DOJ OIG Hotline complaints; BOP public website population data; and a review of previously published OIG work.

**Methodology**. Our fieldwork included interviews, data collection, and analyses. Additionally, we conducted document reviews of relevant policies, guidance, and workforce planning documents.

To understand health services staffing over time, we received and analyzed staffing data provided by BOP's Human Resources, Workforce Systems and Evaluation Section. Specifically, we obtained individual records of health services staffing records of each authorized health services position, including PHS positions, at every BOP institution for pay period 6 in 2019, 2020, 2021, and 2022. We used the staffing data, in aggregate, to determine the distribution of health services position types as well as to calculate fill rates enterprise-wide and for specific positions. We also reviewed and analyzed hiring and separation data by pay period between January 2019 and June 2022.

To determine the extent to which augmentation was used during the pandemic, we analyzed augmentation data by location and position type from January 2019 through August 2022, as provided by the BOP. To determine the extent to which health services personnel worked overtime

and the associated costs, we analyzed overtime transaction data from the National Finance Center. For the overtime analysis, we considered health care occupational series codes (0600 series), as well as the occupation series code for Social Workers (0185).

To examine the use of recruitment and retention incentives, we analyzed data provided by the BOP on recruitment bonuses, relocation bonuses, retention incentives, and student loan repayments given to health services staff between January 2019 and December 2021.

To help understand the causes and impacts of staffing shortages, and to learn about the BOP's efforts to recruit and retain staff, we interviewed regional and central office staff, including the regional health services administrator or acting health services administrator, from each of the BOP's six regions; two regional human resources administrators; a central office human resources official; and a national recruitment specialist. We also reviewed exit surveys from departing health services personnel to understand the reasons for staff departure and suggestions for what could have prevented them from leaving the BOP.

Finally, we summarized and incorporated information from oversight work previously published by the DOJ OIG on the BOP's response to the pandemic, including remote inspections of 16 facilities housing BOP inmates, 2 surveys of BOP staff, 1 survey of inmates, and a COVID-19 Capstone report that highlighted themes identified through the DOJ OIG's COVID-19 oversight work and examined COVID-19 themes that emerged following that work.

## Section 2: Limitations

As discussed in the scope section of this appendix, this review does not include information about contract health care providers who may provide specialized on-site care at BOP institutions, cover institution vacancies on a short-term basis, or deliver care to BOP inmates at community facilities not operated by the BOP. Additionally, the data did not cover staff availability during the period, including whether staff were on sick leave or annual leave,

## Section 3: Standards

We conducted this evaluation in accordance with the Quality Standards for Inspection and Evaluation issued by the Council of the Inspectors General on Integrity and Efficiency.

# APPENDIX C:

# Department of Veterans Affairs



## Section 1: Methodology

**Scope**. The VA Choice and Quality Employment Act (VCQEA) of 2017 requires the VA OIG to report an annual determination of VHA occupations that have the largest shortages at each medical facility.[70] As part of this determination, we administer and analyze an annual survey of all VHA facilities. The survey identifies severe occupational shortages across 139 VHA facilities.[71] We also reviewed VA and VHA directives, policies, memorandums, and documentation; and researched staffing flexibilities granted by the OPM during the pandemic.

We used data collected between February 2020 and February 2022 for previously published reports, as well as additional data collected for this review between July 2022 and May 2023.

**Data Sources**.  Our review used multiple sources of data, including:

- survey data from VHA facilities to report occupational shortages and reasons for those shortages;

- interviews with 18 VISN directors to report examples of impacts of occupational shortages; and

- additional data, such as VHA guidance and fact sheets to identify mitigation strategies used by the VHA to recruit, retain, and reduce burnout of employees within the VHA.

**Methodology**.

## Survey Development and Distribution

For the annual determination of VHA's occupational staffing shortages summarized in this report, we conducted surveys to identify severe occupational staffing shortages at each facility across VHA. VHA-identified facility points of contact reported severe occupational staffing shortages as defined in 5 Code of Federal Regulations (C.F.R.) Section (§) 337.204.

The survey listed occupations categorized by: (1) OPM occupational series codes, (2) VHA assignment codes, and (3) clinical or nonclinical designation.[72] We further categorized the occupations into three groups (medical officer, nurse, and other occupation) to facilitate

identification of VHA assignment codes and titles for medical officer and nurse. We requested, and the VHA provided, the points of contact who would be completing the survey on behalf of the facility.[73] Facility points of contact used a drop-down list within the survey to identify all occupations they considered severe occupational staffing shortages.[74] Facility points of contact also had the option to report that they did not consider any of the occupations as severe occupational staffing shortages. We reviewed submissions as received and, when necessary, worked with the facility points of contact to clarify responses and answer questions.

## Survey Analysis

We identified an occupation as a severe occupational staffing shortage when it was designated as such by the VHA-identified facility point of contact. We counted the total number of times the occupation was identified as a severe occupational staffing shortage across all facilities to determine shortages across the VHA.

We derived the frequency of severe occupational shortages for medical officer and nurse because facility points of contact could identify severe shortages at the OPM occupational series level, VHA assignment code level, or both. As a result, we considered medical officer and nurse severe occupational staffing shortages if the facility points of contact indicated either the OPM occupational series or any of the related VHA assignment codes as shortages.[75]

We used Braun and Clarke's thematic analysis approach to generate themes for the free text responses received in the survey.[76] Upon initial review of the data, we discovered that many of the responses were brief and lacked detail thereby making it difficult to understand the underlying meaning in the free text responses. As a result, we analyzed the data for content, not meaning. Additionally, some facilities designated multiple reasons for a given occupational shortage, while other facilities provided only one reason per occupational shortage.

We derived theme assignments for the medical officer and nurse occupations because the survey was constructed to allow responses at the OPM occupational series level, the VHA assignment code level, or both. We assigned a theme to one of these occupations if the theme showed up either at the occupational series or VHA assignment code level. For example, if "Lack of qualified applicants" was the theme for how a facility determined that Medical Officer (an OPM occupational series job title) and Psychiatry (a VHA assignment code job title falling under Medical Officer) were both severe occupational staffing shortages, "Lack of qualified applicants" would be counted once for the theme in Medical Officer.

We did not assess the validity of the survey responses.

## Interviews

In addition to the annual surveys, We conducted interviews with all 18 VISN directors between October 15, 2020, and November 10, 2020, to review hiring during the pandemic.

We did not assess the validity of the responses provided in the interviews.

## Section 2: Limitations

The shortages discussed in this review represent the frequency of occupations designated as a severe occupational shortage in the VA OIG's annual surveys as defined by 5 C.F.R. Section (§) 337.204, but they do not necessarily represent vacancies and should not be considered the sole measure of VHA-wide severe occupational shortages.[77] A severe occupational shortage refers to particular occupations that are difficult to fill, whereas vacancy refers to an unoccupied position and is distinct from the designation of a severe occupational shortage. For example, a facility could identify an occupation as a severe occupational shortage, which could have no vacant positions or 100 vacant positions. Defining shortages in this manner does not account for other dimensions that could be used to determine shortages such as the priority of a severe occupational shortage at a given facility. For example, one facility may consider an occupation as its number one shortage, while another facility may consider that same occupation as its number 30 shortage. Facility priority was not considered when determining the frequency of occupations being reported as severe occupational shortages across the VHA. Further, the impact that reducing a shortage might have on a facility cannot be assessed by the survey results.

## Section 3: Standards

We conducted the review in accordance with Quality Standards for Inspection and Evaluation published by the Council of the Inspectors General on Integrity and Efficiency.

# APPENDIX D:

# Department of Health and Human Services



## Section 1. Methodology

**Scope**. As of July 1, 2022, there were 15,178 Medicare– and Medicaid–certified nursing homes nationwide. Our review focused on the staffing experiences at these nursing homes from April 1, 2019, through September 11, 2022 (audit period).

We conducted our audit from July 2022 to January 2023.

**Data Sources**. We used nursing home staffing shortage data that nursing homes report weekly to CDC's NHSN to identify the number of nursing homes that reported a staffing shortage for the weeks ended May 24, 2020, through September 11, 2022, and to nonstatistically select nursing homes from which to interview officials about their experiences with staffing shortages before and during the pandemic. We also used nursing home staffing data that nursing homes report quarterly in CMS's PBJ system to analyze the number of hours that nursing home staff worked during the quarters ended June 30, 2019, through June 30, 2022. In addition, we obtained verbal testimony from officials from the nonstatistically selected nursing homes.

**Methodology**. We reviewed staffing shortage data that nursing homes reported weekly to CDC's NHSN for the weeks ended May 24, 2020, through September 11, 2022, and staffing data that nursing homes reported quarterly in CMS's PBJ system for the quarters ended June 30, 2019, through June 30, 2022.

From the 3,556 nursing homes that reported a staffing shortage in at least one of the four categories of nursing home staff (nurses, clinical staff, aides, or other staff) for the week ended July 10, 2022, we nonstatistically selected 50 nursing homes in 44 states. To select the nursing homes, we considered factors, such as the number of weeks that nursing homes reported a shortage (during the weeks ended May 24, 2020, through July 10, 2022) and the locations of the nursing homes.

We interviewed officials, such as nursing home administrators and directors of nursing, from the selected nursing homes during the period August 17, 2022, through September 13, 2022, to understand the nursing homes' experiences with shortages of health care personnel. During each interview, we requested that the nursing home officials speak about their staffing experiences

through a series of open-ended questions focused on the positions that were most affected by the staffing shortages; reasons for the shortages; impact that the shortages had on the nursing home's staff, operations, and residents; and actions that the nursing home took to address the shortages and minimize staff burnout. The blue dots on the map in Exhibit 1 show the locations of the 50 nonstatistically selected nursing homes.

**Exhibit 1: Locations of the 50 Nonstatistically Selected Nursing Homes**



Source: The HHS OIG.

We also discussed with CMS officials their oversight of nursing home staffing and actions that CMS took to help nursing homes lessen the impact of staffing shortages during the pandemic.

## Section 2: Limitations

A limitation of using staffing shortage data and staffing information reported by nursing homes is that some nursing homes may not have submitted the required data or the submitted data may not have passed CMS's or CDC's quality assurance checks. Our review did not include an assessment of nursing homes' compliance with the requirements to report staffing shortage data or staffing information, CMS's oversight of nursing homes' compliance with these requirements, or the

accuracy of the shortage data or staffing information that nursing homes reported to the NHSN and reported in the PBJ system. As a result, we did not assess the nursing homes' or CMS's internal controls related to these requirements.

Additionally, the reasons for the 50 nonstatistically selected nursing homes' staffing shortages and the impacts of those shortages as stated in this report reflect the nursing homes' experiences and perceptions as they were conveyed to us. We did not verify the accuracy of the information that nursing home officials provided, obtain perspectives from existing or former nursing home staff, or corroborate the impact that staffing shortages had on the selected nursing homes. Further, nursing home officials may not have shared with us all of the reasons for staffing shortages at their nursing homes, the impacts of the shortages, or their efforts to attract and retain staff or minimize staff burnout. Therefore, the information in this report may not represent everything that nursing homes experienced, or all the actions they took during the audit period. This information is provided for informational purposes only and, therefore, we did not provide any recommendations.

## Section 3: Standards

We conducted this review in accordance with generally accepted government auditing standards issued by the Government Accountability Office.

# APPENDIX E:

# Shortages Reported by at Least 20 Percent of VHA Facilities

**Table 1: Frequency of Most Common Facility-Designated Severe Occupational Shortages, FY 2020**

| Occupational Series or Assignment Codes[b] | Occupation | Clinical or Nonclinical | Number of Facilities That Identified the Occupation as a Severe Shortage |
|---|---|---|---|
| 31 | Psychiatry[a] | Clinical | 83 |
| 3566 | Custodial Worker | Nonclinical | 65 |
| 0083 | Police | Nonclinical | 62 |
| P1 | Primary Care[a] | Clinical | 51 |
| 0620 | Practical Nurse | Clinical | 49 |
| 0801 | General Engineering | Nonclinical | 48 |
| 0180 | Psychology | Clinical | 47 |
| 0644 | Medical Technologist | Clinical | 45 |
| 25 | Gastroenterology[a] | Clinical | 41 |
| 7408 | Food Service Worker | Nonclinical | 37 |
| 0679 | Medical Support Assistance | Nonclinical | 36 |
| 88 | RN Staff Nurse-Inpatient[b] | Clinical | 36 |
| K6[a] | Hospitalist | Clinical | 34 |
| 0647 | Diagnostic Radiologic Technologist | Clinical | 33 |
| N4 | Nurse Practitioner – Mental Health/Substance Use Disorder[b] | Clinical | 31 |
| Q6 | RN/Staff-Inpatient Community Living Center[b] | Clinical | 31 |
| 0201 | Human Resources Management | Nonclinical | 30 |

Source: VA OIG analysis of VHA facilities' responses to the VA OIG's FY 2020 staffing survey.

a.  Assignment codes within the Medical Officer occupational series.

b.  Assignment codes within the Nurse occupational series.

Note: Only occupations designated by at least 20 percent of the facilities were included in this table.

**Table 2: Frequency of Most Common Facility-Designated Severe Occupational Personnel Shortages, FY 2021**

| Occupational Series or Assignment Codes[b] | Occupation | Clinical or Nonclinical | Number of Facilities That Identified the Occupation as a Severe Shortage |
|---|---|---|---|
| 31 | Psychiatry[a] | Clinical | 70 |
| 0679 | Medical Support Assistance | Nonclinical | 62 |
| 0083 | Police | Nonclinical | 60 |
| 0180 | Psychology | Clinical | 60 |
| 3566 | Custodial Worker | Nonclinical | 59 |
| P1 | Primary Care[a] | Clinical | 57 |
| 0620 | Practical Nurse | Clinical | 51 |
| 0644 | Medical Technologist | Clinical | 50 |
| 0801 | General Engineering | Nonclinical | 45 |
| 7408 | Food Service Worker | Nonclinical | 40 |
| 0647 | Diagnostic Radiologic Technologist | Clinical | 34 |
| 0858 | Biomedical Engineering | Nonclinical | 32 |
| 0675 | Medical Records Technician | Nonclinical | 31 |
| 12 | Urology[a] | Clinical | 31 |
| 0185 | Social Work | Clinical | 30 |
| 0645 | Medical Technician | Clinical | 30 |
| 25 | Gastroenterology[a] | Clinical | 30 |
| 0621 | Nursing Assistant | Clinical | 28 |
| 88 | RN Staff Nurse-Inpatient[b] | Clinical | 28 |

Source: VA OIG analysis of VHA facilities' responses to the VA OIG's FY 2021 staffing survey.

a.  Assignment codes within the Medical Officer occupational series.

b.  Assignment codes within the Nurse occupational series.

Note: Only occupations designated by at least 20 percent of the facilities were included in this table.

**Table 3: Frequency of Most Common Facility-Designated Severe Occupational Shortages, FY 2022**

| Occupational Series or Assignment Codes[b] | Occupation | Clinical or Nonclinical | Number of Facilities That Identified the Occupation as a Severe Shortage |
|---|---|---|---|
| 3566 | Custodial Worker | Nonclinical | 96 |
| 0679 | Medical Support Assistance | Nonclinical | 88 |
| 0620 | Practical Nurse | Clinical | 86 |
| 0180 | Psychology | Clinical | 73 |
| 31 | Psychiatry[a] | Clinical | 71 |
| 0644 | Medical Technologist | Clinical | 65 |
| 0083 | Police | Nonclinical | 62 |
| 7408 | Food Service Worker | Nonclinical | 60 |
| P1 | Primary Care[a] | Clinical | 60 |
| 0801 | General Engineering | Nonclinical | 54 |
| 0621 | Nursing Assistant | Clinical | 53 |
| 88 | RN Staff Nurse-Inpatient[b] | Clinical | 51 |
| 0185 | Social Work | Clinical | 44 |
| 0647 | Diagnostic Radiologic Technologist | Clinical | 36 |
| 0649 | Medical Instrument Technician | Clinical | 36 |
| CM | RN Staff-Critical Care[b] | Clinical | 36 |
| Q6 | RN/Staff-Inpatient Community Living Center[b] | Clinical | 33 |
| CR | RN Staff-Emergency Dept/Urgent Care[b] | Clinical | 32 |
| 0645 | Medical Technician | Clinical | 30 |
| CQ | RN Staff-Inpatient Mental Health[b] | Clinical | 30 |
| 25 | Gastroenterology[a] | Clinical | 30 |
| 0858 | Biomedical Engineering | Nonclinical | 29 |

Source: VA OIG analysis of VHA facilities' responses to the VA OIG's FY 2022 staffing survey

a.  Assignment codes within the Medical Officer occupational series.

b.  Assignment codes within the Nurse occupational series.

Note: Only occupations designated by at least 20 percent of the facilities were included in this table.

# Endnotes

1   Medical officers are positions with duties that advise on, administer, supervise, or perform professional and scientific work in one or more fields of medicine, and when the degree of Doctor of Medicine or Doctor of Osteopathy is a fundamental requirement.

2   There are only 96 BOP facilities represented here because the 97th facility, FCC Beaumont, relies solely on contracted clinical staff, who were not included in the scope of this review.

3   A licensed vocational nurse position does not require full professional nurse education.

4   Title 38, United States Code, Veterans' Benefits, enacted September 2, 1958, includes a special pay authority used to recruit and retain employees in certain health care occupations.

5   Delegation Agreement, U.S. Office of Personnel Management and Department of Defense, effective July 1, 2012, and U.S. Office of Personnel Management Title 38 Delegation Agreement with Department of Justice, effective June 30, 2014.

6   Medical officers are positions with duties that advise on, administer, supervise, or perform professional and scientific work in one or more fields of medicine, and when the degree of Doctor of Medicine or Doctor of Osteopathy is a fundamental requirement.

7   The NHSN is a CDC system for tracking health-care-associated infections. Nursing homes are required to report COVID-19-related data to the NHSN on a weekly basis. The PBJ system is a CMS system designed to collect staffing information, including the category of work for each person who provides direct care and services to residents and information on hours of care provided by each category of staff per resident, per day from nursing homes on a quarterly basis.

8   TRICARE regional contracts provide health care services and support beyond what is available at military hospitals and clinics.

9   Public Law 115-232, John S. McCain National Defense Authorization Act for Fiscal Year 2019, August 13, 2018; Public Law 114-328, National Defense Authorization Act for Fiscal Year 2017, December 23, 2016.

10   DOD's response to House Report 116-442, page 150, accompanying H.R. 6395, the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 on Behavioral Health Requirements of the Department of Defense.

11   DOD OIG Report No. DODIG-2022-081, "Evaluation of Department of Defense Military Medical Treatment Facility Challenges During the Coronavirus Disease-2019 (COVID-19) Pandemic in Fiscal Year 2021," April 5, 2022.

12   DOD clinical personnel are DOD health care providers that provide medical and other patient care services to DOD beneficiaries. DOD nonclinical personnel are in administrative, logistical, or clerical positions that are not involved in direct patient care.

13   DOD OIG Report No. DODIG-2022-081, "Evaluation of Department of Defense Military Medical Treatment Facility Challenges During the Coronavirus Disease-2019 (COVID-19) Pandemic in Fiscal Year 2021," April 5, 2022.

14   Although these positions were the highest reported by the MTF personnel, positions may be underreported because military occupational specialties for Service members did not easily translate to the occupational series for civilian personnel established by the OPM.

15   DOD Instruction 1400.25, Volume 543, "DOD Civilian Personnel Management System: DOD Civilian Physicians and Dentists Pay Plan," February 12, 2018, requires that the sum of payments subject to the Executive Level I annual limitation plus market pay will not exceed the annual salary of the President of the United States, excluding expenses, established by Section 102 of title 3, United States Code.  Section 102, title 3, United States Code, Compensation of the President, establishes that the President shall be paid monthly for compensation in the aggregate amount of $400,000 a year, for services during the elected term.

16   A "grade" refers to the General Schedule (GS) pay scale, or the pay level for the job. Title 38, United States Code, Veterans' Benefits.

17   A common access card is used as an identification badge, or a standard identification card used to physically access buildings and access DOD computer networks and systems.

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 279 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
Endnotes

18  Report No. DODIG-2022-081, "Evaluation of Department of Defense Military Medical Treatment Facility Challenges During the Coronavirus Disease–2019 (COVID–19) Pandemic in Fiscal Year 2021," April 5, 2022.

19  A contract discrepancy report is used to record contract discrepancies or problems when contractor performance is judged unsatisfactory.

20  Operation Allies Welcome assisted vulnerable Afghan nationals, to include those who worked alongside the United States in Afghanistan for the past two decades, as they safely resettled in the United States.

21  DOD Instruction 1400.25, Volume 1230, "DOD Civilian Personnel Management System: Employment in Foreign Areas and Employee Return Rights," July 26, 2012 (Incorporating Change 1, July 29, 2022).

22  Exceptional Family Member Program is a process that documents and evaluates the medical and educational needs of family members to determine whether the family member can be supported at a specific location.

23  The Joint Outpatient Experience Survey collects data on beneficiary views of outpatient care recently received at the MTF.

24  A sentinel event is an unexpected occurrence involving death or serious physical or psychological injury or risk thereof, while an adverse event is an unintended occurrence or condition associated with care or services that reach the patient and that may or may not result in harm to the patient.

25  Federal inmates in BOP custody are also housed in residential reentry centers (halfway houses) or in home confinement; inmates in these settings receive medical care from community providers. Previously, the BOP also housed some inmates in privately-operated prisons, which were responsible for providing health care to those inmates; however, in November 2022, the BOP ended its use of privately-operated prisons to house inmates in compliance with Executive Order 14006 which eliminated the use of these facilities.

26  The Commissioned Corps of the U.S. Public Health Service is a branch of the uniformed services committed to the service of health. Officers serve in agencies across the Federal Government.

27  Other clinical positions include social workers, dental hygienists and assistants, physical and occupational therapists, and radiologic technologists. Other nonclinical positions include medical supply technicians, and additional administrative and support roles.

28  See Department of Justice Office of the Inspector General, "Review of the Federal Bureau of Prisons' Medical Staffing Challenges," Evaluation and Inspections Division 16-02 (March 2016).

29  Department of Justice Office of the Inspector General, "Remote Inspection of Federal Correctional Institution Milan," Evaluation and Inspections Division 21-032 (January 2021).

30  Department of Justice Office of the Inspector General, Inmate Perceptions of the Federal Bureau of Prisons' Management of the Coronavirus Disease 2019 Pandemic, Evaluation and Inspections Division 23-067 (May 2023).

31  Department of Justice Office of the Inspector General, "Staff Perceptions of the Federal Bureau of Prisons' Management of the Coronavirus Disease 2019 Pandemic: A Follow-Up Survey of BOP Staff," Evaluation and Inspections Division 21-126 (September 2021).

32  The U.S. OPM granted BOP direct hire authorities for five health care occupational series: 0610 (nurse), 0620 (licensed practical nurse), 0602 (medical officer), 0660 (pharmacist), and 0647 (diagnostic radiologic technologist).

33  VA medical benefits package includes inpatient and outpatient care, primary and specialty care, preventive care, diagnostic and treatment services, long term care, mental health care, pharmacy benefits, and other services. https://www.va.gov/healthbenefits/resources/publications/hbco/hbco_medical_benefits_package.asp (The website was accessed April 29, 2022.)

34  VHA, Coronavirus Disease 2019 (COVID-19) Response Report, October 27, 2020, states, "In emergency situations, VA avails itself to national, state, territorial, tribal, and local [civilian] governments to prepare and support relief efforts. This service is known as VA's Fourth Mission."

35  Veterans Access, Choice, and Accountability Act of 2014, Pub. L. No. 113-146, 128 Stat. 1754 (2014).

36  VA Choice and Quality Employment Act, Pub. L. No. 115-46, 131 (2017).

Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 280 of 428
Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic
**Endnotes**

37   VA OIG: OIG Determination of Veterans Health Administration's Occupational Staffing Shortages, Fiscal Year 2020, Report No. 20-01249-259, September 23, 2020; OIG Determination of Veterans Health Administration's Occupational Staffing Shortages, Fiscal Year 2021, Report No. 21-01357-271, September 28, 2021; OIG Determination of Veterans Health Administration's Occupational Staffing Shortages, FY 2022, Report No. 22-00722-187, July 7, 2022.

38   Seven facilities reported no severe occupational staffing shortages in FY 2020, which dropped to three in FY 2021.

39   The VA OIG counted the number of times a theme showed up for each of the top five clinical and top five nonclinical occupations.

40   Some facilities designated multiple reasons for a given occupational shortage, while other facilities provided only one reason per occupational shortage resulting in the sum of the percentage of responses exceeding 100 percent.

41   Department of Veterans Affairs Functional Organizational Manual Version 7.0, 2021. Operational control of VHA facilities is organized under 18 VISNs, intended as "shared system(s) of care working together to better meet local health care needs and provide Veterans greater access to care."

42   VA OIG: OIG Determination of Veterans Health Administration's Occupational Staffing Shortages, Report No. 15-00430-103, January 30, 2015; OIG Determination of Veterans Health Administration's Occupational Staffing Shortages, Report No. 15-03063-511, September 1, 2015; OIG Determination of VHA Occupational Staffing Shortages, Report No. 16-00351-453, September 28, 2016; OIG Determination of VHA Occupational Staffing Shortages, FY 2017, Report No. 17-00936-385, September 27, 2017; OIG Determination of Veterans Health Administration's Occupational Staffing Shortages, FY 2018, Report No. 18-01693-196, June 14, 2018; OIG Determination of Veterans Health Administration's Occupational Staffing Shortages, FY 2019, Report No. 19-00346-241, September 30, 2019; OIG Determination of Veterans Health Administration's Occupational Staffing Shortages, Fiscal Year 2020, Report No. 20-01249-259, September 23, 2020; OIG Determination of Veterans Health Administration's Occupational Staffing Shortages, Fiscal Year 2021, Report No. 21-01357-271, September 28, 2021; OIG Determination of Veterans Health Administration's Occupational Staffing Shortages, FY 2022, Report No. 22-00722-187, July 7, 2022.

43   ECRI, "ECRI Reports Staffing Shortages and Clinician Mental Health are Top Threats to Patient Safety," news release March 14, 2022, https://www.ecri.org/press/ecri-reports-staffing-shortages-and-clinician-mental-health-are-top-threats.

44   "Strategies to Mitigate Health care Personnel Staffing Shortages," CDC, accessed January 27, 2023 www.cdc.gov/coronavirus/2019-ncov/hcp/mitigating-staff-shortages.html.

45   GAO, Veterans Health Care Staffing Challenges Persist for Fully Integrating Mental Health and Primary Care Services, GAO-23-105372, December 15, 2022.

46   PRAC, Insights on Telehealth Use and Program Integrity Risks Across Selected Health Care Programs During the Pandemic (as reported by Offices of Inspectors General across government) (Washington, D.C.; December 2022).

47   VA OIG, Review of Access to Telehealth and Provider Experience in VHA Prior to and During the COVID-19 Pandemic, Report No. 20-02794, Awaiting Publication.

48   VA OIG, Appointment Management During the COVID-19 Pandemic, Report No. 20-02794-218, September 1, 2020.

49   COVID-19 Response Plan, Incident-specific Annex to the VHA High Consequence Infection (HCI) Base Plan, March 23, 2020.

50   Various available direct hire authorities as discussed allow for the noncompetitive appointments in certain shortage occupations notwithstanding competitive service and preference eligibility standards.

51   5 U.S.C. § 3304.

52   38 U.S.C. § 7412.

53   Veterans Health Administration COVID-19 Operational Plan, Version 1.5, January 27, 2023.

54   The CDT program, targeted for implementation in quarter four of FY 2023, was influenced by the COVID-19 pandemic to support internal and Fourth Mission emergencies and disasters and will be composed of 360 permanent deployment-ready clinical staff trained in emergency response.

Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic

**Endnotes**

55   VHA's DEMPS program uses a database of volunteer clinical and nonclinical staff who are matched and deployed to meet the needs of internal and external Fourth Mission emergency response missions.

56   Coronavirus Aid, Relief, and Economic Security Act of 2020, Pub. L. No. 116-136 (2020).

57   VA Nurse and Physician Assistant RAISE Act Pub L. No 117–103, 136 Stat. 822. (2022).

58   Honoring our PACT Act of 2022 Pub. L. 117-168, 136 Stat. 1808, (2022).

59   VHA Reduce Employee Burnout and Optimizing Organizational Thriving (REBOOT), Reducing Employee Burnout Fact Sheet, March 3, 2022 (www.va.gov/HEALTH/docs/REBOOT_Task_Force_Fact_Sheet_030122_508.pdf).

60   Medicaid is a state-run program that is jointly funded and administered by the Federal and state governments. Although each state has considerable flexibility in designing and operating its Medicaid program, it must comply with applicable federal requirements.

61   Nursing homes are required to comply with health and safety requirements in federal regulations (42 C.F.R part 483, subpart b) to participate in the Medicare and Medicaid programs. The list of nursing homes was downloaded from CMS's provider data catalog at https://data.cms.gov/provider-data/archived-data/nursing-homes. Accessed on September 20, 2022.

62   This data may vary from week to week because nursing homes have the opportunity to submit corrected data for previously-reported weeks. Available at https://data.cms.gov/covid-19/covid-19-nursing-home-data. Accessed on September 29, 2022.

63   HHS Assistant Secretary for Planning and Evaluation, Behavioral Health, Disability, and Aging Policy; *COVID-19 Intensifies Nursing Home Workforce Challenges*; October 18, 2020. Available at https://aspe.hhs.gov/reports/covid-19-intensifies-nursing-home-workforce-challenges. Accessed on December 12, 2022.

64   CMS required nursing homes to report staffing shortages and other COVID-19 facility data beginning with the week ended May 17, 2020, to support surveillance of COVID-19 cases and increase transparency for nursing home residents, their representatives, and their families. CMS memo to state survey agency directors, QSO-20-29-NH (May 6, 2020); 42 C.F.R § 483.80(g).

65   Direct care staff are those individuals who, through interpersonal contact with residents or resident care management, provide care and services to residents to allow them to attain or maintain the highest practicable physical, mental, and psychosocial well-being. See 42 C.F.R § 483.70(q)(1). 42 C.F.R § 483.70(q)(2).

66   CMS, "Electronic Staffing Data Submission Payroll-based Journal Long-term Care Facility Policy Manual," version 2.6, June 2022. Available at https://www.cms.gov/medicare/quality-initiatives-patient-assessment-instruments/nursinghomequalityinits/downloads/pbj-policy-manual-final-v25-11-19-2018.pdf. Accessed on June 3, 2022.

67   The average daily number of hours worked by clinical staff per nursing home decreased by .1 hour, or 6 minutes.

68   A list of enacted waivers specific to nursing homes and their current status can be found at: https://www.cms.gov/files/document/long-term-care-facilities-cms-flexibilities-fight-covid-19.pdf. Accessed on June 21, 2022.

69   Public Law 115-232, John S. McCain National Defense Authorization Act for Fiscal Year 2019, August 13, 2018; Public Law 114-328, National Defense Authorization Act for Fiscal Year 2017, December 23, 2016.

70   VA Choice and Quality Employment Act, Pub. L. No. 115-46, 131 (2017).

71   The Manila station was excluded, beginning with the OIG Determination of Veterans Health Administration Occupational Staffing Shortages, FY 2018 report, as its staff were not composed VA employees but employed by the State Department and were foreign nationals.

72   The list of 489 occupations included those provided by VHA Workforce Management and Consulting and historically used in prior OIG Determination of VHA's Occupational Staffing Shortages reports. This list included occupations VHA facilities did not have staff in at the time of the reviews. These occupations were included because facilities have previously identified severe staffing shortages in occupations without any staff. Separately, VHA reported that some occupations included in the surveys were consolidated at the VISN level, national level, or may have been employed at both the facility and VISN levels.

73   Prior to the OIG Determination of Veterans Health Administration's Occupational Staffing Shortages, FY 2021, Report No. 21-01357-271, September 28, 2021 report, medical center directors were asked to submit the survey on behalf of their facility.

74   Hiring authority for the respective occupations populated in the survey as severe occupational staffing shortages were identified.

75   For purposes of this report, we used the term occupation when referencing either OPM occupational series or VHA assignment codes.

76   Virginia Braun and Victoria Clarke, "Using thematic analysis in psychology," *Qualitative Research in Psychology*, 3(2), 77–101. July 2006.

77   5 C.F.R. § 337.204, Severe Shortage of Candidates, states:

(a) OPM will determine when a severe shortage of candidates exists for particular occupations, grades (or equivalent), and/or geographic locations. OPM may decide independently that such a shortage exists, or may make this decision in response to a written request from an agency.

(b) An agency when requesting direct-hire authority under this section, or OPM when deciding independently, must identify the position or positions that are difficult to fill and must provide supporting evidence that demonstrates the existence of a severe shortage of candidates with respect to the position(s). The evidence should include, as applicable, information about:

(1) The results of workforce planning and analysis;

(2) Employment trends including the local or national labor market;

(3) The existence of nationwide or geographic skills shortages;

(4) Agency efforts, including recruitment initiatives, use of other appointing authorities (e.g., schedule A, schedule B) and flexibilities, training and development programs tailored to the position(s), and an explanation of why these recruitment and training efforts have not been sufficient;

(5) The availability and quality of candidates;

(6) The desirability of the geographic location of the position(s);

(7) The desirability of the duties and/or work environment associated with the position(s); and

(8) Other pertinent information such as selective placement factors or other special requirements of the position, as well as agency use of hiring flexibilities such as recruitment or retention allowances or special salary rates.

# Acknowledgements

This report was prepared under the guidance of the PRAC Health Care Subgroup, chaired by HHS Inspector General, Christi A. Grimm and led by the DOD OIG in collaboration with the DOJ OIG, VA OIG, and HHS OIG professional staff. Special acknowledgments to the following staff who collaborated on this report:

**DOD OIG**:

James Degaraff

Bridgett Fowler

Kristine Do

Glenn Estrada

Isaac Gallardo Recano

Katelyn Potter

**DOJ OIG**:

DOJ OIG team

**VA OIG**:

Jennifer Baptiste, MD

Julie Kroviak, MD

Patrice Marcarelli, MD

David Vibe, MBA

John Wallis

**HHS OIG**:

Pat Cogley

John Beacham

Lori Ahlstrand

Gerald Illies

Lydia Barbour

Jane Wines

Vlada Hutton

Richard Mills

Jessica Swanstrom

**PRAC**:

Jarrett Fussell

Aaron Jewell

Lisa Reijula

Amanda Seese

Jenniffer Wilson

## For more information:

**Department of Defense,**
**Office of Inspector General**
Office of Public Affairs
Public.Affairs@dodig.mil

**Department of Veterans Affairs,**
**Office of Inspector General**
Fred Baker, Public Affairs Officer
Fred.Baker@va.gov

**Department of Justice,**
**Office of Inspector General**
Stephanie Logan, Communications Director
Stephanie.Logan@usdoj.gov

**Department of Health and Human Services,**
**Office of Inspector General**
Office of Public Affairs
Public.Affairs@oig.hhs.gov

**Pandemic Response Accountability Committee**
Lisa Reijula, Associate Director of Outreach and Engagement
Lisa.Reijula@cigie.gov

## Visit us at:

PandemicOversight.gov

## Follow us at:

  

## Report Fraud, Waste, Abuse, or Misconduct:

To report allegations of fraud, waste, abuse, or misconduct regarding pandemic relief funds or programs please go to the PRAC website at PandemicOversight.gov.



A Committee of the
Council of the Inspectors General
on Integrity and Efficiency

# EXHIBIT E



Inspection of the Federal Bureau of Prisons'

Federal Correctional Institution Tallahassee

★ ★ ★

EVALUATION AND INSPECTIONS DIVISION

24-005

NOVEMBER 2023

# Executive Summary



**The DOJ OIG's Inspections Program**

Between Monday, May 22, and Saturday, May 26, 2023, the U.S. Department of Justice (DOJ) Office of the Inspector General (OIG) conducted an unannounced, on-site inspection of Federal Correctional Institution (FCI) Tallahassee, a low security female institution in Florida with a satellite male detention center.

This was the second unannounced inspection of a Federal Bureau of Prisons (BOP) institution under the OIG's new on-site inspections program. In selecting an inspection site, we sought an institution operationally comparable to our first inspection site, FCI Waseca, but with a different risk profile. FCI Tallahassee fit our selection criteria because, like FCI Waseca, it is a female facility with a similar size inmate complement. Unlike FCI Waseca, however, which rated as "low risk" on a prison inspection tool the OIG is developing and piloting internally, FCI Tallahassee rated as "high risk" on that tool.

As we detail in the report, we identified at FCI Tallahassee many significant issues, most of which were consistent with findings in our other recent BOP oversight work and which we have reported on publicly. We do not make recommendations in this report because in our prior work we have recommended that the BOP address many of its issues at an enterprise level. Therefore, through our efforts to resolve those recommendations, we will monitor the BOP's efforts to address these issues at all of its institutions, including FCI Tallahassee.

Our inspection identified several serious operational deficiencies at FCI Tallahassee. Among the most concerning were the alarming conditions of its food service and storage operations. Specifically, on our second day at the institution, we observed inmates being served moldy bread and vegetables rotting in a refrigerator in a food preparation area at the female prison. We also observed in food storage warehouses likely evidence of rodent droppings and rodents having chewed through boxes of food, as well as bags of cereal with insects in them and warped food containers. Within 24 hours of the OIG alerting institution management of our findings, they and other staff removed large volumes of food from the storage warehouses.

We also identified in the female prison serious infrastructure problems that created unsanitary and potentially unsafe conditions. Inside communal inmate bathrooms, we observed a shower in which discolored water had pooled, a shower that flooded when used, and an inoperable toilet. We also found that female housing unit roofs routinely leak and that all five general population housing unit roofs need to be replaced. Many female inmates live in housing units in which water frequently leaks from ceilings and windows on or near their living spaces. We observed housing areas in which feminine hygiene products were being used to absorb water from leaking windows, an electrical outlet that appeared to have fire damage, a sink that was detached from the wall, and a black substance on walls and ceilings. Additionally, we observed worn bedding, rusted inmate storage lockers, and unlocked supply closets.

Most staff and inmates reported feeling safe and did not believe that sexual abuse was widespread at FCI Tallahassee. We nonetheless identified serious issues affecting inmate safety, including Correctional Officer shortages, a lack of supervisory oversight at the male detention center, and operational deficiencies in core inmate management and security functions, such as weaknesses with inmate search procedures and limited security camera coverage. Staff and inmates also told us that staff do not always enforce rules consistently, and inmates believed that certain staff took retaliatory measures against them. Additionally, inmates reported that some Correctional Officers use offensive language when speaking with them. We found that, collectively, these issues have adversely affected the trust

inmates have in Correctional Officers, which can cause some inmates to be unwilling to report staff and inmate misconduct due to fear of reprisal.

We also found that FCI Tallahassee's Health Services Department is experiencing significant staffing shortages, with 38 percent of its positions vacant, which is consistent with challenges associated with hiring healthcare professionals across the BOP. While we found that Health Services Department staff work hard to complete many of the core tasks within timeframes set by BOP policy, staff shortages have negatively affected healthcare treatment, including causing staff to modify the time of day it distributes insulin and drugs to female inmates, which may limit the therapeutic benefit of these drugs for certain inmates. Separately, we observed a healthcare provider failing to ask required questions during inmate intake screenings and not informing inmates how to access healthcare services.

We note that many of the issues we detail in this report were longstanding and that much of FCI Tallahassee's executive leadership team is new to the institution. For example, the Warden reported for duty there in January 2023. He and the leadership team were aware of many of the issues detailed in the report and at the time of our inspection had been taking steps to address them. We appreciated the full cooperation they and their staff provided to the OIG team during the inspection.

## Report Highlights

| | |
|---|---|
|  **Food Service** | **We identified serious issues with FCI Tallahassee's food service and storage operations.**<br>• Moldy bread was served to inmates, and rotting vegetables were stored in a food preparation area refrigerator.<br>• Pests and compromised food containers were present in food storage warehouses. |
|  **Condition of Facilities** | **Significant facilities issues affect the conditions of confinement for female inmates.**<br>• Many female inmates lived in housing units with water that frequently leaked from ceilings and windows on or near their living spaces.<br>• We observed poor conditions, including an inoperable toilet and showers, in communal bathrooms.<br>• FCI Tallahassee received $3.6 million to replace the roofs of certain administrative buildings and to replace housing unit windows; however, it had neither requested nor received funding to address necessary housing unit roof repairs. |
|  **Staffing Shortages** | **Significant staffing shortages affect institution operations.**<br>• Correctional Officer shortages require the institution to routinely use overtime, which can negatively affect staff attentiveness and therefore safety and security.<br>• The male detention center operates with a small staff complement and lacks supervisory correctional oversight.<br>• Staff shortages in the Health Services Department have required it to modify the timing that drugs and insulin are distributed to female inmates, which may negatively affect their therapeutic effect. |
|  **Safety and Security** | **Most staff and inmates felt safe at the institution; however, we still identified deficiencies in core security and inmate management functions.**<br>• Weaknesses in inmate search procedures contribute to the introduction of contraband.<br>• Staff failed to perform inmate monitoring rounds as required by BOP policy.<br>• Inmates and staff said that rules are not enforced consistently among Correctional Officers, and inmates said that some Correctional Officers use offensive language when speaking with them.<br>• There are not enough cameras to sufficiently observe staff and inmate activities. |

# Table of Contents

Introduction......................................................................................................................................1

    FCI Tallahassee.........................................................................................................................2

    FCI Tallahassee Staffing Challenges........................................................................................3

Inspection Results ..........................................................................................................................4

    Food Service............................................................................................................................4

    Infrastructure and Physical Conditions ................................................................................ 12

    Safety and Security............................................................................................................... 21

    Use of Restrictive Housing................................................................................................... 29

    Staff Discipline...................................................................................................................... 32

    Sexual Misconduct Reporting .............................................................................................. 32

    Inmate Healthcare................................................................................................................ 34

    Inmate Programming............................................................................................................ 36

Conclusion..................................................................................................................................... 38

Appendix 1:  Purpose, Scope, and Methodology......................................................................... 40

    Standards .............................................................................................................................. 40

    Purpose and Scope .............................................................................................................. 40

    Inspection Methodology ...................................................................................................... 40

Appendix 2:  DOJ OIG Related Work............................................................................................ 42

Appendix 3:  BOP Policies Cited .................................................................................................. 43

Appendix 4:  The BOP's Response to the Draft Report ............................................................... 44

# Introduction

This report details the results of the U.S. Department of Justice (DOJ) Office of the Inspector General's (OIG) unannounced inspection of a Federal Bureau of Prisons (BOP) prison, Federal Correctional Institution (FCI) Tallahassee, a low security female institution with an adjacent male detention center located in Tallahassee, Florida.  This is the second unannounced inspection through the OIG's new on-site inspections program.  In May 2023, we issued a report detailing our first inspection, of FCI Waseca, a standalone low security female institution.[1]  In selecting a site for our second inspection, we sought an institution that was operationally similar to FCI Waseca but had a different risk profile according to a prison inspection risk assessment tool that the OIG is developing and piloting internally.  FCI Waseca scored as "low risk" on the tool, and the results of that inspection provided the OIG a baseline against which to compare the operations of other institutions.  FCI Tallahassee, conversely, scored as "high risk" according to the tool.  The collective results of the FCI Waseca inspection, the FCI Tallahassee inspection, and future inspections will allow us to calibrate the tool as we expand our inspection program.  Finally, by selecting FCI Tallahassee as the site of our second inspection, we were able to test the scalability of our inspection protocols because FCI Tallahassee's adjacent male detention center makes the institution more operationally complex than FCI Waseca.



FCI Tallahassee Main Entrance

Source:  OIG, May 2023

The OIG conducted its unannounced, on-site inspection of FCI Tallahassee between Monday, May 22, and Friday, May 26, 2023.[2]  The OIG team consisted of eight OIG staff members and two medical subject matter experts contracted by the OIG.  While on site, we made physical observations; interviewed staff and inmates; reviewed security camera footage; and collected records related to inmate programming and education, institution staffing levels, conditions of confinement, inmate medical and mental healthcare, and staff and inmate misconduct, including sexual misconduct.  We also made follow-up requests of both the institution and the BOP Central Office for additional data, interviews, and documents, which we used to further inform our inspection (see Appendix 1 for more details on the methodology).

---

[1]  See Appendix 2, Item I.

[2]  Pursuant to the OIG's planned procedures for initiating an inspection, which we had previously shared with the BOP, the OIG notified the institution at approximately 8 a.m. on May 22, 2023, that it would be initiating an inspection at noon that same day.

## FCI Tallahassee

FCI Tallahassee is a low security female prison that originally opened in 1938 to house male inmates.  The prison was converted to house female inmates in 1992, and the adjacent detention center opened in 1996.  The detention center is an administrative security facility that houses male inmates of all security levels who are awaiting sentencing or transfer. FCI Tallahassee leadership uses a centralized roster to staff both institutions and oversees the operation of both the female prison and the male detention center from offices located at the female prison.

FCI Tallahassee is a Medical and Mental Healthcare Level 2 institution, meaning that it generally has the capabilities and resources to provide care for stable outpatients whose medical and mental health conditions can be monitored and managed through routine appointments.

As of May 22, 2023, the female prison housed 746 female inmates, which was 88 percent of its physical capacity of 846.  It also had the largest number of transgender inmates in the BOP: 119 at the time of our inspection.  The female prison has five general population housing units.  Four of these units are single level and have an open layout where inmates use common spaces, including shower and bathroom facilities, during the day and sleep in cubicles.  The fifth unit, which houses inmates enrolled in a residential mental health and drug treatment program, has two levels that contain double occupancy cells.  Cells in this

| FCI Tallahassee:  Institution Profile | |
|---|---|
| **Location** | |
| Tallahassee, FL | |
| **Medical Care Level** | |
| 2 of 4 | |
| **Mental Healthcare Level** | |
| 2 of 4 | |
| **Staff** | |
| Total Positions:  307 | |
| On Board:  260 | |
| *47 Vacancies* | |

| Female Prison | Male Detention Center |
|---|---|
| Population | Population |
| Physical Capacity: 846 | Physical Capacity: 294 |
| Actual Headcount: 746 | Actual Headcount: 115 |
| *~88% capacity* | *~39% capacity* |
| Security Level | Security Level |
| Low | Administrative |
| Housing Units | Housing Units |
| 5 General Population | 3 General Population |
| 1 SHU | 1 SHU |

As of May 22, 2023
Source:  FCI Tallahassee documentation

unit contain bunk beds, a sink, and a toilet.  Inmates housed in this building have access to common spaces, including showers, located on both levels of the housing unit.  The female prison also has a Special Housing Unit (SHU) for inmates that BOP staff has determined need to be separated from the general population. SHU inmates are generally housed two to a cell.  SHU cells remain locked and contain their own toilets.  SHU showers are standalone and available to inmates three times a week.

FCI Tallahassee offers a variety of programming, including a residential mental health and drug treatment program, as well as FIRST STEP Act-required Evidence-Based Recidivism Reduction programming and

Productive Activities to its female inmates.  The institution also offers vocational apprenticeships, as well as employment for inmates at an on-site call center operated by UNICOR, a government-owned manufacturing corporation that employs BOP inmates.

As of May 22, 2023, the adjacent detention center housed 115 male inmates, approximately 39 percent of its physical capacity of 294.  The detention center has three housing units, which contain double occupancy cells that are furnished with bunk beds, a sink, and a toilet.  During normal operations, cells remain unlocked during the day and locked at night.  This allows inmates to use common space during the day.  The detention center also has a SHU; SHU cells are locked and contain their own toilet, sink, and shower.  Inmates housed at the detention center tend to remain there only on a short-term basis as they are generally awaiting sentencing or transfer to another institution.  As a result, the BOP does not offer male inmates at the detention center the same level of programming it offers to female inmates at the female prison.

## FCI Tallahassee Staffing Challenges

At the time of our inspection in May 2023, FCI Tallahassee had a total of 307 positions composed of 292 BOP positions authorized specifically for FCI Tallahassee, as well as 15 positions supported through the U.S. Public Health Service and through supplemental staffing allocations from DOJ.[3]  We found that 85 percent (260 of 307) of FCI Tallahassee's total positions were filled.  Consistent with the vacancy rate for the institution overall, the Correctional Services Department was staffed at 89 percent (109 of 122 positions).  The Correctional Services Department is composed primarily of Correctional Officers, who are vital to the safety and security of the institution as they are responsible for providing round-the-clock supervision of inmates.  As we describe later in the report, we found that, due to staff shortages, in order to fully staff Correctional Officer posts both the female and male facilities require significant use of overtime, as well as augmentation—a staffing technique whereby non-Correctional Officer personnel are reassigned from their regular duties to serve in Correctional Officer posts.



**Figure 1**

**FCI Tallahassee Staffing Level Overview**

Source:  FCI Tallahassee staffing data as of May 2023

Moreover, we found that staffing challenges at FCI Tallahassee are consistent with staffing challenges across the BOP and were not limited to the Correctional Services Department.  The Health Services Department in particular was staffed at 62 percent, with only 13 of 21 positions filled, and had vacancies for positions including healthcare providers.  In the Inmate Healthcare section below, we describe the effects of these Health Services staffing shortages on the provision of inmate healthcare.

---

[3]  The Commissioned Corps of the U.S. Public Health Service is a branch of the uniformed services that supports public health and helps fill health service roles within federal agencies and programs.

# Inspection Results

## Food Service

During our inspection, we identified serious issues with FCI Tallahassee's Food Service Department. Specifically, while observing a lunch service at the female prison on our second day, we found that moldy bread had been served to inmates.  In an adjacent food preparation area, we observed discolored and rotting vegetables in a refrigerator.  Additionally, we inspected the food storage warehouses and observed seriously unsanitary conditions that included likely evidence of rodent droppings and rodents having chewed through boxes of food, as well as bags of cereal with insects in them and warped food containers. Due to the severity of the issues we identified and the immediate risks they posed to inmate health, we informed FCI Tallahassee management of our observations.  Within 24 hours of our notification, FCI Tallahassee staff removed large volumes of food from the storage warehouses.  We note that food served at the men's detention center is prepared separately from the food prepared at the female prison.  However, food served at both facilities is stored centrally in the warehouses we inspected.

During the 2 years prior to our inspection, the Food Service Administrator position, which is responsible for food safety within the Food Service Department, had been vacant.  In fact, FCI Tallahassee's current Food Service Administrator's first day of duty in that position was the first day of our inspection and therefore he was not yet in a position to speak to the operation of the Food Service Department.  Notwithstanding this vital vacancy, the issues we identified were wide-ranging and are likely attributable to a number of discrete failures in food service management, for which many staff members, including FCI Tallahassee management, are ultimately accountable.

After receiving a draft of this report, the BOP provided updates and documentation to the OIG on its efforts to improve the Food Service Department at FCI Tallahassee since our inspection.  These efforts include a pest control service provided twice a month, training provided by the Regional Food Service Administrator to food service staff, a stock rotation plan for the food warehouse, internal sanitation checks of the Food Service Department, and repairs made to broken seats in the inmate cafeteria.

### Food Served to Inmates and Food in the Kitchen Preparation Area

In a June 2022 inmate survey conducted by the BOP, 55 percent of FCI Tallahassee inmates rated the food quality at FCI Tallahassee as poor and reported that outdated food was served.  Further, during our inspection in May 2023, many female inmates similarly complained to us about the quality of food served at the institution.  Consistent with these concerns, we observed that, during a lunch service at the female prison, moldy bread had been served to inmates and discolored and rotting vegetables were being stored in a refrigerator in an adjacent food preparation area.  These conditions are potentially hazardous to the health of inmates and are clearly violative of BOP Food Service policies.[4]  See the images below for examples of our observations.

---

[4]  See Appendix 3 (Food Service Manual).

 

*Left,* Moldy Bread Served During an Observed Lunch Service, *Right,* Close-up of Moldy Bread Found on an Inmate's Lunch Tray During Lunch Service

Source:  OIG, May 2023

 

*Left,* A Discolored and Rotting Cucumber Found in a Food Preparation Refrigerator, *Right,* Discolored Celery Found in the Same Refrigerator

Source:  OIG, May 2023

## Food in Warehouse Storage

As outlined in the BOP's Food Service policy, the BOP is required to store food so that it will not be exposed to contamination.[5]  However, inside the food storage warehouses and an adjacent storage freezer, we found insects inside and on top of large bags of dry food—likely evidence of rodent droppings and rodents having chewed through the exterior of food packaging—and damaged containers of food that had warped or were leaking.  We also found that, contrary to BOP Food Service policy, there was a large open hole in a wall surrounding a pipe's entrance into the food storage warehouse, which could allow for the introduction of insects and rodents.  See the images below for examples of these issues.



Insects Inside and on Top of a Bag of Cereal

Source:  OIG, May 2023 (Red Circles Added to Image)

---

[5]  See Appendix 3 (Food Service Manual).




*Left,* Spiderwebs, Insects, and Likely Evidence of Rodent Droppings on Top of and Around Bags of Soy, *Right,* A Close-up Image of Spiderwebs, Insects, and Likely Evidence of Rodent Droppings on Top of and Around Bags of Soy.

Source:  OIG, May 2023




*Left and Right,* Damage Observed in Food Packaging

Source:  OIG, May 2023 (Product Names Blurred in Left Image)



Warped Containers of Food

Source:  OIG, May 2023 (Product Name Blurred)





*Left,* Warped Can of Food, *Right,* Overturned Jug of Liquid That Has Leaked

Source:  OIG, May 2023



Leaking Boxes Containing Jelly

Source:  OIG, May 2023



A large open hole in a wall surrounding a pipe's entrance into the food storage warehouse could allow for the entry of insects and rodents.

Source:  OIG, May 2023 (Red Circle Added to Image)

## Conditions in the Inmate Cafeteria

During our inspection, we observed issues with the inmate cafeteria at the female prison.  We found numerous broken stools, with sharp edges that could cause injury or the broken remnants of which could be used as weapons, as well as cracks in the walls and loose ceiling tiles.  We also observed insects collected in windowsills and one inoperable window that staff told us could not be closed.  Staff told us that water and other debris often entered the inmate cafeteria through the window.  The images below show examples of these issues.



Broken Stools in the Inmate Cafeteria

Source:  OIG, May 2023 (Red Boxes Added to Image)

 

*Left,* Warped Ceiling Tiles in the Inmate Cafeteria, *Right,* Crack in the Wall in the Inmate Cafeteria

Source:  OIG, May 2023 (Red Circle Added to Both Images)

 

*Left,* Inoperable Window That Staff Told Us Could Not Be Closed in the Inmate Cafeteria, *Right,* Insects Collected on a Windowsill in the Inmate Cafeteria

Source:  OIG, May 2023

## Infrastructure and Physical Conditions

We identified serious infrastructure and facilities issues at FCI Tallahassee that negatively affect the conditions of confinement for female inmates.[6]  Specifically, we found that some inmates in the female prison lived in housing units in which water frequently leaked from ceilings and windows on or near their living spaces.  We also observed poor conditions inside communal inmate bathrooms.  According to Facilities Department staff, roofs covering inmate housing units at the female prison routinely leak and roofs covering all five of the general population inmate housing units needed to be replaced.  At the time of our inspection, FCI Tallahassee had requested and received approximately $3.6 million to replace windows in two of its housing units and to replace the roofs covering its administration building, education building, and Special Housing Unit (SHU) building at the female prison.  While these are necessary repairs, FCI Tallahassee had not yet requested or received funding to replace other roofs covering the five general population housing units at the female prison.

In addition to infrastructure issues affecting the physical conditions in the female inmate housing units, we identified additional inmate comfort and security issues there, including worn bedding, rusted storage lockers, and unlocked supply closets.  We observed similar issues with inmate bedding at the male detention center; however, we did not observe the same level of facility deterioration there as we did at the female prison.  One contributing factor may be that the male detention center is a much newer facility:  the male detention center opened in 1996 while the facility that now houses female inmates originally opened in 1938.

## Female Prison Inmate Housing Units

As described in the Introduction, general population inmates at the female prison live in five population housing units.  Four of the housing units are single level, and one is double level.  The single-level housing units have an open layout where inmates sleep in cubicles.  Cubicles are equipped with bunk beds and house two to four inmates.  As these cubicles are open, during the day inmates can utilize common space, including shower, television, telephone, and computer areas.  The images below show the typical housing arrangement in the single-level housing units.

---

[6]  Prior OIG work has cited failing infrastructure as a significant problem for the BOP.  See Appendix 2, Item II.



*Left,* Typical Single-Level Housing Unit in the Female Prison, *Right,* Typical Inmate Cubicle in a Single-Level Housing Unit

Source:  OIG, May 2023 (Inmates' Faces Blurred in Left Image and Product Name Blurred in Right Image)

The fifth unit, which houses inmates enrolled in residential mental health and drug treatment programs, has two levels that contain double-occupancy cells.  Cells in this unit contain bunk beds, a sink, and a toilet.  Cells remain unlocked, allowing inmates to utilize common space, including shower, television, telephone, and computer areas.  The images below show the typical housing arrangement in the double-level inmate housing unit.



*Left,* the Double-Level Housing Unit in the Female Prison, *Right,* Typical Cell in the Double-Level Housing Unit

Source:  OIG, May 2023 (Faces Blurred in Left Image)

*Poor Conditions in the Single-Level Housing Units*

We observed poor physical conditions in the four single-level housing units in the female prison. Specifically, we saw evidence of significant water intrusion, caused by compromised roofs, that has resulted in damage to ceilings and walls. We also saw evidence of water intrusion caused by insufficiently sealed windows. To address these leaks, staff and inmates have used a series of patchwork repairs, including plastic covering on damaged ceiling areas and feminine hygiene products on leaking windows. Many FCI Tallahassee staff told us that they were aware of the leaks inside the housing units and that staff will try to avoid placing inmates in bunks that are directly affected by leaks.



Evidence of Water Intrusion from the Roof, with Plastic Covering a Single-Level Housing Unit Ceiling

Source: OIG, May 2023

 

*Left*, Missing Plaster from the Wall behind a Bunk Bed in a Single-Level Housing Unit, *Right,* Damaged Wall and Evidence of Water Intrusion in a Single-Level Housing Unit

Source: OIG, May 2023 (Television Blurred in Right Image)

 

*Left and Right,* Feminine Hygiene Products Used to Absorb Water Entering a Single-Level Housing Unit through Insufficiently Sealed Exterior Windows

Source: OIG, May 2023 (Right Image Enlarged to Show Detail)

We also observed the presence of a black substance on surfaces in the single-level inmate housing units, which can be seen in the images below. According to inmates, in advance of a BOP correctional audit performed just prior to our unannounced visit, staff had painted over the housing unit ceilings that contained the black substance.

 

*Left,* Black Substance on the Ceiling in a Single-Level Inmate Housing Unit, *Right,* Black Substance behind an Inmate Bed in a Single-Level Housing Unit

Source: OIG, May 2023



*Left,* Black Substance Pooled in an Inoperable Shower in a Single-Level Housing Unit, *Right,* Inoperable Toilet in a Single-Level Housing Unit

Source:  OIG, May 2023

The functionality of single-level housing unit communal bathrooms was also of serious concern, having caused a variety of sanitary issues.  Specifically, we observed inoperable showers with clogged shower drains, with a black substance pooling inside one shower, a shower that would flood the bathroom floor with water when in use, and a toilet that was inoperable.  Facilities Department staff told us that they have had to routinely address plumbing issues and clogged toilets in the inmate housing areas.

We also saw the that the structural integrity of some bathroom surfaces was compromised.  Unlike many modern correctional facilities in which surfaces are made of materials that are tamper proof, many surfaces in FCI Tallahassee's female prison, including in the bathrooms, are made of less-durable porcelain.  As a result, we saw many chipped shower tiles in the bathrooms.  Like the broken cafeteria stools shown above, broken remnants of porcelain can cause injuries or be fashioned into weapons.  Additionally, when inspecting a toilet stall, we found that a metal access panel in the stall was unsecured.  We found a piece of shoestring attached to an unknown object inside the wall, potentially indicative of inmates secreting contraband inside the panel.  Although we could not access that object, we alerted FCI Tallahassee staff to our discovery and they told us that they would conduct a search of the area and resecure the panel.



*Left,* Chipped Porcelain Tile in a Shower Stall in a Single-Level Housing Unit, *Right,* Unsecured Wall Access Panel in a Single-Level Housing Unit

Source:  OIG, May 2023

*Poor Conditions in the Double-Level Housing Unit*

Similar to our observations in the single-level female prison housing units, FCI Tallahassee management personnel told us that the double-level housing unit has a compromised roof.  During our observations, we saw that numerous tiles have fallen off or been removed from the ceiling, likely due to water intrusion.

As evidenced by the images below, we also found that a sink in an inmate's cell was detached from the wall and an electrical outlet in a common area where inmates use clothing irons had clear evidence of fire damage.  Additionally, we observed that inmates had tampered with vent covers in their cells.  Some removed the covers from vent spaces that could thus be used to hide contraband, and others placed paper inside the vents to regulate airflow.



In the double-level housing unit, numerous tiles have fallen off or been removed from the ceiling likely due to water intrusion.

Source:  OIG, May 2023




*Left,* Bathroom Sink That Is Detached from the Wall in an Inmate's Cell in the Double-Level Housing Unit, *Right,* Electrical Outlet with Evidence of Fire Damage in a Common Area of the Double-Level Housing Unit

Source:  OIG, May 2023





*Left,* Unattached Air Vent in an Inmate Cell in the Double-Level Housing Unit, *Right,* Paper Inside an Air Vent Inside an Inmate Cell in the Double-Level Housing Unit

Source:  OIG, May 2023

***Additional Issues Affecting the Physical Conditions in Female Prison Housing Units***

In addition to infrastructure issues affecting the physical conditions in the female prison housing units, we identified other inmate comfort and security issues there.  First, we observed seriously worn inmate bedding, pillows, and mattresses throughout the female prison.  FCI Tallahassee financial management staff explained that one reason why bedding, pillows, and mattresses have not been replaced is that those goods are accounted for in the same sub-account as are feminine hygiene products and in recent years the vendor prices for feminine hygiene products have significantly increased. Although we did not fully assess the institution's budgeting and financial management practices during this inspection, we make note of this issue so that FCI Tallahassee as well as BOP Regional and Central Office financial managers can make informed decisions about how to allocate resources.



Inmate Pillow

Source:  OIG, May 2023



*Left,* Inmate Blanket with a Sewed Repair, *Right,* Inmate Blanket with Holes

Source:  OIG, May 2023

Second, we saw that inmate storage lockers in much of the female prison had rusted.  In the BOP's 2022 institution survey, inmates complained that many lockers were rusty and that some had dangerous sharp edges.  See images of the lockers below.



*Left and Right,* Rusted Inmate Lockers in a Single-Level Housing Unit

Source:  OIG, May 2023 (Right Image Enlarged to Show Detail)

Third, we attempted to open doors of housing unit supply closets and found that, while most doors for supply closets were closed, the doors were unlocked.  We are concerned that these unsecured closets not only afford inmates access to cleaning chemicals, but they also provide spaces in which inmates can engage in illicit activity without detection.  See images of the unlocked inmate supply closets below.



Unlocked Inmate Supply Closets in Single-Level Housing Units.  The OIG opened the doors of these closets.

Source:  OIG, May 2023 (Product Name Blurred in Lower, Left Image)

## Male Detention Center Housing Units

While we observed similar issues with bedding at the male detention center, we did not identify serious infrastructure issues there and found the physical conditions in its housing units to be far better than those in the female prison.  As explained in the Introduction, male inmates at the detention center are housed two to a cell.  Cells contain two bunk beds, a chair, a small desk with an attached stool, two wall-mounted lockers, a sink, and a toilet.  During normal operations, cells remain unlocked during the day and locked at night.  This allows inmates to use common spaces, which include recreation, telephone, computer, and shower areas, during the day.  The images below show the layout of a detention center housing unit and a typical detention center cell.



*Left,* Inmate Housing Unit and Common Area at the Male Detention Center, *Right,* Unoccupied Inmate Cell at the Male Detention Center

Source:  OIG, May 2023 (Inmate Face Blurred in Left Image)

## Safety and Security

Based on interviews with staff and inmates, we found that most FCI Tallahassee staff and inmates felt safe at the institution.  Notwithstanding these sentiments, we identified serious issues that undermine the institution's safety and security.  Specifically, FCI Tallahassee routinely uses overtime and augmentation—the temporary assignment of non-Correctional Officer personnel from their regular non-correctional duties into Correctional Officer posts—to address Correctional Officer shortages.[7]  While these measures have allowed the institution to maintain coverage of Correctional Officer posts, they are imperfect and temporary measures to ensure continuity of inmate supervision that do not solve the core issue of insufficient staffing

---

[7]  In December 2020, the OIG reported that BOP employees worked over 6.7 million overtime hours, the equivalent of more than 3,000 full-time positions, at a cost of over $300 million, during fiscal year 2019.  See Appendix 2, Item III.

at BOP institutions.  Further, even if the institution was able to fill all of its Correctional Officer vacancies, we believe that FCI Tallahassee management may not be able to appropriately staff the female prison and the male detention center given the frequency of overtime and/or augmentation as detailed in the section below.  Additionally, the adjacent male detention center operates with a small staff complement and does not routinely designate a supervisory Correctional Officer to oversee operations.  Correctional Officers assigned to the detention center expressed concerns about their ability to manage the population safely and effectively absent additional supervisory oversight.

In addition to staffing concerns, we identified significant deficiencies in core security and inmate management functions, including deficiencies in inmate search procedures, which can contribute to the introduction of contraband, as well as staff failures to perform inmate monitoring rounds.  Inmates and FCI Tallahassee management also said that Correctional Officers do not enforce rules consistently.  As a result, some inmates may perceive the appropriate enforcement of rules by one officer as unwarranted or retaliatory.  Additionally, inmates reported that some Correctional Officers use offensive language when speaking with them.  Collectively, these issues adversely affect the trust inmates have in Correctional Officers, which can cause some inmates to be hesitant to report staff and inmate misconduct.

Finally, and as we have found in our prior oversight of the BOP, FCI Tallahassee, like other BOP institutions, lacks the number of cameras necessary to sufficiently observe staff and inmate activity.[8]

## Correctional Officer Staffing

Correctional Services Department staff, who are primarily Correctional Officers, are responsible for the daily management and supervision of inmates and the implementation of policies and procedures to maintain a safe and secure environment for inmates and staff.  At the time of our inspection, FCI Tallahassee's Correctional Services Department was staffed at 89 percent (109 filled versus 13 vacant positions). Vacancies in Correctional Officer positions make it difficult for an institution to provide round-the-clock supervision of inmates.  To compensate for vacancies in these critical positions at FCI Tallahassee, institution management has adopted two stopgap measures used widely across the BOP to maintain coverage of correctional posts: (1) use of voluntary and mandated overtime and (2) temporary assignment of non-Correctional Officer personnel into Correctional Officer positions (a practice known as augmentation). Through these two measures, staff performed nearly 67,000 hours of work covering Correctional Officer posts—equivalent to approximately 32 full-time positions.

---

[8]  Prior OIG work has cited insufficient security camera coverage as a significant problem for the BOP.  See Appendix 2, Items IV and V.

While these measures have allowed the institution to maintain coverage of Correctional Officer posts, they are imperfect measures.  Excessive use of overtime can cause staff to become tired and less observant, and the use of mandatory overtime—whereby a Correctional Officer is required to work an additional shift to fill a vacant post immediately after completing their original shift—negatively affects staff morale as it can cause personal challenges.  Moreover, augmentation can have significant negative effects on other aspects of institution operations.  For example, the Facilities Department manager told us that the reassignment of his staff to Correctional Officer positions through augmentation can delay the timely completion of maintenance.  Given FCI Tallahassee's age and significant infrastructure challenges, additional delays in making repairs can prolong the amount of time inmates experience poor conditions of confinement.

Even if FCI Tallahassee's Correctional Services Department filled all of its vacant positions, we question whether it would be able to appropriately staff both the women's prison and the male detention center without the continued use of overtime and/or augmentation.  At the time of our inspection, 109 of 122 Correctional Services Department positions had been filled, which amounts to 13 vacancies.  However, in the year prior to our inspection, FCI Tallahassee management used overtime and augmentation to fill the equivalent of approximately 32 positions.  Given that the extent of staffing gaps the institution covered through overtime and augmentation represents more than double its official number of vacancies less than a year later, the 122 positions officially allocated to the Correctional Services Department may be too low.  Senior institution personnel echoed this concern over the number of positions allocated to the Correctional

## Figure 2

### FCI Tallahassee Correctional Officer Recruiting and Retention Efforts

We note that the institution is taking steps to recruit and retain Correctional Officers.  Specifically:



FCI Tallahassee staff attend in-person and virtual job fairs, as well as university recruiting events.



FCI Tallahassee offers retention incentives of $10,000 or 25 percent of base pay (whichever is higher) for Correctional Officers who have completed 1 year of employment.



FCI Tallahassee offers a $1,000 award to existing Correctional Officers who refer new Correctional Officers to FCI Tallahassee.

Despite these efforts, FCI Tallahassee management reported difficulties in finding talented people who want to work in Correctional Officer positions, largely due to the lack of competitive staff salaries for new recruits.

Source:  BOP data

Services Department.  Specifically, a member of FCI Tallahassee's management team believed that, if the Correctional Services Department was fully staffed at 122 positions, the staffing complement would be appropriate to cover the female prison only.  Similar to the management team member's assessment of appropriate staffing levels at FCI Tallahassee, the OIG recently reported that the BOP lacks reliable information about appropriate staffing levels at the enterprise and institution levels and recommended that the BOP develop and implement a reliable method to calculate staffing levels.[9]  The BOP concurred with this

---

[9]  See Appendix 2, Item VI.

recommendation and reported to the OIG that it was already developing a new staffing tool to assess appropriate staffing levels.

## Supervisory Support at the Male Detention Center

Consistent with the above concerns regarding appropriate Correctional Services Department staffing levels, many of the Correctional Officers assigned to the male detention center expressed concerns about a lack of both housing unit staffing levels at the detention center in general and on-site supervisory support in particular.  Specifically, Correctional Officers mentioned that Lieutenants, who serve as supervisory Correctional Officers, were rarely assigned to the detention center.  Correctional Services Department staffing rosters we reviewed indicated that during the 15 days prior to our on-site inspection a Lieutenant was assigned to the detention center for only 17.5 hours in total.

Although the female prison has a much larger population than the detention center, the lack of correctional supervision at the detention center presents a concern.  This is because, as an administrative security facility, the male detention center houses inmates who have just entered BOP custody in advance of their criminal trial and for whom the BOP may not yet have a full criminal history.  As a result, the detention center may house inmates who pose varying security risks, including inmates who may be ultimately designated as a high security risk.  Conversely, nearly all of the inmates the female prison houses have been designated low security and the BOP has significant knowledge of their criminal histories and past behavior. Overall, staff we spoke with expressed the belief that it would be difficult for them to respond safely and effectively to an inmate disturbance or other emergency in the detention center without a supervisory Correctional Officer.

A psychological reconstruction report that the BOP completed following an inmate suicide at the male detention center recommended additional correctional supervision at the detention center in its assessment of circumstances surrounding the death.  FCI Tallahassee's January 2023 response to this reconstruction report indicated that a Lieutenant would be posted to the male detention center at all times. However, as mentioned above, in the 2 weeks leading up to our inspection in May 2023, a Lieutenant was assigned to the detention center for only 17.5 hours in total.

In addition to their concerns with the lack of supervisory oversight at the detention center, Correctional Officers also believed that more non-supervisory Correctional Officers should be posted there.  During our inspection, only one Correctional Officer was posted in each of the occupied detention center housing units, although additional Correctional Officers performed other tasks at the detention center throughout the day, including facilitating staff and inmate entry and exit and staffing the control room and front desk.  However, staff we interviewed shared the belief that an additional Correctional Officer for each occupied detention center housing unit was necessary to safely monitor inmate activity and respond to a potential emergency in the housing units, given the composition of the inmate population at the detention center.  Both the FCI Warden and another member of the management team acknowledged the need for additional staff at the detention center.

## Correctional Services Department Operational Deficiencies

In August 2022, the BOP's Program Review Division conducted a program review of FCI Tallahassee's Correctional Services Department and determined that it was "At Risk," meaning that the program was "found to be impaired to the point that it was not accomplishing its overall mission and that the existing internal controls were not sufficient to reasonably ensure that acceptable performance could be expected in the future."[10]  Of note, the program review indicated that Correctional Officers were not always searching inmates in accordance with BOP policy, nor were they conducting rounds to monitor inmate activity in housing units.  During our inspection in May 2023, we found that these issues were still ongoing, as described in greater detail below.

We acknowledge that these issues are not unique to FCI Tallahassee and that they take time to address.  Further, we note that FCI Tallahassee's current Captain, who is the head of the Correctional Services Department, and the FCI Warden are new to the institution; the Captain reported for duty in August 2022 and the Warden in January 2023.  At the time of our inspection, both were aware of the issues and were taking steps to address them by coaching and retraining Correctional Officers.  Notwithstanding these efforts, such deficiencies persist at FCI Tallahassee and negatively affect institution safety.

> ### Illicit Drugs Present at FCI Tallahassee
>
> Staff told us that synthetic cannabinoids and illicitly acquired and combined buprenorphine/naloxone were commonly introduced into the institution.
>
> **Synthetic Cannabinoids** (colloquially known as K2 or spice) do not have a medical purpose.  They are a category of synthetic drugs that mimic THC, the main ingredient in marijuana.  The exact ingredients and strength of these drugs are almost impossible for the user to know and can cause severe side effects, such as panic attacks, hallucinations, increased blood pressure and heart rate, and even death.  Typically, synthetic cannabinoids are sprayed onto plant matter and smoked.
>
> **Buprenorphine and naloxone** are opioids that can be combined and ingested orally through pills or dissolvable strips.  When used appropriately, they can help treat opioid abuse disorder by helping patients manage withdrawal symptoms and reduce cravings.  Though the high is less intense than the high from opioids, "the medication can still produce a euphoric effect, as it still acts on the same opioid receptors in the brain and creates a flood of dopamine in the brain."
>
> Sources:  American Addiction Centers and Prison Journalism Project

### Deficiencies in Inmate Search Procedures

Consistent with the findings from the BOP Program Review Division's August 2022 program review, we identified serious issues with inmate search procedures at FCI Tallahassee.  While most inmates are not allowed to leave the institution's secure inner perimeter, female inmates on sanitation and landscaping work crews may exit the secure perimeter to perform work on the institution's vast outer perimeter.  FCI Tallahassee staff told us that these inmates are not routinely searched when they reenter the institution, affording them an opportunity to introduce contraband, including drugs and nuisance contraband such as cigarettes and vape devices, into the female prison.

---

[10]  According to BOP policy, the BOP's internal audit process, known as program review, is "intended to determine compliance with applicable regulations, policies, and adequacy of internal controls, and the effectiveness, efficiency, and quality of program and operations."  The Program Review Division conducts program reviews on 18 program areas of an institution's operations, including Correctional Services.  For BOP Policy on program reviews, see Appendix 3 (Management Control and Program Review Manual).

Institution staff told us that sanitation and landscaping crew inmates are potentially able to collect drugs and other contraband from the outer perimeter of the prison grounds.  Unlike the secure inner perimeter, which is enclosed behind tall double fences, the outer perimeter is enclosed behind a short single fence, large portions of which are easily accessible to the public from a municipal park.  From such a location, individuals could easily throw contraband onto prison property for inmates to collect and bring back into the institution.  The image below shows FCI Tallahassee's outer perimeter fence from the vantage point of the adjacent municipal park.



FCI Tallahassee's Outer Perimeter Fence as Observed from the Adjacent Municipal Park.  Plastic bags are on the municipal park side of the fence.

Source:  OIG, May 2023

BOP policy does not require that work crew inmates always be visually searched when reentering the institution through the secure inner perimeter; however, it does allow for periodic searches.[11]  According to staff, such searches rarely occur.  One explanation they offered as to why these searches rarely occur was that female staff must perform visual and pat searches of female inmates, a requirement of Prison Rape Elimination Act regulations.[12]  Due to a variety of reasons, including that the majority of staff at the institution are male, as well as seniority-based post assignment procedures, female staff are rarely posted

---

[11]  For BOP policy on inmate searches, see Appendix 3 (Searches of Housing Units, Inmates, and Inmate Work Areas).

[12]  28 C.F.R. § 115.15(a).

to the rear gate.  While a female staff member could be relieved of her post and report to the rear gate, such post changes are disruptive and thus avoided when possible.

The OIG has previously identified that BOP's practice of assigning posts solely by seniority has resulted in the assignment of male Correctional Officers to posts where staff must regularly conduct searches of female inmates.  In our September 2018 *Review of the Federal Bureau of Prisons' Management of Its Female Inmate Population,* we recommended that the BOP improve the availability of female staff in female institutions at posts where inmate searches are common, through the establishment of gender-specific posts or other methods.[13]  Although we closed that recommendation in March 2020, after the BOP reported that it had the authority to make certain posts gender specific and received authority to recruit only females for certain Correctional Officer vacancies, our findings at FCI Tallahassee indicate that operational challenges related to the availability of female staff to perform searches of female inmates persist.

Staff also expressed concerns about female inmates introducing contraband through the front entrance of the female prison.  Specifically, they told us that inmates on the sanitation crews collect trash in garbage bags from publicly accessible areas in front of the female prison and the male detention center.  Staff explained that, when reentering the female prison from the front entrance, these inmates are screened by metal detectors; however, their garbage bags, which also enter the institution for future disposal, are not always screened or inspected.  The image on the right shows cigarettes and vape devices that are thought by staff to have entered the institution this way.  During our inspection, we saw inmates enter through the front gate without having their garbage bags screened, although it did not lead to the discovery of contraband during our inspection.



Cigarettes and Vape Devices Discovered by Staff Prior to Our Inspection

Source:  OIG, May 2023 (Brand Names Blurred)

In contrast to inmate search procedures, we observed that staff search procedures were consistent with BOP policy, whereby staff entering the prison should be required to place their belongings in an x-ray machine and pass through a metal detector before entering the building.  We also observed that, if the metal detector alerted to the presence of metal, the front entrance officer conducted a secondary screening with a handheld metal detection wand.  We did not have an opportunity to observe staff screening procedures at the male detention center.

---

[13]  See Appendix 2, Item VII.

*Failure to Complete Rounds*

Failure to conduct rounds increases the risk that inmates attempt self-harm, engage in physical violence, or participate in other illicit behavior such as drug use. However, institution staff told us that their Correctional Officer colleagues do not always conduct rounds of inmate housing units. These statements were consistent with findings of the BOP Program Review Division's August 2022 Correctional Services program review, conducted by staff external to FCI Tallahassee, which found that staff were not always conducting rounds in the SHUs consistent with BOP policy. During our on-site review of video footage, we also found that a staff member failed to make required rounds during two consecutive overnight shifts in the male detention center, leaving inmates unobserved for multiple hours each night. Upon discovery, the responsible supervisor indicated that institution management would file an incident report and that the offending staff member would be subject to potential discipline. The supervisor expressed frustration at this noncompliance due to the fact that, as mentioned above, an inmate committed suicide at the male detention center less than a year prior to our inspection.

## Inconsistent Application of Rules and the Use of Offensive Language among Correctional Officers Directed at Inmates

In May 2022, BOP staff external to FCI Tallahassee performed a Women's Institution Cultural (WIC) assessment and determined that institution staff were not providing the inmate population at FCI Tallahassee with consistent guidance on behavioral expectations. During our inspection, staff we interviewed suggested that differences in staff experience and tenure have negatively affected the consistency and quality of communication from staff to inmates. Additionally, and related to the inmate search issues described above, a commonly repeated inmate complaint was that some staff search inmate property while others do not. Further, some inmates believed that this inconsistency was evidence that staff who searched their property were unfairly retaliating against them. An FCI Tallahassee senior management staff member acknowledged that Correctional Officers are not always consistent in performing their duties.

In addition to staff and inmate statements regarding the consistency with which Correctional Officers perform searches, inmates reported to us that some staff have communicated disrespectfully toward them and other inmates. The May 2022 WIC assessment similarly called attention to punitory communication from staff directed at inmates, as well as the use of insulting and derogatory terms. That WIC assessment also stated that staff repeatedly misgendered transgender inmates after inmates informed staff of their preferred gender identity.

We found that these issues collectively have undermined trust between staff and inmates. We believe that this lack of trust has contributed in part to why some inmates told us that they were hesitant to report staff or inmate misconduct due to fear of reprisal. This hesitance is concerning because, to ensure the safety of a BOP institution, it is vital that inmates feel comfortable reporting misconduct, including sexual misconduct.

## Security Cameras

Although security cameras can serve as a force multiplier for visual coverage in a BOP institution, according to management and staff both the female prison and male detention center at FCI Tallahassee lack the number of cameras necessary to sufficiently observe staff and inmate activities. We found that these facilities have many blind spots that create opportunities for inmates to engage in inappropriate behavior without detection. At the time of our inspection, FCI Tallahassee's female prison had 60 cameras and the male detention center had 53. As a point of reference, FCI Waseca—an institution we recently inspected with a population and security level designation similar to FCI Tallahassee's female prison—had 162 cameras. Although we acknowledge that FCI Tallahassee has a different physical layout, we note that staff and management at FCI Waseca, which had more than double the number of cameras, believed that they needed many more cameras to sufficiently observe staff and inmate activities.

During our review of security camera footage at FCI Tallahassee, we found that the footage was of high quality and that the associated video recording system has the capacity to retain footage for 14 days. Institution internal investigative staff told us that they would prefer the retention timeframe to be longer because some allegations of misconduct are made more than 14 days after the misconduct has occurred; without available camera footage, they said, it can be difficult to investigate such allegations.

The OIG has long identified insufficient camera coverage and recording system storage limitations as challenges, both for the BOP throughout its institutions and for the OIG in its own investigative capacity. In a 2016 report, we found that "deficiencies within the BOP's security camera system have affected the OIG's ability to secure prosecutions of staff and inmates in BOP contraband introduction cases, and these same problems adversely affect the availability of critical evidence to support administrative or disciplinary action against staff and inmates."[14] In response to our June 2016 findings and recommendations, the BOP completed a multiyear update to cameras at 45 institutions; however, serious issues with the BOP's security camera systems remain. Given the persistence of BOP camera issues, Congress passed and the President signed the Prison Camera Reform Act of 2021, which requires the BOP to develop a plan to evaluate and reform its security camera capabilities.[15]

## Use of Restrictive Housing

As of May 23, 2023, 24 inmates were housed in the SHU at the female prison and 4 inmates were housed at the SHU in the male detention center.[16] Inmates are generally housed in the SHU if they:

---

[14] See Appendix 2, Item IV.

[15] The Prison Camera Reform Act became law in December 2022. Under the law, among other things the BOP is required to submit to Congress a plan to "evaluate the security camera, land-mobile radio, and public address systems." Prison Camera Reform Act of 2021, Pub. L. No. 117-321, 136 Stat. 4430 (2022), www.congress.gov/117/plaws/publ321/PLAW-117publ321.pdf (accessed September 26, 2023).

[16] Six of these 24 inmates were from FCI Marianna, which is located in Marianna, Florida, approximately 75 miles from FCI Tallahassee. Because FCI Marianna's satellite female prison camp does not have its own SHU, when its inmates must be separated from the general population they are temporarily transferred to the SHU in the female prison at FCI Tallahassee.

For BOP policy on restrictive housing, see Appendix 3 (Special Housing Units).

- are suspected of having committed serious misconduct and are awaiting the completion of an investigation and disciplinary hearing;

- are serving a disciplinary sanction after having been found to have committed misconduct at the completion of an investigation and disciplinary hearing;

- have been assessed by staff to pose a safety risk to the institution and are awaiting transfer to another institution (certain inmates in this status may have already completed their disciplinary sanction); or

- need to be separated from another inmate or a staff member for their own safety.

As of May 23, 2023, none of the 24 female SHU inmates had been housed there for more than 35 days and the majority had been housed there fewer than 20 days. At the male detention center, the SHU housed four inmates, two of whom had been there for 5 or fewer days. The third inmate had been housed in the SHU for 76 days and was awaiting transfer to another institution; the fourth inmate, who had a history of assaulting staff and was awaiting sentencing, had been housed in the SHU for 138 days.

SHU inmates in both facilities are subject to significant restrictions compared to inmates in the general population. Specifically, they are confined to a locked cell with an opportunity for at least 5 hours of outdoor recreation per week. SHU inmates are generally housed two per cell. SHU cells in the male detention center include a toilet, sink, and shower. SHU cells in the female prison include a toilet and sink only. Female SHU inmates are escorted from their cell to single-use showers three times a week. FCI Tallahassee staff told us that they double-cell inmates whenever possible; but they noted that there are certain times they cannot do so, such as when there is an odd number of inmates assigned to the SHU. The Warden must approve any decision to single-cell an inmate. The images below show living conditions in the female prison and male detention center SHUs.



*Left,* Vacant SHU Cell at the Female Prison, *Right,* SHU Shower at the Female Prison

Source: OIG, May 2023



SHU Outdoor Recreation Cages at the Female Prison

Source:  OIG, May 2023





*Left and Right,* SHU Cell in the Male Detention Center

Source:  OIG, May 2023

## Staff Discipline

Institution management and staff who oversee FCI Tallahassee complained about the amount of time it takes to close a staff administrative misconduct investigation and expressed the belief that such delays make the BOP's staff discipline process ineffective at enforcing standards of conduct.  This is a common refrain we have heard from institution and BOP leadership in recent years.  In a May 2023 OIG report on the BOP's strategies to identify, communicate, and remedy operational issues, we reported that former BOP leadership told the OIG that the BOP's employee discipline process was "horrible" and that "it takes too long to get anything done."[17]

As of June 2, 2023, there were 191 ongoing misconduct investigations involving FCI Tallahassee staff.  We found that the average time these staff misconduct cases have been ongoing exceeds 2 years.  In an additional six cases, the underlying misconduct of staff had been substantiated but the cases were pending a disciplinary sanction decision.  Depending on the severity of staff misconduct allegations and the risk that a staff member may pose to the institution, the Warden may elect to remove a staff member from regular duty pending the outcome of a misconduct investigation.  During our inspection, three staff members who had been posted to the female prison were transferred to the male detention center while investigations into their alleged misconduct involving female inmates were ongoing.

In addition to the amount of time it takes to close a staff administrative misconduct investigation, FCI Tallahassee management attributed the backlog in staff misconduct investigations to recent vacancies in the Special Investigative Agent (SIA) position, which is responsible for investigating staff misconduct.  Prior to the August 2022 arrival of the SIA in place at the time of our inspection, the position had not been permanently staffed for nearly 4 months.  The Warden and the new SIA told the OIG that reducing the backlog of staff misconduct investigations is a priority for the institution.  BOP Director Colette Peters has also publicly stated the importance of reducing the length of time that it takes to investigate staff misconduct across the BOP and has implemented reforms, including centralizing the reporting structure of all SIAs under the BOP's Office of Internal Affairs and allocating resources to hire more SIAs across the BOP.

## Sexual Misconduct Reporting

Many staff and inmates told us that they do not believe that sexual misconduct is widespread at the institution, and we found that inmates had multiple ways to report sexual misconduct, including to the OIG.[18]  Further, inmates had access to sexual abuse counseling services, if necessary.  We found that inmates were generally aware of their options if they experienced or witnessed sexual misconduct; but we identified opportunities for FCI Tallahassee and the BOP to reinforce how inmates can report sexual abuse to the OIG and ensure that such reporting is confidential.

To encourage inmates to report sexual misconduct to staff, the institution has posted educational posters throughout both the female prison and the male detention center.  We also saw that staff carry pocket-size cards reminding them how to respond if an inmate reports sexual misconduct.  See examples of these

---

[17]  See Appendix 2, Item VI.

[18]  For the purposes of this report, we use the term "sexual misconduct" to encompass all forms of sexual misconduct, including harassment and assault.

materials below.  Further, while we were on site, institution leadership posted a new poster with a picture of the Sexual Misconduct Reporting Coordinator and encouraged inmates to reach out to the coordinator if they wanted to report sexual abuse.



Example of BOP Sexual Misconduct Reporting Information, in both English and Spanish, Observed in All Common Areas throughout the Facility

Source:  OIG, May 2023

*Left,* Front of Card Given to Staff, *Right,* Back of Card Given to Staff

Source:  OIG, May 2023

We also asked inmates to show us how they would report sexual misconduct to the OIG through the inmate computer system, TRULINCS.  Most inmates were able to do so, but some were not aware that the report would be forwarded to the OIG.  One reason for this is that, to send a report of sexual misconduct through TRULINCS to the OIG, a BOP inmate (at any institution) must select a drop-down option labeled "DOJ Sexual Abuse Reporting" and the TRULINCS screen prompts do not clearly indicate that the message will confidentially be sent to the OIG.  We note that the Orientation Handbook provided to all BOP inmates

explains that, when inmates report sexual misconduct through the DOJ Sexual Abuse Reporting option, the message will be confidentially relayed to the OIG.  This information is useful; but, given the lack of clarity in the TRULINCS sexual abuse reporting interface, we believe that the BOP should take steps to reinforce how to transmit sexual abuse messages via TRULINCS so that they are confidentially delivered to the OIG.

While staff and inmates told us that they did not believe that sexual abuse was widespread at FCI Tallahassee, we note the following:

- In March 2022 a former Correctional Officer was sentenced to 48 months in federal prison following his conviction on one count of sexual abuse of a ward while on duty at FCI Tallahassee.  In a separate case, in May 2023 another former FCI Tallahassee Correctional Officer pleaded guilty to one count of sexual abuse of an individual in federal custody while he was employed at FCI Tallahassee.

- Based on our review of additional sexual misconduct reporting data from May 2022 through May 2023, we found that investigations into allegations against five other FCI Tallahassee staff members were ongoing and allegations against one other staff member, who no longer works at the institution, had been sustained following investigation.

- During the period from May 2022 through May 2023, there were no substantiated allegations of inmate-on-inmate sexual misconduct occurring at either the female prison or the male detention center.

We report this data for informational and transparency purposes and note that the volume of sexual misconduct investigations, especially those for which the underlying investigation has yet to be concluded, should not be used, alone, to assess the pervasiveness of sexual misconduct or lack thereof at an institution.

## Inmate Healthcare

As part of our inspection at FCI Tallahassee, the OIG undertook a comprehensive review of the institution's delivery of medical and mental healthcare.  We were particularly concerned about the substantial number of vacancies in the Health Services Department.[19]  While FCI Tallahassee's Health Services Department appeared to be able to address the most critical and time-sensitive medical and mental healthcare needs of inmates, its low healthcare provider staffing levels have had an effect on the time of day that prescription drugs are distributed to inmates, which can negatively affect the efficacy of those drugs.  Additionally, we learned that FCI Tallahassee medical providers have difficulty communicating with Spanish-speaking inmates because not many staff speak Spanish.  Further, we identified concerns with the provision of medical care unrelated to staffing levels, specifically, the completeness of the inmate medical screening process, as well as the volume at which certain drugs are prescribed for generalized pain.  Finally, we describe an issue affecting the institution's emergency response capability that is also related to broader

---

[19]  The OIG has previously reported how staffing shortages among healthcare professionals can negatively affect the provision of healthcare at BOP institutions.  See Appendix 2, Items VIII and IX.

institution infrastructure issues:  an elevator servicing the Health Services Department was inoperable at the time of our inspection.

## Health Services Staffing and Effects on Care

As noted in the Introduction, the BOP has difficulty hiring healthcare professionals across its institutions.  As of May 2023, FCI Tallahassee's Health Services Department was 62 percent staffed (13 out of 21 positions filled) with longstanding vacancies in registered nurse and mid-level provider positions (which include Nurse Practitioners and Physician Assistants).  To address these shortages, Health Services Department staff have taken on additional duties to maintain operations.  For example, we learned that physicians are often tasked to conduct intake screenings, a responsibility normally assigned to nurses and mid-level providers.  Based on a review of Health Services performance metrics, the Health Services Department has been able to complete many core tasks within BOP-established timeframes.  Specifically, FCI Tallahassee documentation indicates that, during the first quarter of calendar year 2023, 95 percent of inmate physicals and 99 percent of chronic care clinics (i.e., clinical encounters during which medical providers meet with inmates to discuss how to manage chronic health conditions) were completed within timeframes outlined in BOP policy.  Further, the Health Services Department had been providing pregnancy tests for all female inmates upon their admission to the institution.

Despite these positive metrics, we identified a concern with Health Services Department operations that was caused by staff shortages.  Specifically, at the time of our inspection FCI Tallahassee's female prison was temporarily modifying the time in the afternoon that it distributes insulin and single-dose controlled substance medications to inmates (i.e., pill line) to 2:00 p.m. instead of its regularly scheduled 4:30 p.m.  Our contract medical experts were concerned that providing insulin well before dinnertime at the institution may make it more difficult for diabetic inmates to control their glycemic levels.  Further, both our contract medical experts and an institution psychologist expressed concern that the pill line time change may cause inmates who are prescribed certain psychiatric medications that facilitate sleep to receive these medications too early in the day for them to be effective.

We identified another staffing issue that could compromise patient care, specifically FCI Tallahassee lacked a sufficient number of Spanish-speaking staff to either speak directly with Spanish-speaking inmates or translate on their behalf during clinical encounters.  To address this issue, a member of FCI Tallahassee's management staff told us they are trying to develop a contract to procure a telephonic translation service for use during clinical encounters; but at the time of our inspection, the contract development process was in an early stage.

## Other Issues Affecting Care

Although not directly related to staff shortages, we also identified concerns with the inmate medical screening process.  While observing multiple inmate medical intake screenings at the male detention center, OIG staff, as well as our contract medical experts, found that that the healthcare provider performing the screenings did not ask all the screening questions that were pre-populated in the BOP's medical record.  Further, we found that the provider did not inform these inmates how to access healthcare services, such as how to request to see a medical provider or how to obtain medications, as needed.  According to a member of FCI Tallahassee's management staff, this information should be communicated to inmates during the medical portion of the intake screening.

Further, based on our review of internal Health Services Department meeting minutes, we learned of an internal debate among clinical staff about the frequency with which two medications, a 5 percent concentration lidocaine patch and a 1 percent concentration diclofenac gel, were prescribed to inmates to address pain symptoms (see the text box). While these medications do not have an acute risk of abuse, some clinical staff indicated that the cumulative cost of these prescriptions was an area of concern and that pain should first be treated with over-the-counter pain relievers available for purchase at the inmate commissary.

Although we did not determine the exact financial impact of the lidocaine patch and diclofenac gel prescribing behavior at FCI Tallahassee, we found that FCI Tallahassee healthcare providers prescribed these medications at a rate significantly higher than providers at two other institutions of comparable size and medical care level.  From January 1, 2022, through August 22, 2023, we found that FCI Tallahassee providers wrote 531 total prescriptions for 5 percent lidocaine patches or 1 percent diclofenac gel to 375 distinct inmates.  In contrast, during the same time at FCI Waseca, providers wrote only 16 total prescriptions for these medications to 9 individual inmates; at Federal Prison Camp Alderson, providers wrote only 25 total prescriptions for these medications to 19 individual inmates.

> **Lidocaine and Diclofenac**
>
> Lidocaine is a local anesthetic, and diclofenac is a nonsteroidal anti-inflammatory drug; both are used treat pain.  Depending on the dose and delivery modality, they are available to the public as over-the-counter or prescription medications.  At the BOP, lidocaine and diclofenac are available only as prescription medications.
>
> At FCI Tallahassee, lidocaine was commonly prescribed in a 5 percent concentration in transdermal patch form and diclofenac was commonly prescribed in a 1 percent concentration in gel form.
>
> Sources:  BOP medical data and the Mayo Clinic

Finally, we found that the elevator servicing the Health Services Department at the female prison was nonoperational at the time of our inspection.  The Health Services Department has offices and examination rooms on two levels of an administrative building, and, depending on the nature of an inmate's illness or injury, staff may have to move a nonambulatory inmate between floors.  According to Health Services Department staff, it is difficult to move inmates via backboard or medical chairs throughout the space and such movements can delay emergency response.  A member of FCI Tallahassee's management staff told us that before the elevator can be repaired the FCI Tallahassee Health Services and Safety Departments must agree on safety protocols governing the appropriate use of the elevator.  Determining the appropriate use of the elevator is of heightened concern because a nurse had been badly injured after a safety gate malfunctioned and the nurse then inadvertently walked into the open elevator shaft while pushing a medical cart.

## Inmate Programming

As required by the FIRST STEP Act of 2018, BOP institutions must conduct a needs assessment on all sentenced inmates entering their custody to identify specific Evidence-Based Recidivism Reduction (EBRR) programs and Productive Activities (PA) that will best prepare inmates for their reentry into society.[20]  FCI Tallahassee offers female inmates a variety of these programs, including literacy classes, women's programming, psychology programming, religious programming, vocational training courses, and UNICOR

---

[20]  18 U.S.C. § 3632(a).

employment.  FCI Tallahassee also runs a variety of leisure, wellness, and adult continuing education classes that provide opportunities for learning and engagement outside of an EBRR or PA curriculum.

The Psychology and Education Departments, which run most inmate programming, are nearly fully staffed; however, wait lists for several programs exceeded 500 names at the time of our inspection.  Staff attributed the size of these wait lists to two causes.  First, many inmates who do not intend to participate a program add their names to a wait list because they are under the false impression that they will earn additional early release time credits by signing up for multiple programs.  Second, similar to issues with Correctional Officer staffing, the Psychology and Education Departments' staffing levels may not be aligned with the institution's need.  An Education Department management official said that, while the Education Department is fully staffed on paper, she would like to hire two additional instructors to better address program demand.  Similarly, a Psychology Department management official told us that the institution could better address inmate mental health needs, especially those of male inmates, by hiring an additional psychologist to serve full-time at the detention center.

In an effort to triage program wait lists, FCI Tallahassee staff prioritize program enrollment for inmates with upcoming projected release dates and for whom the program would fulfill a need identified on the inmate's individualized needs assessment.  While this approach may mitigate the risk of inmates being released from FCI Tallahassee without being offered programs aligned with their reentry needs, it also has unintended consequences:  inmates with long sentences and low FIRST STEP Act-identified needs may not be able to participate, for significant periods of their incarceration, in any program with a lengthy wait list.

Due to the relatively short-term period that some male inmates are incarcerated at the detention center, educational programming offered there is limited to a self-study General Educational Development class.  Staff told us that, given the current staffing complement and the programming requirements at the female prison, they would not be able to offer additional programming at the male detention center.  They also added that, due to staffing constraints among recreation staff, male inmates do not always receive required recreation time.

# Conclusion

During our inspection, we observed many serious operational deficiencies at FCI Tallahassee.  Among the most significant was the alarmingly poor and potentially dangerous food service conditions.  We observed moldy bread being served to female inmates, rotting vegetables in a food preparation refrigerator, likely signs of rodent and pest infestation in food storage warehouses, and compromised food containers in the warehouses.  We also found significant issues with the institution's infrastructure, including leaking roofs in need of repair, female inmates living in housing units with ceilings and windows leaking water in or near their living spaces, a shower in which discolored water had pooled, and communal bathrooms in need of repair.  Further, we identified additional inmate comfort and security issues including worn bedding, rusted inmate storage lockers, and unlocked supply closets.

While most staff and inmates reported feeling safe at the institution, we identified serious issues affecting inmate safety, including Correctional Officer shortages; a lack of supervisory oversight at the male detention center; and operational deficiencies in core inmate management and security functions throughout the institution, including problems with inmate search procedures and security camera coverage.  We also learned that Correctional Officers may not be consistently enforcing institutional rules and some Correctional Officers may use offensive language when interacting with inmates.  We found it likely that these issues collectively have adversely affected the trust inmates have in Correctional Officers, which can cause some inmates to be unwilling to report staff and inmate misconduct due to fear of reprisal.

We also found that 38 percent of positions in the Health Services Department are vacant and that these low healthcare staffing levels have caused FCI Tallahassee to modify the time that it distributes insulin and drugs to female inmates, which may limit their therapeutic benefit for certain inmates.  Additionally, we learned that FCI Tallahassee medical providers have difficulty communicating with Spanish-speaking inmates because not many staff speak Spanish.  Further, we identified concerns with the provision of medical care unrelated to staffing levels, specifically the completeness of the inmate medical screening process, the volume at which certain drugs are prescribed for generalized pain, and the ability to promptly address a medical emergency due to an inoperable elevator in the female prison treatment area.

In recent years, the DOJ OIG has cited many of the issues we identified at FCI Tallahassee as BOP-wide challenges, including its aging infrastructure, staffing issues, insufficient security camera coverage, and difficulties preventing the introduction of contraband.  Further, we have reported on how staff shortages, especially among healthcare professionals, can negatively affect the provision of healthcare at BOP institutions.  In addition, prior OIG work has identified significant enterprise-wide delays in the BOP's staff discipline process and has described how those delays make it difficult for the BOP to enforce standards of employee conduct that help to ensure the efficient and safe operations of its institutions.  See Appendix 2 for details on related DOJ OIG work.

Given the OIG's past reporting on these systemic issues and the recommendations we have made to the BOP to address them at an enterprise level, we do not make specific recommendations in this report to address the manifestation of these issues at FCI Tallahassee.  However, through our efforts to ensure the implementation of recommendations made in our prior work, we will monitor the BOP's efforts to address these issues at all BOP institutions, including FCI Tallahassee.  Finally, through our future inspections and BOP oversight work, we intend to assess how other institutions are monitoring the quality of food served to inmates, as well as healthcare administration.  With this additional information, we will be better positioned

to make recommendations, where appropriate, to ensure that all BOP institutions comply with applicable laws and regulations and fulfill the BOP's mission of fostering a humane and secure environment and ensuring public safety by preparing individuals for successful reentry into our communities.

# Appendix 1:  Purpose, Scope, and Methodology

## Standards

The DOJ OIG conducted this inspection in accordance with the Council of the Inspectors General on Integrity and Efficiency's Quality Standards for Inspection and Evaluation (December 2020).

## Purpose and Scope

The OIG has determined that it can enhance the effectiveness of its oversight, and its ability to alert the BOP of concerns, by conducting short-notice and unannounced inspections of BOP facilities, as appropriate. Pursuant to the OIG's planned procedures for initiating an inspection, which we had previously shared with the BOP, the OIG notified FCI Tallahassee at approximately 8 a.m. on May 22, 2023, that it would be initiating an inspection beginning at noon that same day.  The OIG team, which consisted of eight OIG staff members and two medical subject matter experts contracted by the OIG, conducted the on-site inspection on Monday, May 22, through Friday, May 26, 2023.  The focus of our inspection was the state of institution operations at the time of our inspection, although for certain portions of our analysis our scope included roughly the 1 year that preceded our inspection, beginning in May 2022.

In selecting a site for our second inspection, we sought an institution that was operationally similar to our first inspection site, FCI Waseca, but had a different risk profile on an inspection risk assessment tool that the OIG is developing and piloting internally.  FCI Waseca scored as low risk, and the results of that inspection provided the OIG a baseline against which to compare the operations of other institutions. Conversely, FCI Tallahassee scored as high risk and the collective results of the FCI Waseca inspection, the FCI Tallahassee inspection, and future inspections will allow us to calibrate the tool as we expand our inspection program.  Finally, by selecting FCI Tallahassee as the site of our second inspection, we were able to test the scalability of our inspection protocols because FCI Tallahassee's adjacent male detention center makes it more operationally complex than FCI Waseca.

The scope of this inspection did not include specialized testing to definitively determine, for example, the potential presence of mold and other hazardous substances.  In addition, although this report includes information on allegations of sexual misconduct, we report this data for informational and transparency purposes and note that the volume of sexual misconduct investigations (especially those for which the underlying investigation has yet to be concluded) should not be used, alone, to assess the pervasiveness of sexual misconduct or lack thereof at an institution.

## Inspection Methodology

To better understand FCI Tallahassee's operations, we toured the institution, interviewed its inmates and staff, and reviewed its operational records.

### Observations

We toured the interior and exterior of the female prison and its adjacent male detention center, including general population inmate housing units; the Special Housing Units (SHU); Health Services Department examination spaces; front lobby staff entrances and screening areas; programming areas used by the

Psychology, Education, and Recreation Departments; the mail room; the evidence storage area; the UNICOR call center; the visitation room; inmate intake and screening areas; Facilities Department areas; food storage warehouses; and food preparation and inmate dining areas in the female prison.

We also reviewed security camera footage, as well as the functionality of the security camera system. Further, we tested ambient temperatures throughout the institution, as well as the functionality of showers, sinks, and toilets in inmate housing areas.

## Interviews

We conducted on-site interviews with FCI Tallahassee inmates who were housed in both the general population and the SHU, as well as on-site interviews with institution staff.  Staff we interviewed included the Warden; Associate Wardens, one of whom serves as the institution's Sexual Misconduct Reporting Coordinator; supervisory and nonsupervisory Correctional Officers; healthcare providers; inmate case managers; teachers; food service workers; and staff responsible for institution safety, facilities management, the UNICOR call center, and the inmate trust fund program.  Following our on-site work at FCI Tallahassee, we also conducted virtual follow-up interviews with select FCI Tallahassee staff and the BOP's Central and Regional Offices.

## Document Review and Analysis

We reviewed FCI Tallahassee records related to facilities management, staffing levels, use of overtime and augmentation, use of restrictive housing, provision of inmate healthcare and programming, food service, inmate discipline, staff misconduct, sexual misconduct reporting, and FIRST STEP Act implementation.

## External Subject Matter Experts Assisting the OIG

To assist the OIG in its efforts to assess the provision of healthcare to FCI Tallahassee inmates, the OIG contracted the services of two healthcare subject matter experts:  one physician and one registered nurse.

# Appendix 2:  DOJ OIG Related Work

I.   For the FCI Waseca **inspection report**, see DOJ OIG, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Waseca,* Evaluation and Inspections (E&I) Report 23-068 (May 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-waseca.

II.   For prior OIG reporting on the BOP's **infrastructure management challenges**, see DOJ OIG, *Audit of the Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions,* Audit Report 23-064 (May 2023), oig.justice.gov/reports/federal-bureau-prisons-efforts-maintain-and-construct-institutions.

III.   For prior OIG reporting on the BOP's use of **overtime**, see DOJ OIG, *Management Advisory Memorandum:  Analysis of the Federal Bureau of Prisons' Fiscal Year 2019 Overtime Hours and Costs,* Audit Report 21-011 (December 2020), oig.justice.gov/reports/management-advisory-analysis-federal-bureau-prisons-fiscal-year-2019-overtime-hours-and.

IV.   For prior OIG reporting on the insufficiency of the BOP's **security camera systems and contraband introduction** at BOP institutions, see DOJ OIG, *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts,* E&I Report 16-05 (June 2016), oig.justice.gov/reports/review-federal-bureau-prisons-contraband-interdiction-efforts.

V.   For additional prior OIG reporting on the insufficiency of the BOP's **security camera systems**, see DOJ OIG, *Management Advisory Memorandum:  Notification of Needed Upgrades to the Federal Bureau of Prisons' Security Camera System,* E&I Report 22-001 (October 2021), oig.justice.gov/reports/management-advisory-memorandum-notification-needed-upgrades-federal-bureau-prisons-security.

VI.   For prior OIG reporting on the BOP's **staffing challenges and investigative backlog of employee misconduct cases**, see DOJ OIG, *Limited Scope Review of the Federal Bureau of Prisons' Efforts to Identify, Communicate, and Remedy Operations Issues,* E&I Report 23-065 (May 2023), oig.justice.gov/reports/limited-scope-review-federal-bureau-prisons-strategies-identify-communicate-and-remedy.

VII.   For prior OIG reporting on the BOP's **management of female inmates**, see DOJ OIG, *The Federal Bureau of Prisons' Management of Its Female Inmate Population,* E&I Report 18-05 (September 2018), oig.justice.gov/reports/review-federal-bureau-prisons-management-its-female-inmate-population.

VIII.   For prior OIG reporting on the BOP's **medical staffing** challenges, see DOJ OIG, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges,* E&I Report 16-02 (March 2016), oig.justice.gov/reports/review-federal-bureau-prisons-medical-staffing-challenges.

IX.   For additional prior OIG reporting on the BOP's **medical staffing** challenges, see Pandemic Response Accountability Committee, *Review of Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic* (September 2023), www.pandemicoversight.gov/media/file/healthcare-staffing-shortages-report.

# Appendix 3:  BOP Policies Cited

| Topic Discussed in Report | Relevant Program Statement | Link (if Public) |
|---|---|---|
| Food Service | 4700.06<br>Food Service Manual<br>June 8, 2022 | www.bop.gov/policy/progstat/4700.06_cn.pdf<br><br>(accessed September 15, 2023) |
| Program Review | 1210.23<br>Management Control and Program Review Manual<br>August 21, 2002 | www.bop.gov/policy/progstat/1210_023.pdf<br><br>(accessed September 15, 2023) |
| Inmate Searches | 5521.06<br>Searches of Housing Units, Inmates, and Inmate Work Areas<br>June 4, 2015 | www.bop.gov/policy/progstat/5521_006.pdf<br>(accessed September 15, 2023) |
| Special Housing Units | 5270.11<br>Special Housing Units<br>November 23, 2016 | www.bop.gov/policy/progstat/5270.11.pdf<br>(accessed September 15, 2023) |

# Appendix 4:  The BOP's Response to the Draft Report



**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Office of the Director*                    *Washington, DC 20534*

October 30, 2023

MEMORANDUM FOR   RENÉ L. ROQUE
                 ASSISTANT INSPECTOR GENERAL
                 EVALUATIONS AND INSPECTIONS

FROM:            Colette S. Peters, Director

SUBJECT:         Response to the Office of Inspector General's (OIG) Draft Report:
                 Inspection of the Federal Bureau of Prisons' Federal Correctional
                 Institution Tallahassee, Assignment Number A-2023-003

The Federal Bureau of Prisons (FBOP) values the opportunity to formally respond to the Office of the
Inspector General's (OIG) above-referenced draft report which identified four areas of concern —
food service, condition of facilities, staffing shortages, and safety and security.

In response to this inspection, the FBOP has taken several steps to enhance operations at the
Federal Correctional Institution, Tallahassee (FCI Tallahassee), particularly in the area of food
service.  As noted by OIG, these corrective measures include, "a pest control service provided
twice a month, training provided by the Regional Food Service Administrator to food service
staff, a stock rotation plan for the food warehouse, internal sanitation checks of the Food Service
Department, and repairs made to broken seats in the inmate cafeteria."  Report at 4.
Additionally, the United States Department of Agriculture (USDA) Food Safety and Inspection
Service subsequently visited the FCI Tallahassee and verified no violations were found regarding
meat and poultry.

FBOP recognizes the importance of improving its physical infrastructure, increasing staffing,
and improving safety and security.  FBOP has incorporated each of these issues into its new
strategic framework and has previously provided OIG with information about actions that it is
taking to address each area.  For example, FBOP is developing an infrastructure strategy that will
increase the overall effectiveness of facilities management.[1]  For example, FBOP has awarded a
contract to enable the development of a methodology to address infrastructure needs.  This will
include funding priorities for critical requirements, the identification of a cost benefit process
regarding replacement versus repair, and a system by which the BOP can support its future
budget requests for modernization and repair.  Moreover, FBOP continues development of its

---

[1] See Audit of the Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions, Appx 6 at 43, available
at https://oig.justice.gov/sites/default/files/reports/23-064_1.pdf.

OIG Formal Draft Report: Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee
October 30, 2023
Page 2 of 2

automated staffing tool that will provide an updated, standardized, and transparent view of staffing guidelines and by conducting analysis and implementation work to address the impact of staffing shortages, augmentation and overtime use, and staffing incentives.  Finally, FBOP has provided OIG with its comprehensive strategy for transitioning to a fully digital security camera system.

No recommendations were issued with this report and OIG indicates that although FCI Tallahassee's executive leadership is "new to the institution," the Warden and his leadership team were already "taking steps to address" many issues identified in the report at the time of OIG's inspection.  See Report at ii.  FBOP remains committed to addressing any resolved recommendations from the related products referenced in the Report and it looks forward to continuing its work with OIG on the onsite inspections program.

# EXHIBIT F



Inspection of the Federal Bureau of Prisons'

Federal Correctional Institution Waseca

★  ★  ★

EVALUATION AND INSPECTIONS DIVISION

23-068

MAY 2023

# Executive Summary



**The DOJ OIG's Inspections Program**

Between Monday, January 30, and Saturday, February 4, 2023, the Department of Justice (DOJ) Office of the Inspector General (OIG) conducted an unannounced, on-site inspection of Federal Correctional Institution (FCI) Waseca, a low security female institution in southern Minnesota.

This was the first unannounced inspection of a Federal Bureau of Prisons (BOP) institution under the OIG's new on-site inspections program; therefore, we sought to inspect an institution of relative operational simplicity and one that scored as "low risk" on the OIG's prison inspection risk assessment tool. We also were interested in inspecting a facility that housed female inmates, given the significant number of sexual assault and harassment investigations that the OIG has been handling recently. FCI Waseca fit our selection criteria because, in addition to being a female-only institution, it is a standalone facility with relatively small staff and inmate complements. Further, it ranked among the least risky BOP institutions on our risk assessment tool.

Nonetheless, as we detail in the report, despite this low risk profile, we identified many significant issues at FCI Waseca, most of which were consistent with findings in our other recent BOP oversight work and which we have reported on publicly. We do not make recommendations in this report because, in our prior work, we have recommended that the BOP address many of these issues at an enterprise level. Therefore, through our efforts to resolve those recommendations, we will monitor the BOP's efforts to address these issues at all of its institutions, including FCI Waseca.

While our inspection found that FCI Waseca is generally well-run, with dedicated staff and an environment in which both inmates and staff generally reported feeling safe, we also identified areas of concern that highlight institution challenges and potential serious risks. For example, FCI Waseca suffers from a significant shortage of Correctional Officers, despite ongoing recruitment efforts. As a result, in order to staff all scheduled posts to ensure the safety and security of the institution, FCI Waseca leadership frequently needs to require staff from other departments such as Facilities and Education to serve in correctional posts rather than attend to their regular duties. However, doing so exacerbates challenges elsewhere in institution operations and creates a cascading set of consequences.

For example, when the institution's Education Department staff work correctional posts instead of their regular duties, this has left insufficient personnel available to support inmate education and training programming and has caused FCI Waseca to cancel or delay programming. Moreover, wait lists for programs are already long, so additional delays could result in inmates not receiving sufficient programming during their incarceration. This in turn could result in inmates being released without the skills they need to successfully reintegrate into society, thereby increasing the risk of recidivism. This is precisely the issue that the bipartisan First Step Act of 2018 (FSA) was attempting to address.

Similarly, when FCI Waseca's Facilities Department staff work correctional posts instead of their regular duties, the Facilities Department in turn becomes short staffed and must triage only the most pressing issues, as opposed to addressing the full scope of its regular duties. As a result, Facilities Department staff may be delayed in addressing maintenance problems that affect the conditions of confinement for inmates and work conditions for FCI Waseca staff. Further, unaddressed maintenance problems can increase the scope of the original problem, as well as the costs associated with addressing it in the future.

We also found that staff shortages in both FCI Waseca's Health Services and Psychology Services Departments have caused delays in treatment of the physical and mental healthcare needs of inmates. Such delays can potentially create more

serious health issues for inmates, create further demands on healthcare staff, and increase the costs of future treatments.  Additionally, we identified serious infrastructure issues, including significant damage to several building roofs that have caused leaks throughout the institution.  Not only do damaged and leaking roofs present an inherent structural danger, but the BOP's failure to fix them has led to damaged medical and dental equipment, required medical and dental offices to be temporarily abandoned, ruined portions of the gymnasium floor, occasionally left certain inmate cells unusable, and created unsanitary food services situations.

## Report Highlights



**Condition of Facilities**

**Serious facilities issues affect the conditions of inmate confinement.**
- Many inmates live in basements.  At the time of our inspection, some inmate beds were in close proximity to pipes that occasionally leak.
- Institution roofs are in disrepair, routinely leak, and need to be replaced.  FCI Waseca estimates replacement costs to be approximately $3.5 million.



**Staffing Shortages**

**Significant staffing shortages have cascading effects on institution operations.**
- Correctional Officer shortages require the institution to:
  ➢ routinely use overtime, which can negatively affect staff attentiveness and therefore institution safety and security, and
  ➢ temporarily reassign non-Correctional Officers to Correctional Officer posts, negatively affecting their ability to perform their regular duties (e.g., performing maintenance and teaching inmate programs).
- Health Services and Psychology Services Department vacancies affect the timeliness of inmate care and the availability of certain programs.



**Staff and Inmate Safety**

**Staff and inmates told us that they generally felt safe at the institution; however, we identified substantial concerns with:**
- **Cameras:**  numerous blind spots, poor night vision, poor zoom quality, and an insufficient number of cameras, and
- **Contraband:**  significant challenge limiting the amount of contraband in the institution, specifically drugs (synthetic cannabinoids and illicitly acquired opioid use disorder medication).



**Staff Discipline**

**Institution management and staff were frustrated by the amount of time it takes to close a staff misconduct investigation.**
- As of January 30, 2023, FCI Waseca had 38 open staff misconduct cases.
- Those 38 cases had been open an average of 221 days, with 10 open for at least a year.

**Sexual Misconduct Reporting**

**Staff told us that they do not believe sexual misconduct is widespread at the institution.**
- Inmates demonstrated how they would report sexual misconduct, if needed.
- Despite a general sentiment that the institution is free from widespread sexual misconduct, as of January 30, 2023, five staff-on-inmate sexual misconduct allegations were being investigated.

**First Step Act Programs and Time Credits**

**Inmate programming is in high demand, but there are long participation wait lists.**
- Wait lists for many FSA-related programs contained 300+ names.
- Due to excess demand for programming, inmates can potentially be released without the skills they need to successfully reintegrate into society.
- Staff and inmates expressed confusion with how inmates earn and apply time credits.

# Table of Contents

**Introduction** ..................................................................................................................................1

    FCI Waseca ...............................................................................................................................2

    FCI Waseca Staffing Challenges.............................................................................................3

**Inspection Results** ..........................................................................................................................4

    Condition of Facilities..............................................................................................................4

    Safety and Security...............................................................................................................12

    Use of Restrictive Housing ...................................................................................................20

    Staff Discipline .....................................................................................................................22

    Sexual Misconduct Reporting...............................................................................................24

    Medical and Mental Healthcare ...........................................................................................26

    First Step Act Programming and Time Credits .....................................................................30

**Conclusion** ...................................................................................................................................33

**Appendix 1:  Purpose, Scope, and Methodology** ......................................................................34

    Standards ..............................................................................................................................34

    Purpose and Scope ..............................................................................................................34

    Inspection Methodology........................................................................................................34

**Appendix 2:  DOJ OIG Related Work**.........................................................................................36

**Appendix 3:  BOP Policies Cited** ..............................................................................................37

**Appendix 4:  The BOP's Response to the Draft Report** ............................................................38

# Introduction

This report details the results of the U.S. Department of Justice (DOJ) Office of the Inspector General's (OIG) first unannounced inspection of a Federal Bureau of Prisons (BOP) prison, Federal Correctional Institution (FCI) Waseca, a low security female institution located in southern Minnesota. As this was our first unannounced inspection through the OIG's new on-site inspections program, we sought to inspect a BOP institution of relative operational simplicity and one that scored as "low risk" on a prison inspection risk assessment tool that the OIG is developing and piloting internally. We determined that by doing so we would be able to establish a baseline against which to compare the operations of other BOP institutions and test the scalability of our inspection protocols in advance of inspections of more operationally complex institutions.[1] FCI Waseca fit our selection criteria because, unlike many BOP institutions, it is a standalone facility with relatively small staff and inmate complements. Further, it ranked among the least risky BOP institutions in our piloted risk assessment tool.

The OIG conducted its unannounced, on-site inspection of FCI Waseca between Monday, January 30, and Saturday, February 4, 2023.[2] The OIG team consisted of seven OIG staff members and two medical subject matter experts contracted by the OIG. While on site, we made physical observations; interviewed both staff and inmates; reviewed security camera footage; and collected records related to inmate programming and education, institution staffing levels, conditions of confinement, inmate medical and mental healthcare, and staff and inmate misconduct including sexual misconduct. We also made follow-up requests of both the institution and the BOP Central Office for additional data, interviews, and



FCI Waseca Main Entrance
Source: OIG, February 2023

documents, which we used to further inform our inspection (see Appendix 1 for more details on the methodology). As this was our first unannounced inspection of a BOP facility, we particularly appreciated the full cooperation and assistance that we received from the Warden, the prison staff, and BOP personnel during our on-site visit and in responding to our follow-up requests.

---

[1] Many BOP institutions have sub-facilities, each of which houses inmates of specific security levels and genders. These BOP institutions house multiple thousands of inmates.

[2] Pursuant to the OIG's planned procedures for initiating an inspection, which we had previously shared with the BOP, the OIG notified the institution at approximately 8 a.m. on January 30, 2023, that it would be initiating an inspection at noon that same day.

## FCI Waseca

FCI Waseca is a low security women's prison located in Waseca, Minnesota, approximately 80 miles south of Minneapolis.  It was originally built as a university campus and was purchased by the BOP in 1993.  In 1995, the BOP opened FCI Waseca as a male institution, and between 2008 and 2009 the BOP converted it to a female institution.

FCI Waseca is a Medical and Mental Health Care Level 2 institution, meaning that it generally has the capabilities and resources to provide care for stable outpatients whose medical and mental health conditions can be monitored and managed through routine appointments.[3]  While the vast majority of inmates at FCI Waseca have been classified at Level 1 or 2 Medical and Mental Health Care Levels, at the time of our inspection 13 inmates were classified at either medical or mental healthcare levels beyond the designation for this institution.

As of February 1, 2023, FCI Waseca housed 806 female inmates.[4]  This was approximately 13 percent over its rated capacity of 712 inmates.  FCI Waseca has five general population housing units.  Collectively, these units contain both unlocked dormitory rooms and open concept living spaces that that span the entire floor of a housing unit.  Four of these open concept living areas are located in basements.  General population housing units have communal bathrooms and shower facilities.  FCI Waseca also has a Special Housing Unit (SHU) for inmates that BOP staff has determined need to be separated from the general population.  SHU inmates are generally housed two to a cell.[5]  SHU cells are locked and contain their own toilets and showers.

FCI Waseca offers inmates a variety of programming, including both residential and nonresidential drug treatment programs, as well as First Step Act-required Evidence-Based Recidivism Reduction programming and Productive Activities.  The institution also offers vocational apprenticeships, as well as

| FCI Waseca:  Institution Profile |
|---|



**Location**
Waseca, MN



**Population**
Female Inmates
Rated Capacity:  712
Actual Headcount:  806
*~113% Capacity*



**Security Level**
Low



**Housing Units**
5 General Population Units
1 SHU



**Medical Care Level**
2 of 4



**Mental Healthcare Level**
2 of 4



**Staff**
Total Positions:  255
On Board:  191
*64 Vacancies*

As of February 1, 2023
Source:  FCI Waseca documentation

---

[3]  The BOP classifies inmates at a Level 1, 2, 3, or 4 for medical care purposes, with Level 1 inmates requiring the least amount of medical care.  The BOP uses a similar classification for inmate mental healthcare.

[4]  A small portion of FCI Waseca inmates do not identify with the gender assigned to them at birth.

[5]  FCI Waseca staff told us that they double cell inmates whenever possible but noted that there are certain times they cannot do so, such as when there is an odd number of inmates assigned to the SHU.

employment for over 200 inmates at an on-site textile factory operated by UNICOR, a government-owned manufacturing corporation that employs BOP inmates.

## FCI Waseca Staffing Challenges

At the time of our inspection, FCI Waseca was struggling to maintain a staffing complement consistent with the BOP's determination of the needs of the institution.  Overall, FCI Waseca had only 75 percent (191 of 255) of its total positions filled as of January 2023. Staffing shortages have been particularly acute within the Correctional Services Department, which is composed primarily of Correctional Officer positions. Correctional Officers are vital to the safety and security of the institution, as they are responsible for providing round-the-clock supervision of inmates.  Specifically, FCI Waseca had only 67 percent of its Correctional Services positions filled at the time of our inspection (see Figure 1).



**Figure 1**

**FCI Waseca Staffing Level Overview**

Source:  FCI Waseca staffing data, as of January 2023

Moreover, we found that staffing challenges at FCI Waseca were not limited to Correctional Services positions.  For example, consistent with the overall vacancy rate for the institution, both the Health Services and Psychology Services Departments were staffed at 75 percent or less, including vacancies for medical provider positions.  The impact of these staffing shortages is exacerbated by the fact that, as described above, the facility was 13 percent over capacity at the time of our visit.  Throughout the report, we describe how current and longstanding staffing issues have contributed to operational challenges in many of FCI Waseca's mission areas.

# Inspection Results

## Condition of Facilities

During our inspection, we observed that most parts of the institution were clean and temperatures in inmate housing units were comfortable and in compliance with BOP policy on temperature ranges, despite below-zero outside temperatures throughout the week of our inspection.[6]

However, we identified serious facility infrastructure issues that negatively affect the conditions of confinement for inmates and the work conditions for staff.  While institution management and nonmanagement staff stated that the Facilities Department was responsive to routine maintenance requests, our interviews and on-site observations identified long-standing, significant infrastructure needs that remain unaddressed by the BOP.  Specifically, as the photographs below demonstrate, we found that some FCI Waseca inmates lived in basements, with beds positioned in close proximity to pipes that occasionally leak.  Further, roofs covering the food service area, health services area, recreation area, and Special Housing Unit (SHU) routinely leak and need to be replaced.  At the time of our inspection, FCI Waseca estimated the cost of roof repairs to exceed $3 million.

### Conditions in Inmate Housing Units

Inmates at FCI Waseca live in five general population housing units.[7]  These housing units contain a collective 12 floors of inmate housing.  Eight of those floors are above ground, while four are basements.  In six of the above-ground housing floors, inmates live four to a room.  Rooms on these floors contain two bunk beds and do not have lockable doors.  Inmates on these housing floors share communal bathroom and shower facilites.  The images below show the typical housing arrangement in these above-ground housing floors.

---

[6]  BOP policy provides that:  "Temperature set points will be targeted to 76 degrees Fahrenheit in the cooling season and 68 degrees Fahrenheit in the heating season.  All spaces will be maintained as close to the targeted set point as possible."  See Appendix 3 (Facilities Operations Manual).

[7]  In addition to the five general population housing units, FCI Waseca also has a SHU for inmates who must be separated from the general population.



*Left,* Hallway of Above-Ground Housing Floor, *Right,* Typical Inmate Room in the Above-Ground Housing Floor

Source:  OIG, February 2023 (Inmates Blurred in Left Image)

In the remaining two above-ground housing floors and four basement housing floors, inmates live in open-concept floor plans and share communal bathrooms and shower facilites.  The images below show the typical housing arrangements in the basement housing floors.



Inmate Housing in an FCI Waseca Basement Housing Floor

Source:  OIG, February 2023 (Inmates Blurred in Left Image and Product Names Blurred in Right Image)

As can be seen in the images above and below, we observed that the basement housing floors contain exposed pipes, pipes that have been patched or wrapped in plastic, and pipes that have suffered from what appeared to be long-term damage.  We also found that inmates with top bunks slept in very close proximity to exposed pipes and could hit their heads on the pipes if they sat up in bed.  Inmates told us that these pipes regularly leak on their beds.  While we did not observe pipes actively leaking during our inspection, the patches and plastic covering of pipes evidenced prior leaks.  Although we did not independently determine the purpose or contents of all the exposed pipes during our inspection, we questioned Facilities Department staff about this issue.  These staff explained that pipes that move water off and away from the roofs of housing buildings pass through basements and, during periods of significant rainfall or snow melt, these water pipes may experience strain that creates leaks.  Facilities Department staff also explained that shower water may leak from floors above ground level and create leaks in the basement.  The pictures below show the proximity of certain beds to exposed pipes, the plastic wrapping around pipes, and the condition of those pipes.



Condition of Pipes and Their Proximity to Inmate Beds in a Basement Housing Floor

Source:  OIG, February 2023 (Left Image) and January 2023 (Right Image) (Product Names Blurred in Both Images)



*Left and Center,* Bolt Attached to Overhead Pipe Close to an Inmate Bed, *Right,* Inmate-Fashioned Protective Covering on the Bolt

Source:  OIG, January 2023 (Product Names Blurred in Left Image)



Pipe Uncovered in a Basement Housing Floor.  To better assess the pipe's condition, the OIG cut open the plastic sheeting that had been covering the pipe.

Source:  OIG, January 2023

While onsite, FCI Waseca's Warden told us that he was aware of the conditions in the basement housing floors but did not have an alternative housing solution due to the size of the existing inmate population (as explained in the Introduction, FCI Waseca is currently about 13 percent over its rated capacity).  Following our visit, we spoke with the BOP's North Central Regional Director, who had become aware of concerns we expressed to institution management about the basement housing floors.  He told us that, in the short term, there is a plan for FCI Waseca to potentially remove top bunks from its basement housing floors in order to improve the conditions of confinement.  After receiving a draft of this report, FCI Waseca management did in fact relocate inmates from top bunks in close proximity to pipes to other areas of the institution.  According to FCI Waseca management, they do not intend to assign inmates to those bunks in the future.  Further, the Regional Director said that, in the long term, the BOP plans to conduct a national bed-space audit, which will allow it to better allocate the inmate population throughout its institutions and, as a result, ensure that inmates do not have to live in conditions comparable to those with beds in close proximity to pipes.

### Unaddressed Roof Repairs

According to Facilities Department staff, FCI Waseca needs to replace the flat roofs that shelter its food services area, health services area, recreation area, and SHU.  They explained that these roofs regularly leak and prevent the institution from effectively using these areas.  Institution staff attribute roof failures to the weather in Minnesota, which can vacillate between extremely cold winter temperatures and hot summer temperatures, causing roof materials to expand and contract.  Significant snow accumulation also places the flat roofs under stress.  The pictures below show examples of water damage in the food services area caused by water penetrating the damaged roof.



*Left,* Food Service Area Ceiling Panels Warped Due to Water Damage, Riveted Together to Maintain Overhead Cover.
*Right,* Water Damage Rendered This Section of the Food Service Area Unusable.

Source:  OIG, January 2023

FCI Waseca estimates the cost of necessary roof repairs to be $3.5 million.  Below, we summarize the Facilities Department's assessment of current and potential future effects of these unaddressed repairs.

| Current and Potential Future Effects of Unaddressed Roof Repairs at FCI Waseca | |
|---|---|
| <br>**Health Services Area** | **Current Effects**<br>• Leaks have caused damage to medical and dental treatment equipment.<br>• Leaks have caused medical and dental offices to be temporarily vacated.<br><br>**Potential Future Effects**<br>• The institution believes that, if repairs are not made soon, future repairs will be more costly and invasive, potentially affecting FCI Waseca's ability to provide medical and dental care in the area while extensive repairs are being completed. |
| <br>**Food Services and Dining Areas** | **Current Effects**<br>• Leaks have caused issues with food preparation and sanitation.<br>• Multiple recurring leaks in the dining area have interrupted meal service.<br><br>**Potential Future Effects**<br>• The institution believes that, if needed repairs to the roof in the food services area remain unaddressed, the roof may not be able to hold the added weight of rainwater and snow in coming years, which could cause it to collapse. |
| <br>**Special Housing Unit** | **Current Effect**<br>• Leaks in the SHU have rendered inmate cells unusable at times.<br><br>**Potential Future Effects**<br>• The institution believes that, if repairs are not made soon, future repairs will be more costly and invasive, potentially affecting FCI Waseca's ability to house inmates in the SHU. |
| **Recreation Area** | **Current Effect**<br>• Leaks caused damage to portions of the gymnasium floor that needed to be remediated.<br><br>**Potential Future Effect**<br>• The institution believes that, if needed recreation area roof repairs remain unaddressed, the roof may not be able to hold the added weight of rainwater and snow in coming years, which would cause it to collapse. |

Source:  FCI Waseca Facilities Department roof repair project funding requests

To receive funding for any repair project that is estimated to cost over $10,000, a BOP institution must request funding from its regional office.[8]  We found that since 2019 FCI Waseca has been requesting at least

---

[8]  For projects estimated to cost less than $300,000, the regional office creates a priority list of regional projects and allocates funds based on that list.  For projects estimated to cost over $300,000, the regional office creates a priority list of regional projects and submits that list to the BOP's Central Office.  The Central Office then creates a national priority list and allocates funds based on that list.  For a description of the BOP's approval process for minor and major repairs, see Appendix 3 (Facilities Operations Manual).

part of the $3.5 million estimated as necessary for roof repairs.[9]  However, it had not received any funding to begin these roof repairs as of March 2023.  As detailed in a recent OIG report on the BOP's efforts to maintain and construct institutions, we found that the BOP does not have a well-defined infrastructure strategy and lacks the funding to address what the BOP estimates to be a nearly $2 billion unresolved institution repair project backlog.[10]  As a result, the BOP has been unable to fund many repair projects, like the FCI Waseca roof repair project, at institutions throughout the country.

With regard to the unaddressed roof repair project at FCI Waseca, the North Central Regional Director acknowledged the need for the repairs but told us that there were more serious facilities issues at other institutions in the North Central Region.  He further stated that, given the limited amount of funding available to him, he could not prioritize FCI Waseca's roof repairs over certain other repairs at other institutions.

## Other Facilities Issues Observed

During our inspection, we observed four other significant facilities issues.

First, during the week of our visit, FCI Waseca's external electrical service was interrupted during the early morning hours of February 3.  Following the interruption of service, one of the institution's emergency generators did not turn on and as a result FCI Waseca experienced a partial power outage that rendered systems providing heat and overhead lighting to inmate housing units inoperable between approximately 4 and 5 a.m.  Nevertheless, FCI Waseca temperature sensors (which were unaffected by the power outage) recorded that temperatures inside inmate housing units remained within the BOP acceptable range during the outage, despite contemporaneous outdoor temperatures registering minus 15 degrees Fahrenheit.  Facilities Department staff and FCI Waseca's Warden told us that they reported to the institution during the outage, took manual temperature readings, and similarly found the manual readings to indicate that temperatures in housing units remained within the BOP acceptable range.  Facilities Department staff also explained that, because the housing buildings are made of brick reinforced with concrete, they retain heat well.  Facilities Department staff attributed the generator failure to a communication issue between the

---

[9]  Additionally, FCI Waseca has requested, and has not yet been approved to receive, approximately $232,000 to fund additional projects to replace an uninterrupted power supply system that supports the institution's communications equipment, to replace exterior doors that have deteriorated, and to repair interior institution roads and the food services dock.  We also note that between January 2022 and January 2023 FCI Waseca completed two major repair projects to upgrade perimeter detection and to replace an emergency propane supply station.  The cumulative cost of these projects was nearly $500,000.  As of February 2023, FCI Waseca was conducting three repair projects to replace the institution's water softener, to upgrade exterior lighting, and to replace a dust collector in a vocational education woodworking shop.  The cumulative cost of these projects was over $450,000.

[10]  See Appendix 2, Item I.

generator and the institution's electrical system. They told us that they were actively addressing the issue with the generator's manufacturer. According to documentation provided by the BOP, FCI Waseca has not experienced a similar power outage in the past 12 months.

Second, we found that that, similar to basement inmate housing floors, the institution's evidence room, which is also located in a basement, experiences leaks. Institution staff attributed the cause of those leaks to groundwater seepage through the basement's walls, as well as roof issues. In 2017, as a result of these leaks, the evidence room flooded and staff and inmate misconduct case evidence was damaged. To address these leaks and prevent future damage to evidence, evidence lockers were placed on lifts, above the ground, and a makeshift sump pump was installed to remove water that enters the space (see image). FCI Waseca is not currently requesting funds from the North Central Regional Office to address the underlying causes of flooding in the evidence room building.



Makeshift Sump Pump in Evidence Room

Source: OIG, February 2023

Deterioration of an External Walkway

Source: OIG, February 2023

Third, similar to the cause of roof failures, exterior walkways between institution buildings have deteriorated over time due to the extended effects of weather. Health Services Department staff told us that that cracks and heaves in walkways make it difficult for inmates with mobility issues to safely navigate the institution. Further, they expressed concerns for their own safety as they regularly have to transport medical carts throughout the institution and fear that they may lose control of the carts while traversing the uneven pavement. Facilities Department staff were aware of this problem and told us that they will make repairs as weather permits.

Fourth, due to the shortage of correctional staff at FCI Waseca, Facilities Department staff are required to cover unfilled Correctional Officer posts instead of performing their regular duties. This practice is known as augmentation, and we discuss it in greater detail in the next section of the report. We reviewed FCI Waseca augmentation data and found that staff from the Facilities Department were the staff most likely to fill correctional posts via augmentation between January 2022 and January 2023, working a total of more than 2,200 augmentation hours. This corresponds to more than one full-time equivalent position. A senior member of the Facilities Department told us that because of augmentation the

Facilities Department can only "put out fires."  Specifically, he said that augmentation interferes with his department's ability to perform preventive maintenance and complete administrative work documenting repairs completed.

## Safety and Security

During our inspection interviews, staff and inmates told us that they generally felt safe at the institution. The sentiments inmates expressed to us were consistent with those collected by the BOP, which found through polling FCI Waseca inmates in January 2023 that 86 percent of inmates rated the institution safe. According to our interviews, staff and inmates do not believe that sexual abuse and misconduct are widespread at FCI Waseca, and inmates told us that they are not afraid to report sexual misconduct and that they know how to do so.

While we are pleased to hear from staff and inmates that they generally feel safe at FCI Waseca, we identified serious issues that undermine the institution's safety, many of which are consistent with issues that the OIG has found affecting institutions throughout the BOP:

- First, FCI Waseca has significant Correctional Officer vacancies; to address these vacancies the institution has adopted stopgap measures that have significant negative effects on staff and other aspects of institution operations.

- Second, we found that the institution lacks the number of cameras necessary to sufficiently observe staff and inmate activity and the existing complement of cameras produces low-resolution footage that makes it difficult to monitor and investigate inmate and staff misconduct.

- Third, the institution is struggling to contain the introduction of synthetic cannabinoids (colloquially known as K2 or spice), and illicitly acquired sublingual strips of buprenorphine and naloxone, which, when used appropriately, are prescribed to treat opioid use disorder.

### Staffing of Correctional Officer Positions

Correctional Services Department staff, who are primarily Correctional Officers, are responsible for the daily management and supervision of inmates and the implementation of policies and procedures to maintain a safe and secure environment for inmates and staff.  At the time of our inspection, FCI Waseca had significant staffing shortages in the Correctional Services Department, which was staffed at 67 percent, with 36 vacancies.  FCI Waseca staff we interviewed described persistent staffing shortages in positions across the institution and in Correctional Officer positions specifically.[11]

Shortages in Correctional Officer positions make it difficult for an institution to provide round-the-clock supervision of inmates.  To compensate for vacancies in these critical positions at FCI Waseca, institution management has adopted two stopgap measures used widely across the BOP to maintain coverage of correctional posts:  (1) the use of overtime and (2) the temporary assignment of non-Correctional Officer personnel into Correctional Officer positions (a practice known as augmentation).  While these measures

---

[11]  Prior OIG work has cited staffing shortages as a significant problem for the BOP.  See Appendix 2, Item II.

have allowed the institution to maintain coverage of Correctional Officer posts, they are imperfect measures to ensure continuity of inmate supervision; they also have compounding and often significant negative effects on other aspects of institution operations, as discussed in greater detail throughout this report.

## Overtime

To counteract ongoing staffing shortages of Correctional Officers and reduce institution reliance on augmentation, FCI Waseca staff routinely work overtime to fill certain Correctional Officer posts, which must be staffed 24 hours a day, 7 days a week.  At FCI Waseca, when relying on overtime to cover Correctional Officer posts, institution management first offers staff the opportunity to take on additional shifts via voluntary overtime.  As a final resort, institution management requires Correctional Officers to cover shifts via mandatory overtime, by requiring them to remain at the institution after completing their original shifts.

We found that ongoing staffing shortages among Correctional Officer positions may result in staff working double shifts, some as long as 16 hours, to cover vacant posts.  We have concerns that, when staff work consecutive shifts or multiple overtime shifts during a week, they may become tired and less observant, which can negatively affect the operation and safety of the institution.  Over the period of approximately 1 year (January 1, 2022–January 14, 2023), we found that Correctional Services staff worked an estimated total of 14,143 voluntary and mandatory overtime hours, which corresponds to approximately 6.8 full-time positions.[12]  The use of overtime to fill staffing gaps also carries financial consequences for the BOP, as personnel working overtime must be compensated over their base salary.  According to FCI Waseca financial management documentation for fiscal year 2023, the institution spent over $335,000 on overtime across all departments during the first quarter alone, which put the institution on pace to far exceed its annual overtime expenditure target of $450,000.

## Augmentation

FCI Waseca relies heavily on staff augmentation—the temporary assignment of non-Correctional Officer personnel from their regular non-correctional duties into Correctional Officer posts—to help compensate for the high vacancy rate among Correctional Officer positions.  According to local practice, non-Correctional Officer staff members can be used for augmentation in Correctional Officer posts only on non-holidays and weekdays, during day shifts (6 a.m. to 4 p.m.).

We found that between January 1, 2022, and January 14, 2023, at least one non-Correctional Officer staff member filled a Correctional Officer position via augmentation on 93 percent of the weekdays in that year.  Additionally, we found that 83 different non-Correctional Officer staff members worked at least one augmentation shift, for a cumulative total of approximately 10,000 hours, which is equivalent to nearly five full-time positions.  As described above, for the year we examined, when supplemented through augmentation, Correctional Officer posts were filled most commonly with personnel from the Facilities Department.  This was followed by personnel from FCI Waseca's Unit Team and Education Department, which are together responsible for duties that include managing inmate programming, planning for inmate releases, and facilitating and teaching educational programs.  Based on our analysis, each of these three

---

[12]  In December 2020, the OIG reported that BOP employees worked over 6.7 million overtime hours, the equivalent of more than 3,000 full-time positions, at a cost of over $300 million, during fiscal year 2019.  See Appendix 2, Item III.

departments lost at least one staff member to augmentation duties in correctional posts for more than half the total weekdays in the year we examined (see Figure 2).

**Figure 2**

**Top 3 Departments Supplying Staff for Augmentation in Correctional Posts:
Percentage of Weekdays Each Department Lost at Least One Staff Member to Augmentation**



Source:  OIG analysis of FCI Waseca staff augmentation data, January 1, 2022–January 14, 2023

We found that augmentation has ripple effects impeding operations across the institution.  For example, as described above, a senior member of the Facilities Department told us that augmentation interferes with his department's ability to perform preventive maintenance and complete administrative work documenting facility repairs completed.  Further, a Unit Team staff member (who, among other duties, works to identify inmates' individual programming needs and prepare them for reentry) told us that, given how frequently she has had to serve in Correctional Officer posts, it has been difficult to give her full attention to all of the inmates in her caseload, which approaches 150 inmates.  Finally, Education Department staff told us that inmate programs may be delayed or canceled because course instructors are pulled away from their normal duties and a supervisor estimated that, due to augmentation, inmates enrolled in the institution's General Educational Development (GED) high school equivalency program receive only 3 to 5 hours of instruction per week, short of the 7.5 hours required by BOP policy.[13]

In addition, when institutions such as FCI Waseca adopt augmentation, or have to mandate overtime to fill crucial Correctional Officer posts, this can result in a variety of negative effects for institution staff, including

---

[13]  See Appendix 3 (Literacy Program (GED Standard)).

low morale and failure to perform assigned shifts.  We were told that the staff generally prefer to perform the duties for which they were hired and stopgap strategies such as augmentation negatively affect their morale.  Further, staff who are unwilling to work Correctional Officer shifts assigned through augmentation or overtime may abuse sick leave or take an absence without leave.  This can perpetuate a vicious cycle of understaffing:  staff absences create additional gaps for an already understaffed institution, which in turn increases the likelihood that the institution will have to use additional augmentation or mandatory overtime to cover correctional posts.

**Recruitment, Retention, and Associated Challenges**

To help address the institution's safety concerns associated with Correctional Officer staffing, FCI Waseca management implemented recruitment, hiring, and retention initiatives that have included:

- hosting job fairs at the institution and participating at statewide recruiting events,

- a 10 percent retention incentive for Correctional Officers,

- a 10 percent recruitment bonus for all new staff, and

- paid moving expenses for existing BOP staff working at other institutions to relocate and work at FCI Waseca.

The institution had also sought approval from the BOP's Central Office for increases to Correctional Officer retention incentives, from 10 percent to 25 percent, as well as a 10 percent pay increase for all other staff.  As of March 2023, FCI Waseca was awaiting a decision from the Central Office on these proposals.

Despite these efforts, FCI Waseca management reported difficulties in finding talented people who want to work in the institution, due in part to the rural location of the institution and lack of competitive staff salaries for new recruits.  Management explained that the rural location may not be a desirable location for potential applicants and that the commute to the institution from larger metropolitan areas in the state—such as Rochester, Minneapolis, and St. Paul—is over an hour.

Another barrier to recruiting new applicants, we were told, is the lack of competitive salary and low locality pay.  According to FCI Waseca staff, local businesses and the nearby state prison offer higher starting salaries than the average starting salary for Correctional Officers at FCI Waseca.

Additionally, institution management suggested that the lack of locality pay for staff at FCI Waseca hinders its ability to match competitor salaries.[14]  As shown in Figure 3, FCI Waseca is located just outside the boundary of the Minneapolis-St. Paul, Minnesota–Wisconsin locality pay area, where federal employees receive locality pay that supplements their base salaries.  As a result, the salary for a General Schedule Level 8, Step 1 Correctional Officer is $4,682 less than it would be if FCI Waseca were located approximately 11 miles to the north, within the bounds of the Minneapolis-St. Paul, Minnesota-Wisconsin locality pay area.

**Figure 3**

**FCI Waseca Is Situated Outside the Minneapolis-St. Paul Locality Pay Area**



Source:  OIG visualization based on U.S. Office of Personnel Management locality pay areas

| Staffing Challenges at FCI Waseca | | |
|---|---|---|
| **Lack of Applicants** | **Location & Locality Pay** | **Competition** |
| • Qualified applicants have not applied to repeated vacancy announcements. | • Outside locality pay area with higher salaries<br>• Location in a rural community<br>• Longer than 1-hour commute from several large metropolitan areas | • Unable to match competitor salaries |

Source: FCI Waseca documentation, interviews with staff, and OIG analysis

---

[14]  Locality pay supplements a federal employee's base salary and is calculated from the cost of living in a specific area.  As a result, federal employees with duty stations in locality pay areas receive higher overall salaries compared to federal employees with duty stations outside of locality pay areas, which includes Waseca, Minnesota.

## Security Cameras

As described in the Introduction to this report, FCI Waseca was converted to a prison after having been designed and built as a university.  As a result, compared to facilities designed as prisons, this institution has many blind spots and areas where inmates or staff could remain beyond lines of sight.  Although security cameras can serve as a force multiplier for visual coverage in a BOP institution, according to FCI Waseca management and staff, FCI Waseca lacks the number of cameras necessary to sufficiently observe staff and inmate activity.  We confirmed in our walkthrough that blind spots exist throughout the institution.  Staff we interviewed told us that they would prefer to have more cameras so they can more closely monitor inmate activity and increase the overall level of safety.

During our on-site review of security camera footage available from the existing complement of cameras, we found the video quality to be of low resolution, consistent with complaints we heard from institution management.  We also found that the cameras had poor night vision and poor zoom quality.  According to members of FCI Waseca's Special Investigative Services (SIS) staff, who investigate inmate incidents and staff misconduct, it is difficult to fully investigate alleged behavior that is not captured by cameras, as well as activity that is captured by cameras that produce low resolution footage.

The OIG has long identified insufficient camera coverage and low video resolution as a challenge, both for the BOP throughout its institutions and for the OIG in its own investigative capacity.  In a 2016 report, we found that "deficiencies within the BOP's security camera system have affected the OIG's ability to secure prosecutions of staff and inmates in BOP contraband introduction cases, and these same problems adversely impact the availability of critical evidence to support administrative or disciplinary action against staff and inmates."[15]  In response to our June 2016 findings and recommendations, the BOP completed a multiyear update to cameras at 45 institutions; however, serious issues with the BOP's security camera systems remained unresolved.  Specifically, as we reported in October 2021, 86 percent of the BOP's cameras were still using analog or old technology, resulting in poor-quality video, limited areas of coverage, limited ability to zoom and search recorded video, and restricted video storage periods.[16]  Given the persistence of BOP camera issues, in December 2022 Congress passed and the President signed the Prison Camera Reform Act, which requires the BOP to develop  plan to evaluate and reform its security camera capabilities.[17]

As of the time of our inspection, FCI Waseca did not have an upgraded camera system.  According to FCI Waseca management, the institution is slated to receive and then install fiber optic cable that will serve as the foundation for the new camera system in and around October 2023.  After installation of the fiber optic cable, FCI Waseca will receive and install new high-resolution cameras, as well as additional supporting camera system infrastructure.  As of April 2023, FCI Waseca management was uncertain about when the new camera system will be fully operational.  While the institution is awaiting equipment, the Warden plans

---

[15]  See Appendix 2, Item IV.

[16]  See Appendix 2, Item V.

[17]  The Prison Camera Reform Act became law in December 2022.  Under the law, among other things, the BOP is required to submit to Congress a plan to "evaluate the security camera, land-mobile radio, and public address systems." Prison Camera Reform Act of 2021, Pub. L. No. 117-321, 136 Stat. 4430 (2022), www.congress.gov/117/plaws/publ321/PLAW-117publ321.pdf (accessed May 8, 2023).

to have a committee determine where the institution could install additional cameras to improve visibility in existing blind spots.

| **FCI Waseca Security Camera System** | | |
|---|---|---|
| **Existing Cameras** | **Limitations** | **Security Implications** |
| • 162 analog cameras | • Poor night vision<br>• Poor zoom quality<br>• Blind spots due to insufficient number of cameras at the institution | • Inmates and staff are aware of blind spots, making it more likely that they can commit misconduct in those areas.<br>• Poor-quality camera footage makes it difficult to investigate misconduct. |

Source: FCI Waseca documentation, OIG observations, and interviews with staff and inmates

## Contraband

FCI Waseca management told us that they did not believe BOP staff were introducing contraband into the institution and they did not believe that there were large volumes of common prison contraband such as cellular telephones or inmate-fashioned weapons in the institution.  However, they told us that there was an inmate drug problem at FCI Waseca, particularly with synthetic cannabinoids and illicitly acquired buprenorphine and naloxone.  When we asked about potential sources of this contraband, institution staff told us that drugs enter through the mail (letters and books sent to inmates) and, to a lesser extent, during in-person visitation.  These drugs are difficult to detect and can be easily concealed in mail and books:  synthetic cannabinoids can be sprayed onto paper, while buprenorphine and naloxone can be transmitted via small dissolvable strips that, for example, easily fit behind a stamp or in the binding of a book (see the text box for more information about these drugs).

Consistent with BOP policy, FCI Waseca staff screen all non-legal mail by opening it, touching it to detect obvious lumps, and scanning suspected drug-laden paper with a light bar that can indicate whether a piece of piece of has been saturated with a fluid.[18]
However, according to mailroom personnel, mailroom staff cannot detect all drugs contained in mail for

**Synthetic Cannabinoids and Compounded Buprenorphine/Naloxone**

**Synthetic Cannabinoids** (colloquially known as K2 or spice) do not have a medical purpose.  They are a category of synthetic drugs that mimic THC, the main ingredient in marijuana.  The exact ingredients and strength of these drugs are almost impossible for the user to know and can cause severe side effects, such as panic attacks, hallucinations, increased blood pressure and heart rate, and even death.  Typically, synthetic cannabinoids are sprayed onto plant matter and smoked.

**Buprenorphine and Naloxone** are opioids that can be compounded together and ingested orally through pills or dissolvable strips.  When used appropriately, they can help treat opioid use disorder by helping patients manage withdrawal symptoms and reduce cravings.  Though the high is less intense than the high from opioids, "the medication can still produce a euphoric effect, as it still acts on the same opioid receptors in the brain and creates a flood of dopamine in the brain."

Source:  American Addiction Centers and Prison Journalism Project

---

[18]  According to BOP policy, legal mail can be opened only by institution staff, and staff must do so in the inmate's presence.  See Appendix 3 (Mail Management Manual).

reasons that include the volume of incoming mail, the limited number of staff who work in the mailroom, and the novel ways synthetic cannabinoids and buprenorphine and naloxone strips can be concealed.

BOP staff at other, higher security, male institutions photocopy all non-legal mail, with inmates receiving only a photocopy, to help prevent drugs from making their way to inmates.  At FCI Waseca, staff photocopy only mail containing cardstock (the type of paper believed to be most likely saturated with drugs).  FCI Waseca's Warden acknowledged the potential benefits of photocopying all mail but was also hesitant to pursue this contraband interdiction approach, as he was concerned with the psychological effects it could have on FCI Waseca inmates.  For example, he was concerned that the female inmates at FCI Waseca could become distressed if they were allowed to receive only black and white photocopies of photos of their children. Another obstacle to photocopying all non-legal mail is the staffing that would be necessary if the institution decided that such an interdiction effort was necessary.  Supervisory personnel estimated that two additional staff members would be needed to photocopy the volume of non-legal mail arriving at FCI Waseca.

To help prevent the introduction of drug-laden books, other, higher security, male BOP institutions allow inmates to receive books shipped by verified publishers only.  At FCI Waseca, inmates can receive books from anyone who sends them.  The Warden told us that he requested from the North Central Regional Office the authority to limit the source of shipped books to verified publishers but this request was denied. The Warden also told us that he established an advisory committee to consider potential solutions to the institution's contraband issues.

## Inmate and Staff Searches

In addition to searching non-legal inmate mail, FCI Waseca conducts:

- routine searches of *inmates* entering the institution,
- random searches of *inmates* and their living areas,
- routine screening of *staff* entering the facility, and
- random searches of *inmate visitor* vehicles.

According to FCI Waseca management, mass searches of inmate living spaces are conducted on a quarterly basis.  A supervisory Correctional Officer told us that, during a December 2022 mass search, staff seized drugs.[19]

The supervisory Correctional Officer also told us that staff were being screened according to the BOP staff search policy when entering the institution.[20]  We identified no evidence to indicate that FCI Waseca was out of compliance with this policy.  While at FCI Waseca we also observed that, consistent with BOP policy, the institution followed the procedures below.

---

[19]  For policy governing inmate searches, see Appendix 3 (Searches of Housing Units, Inmates, and Inmate Work Areas).

[20]  The BOP's policy governing staff searches, see Appendix 3 (Staff Entrance and Search Procedures).  The BOP does not make this policy publicly available.

| Staff Search Procedures at FCI Waseca | | |
|---|---|---|
| **Circumstance** | | **Procedure** |
| When staff entered the institution… | ≫ | All staff walked through a metal detector and all staff belongings were x-rayed. |
| If a walkthrough metal detector repeatedly indicated presence of metal on staff… | ≫ | Staff were separately scanned with a handheld metal detector before being allowed to enter the institution. |
| If a staff member had to exit and reenter the institution throughout the day… | ≫ | Procedures above were repeated. |

Source:  OIG observations

We also observed that FCI Waseca had a second staff member assist with staff screening when a large number of staff entered the institution during a shift change.

## Use of Restrictive Housing

As of February 2, 2023, 50 FCI Waseca inmates were housed in the institution's Special Housing Unit (SHU).[21] SHU inmates are subject to significant restrictions compared to inmates in the general population.

Specifically, they are confined to a locked cell with an opportunity for 5 hours of outdoor recreation per week.  Despite opportunities for outdoor recreation, our review of BOP records found that many SHU inmates declined their opportunities during the week of January 15, 2023.  We note that outdoor temperatures during this week reached lows of minus 16 degrees Fahrenheit.  Through our review of BOP records, we found that SHU inmates at FCI Waseca are generally housed two to a cell in cells that contain their own toilets and showers.  FCI Waseca staff told us that they double-cell inmates whenever possible but noted that there are certain times they cannot do so, such as when there are an odd number of inmates assigned to the SHU.  In such situations, the Warden must approve any decision to single-cell an inmate. These photos below show a vacant SHU cell and the SHU's outdoor recreation area.

Inmates are generally housed in the SHU if they:

- are suspected of having committed serious misconduct and are awaiting the completion of an investigation and disciplinary hearing,

---

[21]  For BOP policy on restrictive housing, see Appendix 3 (Special Housing Units).

- are serving a disciplinary sanction after having been found to have committed misconduct at the completion of an investigation and disciplinary hearing,

- have been assessed by staff to pose a safety risk to the institution and are awaiting transfer to another institution (certain inmates in this status may have already completed their disciplinary sanction), or

- need to be separated from another inmate or staff member for their own safety.

FCI Waseca's leadership gathers each week to review and share information about SHU inmates.  During a meeting we attended, FCI Waseca staff discussed the mental and physical health of each inmate in the SHU, as well as how long each inmate had been housed in the SHU and the reason for their continued SHU housing.  According to FCI Waseca's Warden, these meetings allow different department leaders to communicate and ensure that inmates remain safe while housed in the SHU and that they do not remain in the SHU for extended periods of time.  The Warden told us that the North Central Regional Director has prioritized reducing extended SHU stays, especially when inmates have completed their sanctions and are awaiting transfer to



Vacant SHU Cell, Pictured Without Mattresses That Would Be Furnished When the Cell Was Occupied

Source:  OIG, January 2023

another institution.  The Warden believes that, through both his and the Regional Director's oversight, FCI Waseca has reduced the amount of time that inmates remain in the SHU.



SHU Recreation Area

Source:  OIG, January 2023

21

Of the 50 FCI Waseca inmates housed in the SHU as of February 2, we found that no inmate had been housed in the SHU for more than 80 days.  The majority of inmates had been housed in the SHU for fewer than 40 days.  See Figure 4 below for more detail.

**Figure 4**

**Duration of Stay for FCI Waseca Inmates Housed in the SHU**



Source:  FCI Waseca inmate SHU records as of February 2, 2023

Based on our review of SHU placement records, we found that six of the eight FCI Waseca inmates who had been housed in the SHU beyond 61 days were still serving a disciplinary sanction.  The remaining two inmates were no longer serving a disciplinary sanction but were awaiting transfer to another institution, as it was determined that they would continue to be disruptive if they remained in FCI Waseca's general population.

## Staff Discipline

Institution management complained about the amount of time it takes to close a staff administrative misconduct investigation and expressed the belief that the BOP's staff discipline process is ineffective at enforcing standards of conduct.  This is a common refrain we have heard from institution and BOP leadership in recent years.  In a May 2023 OIG report on the BOP's strategies to identify, communicate, and remedy operational issues, we reported that former BOP leadership told the OIG that the BOP's employee discipline process was "horrible" and that "it takes too long to get anything done."[22]

---

[22]  See Appendix 2, Item VI.

As of January 30, 2023, FCI Waseca had 38 ongoing staff misconduct cases.  Of those cases, 27 were still being investigated.  In the remaining 11 cases, the underlying misconduct had been substantiated but the cases were pending a disciplinary sanction decision.  As of January 30, the average time that the 38 misconduct cases had remained open was 221 days, with 9 open for longer than a year and 1 open for longer than 2 years.

Depending on the severity of staff misconduct and the potential risk that a staff member may pose to the institution, the Warden may elect to remove a staff member from regular duty pending the outcome of a misconduct investigation.  At FCI Waseca, as of January 30, four staff members had been removed from regular duty pending the outcome of their misconduct investigations.[23]  These staff members were assigned to duties, such as monitoring inmate telephone calls or performing other administrative duties outside the secure perimeter of the institution, that did not involve direct contact with inmates.

Delays in the administrative discipline process that caused staff to be removed from regular duty further exacerbate FCI Waseca's existing staff shortages.  Therefore, it is vital that FCI Waseca and the BOP complete staff misconduct investigations as promptly as possible, so that:

- if the investigation results in exoneration, the staff member can return to regular duty;

- if the investigation results in sanction, the staff member, when appropriate, can return to regular duty after fulfilling the terms of their sanction; or

- if the investigation results in termination, the institution can quickly backfill the vacated position with a new staff member.

Institution management acknowledged that there can be investigative delays for staff misconduct cases and told us that the institution has only one staff member, a SIS Lieutenant, assigned to work staff misconduct cases full time.[24]  FCI's Waseca Warden told us he believed that, in the future, the institution would be able to conduct staff misconduct investigations more quickly, as the institution had recently selected a Special Investigative Agent, a position that would supplement the work of FCI Waseca's SIS Lieutenant.  In a written response to this report, the BOP told us that a Special Investigative Agent reported to duty at FCI Waseca as of April 23, 2023.

---

[23]  One additional FCI Waseca staff member transferred to another institution while on administrative duty as a result of a misconduct allegation.  As of March 2023, that investigation into the staff member's alleged misconduct was still ongoing and the staff member remained on administrative duty at the new institution.

[24]  At FCI Waseca, Associate Wardens have assisted in conducting staff misconduct investigations.  Additionally, some FCI Waseca staff misconduct cases are investigated by BOP Central Office investigators within the BOP's Office of Internal Affairs.

## Sexual Misconduct Reporting

Many FCI Waseca staff told us that they do not believe that sexual misconduct is widespread at the institution.[25] Both staff and inmates we interviewed also expressed the belief that inmates would feel comfortable reporting report sexual misconduct, if necessary, and that they know how to do so.[26]  Inmates can report sexual misconduct in a variety of ways, including directly to institution staff and to the OIG through the inmate computer system, TRULINCS.[27]  Inmates can also report sexual misconduct through telephones that connect to a third party sexual abuse support center.  During our on-site inspection, we asked inmates to show us how they would report sexual misconduct in TRULINCS and they were able to do so.  However, inmate computers are in public spaces (see the image below), which may create a challenge for an inmate concerned about staff or other inmates observing a report made via these computers.  One inmate told us that, while she would feel comfortable reporting sexual misconduct via computer, she would probably wait to do so when no one else



*Left,* Inmate Computers in a Housing unit, *Right,* Sexual Abuse Reporting Information

Source:  OIG, February 2023 (Left Image) and January 2023 (Right Image) (Bulletin Board Blurred in Right Image)

was nearby.  We also directly observed throughout the institution the presence of sexual abuse support center telephones and educational posters with information about how to report sexual abuse.

---

[25]  For the purposes of this report, we use the term "sexual misconduct" to encompass all forms of sexual misconduct, including harassment and assault.

[26]  The BOP has policy in place to ensure that sexual abuse is detected, reported, and investigated.  See Appendix 3 (Sexually Abusive Behavior Prevention and Intervention Program).

[27]  Inmates may also report sexual misconduct by writing directly to the OIG.  The BOP also reports all allegations of staff misconduct, including sexual misconduct, to the OIG.

Based on our review of sexual misconduct reporting data, as well as staff and inmate misconduct data, we found that between January 2022 and January 2023:

- Six FCI Waseca *staff members* had been alleged to have committed an act of *staff-on-inmate* sexual misconduct.  As of January 2023, five of the six staff-on-inmate allegations were being investigated by the BOP and the sixth allegation was determined to be unsubstantiated following an investigation.

- Three FCI Waseca *inmates* had been alleged to have committed an act of *inmate-on-inmate* sexual misconduct.  As of January 2023, one of the three inmate-on-inmate sexual misconduct allegations had been substantiated and the remaining two were not substantiated as a result of BOP investigations.

We report this data for informational and transparency purposes and note that the volume of sexual misconduct investigations, especially those for which the underlying investigation has yet to be concluded, should not be used, alone, to assess the pervasiveness of sexual misconduct or lack thereof at an institution.  To this point, FCI Waseca's Warden told us that the existence of allegations can indicate that an institution has developed a healthy culture in which inmates feel comfortable reporting allegations of sexual misconduct.  Given the seriousness of sexual misconduct allegations, they are all investigated by either Special Agents in the BOP's Central Office-based Office of Internal Affairs or by the OIG.[28]

FCI Waseca staff also told us of some unintended consequences related to sexual misconduct reporting that had been negatively affecting institution safety and security.  Specifically, we learned that, despite receiving routine training on how to announce themselves prior to entering inmate living areas, some male staff are hesitant or unwilling to monitor inmate activity in communal bathrooms because they fear that inmates may report a baseless sexual misconduct allegation against them.[29]  FCI Waseca staff told us that inmates are aware of this and, as a result, regularly use and exchange drugs, fight, or engage in sexual activity in bathrooms because they believe that they are unlikely to be monitored there.  Further, a supervisory Correctional Officer told us that they had reviewed an inmate email that stated that death by suicide would be easy for an inmate to complete in FCI Waseca bathrooms because staff do not monitor those areas.  In addition, staff told us that they know of other staff who are hesitant or unwilling to physically restrain a

---

[28]  The OIG investigates the most serious, and often most complex, allegations of BOP employee misconduct, including allegations of criminal misconduct.

[29]  BOP policy explains that monitoring inmates to prevent and deter the movement of contraband is an example of an official duty that may require a Correctional Officer to monitor inmate activities in bathrooms.  The relevant program statement further states that sexual harassment includes voyeurism, meaning the invasion of an inmate's privacy "by staff for reasons unrelated to official duties, such as peering at an inmate who is using a toilet in his or her cell to perform bodily functions; requiring an inmate to expose his or her buttocks, genitals, or breasts; or taking images of all or part of an inmate's naked body or of an inmate performing bodily functions."  See Appendix 3 (Sexually Abusive Behavior Prevention and Intervention Program).

female inmate at FCI Waseca when circumstances warrant it because they fear that the inmate will allege that the physical restraint amounted to sexual assault.[30]

## Medical and Mental Healthcare

We found that FCI Waseca appeared to be able to address the most critical and time-sensitive medical and mental healthcare needs of inmates.  However, the institution faces several challenges in the effective and timely provision of healthcare to inmates, particularly for less urgent and more routine issues.  We found that, like the challenges this institution is experiencing in other operational areas, many of these issues stem from chronic and persistent understaffing, especially in clinical positions.  As detailed below, our inspection found that:

- FCI Waseca houses inmates whose assessed medical and mental health needs exceed the core capabilities of the institution;

- inmates experience significant delays in receiving nonemergency care, due to both institution Health Services Department staff vacancies and constraints involving the surrounding community of medical providers;

- staff vacancies in the Psychology Services Department limit FCI Waseca's ability to provide psychology services and substance use programs, with primarily "crisis focused" services provided instead; and

- many inmates decline to take prescribed psychiatric medication, and the institution is limited in its ability to address this issue.

### Alignment of Institution Capabilities with Inmate Needs

FCI Waseca is a Medical Care and Mental Health Care Level 2 institution, meaning that it generally has the capabilities and resources to provide care for stable outpatients whose health conditions can be monitored and managed through routine appointments.  Health Services Department staff we interviewed at FCI Waseca reported experiencing an increase in the number of inmates with more complex medical care needs that they believe would be better managed by a Medical Care Level 3 institution.  At the time of our inspection, there were 11 inmates classified at Medical Care Level 3 at FCI Waseca and 2 inmates classified at Mental Health Care Level 3.  This presents a challenge for FCI Waseca, as inmates designated at Care Level 3 have complex, usually chronic, medical or mental health conditions and generally require frequent clinical contact to maintain control of their conditions or to prevent hospitalization.

In attempt to better align inmates on the FCI Waseca roster with BOP institution capabilities, FCI Waseca has submitted requests to transfer inmates to other institutions that may be more appropriate for inmates'

---

[30]  BOP policy defines sexual abuse as including "intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of another person, excluding contact incidental to a physical altercation."  See Appendix 3 (Sexually Abusive Behavior Prevention and Intervention Program).

assigned care levels in accordance with the BOP's standard medical transfer process.  However, Health Services Department staff told us that the only medical center in the BOP established for female inmates, Federal Medical Center Carswell, has not had the space to accept the transfers.  In the interim, this means that, despite already limited health services staffing resources, FCI Waseca must manage higher complexity and more resource-intensive inmate medical care than it may be equipped to manage.

## Health Services Staffing and Appointments

While we were told that FCI Waseca is able to sufficiently address the urgent and emergency care needs of inmates, as well as routine activities such as triaging inmate requests for care (sick call) and medication distribution (pill line), the institution faces several challenges in the provision of health services to inmates, many of which stem from concerning vacancy rates in both Health Services Department positions and Correctional Officer positions.  As noted in the Introduction, as of January 2023, the Health Services Department was 75 percent staffed.[31]  Specifically, at the time of our inspection, the Health Services Department had five vacancies, four of which had been open for over a year, including a Midlevel Practitioner position, whose role is to assess, diagnose, and treat medical conditions under the license of the physician.  See Table 1.  Staff mentioned that it can be hard to recruit medical staff to FCI Waseca because of competition with a nearby hospital system.

**Table 1**

**Health Services Vacancies**

| Vacancy | Time Unfilled |
|---------|---------------|
| Psychiatrist | 1 year, 1 month |
| Midlevel Practitioner | 3 years, 7 months |
| Registered Nurse | 1 year, 3 months |
| Registered Nurse | 1 year, 2 months |
| Social Worker | 4 months |

[a] In a written response to this report, the BOP told us that the Social Worker position will be filled in May 2023 and that FCI Waseca has awarded contracts for two nursing positions.

Source:  FCI Waseca staffing data as of January 2023

Health Services Department staff we interviewed described low staffing levels as a strain on staff, who often put in extra work to ensure that they can fulfill their responsibilities.  Based on the data available for certain Health Services Department positions, we estimate that between January 2022 and January 2023 staff in this department worked a minimum of 1,365 overtime hours, although this total is likely higher, as it does not capture extra hours worked by two clinical personnel in positions ineligible for overtime pay.

At FCI Waseca, we found that there are only two providers on staff to conduct nonemergency appointments with inmates on site.  Although the institution has received some support via telehealth providers at other BOP institutions, as well as the BOP's Central Office and regional offices, this has not been sufficient to fully compensate for the vacancies in health services staffing at FCI Waseca.  FCI Waseca's Health Services Administrator estimated that the wait time for nonemergency follow-up appointments can be as long as a month to a month and a half, and FCI Waseca can typically schedule only one to two outside medical trips per day.  At the time of our inspection, Health Services Department staff reported that they were working

---

[31] The OIG has previously reported how staff shortages among healthcare professionals can negatively affect the provision of healthcare at BOP institutions.  See Appendix 2, Item VII.

through a backlog of outside medical consultations after delays due to the coronavirus disease 2019 pandemic and estimated that there were about 175 consultations pending scheduling.

We also found that scheduling constraints of outside medical providers, as well as shortages among Correctional Officers, contribute to delays in nonemergency appointments for inmates.  For example, FCI Waseca staff told us that outside medical providers have limited appointment availability and, as a result, it can be difficult to promptly schedule an inmate visit.  Further, the ability to transport inmates to outside medical appointments is dependent on the availability of FCI Waseca Correctional Officers and shortages in Correctional Officer staffing limit the number of outside medical trips FCI Waseca can support.  This is because it is routinely Correctional Officers who must be available to escort inmates to each outside medical appointment and FCI Waseca generally requires two staff members, one of whom must be female, to accompany an inmate on an outside medical trip.

An additional factor that may contribute to nonemergency wait times is that FCI Waseca houses inmates at care levels above those for which the institution is rated.  According to a staff member, inmates at these higher care levels tend to have more urgent needs for outside medical consultations, which sometimes requires the institution to cancel less-urgent appointments in favor of the urgent ones, further contributing to delays in outside medical trips.

We are concerned that long wait times for nonemergency appointments may have long-term effects on inmate health and well-being.  We are also concerned that potential staff burnout may result in additional staff departures, and losing additional staff could greatly jeopardize FCI Waseca's ability to deliver medical care, especially given the difficulty in filling vacant positions.

## Psychology and Substance Use Programs

FCI Waseca's ability to provide psychology and substance use programs has been severely curtailed by staff vacancies.  The Chief Psychologist described the psychology and substance use programs as severely short-staffed "for years."  The institution has made moderate progress but still has key vacancies in these program areas.  In January 2022, there were eight vacancies and only one Psychologist on staff.  While FCI Waseca was able to fill four positions in 2022 and increase the number of Psychologists to three, as of January 2023 there were still four staff vacancies despite ongoing recruitment efforts and incentives (see Figure 5).  According to the Chief Psychologist, short staffing means that services are "crisis focused" and staff have to prioritize inmates whose needs are more severe.

Psychology staff also reported that vacancies, along with extended staff unavailability, have affected their ability to offer certain programming at FCI Waseca.  For example, FCI Waseca's Residential Drug Treatment Program should have a capacity of 72 inmates but was capped at 48 due to the number of available drug treatment specialists.  In

**Figure 5**

**Psychology and Substance Use Program Staffing Snapshots**



Source:  OIG analysis of FCI Waseca staffing data

addition, according to Psychology Services Department staff, FCI Waseca should be offering Steps Toward Awareness, Growth, and Emotional Strength, a residential treatment program for inmates with serious mental illnesses and a primary diagnosis of borderline personality disorder.  However, despite the fact that two treatment specialists have been hired for the program and resources and bedspace are allocated for it, this program is essentially inactive as the institution has been unable to hire a coordinator for the program after 15 consecutive job announcements, as of January 2023.  Similarly, FCI Waseca's Resolve Program, a therapy program designed to address trauma-related mental health needs, is not running, as there is no coordinator for the program on staff.

Additionally, short staffing has affected implementation of FCI Waseca's Medication Assisted Treatment (MAT) Program which, according to the BOP, combines medication and psychosocial services as treatment for opioid use disorder (OUD).  Specifically, the Psychologist position dedicated to facilitating the psychosocial component of the MAT Program has remained unfilled after 14 consecutive job announcements, as of January 2023.  In the interim, these responsibilities have been adopted by another Psychologist on staff, in addition to other responsibilities.  This staff member reported a list of about 200 inmates pending the Psychology Services Department component of MAT Program screening.  At the time of our inspection, there were only 11 inmates enrolled in the MAT Program and were prescribed medication for OUD, 7 of whom arrived at FCI Waseca already taking medication for OUD.  We also learned that coordination issues between departments, exacerbated in part by staff shortages, have caused delays in screening inmates for MAT.  In addition to the screening performed by Psychology Services Department staff, Health Services Department staff must screen inmates to determine whether medication-based treatment for OUD is clinically indicated and initiate these medications in compliance with all regulatory standards.  Staff described conflicting views on whether Psychology Services Department staff must fully document the results of a psychology screening before Health Services Department staff can conduct their screening.

## Distribution of Psychiatric Medication

OIG analysis of FCI Waseca inmate healthcare data found that, in January 2023, 25 percent of all doses of prescribed psychiatric medications were not administered due to inmates not attending scheduled medication administration (pill line).  Seventy-two percent of inmates who were prescribed a psychiatric medication skipped at least one dose, and nearly 10 percent skipped doses daily.  FCI Waseca's Chief Pharmacist estimated that rates of missed psychiatric medication could be even higher, closer to 30–35 percent.  This raises several concerns, including the following:

- **Increased Medical Risk.**  Certain medications require sequentially higher or lower doses.  Skipping doses increases the risk of an inmate receiving an improper dose, which could result in negative outcomes.

- **Staff and Inmate Safety.**  If Correctional Officers are not aware that an inmate has not been taking their psychiatric medications, it could lead to escalation of situations that might otherwise be avoided.

- **Operational Efficiency.**  Pharmacy staff expend time and resources preparing medications that do not get administered.  Missed doses may also result in waste.

FCI Waseca's Warden, who receives a weekly report detailing inmates who have missed medications, explained that inmates have the autonomy to choose whether or not they take a medication but ideally inmates who miss doses should be counseled by medical staff and asked whether they want to continue with the prescribed medication.  However, as discussed above, there are long wait times for nonemergency appointments with medical providers, limiting FCI Waseca's ability to address medication no-shows in a timely manner.

## First Step Act Programming and Time Credits

As required by the First Step Act of 2018 (FSA), BOP institutions conduct a needs assessment on all inmates entering their custody to identify specific Evidence-Based Recidivism Reduction (EBRR) programs and Productive Activities (PA) that will best prepare inmates for their reentry into society.[32]  FCI Waseca offers a variety of these and other programs, including educational programming, such as literacy and post-secondary classes; psychology programming, such as trauma and drug treatment programs; recreational and wellness programming; UNICOR employment; and vocational training and apprenticeships.  See photos of some of the programming offered at FCI Waseca below.

Nevertheless, wait lists for several of these programs exceeded 300 names, meaning that over a third of the entire institution population was waiting to participate in these programs at the time of our inspection.  Staff told us about institution plans to expand the range of programming offered.  However, as described above, staff shortages in the Psychology Services Department limit the programing it can offer and augmentation limits the programming the Education Department can offer when its personnel are augmented into Correctional Officer posts.

### Other Challenges That Have Limited Program Offerings



Space limitations have limited class sizes and caused challenges in launching a Certified Nursing Assistant program.



Delays in software installation on new computers have limited the availability of certain typing courses and resumé workshops.

Sources:  Interview with FCI Waseca Education Department staff member and the BOP's response to draft of this report

The FSA sought to incentivize EBRR program and PA participation by providing eligible participating inmates time credits that can be applied toward additional time in prelease custody (i.e., satisfying the end of a court-ordered sentence in a Residential Reentry Center or on home confinement) or on supervised release (i.e., a period of monitoring that occurs after an inmate has satisfied his or her court-ordered sentence).[33]  Under the FSA, an eligible inmate earns time credits for every 30 days of "successful participation" in EBRR programs or PAs that are recommended based on the inmate's individualized needs assessment.[34]  The regulation promulgated by DOJ to implement the FSA, however, defines "successful participation" in a manner that does not actually require eligible

---

[32]  18 U.S.C. § 3632(a).

[33]  18 U.S.C. § 3632(d)(4) provides greater detail about the number of time credits inmates can earn in a 30-day period, as well as a list of offenses that make an inmate ineligible to earn FSA time credits.  18 U.S.C. § 3624(g) provides greater detail about the application of time credits toward time in prerelease placement or supervised release.

[34]  18 U.S.C. §§ 3632 (b) and (d)(4).

inmates to participate in individualized EBRR programs or PAs to earn time credits if their institution is unable to offer those EBRR programs or PAs due to "temporary operational or programmatic interruptions."[35]  We were told that the BOP has considered this regulation to cover program interruptions when the demand for programs exceeds an institution's capacity to offer them, which is common at FCI Waseca.



*Top:*  UNICOR Textile Factory Where Approximately 200 FCI Waseca Inmates Work.  Inmate workers can also participate in related apprenticeship programs that train them as pattern makers or sewing machine repairers.

*Bottom:*  A Service Dog in Training in the Prisoners Assisting With Service Dogs (PAWS) Program.  Inmates who participate in the PAWS program raise and train dogs that will assist people with disabilities.  Inmates in the PAWS program may also participate in a related apprenticeship that trains them as animal handlers.

Source:  OIG, February 2023 (Top Image) (Product Names Blurred in Top Image) and January 2023 (Bottom Image)



---

[35]  28 C.F.R. §§ 523.40–523.42.

Given that FCI Waseca inmates can earn FSA time credits irrespective of the availability of EBRR programs and PAs, and because demand for programs exceeds FCI Waseca's capacity to offer them, inmates may not have the opportunity to participate in programs designed to address their recidivism risk before they are released.

FCI Waseca staff told us that they first prioritize for program enrollment inmates with upcoming projected release dates and for whom the program would fulfill a need identified on the inmate's individualized needs assessment.  Staff said that they then prioritize for enrollment inmates farther away from their projected release dates and for whom the program would fulfill a need identified on the inmate's individualized needs assessment.  While this approach may mitigate the risk of inmates being released from FCI Waseca without being offered programs aligned with their reentry needs, it also has unintended consequences:  inmates with long sentences and low FSA-identified needs may not be able to participate, for significant periods of their incarceration, in any programs with lengthy wait lists.

Further, based on our interviews with staff at FCI Waseca, we identified a lack of expertise on FSA topics, including the application of the time credits rules.  For example, FCI Waseca staff told us that inmates often sign up for more programming than they need or intend to participate in so they can earn more time credits.  This indicates a misunderstanding on the part of both staff and inmates, as, under the regulations implementing the FSA published in January 2022, time credits are earned per 30-day period of successful participation in programming, not on a per-program basis.  Thus, inmates do not earn more time credits for being on more wait lists; yet, when inmates sign up for more programs than they intend to participate in, FCI Waseca's already lengthy wait lists become even lengthier without benefit.  Further, inmates will remain confused about the application of the FSA and time credits if staff themselves are unclear on the nuances of the law and unable to convey accurate explanations to the inmates as they navigate their sentences.

Finally, as described earlier in this report, one of the departments at FCI Waseca most commonly tapped to cover staffing gaps in Correctional Officer posts via augmentation is the Unit Team, whose responsibilities include routinely meeting with inmates to identify their programming needs and prepare them for reentry.  These reassignments can interfere with the institution's ability to effectively prepare its inmates for reentry into the community upon release.  For example, one Unit Team staff member told us that, due to how frequently she has had to serve in a Correctional Officer post instead of performing her regular duties, it has been difficult to provide full attention to all of the inmates in her caseload of nearly 150 inmates.  When an institution is unable to closely monitor and support inmates' progress in addressing their risk factors and completing rehabilitation programming suited to their needs, inmates may not be learning the skills they need to reenter society, thereby increasing rather than reducing the risk of recidivism.  This is precisely the issue that the bipartisan FSA was attempting to address.

# Conclusion

In general, we found that FCI Waseca is well-run and that staff and inmates reported feeling safe there, although we identified areas of concern that highlight challenges and risks for the institution.  For example, we identified serious facilities issues affecting the conditions of confinement for inmates.  Specifically, at the time of our inspection, many inmates were living in basement housing floors and slept in beds positioned near damaged, leaking pipes.  Further, roofs at FCI Waseca routinely leak and the resulting water damage occasionally renders spaces throughout the facility unusable.  According to FCI Waseca Facilities Department documentation, the cost of needed repairs would be over $3 million, and unaddressed repairs could eventually cause further deterioration of the roofs with some at risk of potential collapse.  We also found that the institution suffers from significant staffing shortages, particularly among medical and Correctional Officer positions.  Shortages of Correctional Officers require the institution to routinely use overtime and augmentation of non-Correctional Officer staff to cover Correctional Officer posts.  We found that these strategies have cascading effects throughout the institution, particularly on institution operations including facility maintenance, managing inmate programming, planning for inmate release, and facilitating and teaching educational programs.

The issues identified during this inspection are not unique to FCI Waseca.  In recent years, the DOJ OIG has cited many of the issues we identified at FCI Waseca as BOP-wide challenges, including its aging infrastructure, staffing issues, insufficient security camera coverage, and difficulties preventing the introduction of contraband.  Further, we have reported on how staff shortages, especially among healthcare professionals, can negatively affect the provision of healthcare at BOP institutions.  In addition, prior OIG work has identified significant enterprise-wide delays in the BOP's staff discipline process and described how those delays make it difficult for the BOP to enforce standards of employee conduct that help to ensure the efficient operations of its institutions.  See Appendix 2 for details on related DOJ OIG work.

Given the OIG's past reporting on these systemic issues and the recommendations we have made to the BOP to address them at an enterprise level, we do not make specific recommendations in this report to address the manifestation of these issues at FCI Waseca.  However, through our efforts to resolve recommendations made in our prior work, we will monitor the BOP's efforts to address these issues at all BOP institutions, including FCI Waseca.  Finally, through our future inspections and BOP oversight work, we intend to assess how other institutions are implementing the FSA and the availability of recidivism reduction programs at those institutions.  With this additional information, we will be better positioned to make recommendations, where appropriate, that will assist the BOP in implementing the law and achieving its primary goal of reducing recidivism among federal offenders.

# Appendix 1:  Purpose, Scope, and Methodology

## Standards

The DOJ OIG conducted this inspection in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (December 2020).

## Purpose and Scope

The OIG has determined that it can enhance the effectiveness of its oversight, and its ability to alert the BOP to concerns, by conducting short notice and unannounced inspections of BOP facilities, as appropriate. Pursuant to the OIG's planned procedures for initiating an inspection, which we had previously shared with the BOP, the OIG notified FCI Waseca at approximately 8 a.m. on January 30, 2023, that it would be initiating an inspection beginning at noon that same day.  The OIG team, which consisted of seven OIG staff members and two medical subject matter experts contracted by the OIG, conducted the on-site inspection Monday, January 30, through Saturday, February 4.  The focus of our inspection was the state of institution operations at the time of our inspection, although, for certain portions of our analysis, our scope included roughly the 1 year that preceded our inspection, beginning in January 2022.

Since this was our first inspection of a BOP institution as part of our new on-site inspections program, we sought to inspect an institution of relative operational simplicity and one that scored as "low-risk" on the OIG's prison inspection risk assessment tool.  We also were interested in inspecting a facility that housed female inmates, given the significant number of sexual assault and harassment investigations that the OIG has been handling recently.  FCI Waseca fit our selection criteria because, in addition to being a female-only institution, it is a standalone facility with a relatively small staff and inmate complements.  Further, it ranked among the least risky BOP institutions on the risk assessment tool that the OIG is developing and piloting internally.

The scope of this inspection did not include specialized testing of facility plumbing to definitively determine, for example, the contents of certain pipes or the potential presence of mold and other hazardous substances.  In addition, although this report includes information on allegations of sexual misconduct, we report this data for informational and transparency purposes and note that the volume of sexual misconduct investigations (especially those for which the underlying investigation has yet to be concluded) should not be used, alone, to assess the pervasiveness of sexual misconduct, or lack thereof, at an institution.

## Inspection Methodology

To better understand FCI Waseca's operations, we toured the institution, interviewed its inmates and staff, and reviewed its operational records.

### Observations

We toured the interior and exterior of the institution, including general population inmate housing units; the Special Housing Unit (SHU); Health Services Department examination space; the front lobby staff entrance and screening area; Psychology, Education, and Recreation Departments; the mail room; evidence storage

area; the UNICOR textile factory; the visitation room; inmate intake and screening areas; Facilities Department areas; the kitchen; and the inmate dining hall.

We also reviewed security camera footage, as well as the functionality of the security camera system. Further, we tested ambient temperatures throughout the institution, as well as the functionality of showers, sinks, and toilets in inmate housing areas.

## Interviews

We conducted 11 on-site interviews with FCI Waseca inmates who were housed in both the general population and SHU, as well as 40 on-site interviews with FCI Waseca staff.  FCI Waseca staff we interviewed includes the Warden; Associate Wardens, one of whom serves as the institution's sexual misconduct reporting coordinator; supervisory and non-supervisory Correctional Officers; healthcare providers; inmate case managers; teachers; food service workers; and staff responsible for institution safety, facilities management, the UNICOR factory, and the inmate trust fund program.  Following our on-site work at FCI Waseca, we also conducted virtual interviews with BOP staff who are posted at BOP duty stations other than FCI Waseca.  From the BOP's North Central Regional Office, we interviewed the North Central Regional Director.  From the BOP's Central Office, we interviewed the Chief of the BOP's Office of Emergency Preparedness, as well as a First Step Act of 2018 (FSA) implementation subject matter expert.  From the Federal Law Enforcement Training Center, we interviewed the Director of the BOP's Staff Training Academy.

## Document Review and Analysis

We reviewed FCI Waseca records related to facilities management, staffing levels, use of overtime and augmentation, use of restrictive housing, provision of inmate healthcare and programming, food service, inmate and staff misconduct, sexual misconduct reporting, and FSA implementation.

## External Subject Matter Experts Assisting the OIG

To assist the OIG in its efforts to assess the provision of healthcare to FCI Waseca inmates, the OIG employed the services of two contract healthcare subject matter experts:  one physician and one registered nurse.

# Appendix 2:  DOJ OIG Related Work

I.    For prior OIG reporting on the BOP's **infrastructure management challenges,** see DOJ OIG, *The Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions*, Audit Report 23-064 (May 2023) oig.justice.gov/reports/federal-bureau-prisons-efforts-maintain-and-construct-institutions.

II.   For prior OIG reporting on the BOP's **staffing challenges,** see DOJ OIG, *Department of Justice Top Management and Performance Challenges 2022*, oig.justice.gov/reports/top-management-and-performance-challenges-facing-department-justice-2022.

III.  For prior OIG reporting on the BOP's use of **overtime,** see DOJ OIG, *Management Advisory:  Analysis of the Federal Bureau of Prisons' Fiscal Year 2019 Overtime Hours and Costs*, Audit Report 21-011 (December 2020), oig.justice.gov/reports/management-advisory-analysis-federal-bureau-prisons-fiscal-year-2019-overtime-hours-and.

IV.   For prior OIG reporting on **contraband introduction** at BOP institutions, as well the insufficiency of BOP **security camera systems,** see DOJ OIG, *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts*, Evaluation and Inspections (E&I) Report 16-05 (June 2016), oig.justice.gov/reports/review-federal-bureau-prisons-contraband-interdiction-efforts.

V.    For additional prior OIG reporting on the insufficiency of BOP **security camera systems,** see DOJ OIG, *Management Advisory Memorandum:  Notification of Needed Upgrades to the Federal Bureau of Prisons' Security Camera System*, E&I Report 22-001 (October 2021), oig.justice.gov/reports/management-advisory-memorandum-notification-needed-upgrades-federal-bureau-prisons-security.

VI.   For prior OIG reporting on delays in the BOP's **staff discipline** process, see DOJ OIG, *Limited Scope Review of the Federal Bureau of Prisons' Efforts to Identify, Communicate, and Remedy Operational Issues*, E&I Report 23-065 (May 2023), oig.justice.gov/reports/limited-scope-review-federal-bureau-prisons-strategies-identify-communicate-and-remedy.

VII.  For prior OIG reporting on BOP **medical personnel staffing** challenges, see DOJ OIG, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, E&I Report 16-02 (March 2016), oig.justice.gov/reports/review-federal-bureau-prisons-medical-staffing-challenges.

VIII. The OIG has also posted on its website a compendium of non-investigative reports that highlight the reports listed above, as well as other DOJ OIG reports that detail the **BOP's longstanding challenges**.  See DOJ OIG, "Compendium of Non-Investigative Reports on the Federal Bureau of Prisons," February 16, 2022, oig.justice.gov/news/compendium-non-investigative-reports-federal-bureau-prisons.

# Appendix 3:  BOP Policies Cited

| Topic Discussed in Report | Relevant Program Statement | Link (If Public) |
|---|---|---|
| Facility Temperatures and Approvals for Repair Projects | 4200.12<br><br>**Facilities Operations Manual**<br><br>July 18, 2017 | www.bop.gov/policy/progstat/4200.12.pdf<br><br>(accessed May 8, 2023) |
| General Education Development (GED) | 5350.28<br><br>**Literacy Program (GED Standard)**<br><br>December 1, 2003 | www.bop.gov/policy/progstat/5350_028.pdf<br><br>(accessed May 8, 2023) |
| Mail Management | 5800.16<br><br>**Mail Management Manual**<br><br>April 5, 2011 | www.bop.gov/policy/progstat/5800_016.pdf<br><br>(accessed May 8, 2023) |
| Inmate Searches | 5521.06<br><br>**Searches of Housing Units, Inmates, and Inmate Work Areas**<br>June 4, 2015 | www.bop.gov/policy/progstat/5521_006.pdf<br><br>(accessed May 8, 2023) |
| Staff Searches | 3740.02<br><br>**Staff Entrance and Search Procedures**<br><br>March 28, 2016 | Not applicable.  The BOP does not make this policy publicly available. |
| Special Housing Unit | 5270.11<br><br>**Special Housing Units**<br>November 23, 2016 | www.bop.gov/policy/progstat/5270.11.pdf<br><br>(accessed May 8, 2023) |
| Sexual Abuse | 5324.12<br><br>**Sexually Abusive Behavior Prevention and Intervention Program**<br>June 4, 2015 | www.bop.gov/policy/progstat/5324_012.pdf<br><br>(accessed May 8, 2023) |

# Appendix 4:  The BOP's Response to the Draft Report



**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Office of the Director*                    *Washington, DC 20534*

May 3, 2023

MEMORANDUM FOR      RENÉ L. ROQUE
                    ASSISTANT INSPECTOR GENERAL
                    EVALUATIONS AND INSPECTIONS

FROM:               Colette S. Peters, Director

SUBJECT:            Response to the Office of Inspector General's (OIG) Draft Report:
                    Inspection of the Federal Bureau of Prisons' Federal Correctional
                    Institution Waseca, Assignment Number A-2023-002

The Bureau of Prisons (BOP) values the opportunity to formally respond to the Office of the Inspector General's (OIG) above-referenced draft report. As noted by OIG, this report documents its first unannounced inspection of a BOP facility under OIG's new on-site inspections program. BOP appreciates the clear communication and professionalism demonstrated by OIG's Evaluations and Inspections Division during both its fieldwork and the drafting of this report, particularly as this is a new area of oversight.

No recommendations were issued with this report and OIG indicates, "FCI Waseca is well-run staff and inmates reported feeling safe." However, BOP has also taken specific steps to address possible areas of concern such as relocating individuals from top bunks in basement housing to other areas of the institution. BOP remains committed to addressing any resolved recommendations from the related products referenced in Appendix 2 and we look forward to continuing our work with OIG on the new onsite inspections program.

# EXHIBIT G



 

**Play Live Radio**



DONATE

---

INVESTIGATIONS

# 1 in 4 inmate deaths happens in the same federal prison. Why?

SEPTEMBER 23, 2023 · 6:00 AM ET

HEARD ON ALL THINGS CONSIDERED

Meg Anderson

**14-Minute Listen**

PLAYLIST    Download

Transcript



A photo of Jeffrey Ramirez is seen at his parents' home in Vista, California. He was diagnosed with cancer while in prison and died at age 41.

*Ariana Drehsler for NPR*

Ever since his release from federal prison, Jeffrey Ramirez had been waiting to die.

He passed the time at his parents' home near San Diego, doting on his mom and watching movies with his teenage daughters. But his doctors had recently told him they'd run out of options for treating his cancer.

"I can go almost about any day. I can go tomorrow. I can go a week from now, a month from now. It's all on God," he told NPR. "I try not to think about it. It hurts."

He was focused on managing his pain — and his anger.

"I'm ticked off. I'm mad," he said. "There's a lot of emotions and there's, like, what-ifs."

---

Sponsor Message

What if, he wondered, he could have seen a doctor right away when he first felt an inkling that something was wrong, instead of waiting more than a year for prison officials to take him to one?

"I know myself. That's the first place I would go — I'd go to the doctor. This would not happen," he said. "I'm angry because it didn't have to get this far."

Eleven days after that interview this past January, Ramirez died at age 41.

NPR looked into the deaths of people like Ramirez, who died during or shortly after their time in federal prison. Records obtained from the Bureau of Prisons (BOP) show at least 4,950 people died in its custody over roughly the past decade. Although there are more than 120 federal prisons nationwide, a quarter of those deaths occurred in a single place: the Butner Federal Correctional Complex in Butner, North Carolina. Ramirez was there in the months before his release.

More deaths at Butner are to be expected. The complex includes a federal medical center (FMC), which is essentially a prison hospital. Inmates who need intensive medical care often end up at one of these hospitals, and FMC Butner is the bureau's largest cancer treatment facility. According to NPR's analysis, more people in BOP custody died of cancer than any other cause from 2009 to 2020.



Case 3:20-cr-00365-MMC Document 137-1 Filed 12/01/23 Page 381 of 428



The Butner Federal Correctional Complex in Butner, N.C., includes a federal medical center that has the Bureau of Prisons' largest cancer treatment facility.

*Cornell Watson for NPR*

But looking closer at the experiences of individual people, NPR found numerous accounts of inmates nationwide going without needed medical care. More than a dozen waited months or even years for treatment, including inmates with obviously concerning symptoms: unexplained bleeding, a suspicious lump, intense pain. Many suffered serious consequences. Some, like Ramirez, did not survive.

Too often, sources told NPR, federal prisons fail to treat serious illnesses fast enough. When an ailment like cancer is caught, the BOP often funnels these sick inmates to a place like Butner, where it is assumed they'll receive more specialized treatment. But by the time prisoners access more advanced care, it's sometimes too late to do much more than palliative care. What's more, current and former inmates and staff at Butner told NPR the prison has issues of its own, including delays in care and staffing shortages.

Sponsor Message



Slusbok

29+ Coolest Gi
Nobody Would
Think Of

The Bureau of Prisons claims to meet the same medical standards as any independent hospital, stating on its website that it is accredited by the nation's leading accreditation agency. But NPR found that, in fact, the BOP's certification lapsed two years ago.

Sources NPR interviewed say all this leads to a troubling conclusion: Federal inmates — a group with a constitutional right to health care yet without the autonomy to access it on their own — are dying more often than they should.

"Deaths in custody should be rare events, given that this is such a controlled environment," says Michele Deitch, director of the University of Texas at Austin's Prison and Jail Innovation Lab.

"Are there preventable deaths happening in the BOP? The answer to that is clearly yes."

The BOP declined NPR's request for an interview and declined to comment on individual cases, but it wrote in a statement that the bureau is "committed to providing safe, effective healthcare that is clinically appropriate" and that it "makes a proactive effort to screen and identify disease at its earliest stages."

## "What took them so long to get to us?"

In addition to gathering and analyzing data from the federal government, NPR reviewed court and medical records and interviewed inmates, lawyers, families and bureau employees while looking into the stories of patients in federal prisons. Ramirez was far from the only person NPR identified who didn't get timely medical care while in federal prison.

- Angela Beck, a 47-year-old at the time with a family history of breast cancer, discovered lumps in her left breast while in federal prison in Aliceville, Ala., and asked to see a doctor. After receiving imaging results "'highly suggestive' of cancer," according to an opinion issued by a federal judge, she waited more than eight months for a biopsy, which confirmed the cancer. Another two months passed before she got surgery, during which doctors confirmed the disease had spread to her lymph nodes. Beck then waited another five months before she saw an oncologist. By that time, it was too late to start chemotherapy or radiation. A federal judge granted her release in June 2019.

- Michael Derentz, a 70-year-old inmate at the Fort Dix federal prison in New Jersey, was granted compassionate release in 2022 after a federal

judge found the BOP's repeated delays in care "disturbing." "Delays in securing urgently needed follow-up appointments contributed to Derentz becoming blind in his left eye," the judge wrote.

- Joseph Guadagnoli died of cancer while in custody at the federal prison in McDowell County, W.Va., in July 2022, after complaining of a litany of ailments. By the time doctors diagnosed his cancer in May of that year, it was too late for treatment, his brother Michael Guadagnoli said. On Sept. 7, 2020, records show, Joseph wrote a sick call request to staff: "My conditions are getting worse. I need to be seen soon." On Oct. 10: "This is taking a psychological toll on me — what do I have to do to be seen — to get attention?" On Dec. 1: "I cannot breathe. ... I have been asking for seven months."

- In April 2020, Turhan Law began having nosebleeds several times a day at the federal prison in Loretto, Pennsylvania. According to a compassionate release motion filed by his lawyer, that bleeding continued for months before prison officials took him to a hospital. In the summer of 2020, a biopsy confirmed squamous cell carcinoma, a type of cancer. But by the time Law arrived at Butner in November of that year, no treatment plan had been started, according to a supplemental motion filed in support of Law's release request. In December 2020, a month after the BOP sent Law to Butner, a federal judge granted his request for release, citing in part the delays in care Law experienced.

- Michael Boughner, a federal prisoner at the U.S. penitentiary in Florence, Colo., complained of horrible headaches for at least five weeks before he saw a doctor, his mother, Linda Renta, said. "He fainted four or five times, and the guards were convinced he was faking it," Renta said. "They found that he had a tumor in his brain the size of an egg." The BOP sent Boughner to Butner, where he lived for about five months before, prison records show, he died of cancer at age 50 in March 2019.

Like Ramirez, Boughner and Law were transferred to Butner for cancer treatment. A current medical staff member at Butner who requested that her name not be used for fear of retaliation said she has heard stories like theirs "so many times."

"So many inmates have told me, 'I complained about this lump, or I complained about this pain for so long, and they only gave me cream, they only gave me Motrin, they never sent me out for tests or anything. Now they send me here and I have Stage 3 or Stage 4 cancer,'" she said. "Our question is always: What took them so long to get to us, and why did they send them to us when there's nothing that we can do?"

The staff member told NPR that she has seen many patients for whom nothing could be offered beyond palliative care. "What is shocking and frustrating is when a patient has an issue where death could have been prevented had they received the medical care in a timely manner," she added.



What type of punishment are we really wanting to dole out on people? Because none of these people had death sentences.

Elizabeth Blackwood, National Association of Criminal Defense Lawyers

Art Beeler, a former Butner warden, said it was hard for him and his staff to see inmates arrive at the prison with late-stage cancer.

"It did not happen every day or even every week, but there were cases we received late, and every one of them were frustrating," Beeler told NPR. "If we received someone who had Stage 4 prostate cancer, who showed indicators early on in the process, we were very frustrated. ... We knew more than likely the patient would live if they had received treatment early on."

Elizabeth Blackwood, counsel and director for the First Step Act Resource Center at the National Association of Criminal Defense Lawyers, says whether a person in custody can get the medical care they need should be considered at sentencing, before they ever set foot in a prison.

"What type of punishment are we really wanting to dole out on people? Because none of these people had death sentences," she said. "None of these people were sentenced to excruciating pain and torture while they aren't getting the medical treatment and not getting relief from their painful cancer, but yet that's being inflicted on them every day on a regular basis."

## "It just fell through the cracks"

Jeffrey Ramirez estimated he first felt the smallest trace of a lump in his left testicle in the summer of 2020.

"I remember when I was younger, I was told once you get to a certain age, you should check yourself. And so that's exactly what I did," Ramirez said. He was 39 at the time and had been sentenced to 10 years in prison in January of that year for intent to distribute methamphetamine and a related weapons charge.





Margarita Ramirez holds a photo of her son, Jeffrey Ramirez. It took over a year for Jeffrey to see a specialist after he first asked for medical attention.

*Ariana Drehsler for NPR*

The lump was about the size of a BB, not even a quarter of an inch in diameter, he said.

"I put in a medical slip, and they didn't really pay much attention," he said. "I didn't really push it because I didn't think it was anything serious."

By early 2021, he had been transferred to the federal prison in Phoenix to serve out his time. At that point, his testicle had grown considerably. He filled out an "Inmate Request to Staff" form, sometimes called a cop-out.

"I've been putting in multiple cop-outs about my medical problem and I haven't been seen," Ramirez wrote to the prison's health services staff on Jan. 19, 2021. "My left testicle is becoming unbearable. I need help, please help me."

"I need help please help me" (p. 1)



When a medical staff member saw him a week later, the staff member noted a possible hernia and ordered an ultrasound. On Feb. 2, he was seen again. This time, a nurse practitioner ruled out a hernia but observed that the left testicle was "much larger" than the right one and firm to the touch, according to prison medical records obtained by NPR. The nurse practitioner scheduled an ultrasound for about two weeks later and listed the priority as "urgent."

But nearly four months went by — and no ultrasound. On May 23, Ramirez wrote to staff again: "I'm requesting medical attention for my left testicle. This has been an ongoing issue and haven't received any further medical attention. My testicle has grown more in size and I have pain shooting through my testicle to the left side of my stomach and even my lower left back."

Two days later, a nurse wrote back: "You have an ultrasound pending."

**"You have an ultrasound pending."** (p. 1)

SUBJECT: (Briefly state your question or concern and the solu
Continue on back, if necessary. Your failure to be specific
taken. If necessary, you will be interviewed in order to suc
request.

IM REQUESTING MEDICAL ATTEN
LEFT TESTICAL. THIS HAS BEEN AN o
AND HAVENT RECIEVED ANY FURTHE

Ramirez wrote again about a week later and was told again that an ultrasound was being scheduled and to take ibuprofen and Tylenol. All of June went by. Then all of July. He was seen on Aug. 3, and another ultrasound, labeled again as urgent, was scheduled, this time for September. But that ultrasound never came either.

"It was like getting kicked in the groin that whole time. I got to the point where it was really uncomfortable. I couldn't even sit down," Ramirez told NPR. "When I asked the assistant warden, she told me to 'trust the process.'"

By the time Ramirez saw a specialist out in the community, it was January 2022 — more than a year after he first started complaining.

"While I was there, they did the ultrasound and whatnot, and they're like, 'OK, you can go,'" Ramirez recalled. "So I'm on the way out and all of a sudden I see

11/27/23, 2:16 PM
Case 3:20-cr-00365-MMC    Document 137    Filed 12/01/23    Page 389 of 428
Federal prison deaths with medical neglect: Inside a Butner, N.C. medical center | NPR

three nurses running out towards us like, 'Uh, you're not going anywhere. You need to be admitted.' And that's when I found out that I had cancer."

Doctors diagnosed him with Stage 3C testicular cancer, the final stage of the disease. By then, it had spread to his brain and lungs.

Two months later, in March 2022, Ramirez started a first round of chemotherapy and had surgery to remove his left testicle. About two weeks after that, prison officials transferred him to Butner.



When I asked the assistant warden, she told me to 'trust the process.'

Jeffrey Ramirez, a former federal inmate who died of cancer shortly after being granted compassionate release

Early detection is especially important in treating testicular cancer. If the disease is caught early, the cure rate is as high as 98%. But a delay in diagnosis of more than six months is an independent predictor of a lower chance of survival, says Dr. David Vaughn, a genitourinary oncology professor at the University of Pennsylvania.

Vaughn did not treat or diagnose Ramirez, but he stressed that any patient with a firm, enlarged testicle — like what Ramirez had — should get an ultrasound as soon as possible.

"Honestly, if someone comes into our emergency room with this complaint, they get an ultrasound while they're in the emergency room. If someone's going to see their primary care doctor, one would expect that the ultrasound would be done within a few days," Vaughn said. "That's the standard. That's what happens every day in America."

Yet that's not even close to what Ramirez experienced.

"It just fell through the cracks," says Zandra Lopez, a federal public defender who represented Ramirez. "Jeff's case was obvious, but we've seen it in a lot of our cases. It seems to be something systemic that's happening in all of the BOP prisons."



Margarita Ramirez stands in front of an altar for Jeffrey at her home.
*Ariana Drehsler for NPR*

"When our clients are requesting help, the internal medical staff recognize that these people need to go out to a specialist," she added. "But it goes in this hole. And I don't understand why they're not being seen. And by the time they do, it's oftentimes too late."

There's evidence to back that up. Several studies suggest the risk of dying from cancer may be higher behind bars and in the time shortly after inmates are released.

## "I don't want to be one of those statistics"

When Bernie Madoff, who orchestrated the largest Ponzi scheme in U.S. history, was sent to Butner in 2009, a prominent criminal defense attorney said Madoff "hit the inmate lottery" by landing in what he called the "crown jewel" of the federal prison system. But the stories of patients at Butner suggest inmates don't always receive the better care that might have been expected there.

11/27/23, 2:16 PM
Case 3:20-cr-00365-MMC Document 137 Filed 12/01/23 Page 391 of 428
Deaths of sick inmates at low-security federal medical center spur questions : NPR

In January 2009, doctors at Butner noted a lesion on inmate Greg Baker's penis during a surgery for a narrowing of his urethra. At the time, a pathology report indicated the lesion's cells were abnormal and should be watched. During the next few months, doctors evaluated Baker frequently, but the lesion wasn't biopsied until July, when he was diagnosed with a rare form of cancer. In September, doctors partly removed Baker's penis. He sued the BOP after his release, but a federal judge ruled in the government's favor, saying Baker had not shown that the outcome would have been any different had he gotten care earlier.

"Greg went into prison a healthy man," Jay Hurst, Baker's trial lawyer, said. "He came out unable to work. A complete disabled person."

Butner inmates sometimes receive medical care at hospitals out in the community, like the nearby Duke University Medical Center. In July 2013, a doctor at Duke "strongly recommended" that Butner inmate Michael Krembel have surgery to treat his squamous cell carcinoma "as soon as possible," according to medical records filed as exhibits in court. But that didn't happen, and by December of that year, the surgery was no longer feasible.

"That delay, in my opinion, was critical, not up to any standard of care under the circumstances, and certainly not in the best interests of the patient," John Carr, a dermatologist who worked at Duke, wrote in a consultant report filed in court. "Because of the delay, the medical records reflect that Krembel has had to undergo more extensive, dangerous, life-threatening, painful and disfiguring series of procedures than otherwise would have been necessary."

Krembel later filed a lawsuit but died while appealing the case. The appeal was dismissed in 2020.





The entrance of the federal medical center at the Butner Federal Correctional Complex.
*Cornell Watson for NPR*

In May 2017, Tamarquis Ashanti Phillips, 38, died after being transferred from a jail in Mecklenburg County, N.C., to Butner. Phillips took three anti-epileptic medications twice daily. According to a lawsuit filed by his family, he had not experienced a seizure in more than a year at the time of his incarceration. Phillips arrived at Butner on May 16 of that year.

Although the lawsuit states he requested his medications multiple times, Phillips' prison medical record showed no indication that he received any

medications while at Butner.

On May 20, four days after he arrived, he was discovered "face down, unresponsive, pulseless, and cold, with locked muscles and blood on his pillow," the lawsuit says. Prison records obtained by NPR list his cause of death as epilepsy. Though the government has denied any wrongdoing, the lawsuit was settled this year, according to the family's lawyers.

Frank Carr, an inmate at Butner, waited almost two years for a heart surgery to repair a narrow aortic valve, which prosecutors acknowledged he needed at his sentencing in December 2020. Though Carr refused the surgery at least twice while in custody, records obtained by NPR show he emailed prison staff in August 2021 to let them know he wanted the procedure done.

"The last visit we had in July you told me to let you know when I'm ready to have the surgery," Carr wrote in all caps on Aug. 14, 2021. "I'm officially notifying you to let you know I'm ready to have the surgery because I don't want to die in prison."

More than a year later, he still had not had the surgery. In a September 2022 memorandum to the court, Carr's lawyer, Trent LaLima, calculated how long Carr had been waiting.

"It has been 639 days since this court's recommendation to the Bureau of Prisons that Mr. Carr receive surgery as soon as possible. It has been 582 days since Mr. Carr's first motion for compassionate release on this basis. 474 days since he experienced a heart attack," LaLima wrote. "In all that time no surgery has occurred."

Around the same time, Carr told NPR he worried he might die waiting for the surgery.

"I see so many people die in here. I witnessed people die. I witnessed it. And I don't want to be one of those statistics," he said during a phone call from prison. "I should still get the fair medical standard of anybody that's not incarcerated. I'm a father. I'm a brother. I'm a son. And this could be your family member. This could be your son, your father, your husband in here."

11/27/23, 2:16 PM
Case 3:20-cr-00365-MMC Document 137 Filed 12/01/23 Page 394 of 428
Federal prison deaths: Butner medical center sick inmates : NPR

Carr got his long-awaited surgery in November 2022 and has since been transferred to the Fort Dix federal prison in New Jersey.

## "Death is becoming the price paid"

In March 2022, the Department of Justice's Office of the Inspector General audited the BOP's contract with the University of Massachusetts Chan Medical School, which provides some of the medical services at Butner. The report found the BOP "did not have a reliable, consistent process in place to evaluate timeliness or quality of inmate healthcare."

The report also noted "challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointments that could delay an inmate's healthcare." UMass officials told auditors that their staff spent a "significant amount of time" canceling and rescheduling inmate appointments, according to the report.

"We believe it is difficult for the BOP to determine whether inmates are receiving care within the required community standard," the report noted.

A UMass Chan Medical School spokesperson declined NPR's request for an interview. "We defer to BOP," the spokesperson said, noting that the clinical director at Butner has medical control and is a federal employee. The university does not determine what care is provided, and delays in care due to Butner's staffing were outside its scope, the spokesperson added.

Delshon Harding, president of the AFGE-CPL 33 Local 408 union and a correctional officer at Butner, said he believes staff shortages are the primary

reason inmates go without essential care.



Delshon Harding is a correctional officer at the Butner Federal Correctional Complex and is president of the AFGE-CPL 33 Local 408 union. He believes staff shortages are the primary reason inmates go without essential care at Butner.

*Cornell Watson for NPR*

"With the cuts to the staffing, we can't provide the security that is needed, we can't provide the medical treatment that is needed and the safety that's needed to fulfill the mission," Harding said.

In fact, union officials told NPR that out of roughly 200 nurse and paramedic positions listed for the prison complex, more than 20% are currently vacant, a fact the bureau confirmed to NPR.

Harding said the medical center used to have five nurses on each unit, for instance. Now, it has only three nurses on each, and in the past, it has been as low as two.

"You're talking about anywhere up to 30 inmate-patients being required to be assessed and properly receive adequate medical care from two nurses," Harding said. "We have a lot of concerns and complaints from the nurses about being burned out."

When medical emergencies happen at night, the potential outcome can be deadly. Danielle Garner, vice president of the union and a correctional officer at Butner, told NPR that while Butner's federal medical center does have

Many federal prisoners with urgent medical needs aren't getting timely care. Some have died. : NPR

medical coverage on-site from 9 p.m. until 5 a.m., the other three prisons and prison camp within the Butner Federal Correctional Complex do not.

That's allowed under BOP policy, as long as a plan for emergency transportation to another facility is in place and staff certified in CPR are available. But Garner alerted NPR to two deaths last fall. Both occurred at night, when medical care was not immediately available.

"Staffing shortages and unsafe practices can no longer be accepted nor excused. Death is becoming the price paid for doing more with less at FCC Butner," Garner wrote in a letter to the bureau's mid-Atlantic regional director.

In October 2022, an inmate fell and bumped his head during the night, according to Garner's letter. "Immediate patient care was not available. The inmate was later taken to the outside hospital and the inmate passed away," Garner wrote, referring to a non-prison hospital out in the surrounding community.



Danielle Garner is a correctional officer at the Butner Federal Correctional Complex and is vice president of the AFGE-CPL 33 Local 408 union. "Staffing shortages and unsafe practices can no longer be accepted nor excused.

Many federal inmates with low medical care die the same preventable deaths : NPR

Death is becoming the price paid for doing more with less at FCC Butner," Garner wrote in a letter to the Bureau of Prisons' mid-Atlantic regional director.

*Cornell Watson for NPR*

Then, in November, another inmate was unable to get timely medical care during the night after staff had to escort a different inmate to the hospital. The inmate who did not get immediate care later died, according to the letter.

"The quality of care proves to be deadly," Garner wrote. "It is reasonable to believe that some of these medical complaints/conditions could have been prevented resulting in life being saved if adequate medical staff was available."

In a statement, a bureau spokesperson said that the BOP has issued guidance to all employees detailing specific procedures for after-hours emergencies and that all employees are trained in responding to emergencies.

"The U.S. is experiencing a national shortage of healthcare providers, exacerbated by the exhaustion and burnout attributed to the COVID-19 pandemic. The [BOP] is not immune to these trends and is working diligently on recruitment and retention efforts to ensure that facilities are appropriately staffed," the spokesperson wrote.

### "All of that creates this predictable outcome"

Across the federal prison system, staffing shortages have been documented for decades.

Nearly 30 years ago, in 1994, a report from the Government Accountability Office determined that inmates with special needs — including women, psychiatric patients and patients with chronic illnesses — were not receiving needed medical services due to staffing shortages. The report focused in part on Butner.

More than 20 years ago, in 2000, the Government Accountability Office documented increasing numbers of chronically ill inmates being sent to medical referral centers like the FMCs because they couldn't be treated appropriately at their own prison.

"For these inmates, the medical referral center is the end of the line," the report said. "This means that fewer and fewer hospital beds are turning over. It also means that new patients from standard prisons may have to wait for the next available medical referral center hospital bed to be freed up."

In 2015, the Justice Department's Office of the Inspector General (OIG) found that "limited institution staff and inadequate staff training" affected the prison system's ability to care for inmates, especially as they age. At one prison, the OIG found that inmates had to wait, on average, nearly four months to see a specialist for cardiology, urology, neurosurgery and pulmonology.

In 2016, the Justice Department's OIG reported that medical staff positions throughout the system were only 83% filled, even though BOP policy says the vacancy rate shouldn't be more than 10% during an 18-month time frame. The report found that 3 out of every 4 federal prisons had a vacancy rate higher than that.

And according to a report this month from the Pandemic Response Accountability Committee, more than two-thirds of BOP facilities experienced a nursing shortage during the COVID-19 pandemic.

Todd Bussert, a federal criminal defense lawyer who has worked on prison issues for two decades, says that staffing matters because an inmate who needs to be seen by a provider or specialist out in the surrounding community, for example, requires more resources.

"What that entails is putting the prisoner in a transport vehicle, taking them into the community, bringing them into a hospital, with staff going along and being pulled away from their other responsibilities," Bussert said. "So that is generally a pretty heavy lift just to get that level of attention."

This means that when inmates have potentially long-lasting, serious and complex conditions, prisons may opt to transfer them to higher-level care facilities within the federal prison system, rather than continuously taking them out into the community, Bussert said.

"The institution's not going to say, 'Let's start you on a course of care with a local oncologist or go to the hospital here,' because the costs will be astronomical for them. They'll say, 'Let's send you to our facility that focuses on that,' which would be Butner," he said.

Lack of staffing can also have a direct impact on the quality of care itself. Finding cancer early or keeping a chronic health problem from becoming severe requires regular contact between patients and health providers, says Homer Venters, a physician who works as a court-appointed monitor of health care in jails and prisons.

"Without enough staff to do that, it's absolutely inevitable that people's symptoms will worsen, their illness will worsen," Venters says. "All of that creates this predictable outcome. People then come to the attention of health staff much closer to death, much more into an acute emergency than what needed to have happened."

**"We can't answer fundamental questions"**

On the face of it, the question of why so many people die at Butner seems simple to answer: The sickest of the sick get sent there, and those are the people more likely to die in the first place. The challenge, according to Venters, is determining which deaths are "jail attributable."

Venters, who was the chief medical officer of New York City's jails, says after a death in custody, prison officials should ask two questions: Did the inmate

receive the appropriate standard of care, and did anything happen behind bars that significantly contributed to the death?

"That is something that should happen. It would happen if you were in a nursing home and died. It would happen if you're at a hospital," Venters says. But it is something, he added, that the BOP does not consistently do.

"And they're not alone," he said. "Most prisons and jails want nothing to do with that kind of accountability."

Because the federal prison system is not under the oversight of health authorities like the Department of Health and Human Services or the Centers for Disease Control and Prevention, Venters says the bureau sometimes comes up with "soft and exculpatory" reviews when an inmate dies.



Why do we have one of the nation's biggest health services not really being overseen by anybody outside of them?

Homer Venters, physician who works as a court-appointed monitor of health care in jails and prisons

NPR requested the mortality reviews of each person who died in the BOP's custody since 2009 but has yet to receive them from the bureau.

"My question is: Why do we have one of the nation's biggest health services not really being overseen by anybody outside of them?" Venters added.

Despite being the largest incarcerator in the world, the U.S. has very little independent oversight of its state and federal prison systems, says Deitch, of the University of Texas at Austin's Prison and Jail Innovation Lab.

"There are so many things that we don't know about our prisons, things that you would just assume we would know," she said. "How dangerous are they? How much violence is there? How well does the health care system work? We can't answer fundamental questions."

On a federal level, the courts, the Justice Department's OIG and the Government Accountability Office each provide a mechanism for accountability, but they're more reactive than proactive, says Deitch. In Congress, Sen. Jon Ossoff, D-Ga., along with Sen. Dick Durbin, D-Ill., and Sen. Mike Braun, R-Ind., introduced a bill last fall called the Federal Prison Oversight Act, which would require the OIG to conduct inspections of prisons and establish an ombudsman in the Justice Department.



Sen. Jon Ossoff, D-Ga., (left); Sen. Dick Durbin, D-Ill.; and Sen. Mike Braun, R-Ind., introduced the Federal Prison Oversight Act, which would require the Justice Department's Office of the Inspector General to conduct inspections of prisons and establish an ombudsman in the department.

*Kevin Dietsch/Erin Scott/pool and Anna Moneymaker/Getty Images*

Another potential layer of oversight could be accreditation. The bureau's federal medical centers used to be accredited by the Joint Commission, which accredits 80% of U.S. hospitals.

At the time of this story's publication, the BOP still publicly lists the Joint Commission on its website as the accrediting agent for its FMCs, but they are no longer accredited by the Joint Commission. The commission told NPR that

the bureau's accreditation with it expired two years ago, in September 2021. When NPR reached out to the BOP with this information, the bureau responded that it is soliciting new accreditors and that the FMCs are continuing to observe commission standards.

"No healthcare system is perfect, but the BOP makes a concerted effort to identify trends and improve operations based on changes in community practice and lessons learned from previous experience," a bureau spokesperson told NPR. "Our commitment remains to provide quality medical care and a safe environment to all individuals in our care and custody."

When any facility in the community is no longer accredited, it has "real consequences," says Dr. Jody Rich, a professor of medicine and epidemiology at Brown University. But, he added, because of the lack of oversight at federal prison facilities, it's difficult to assess the significance of the bureau discontinuing its Joint Commission accreditation.

"Nobody can tell you if it matters," Rich said.

Rich said the quality of health care varies widely from prison to prison.

"There are some really outstanding physicians, nurse practitioners, nurses and technicians that really care and really work very hard," Rich said. "But at the same time, is correctional health care good or bad? I have no idea. Nobody has any idea. Because there's no oversight."

## "He just wanted to be with his family"

Once the BOP sent Jeffrey Ramirez to Butner, he continued cancer treatment there.

"Jeff told me it was really tough and he just wanted to be with his family. He knew he was going to die," Zandra Lopez, the lawyer who represented him, said.

Lopez prepared his motion for compassionate release.





Teodoro Ramirez stands behind his wife, Margarita Ramirez, and their granddaughters, Yelena (center) and Evette Ramirez.

*Ariana Drehsler for NPR*

"The medical records were just crying out that this man had been suffering for so long and that he needed to go home," she said. "We filed it, and it was granted within a matter of days."

His family waited for him at the airport in San Diego in August 2022.

"When he came out, it hit me that this is reality," Evette Ramirez, his 20-year-old daughter, said. "But he came to us with the biggest smile on his face. And he just embraced all of us, and it was the best feeling."

Ramirez spent much of his final months with Evette and his 18-year-old daughter, Yelena Ramirez, who were also living at his parents' house in Vista, California. They'd go to the beach or the 7-Eleven down the street. They had movie nights and saw the latest Avatar movie.

"Little things like that, because he didn't have energy to be going to places and walking around," Evette said. "We still made the most of it."

Evette was with her father when he died on Jan. 16, 2023.

"It was 6:43 a.m., and I was right there," she said. "That's what gives me the most peace — that I was there, holding his hand in the hospital room."



A painting of Teodoro and Margarita Ramirez hangs on their wall along with photos of their son, Jeffrey Ramirez.

*Ariana Drehsler for NPR*

In the days after Ramirez's death, his daughters and parents, Teodoro and Margarita Ramirez, put up an altar for him in their living room. People left flowers, and Evette would sometimes come there to talk to him.

But she says it didn't have to be that way: "I definitely think if he had gotten medical attention when he asked for it, I probably would have gotten to spend more time with my dad."

11/27/23, 2:16 PM
Case 3:20-cr-00365-MMC Document 137-1 Filed 12/01/23 Page 404 of 428
Many federal inmates with Covid medical issues die at some prison, feds. NPR

*Editor's note:* Some of Jeffrey Ramirez's and Joseph Guadagnoli's written accounts contain minor grammatical errors, which NPR corrected for clarity.

*This story was edited by Robert Little and copy edited by Preeti Aroon. It was produced for radio by Graham Smith. Barbara Van Woerkom and Tirzah Christopher contributed research, and Nick McMillan provided data analysis. Photo editing by Emily Bogle.*

federal bureau of prisons

## Broadcast Your Support this Giving Season

This week, give thanks to the independent journalism you love and rely on. Your donation fuels in-depth, meaningful stories for your community, your nation, your world. Donate today to voice your support ahead of Giving Tuesday. Every dollar makes a difference. Can you help?

♥ YES, I'LL DONATE

**More Stories From NPR**

11/27/23, 2:16 PM
Case 3:20-cr-00365-MMC Document 137-1 Filed 12/01/23 Page 405 of 428
Many federal inmates with low medical care died. Here I reveal some danger. NPR



INVESTIGATIONS

**Only 51 of these U.S. whales remain. Little has been done to prevent their extinction**



INVESTIGATIONS

**Senators to VA: Stop needless foreclosures on thousands of veterans**

11/27/23, 2:16 PM
Case 3:20-cr-00365-MMC Document 137-1 Filed 12/01/23 Page 406 of 428
Many federal inmates with low medical care died after some got worse : NPR



INVESTIGATIONS

**Will the VA stop thousands of veterans from losing their homes?**



INVESTIGATIONS

**These kids used to get the bill for their own foster care. Now that's changing**

11/27/23, 2:16 PM
Many federal inmates in Butner medical facility are dying. Some never got better : NPR
Case 3:20-cr-00365-MMC   Document 137-1   Filed 12/01/23   Page 407 of 428



INVESTIGATIONS

**For election workers, Trump's lies have meant threats, harassment and a poisoned dog**



INVESTIGATIONS

**Coastal biomedical labs are bleeding more horseshoe crabs with little accountability**

11/27/23, 2:16 PM
Case 3:20-cr-00365-MMC Document 137-1 Filed 12/01/23 Page 408 of 428
Many federal inmates with poor medical care in real some hope or NPR

## Popular on NPR.org



MIDDLE EAST
### More captives are freed as Israel and Hamas agree to extend their truce in Gaza



STRANGE NEWS

**Rat plague hits an Australian coastal town, and thousands more wash up on shore**



NATIONAL

**U.S. airlines lose 2 million suitcases a year. Where do they all go?**



MIDDLE EAST

11/27/23, 2:16 PM
Case 3:20-cr-00365-MMC Document 137-1 Filed 12/01/23 Page 410 of 428
Many federal inmates with poor medical care die alone, their families feel, some say : NPR

**Civilian deaths are being dismissed as 'crisis actors' in Gaza and Israel**



HEALTH

**'Today, your son is my son': A doctor's words offer comfort before surgery**



NATIONAL

**Millions of U.S. apples were almost left to rot. Now, they'll go to hungry families**


## NPR Editors' Picks



11/27/23, 2:16 PM
Case 3:20-cr-00365-MMC Document 137-1 Filed 12/01/23 Page 412 of 428
Many federal inmates with low medical care die at some federal med... : NPR

WORLD

**Mother of Palestinian student shot in Vermont thought he would be safer in U.S.**



GLOBAL HEALTH

**New Zealand's new government plans to roll back cigarette ban as it funds tax cuts**



TELEVISION

**'Squid Game: The Challenge' players say they suffered injuries while filming**



ART & DESIGN

**Tatreez is a testament to the resilience and creativity of Palestinian women**



MUSIC

**Tomorrow X Together: Tiny Desk Concert**

11/27/23, 2:16 PM
Case 3:20-cr-00365-MMC Document 137-1 Filed 12/01/23 Page 414 of 428
Many federal inmates with LGBT medical needs die in Butner's medical center | NPR



CULTURE
**A musical parody of 'Saw' teases out the queer love story from a cult horror hit**

| | |
|---|---|
| **READ & LISTEN** | **CONNECT** |
| **Home** | **Newsletters** |
| **News** | **Facebook** |
| **Culture** | **Instagram** |
| **Music** | **Press** |
| **Podcasts & Shows** | **Public Editor** |
| | **Corrections** |
| | **Contact & Help** |
| **ABOUT NPR** | **GET INVOLVED** |
| **Overview** | **Support Public Radio** |
| **Diversity** | **Sponsor NPR** |
| **NPR Network** | **NPR Careers** |

**Accessibility**

**Ethics**

**Finances**

**NPR Shop**

**NPR Events**

**NPR Extra**

---

terms of use

privacy

your privacy choices

text only

© 2023 npr

EXHIBIT H



**Sign in**

## Physician (Psychiatric Physician)
**Justice, Bureau of Prisons/Federal Prison System**
Anywhere in the U.S. (remote job)
Starting at $115,587 Per Year (GP 15)

This job is open to: 

🕐 *Open 11/17/2023 to 11/27/2023*

## Contract Specialist (Contracting Officer)
**Justice, Bureau of Prisons/Federal Prison System**
Anywhere in the U.S. (remote job)
Starting at $69,107 Per Year (GS 11-12)

This job is open to:  

🕐 *Open 11/20/2023 to 12/12/2023*

## DOJ Pathways Recent Graduate Program - Bureau of Prisons (Psychology Postdoctoral Trainee)
**Justice, Bureau of Prisons/Federal Prison System**
Multiple Locations
Starting at $69,107 Per Year (GS 11)

This job is open to:   

🕐 *Open 11/27/2023 to 12/04/2023*

## Supervisory Correctional Officer (Lieutenant GL-09)
**Justice, Bureau of Prisons/Federal Prison System**
Prisons - Nationwide,
Starting at $59,021 Per Year (GL 09)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

 Filter    3     Sort     Save

Prisons - Nationwide,

Starting at $59,021 Per Year (GS 09-11)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

## Supervisory Correctional Officer (Lieutenant GS-11)

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $69,107 Per Year (GS 11)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

## Supervisory Correctional Officer (Captain GS-11)

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $69,107 Per Year (GS 11)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

## Supervisory Correctional Officer (Captain GS-12)

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $82,830 Per Year (GS 12)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

## Supervisory Correctional Officer (Captain GS-13)

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $98,496 Per Year (GS 13)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

 **3**
Filter


Sort


Save

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $46,495 Per Year (GL 05)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

## Correctional Officer (Senior Officer Specialist GL-06)

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $49,023 Per Year (GL 06)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

## Correctional Officer (Senior Officer Specialist GL-07)

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $52,921 Per Year (GL 07)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

## Correctional Officer (Senior Officer Specialist GL-08)

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $55,162 Per Year (GL 08)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

## Correctional Officer

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $46,495 Per Year (GL 05-08)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

 
Filter

Sort 

Save 

### Clinical Psychologist (Staff Psychologist)
**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $69,107 Per Year (GS 11-12)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

---

### Dentist (Dental Officer)
**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $115,587 Per Year (GP 13)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

---

### Nurse (Registered Nurse)
**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $46,495 Per Year (GL 05-10)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

---

### Advance Practice Nurse (Mid-Level Practitioner)
**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $59,021 Per Year (GS 09-11)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

---

### Physician (Psychiatric Physician)
**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $115,587 Per Year (GP 13-15)

This job is open to:  


Filter

3


Sort


Save

### Physician (Medical Officer)

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $115,587 Per Year (GP 14-15)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

---

### Physician (Clinical Director)

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $115,587 Per Year (GP 15)

This job is open to: 

🕐 *Open 10/01/2023 to 09/30/2024*

---

### Physician Assistant (Mid-Level Practitioner)

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $52,921 Per Year (GS 07-11)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

---

### Correctional Officer

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $55,162 Per Year (GL 08)

This job is open to:  

🕐 *Open 10/01/2023 to 09/30/2024*

---

### Chaplain

**Justice, Bureau of Prisons/Federal Prison System**

Prisons - Nationwide,

Starting at $82,830 Per Year (GS 12)


Filter

 3


Sort


Save

Open 10/01/2023 to 09/30/2024

**Nursing Assistant**

**Justice, Bureau of Prisons/Federal Prison System**

Springfield, Missouri

Starting at $46,495 Per Year (GL 05)

This job is open to: 👥

Open 11/16/2023 to 12/01/2023

Next ›

**Filters 26 jobs found**    ✕

👤 **Sign in** to use your profile.

**Hiring path**    —

Select all                                           ❓ Help

☐ 👥 Open to the public (14)

**Federal employees** (26)

☐ 🏛 Excepted service (2)

☐ ◎ Internal to an agency (12)

☐ ⇄ Career transition (CTAP, ICTAP, RPL) (12)

**Armed forces** (11)

☐ 🛡 Veterans (11)

**Students & recent graduates** (1)

☐ 🎓 Recent graduates (1)

Show options with 0 jobs

| Filter | 3 | ↕ Sort | 🔖 Save |

| Pay | + |
|---|---|

| Department & Agency | + |
|---|---|

| Series | + |
|---|---|

| Location | + |
|---|---|

| Remote jobs | + |
|---|---|

| Work schedule | − |
|---|---|

Select all                                          ? Help

☐ Full-time (26)

Show options with 0 jobs

| Appointment type | − |
|---|---|

Select all                                          ? Help

**Permanent** (25)
☐ Permanent (25)

**Student** (1)
☐ Recent graduates (1)

Show options with 0 jobs

| Security clearance | − |
|---|---|

Select all                                          ? Help

☐ Other (26)

Show options with 0 jobs

| Position sensitivity and risk | − |
|---|---|

                                                    ? Help

| ⚙ Filter ③ | ⇅ Sort | 🔖 Save |
|---|---|---|

## Travel percentage                                                            —

Select all                                                              ? Help

☐ Not required (1)

☐ Occasional travel (25)

Show options with 0 jobs

## Mission-critical career field                                               —

                                                                                ? Help

Show options with 0 jobs

✕ Remove all filters

Return to top

⌄ **Account**

Home

Profile

Documents

Saved jobs

Saved searches

⌄ **Help**

Help center

About USAJOBS

FAQs

Contact us

Get started

| ⚙ Filter ③ | ⇅ Sort | 🔖 Save |

Working in government



USAJOBS is a United States Office of Personnel Management website.

Terms and Conditions

Budget and Performance

FOIA

Inspector General

No Fear Act Data

Privacy Policy

USA.gov

Filter

3

Sort

Save

# EXHIBIT I



**U.S. Department of Justice**
Federal Bureau of Prisons

U.S. Medical Center for Federal Prisoners
1900 W. Sunshine Street

*Office of the Warden*
Springfield, Missouri 65807

May 10, 2023

Wallach, Lewis
Reg. No. 79042-509

RE:     Request for Reduction in Sentence

Dear Mr. Wallach,

You requested a reduction in sentence (RIS) based on your medical condition. This letter is to advise you that your request was reviewed considering all factors listed in Section 7 of Program Statement 5050.50.

After careful review of your case, your request has been denied because you do not meet the medical criteria. While you have chronic medical issues, you do not have a debilitating medical condition that leaves you disabled or capable of only limited self-care. Medical records indicate you are primarily able to care for yourself and need minimal assistance with your activities of daily living. You can use a wheelchair and have shown some points of recovery. Accordingly, you are not appropriate for RIS at this time.

If you are not satisfied with this decision, you may exercise your appeal rights through the Administrative Remedy Procedure by contacting your unit counselor.

Sincerely,

E. Williams
Warden