1  Edward Swanson (SBN 159859)
   ed@smllp.law
2  Carly Bittman (SBN 305513)
   carly@smllp.law
3  SWANSON & McNAMARA LLP
   300 Montgomery Street, Suite 1100
4  San Francisco, California 94101
   Telephone: (415) 477-3800
5  Facsimile: (415) 477-9010

6  Attorneys for Defendant Lewis Wallach

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 20-CR-00365-MMC |
| Plaintiff, | **DECLARATION OF CAROLE SANTOS IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE** |
| v. | |
| LEWIS WALLACH, | |
| Defendant | |

I, Carole Santos, declare as follows:

1. I am a licensed Registered Nurse in California. I specialize in acute care, medical-surgical, and telemetry nursing. I hold a master's degree in nursing. My professional credentials include Registered Nurse, Public Health Nurse, Clinical Nurse Leader, and Certified Medical-Surgical Registered Nurse. I have 13 years of experience working in tertiary-level and quaternary-level academic medical centers and as faculty teaching nursing theory and clinical practice at the university level. My expertise spans 20 years of working with individuals confined in the Federal Bureau of Prisons.

2. Correctional facilities such as the Bureau of Prisons ("BOP") primarily focus on mass detention rather than individualized care. Institutional policies and practices rarely align with established healthcare standards for optimal care and risk mitigation. Despite the inevitability of predictably poor outcomes, institutional security is prioritized over individual well-being.

3. In correctional healthcare settings, numerous factors contribute to the systemic problem of inadequate care. High patient-to-nurse ratio, critical staffing shortages, and high workload stress increase the likelihood of errors. These problems are longstanding and well documented in the BOP.

4. I have reviewed over 1,000 pages of Mr. Wallach's medical records from his time in the custody of the BOP. I have also communicated directly with Mr. Wallach regarding his medical condition and the care he has received in BOP custody.

5. Mr. Wallach's medical records indicate that he was seen in medical on December 21, 2022, for presyncope/syncopal episodes. These same records indicate that in the days leading up to and following this episode, Mr. Wallach's blood glucose levels were checked only twice (12/17/22 and 12/21/22) and found to be alarmingly low. Normally, such blood sugar readings are considered hypoglycemic and, at a minimum, require close monitoring of a patient in the form of scheduled blood sugar checks three or four times a day (before meals and at bedtime)

until the problem is resolved.  Despite the fact that he was a documented fall risk with a history of falls, nothing in Mr. Wallach's medical records indicate that this was done or that he was otherwise treated in late December for his low blood sugar.  In fact, the records indicate only one additional blood glucose test was performed on December 30, 2022, nearly 10 days later.  That non-fasting result of 62 was also dangerously low.

6. Mr. Wallach's medical records also indicate that on January 5, 2023, he sought medical treatment for feeling "shaky and dizzy."  In response, BOP staff temporarily discontinued a medication used to manage Mr. Wallach's diabetes, but did not institute additional, frequent checks of Mr. Wallach's blood glucose level to monitor his progress—an expected intervention for symptomatic hypoglycemia.  The minimum standard of care for treating a symptomatic diabetic patient with unstable blood glucose levels would require not only pausing the medication that BOP staff believed was causing Mr. Wallach's blood sugar to be dangerously low, but it would also require medical staff to closely monitor Mr. Wallach by checking his blood sugar levels three or four times a day for several days to confirm that the intervention resolved the problem.  This was not done.

7. Just three days later, on January 8, 2023, Mr. Wallach sustained a traumatic brain injury from a catastrophic fall onto the concrete floor in BOP custody.  During emergency triage at the hospital, Mr. Wallach tested positive for M. catarrhalis, a bacterial pathogen associated with respiratory infections, and was simultaneously diagnosed with coronavirus, influenza, pneumonia, and acute respiratory failure.  In my professional opinion, someone this sick on January 8 would have had observable symptoms on January 5 when Mr. Wallach sought medical treatment from the BOP for feeling "shaky and dizzy."

8. Based on the medical records I have reviewed, in addition to their failure to properly assess, treat, and monitor Mr. Wallach's hypoglycemia, I believe that BOP staff failed to recognize (or simply ignored) how sick Mr. Wallach was in late December 2022 and early January 2023.  At a minimum, medical staff should have instituted several daily checks of Mr.

3

Wallach's blood glucose level. This expected intervention would not only have caught any ongoing issues with hypoglycemia, which can cause a patient to faint, it would have also alerted the medical staff that Mr. Wallach was otherwise acutely ill. During this period, medical staff could have performed a simple nasal swab to test for influenza and coronavirus and prescribed Tamiflu and/or other antiviral medications. His vital signs should have been monitored daily by nursing staff, he should have been tested and treated for respiratory viruses by medical providers, and his condition should have been documented by all care providers until he recovered. However, there are no medical records for the period of January 5 to January 8.

9. Based on this documented series of events, I believe that the BOP failed to properly monitor, assess, treat, and protect Mr. Wallach from harm. I specifically believe that Mr. Wallach's fall on January 8 was preventable and was the direct result of the BOP's failure to recognize how sick he was, intervene, and provide him with appropriate care after his prior fainting spells, complaints of dizziness, dangerously unstable glucose levels, and infection by multiple pathogens.

10. The BOP again failed to institute basic fall precautions when Mr. Wallach returned to MCFP Springfield after his hospital stay. With a patient experiencing confusion and other mental deficits, it is unreasonable to rely on the patient's using a call light, as was done here. Expecting a patient with a traumatic brain injury, poor memory, and impaired, impulsive thinking to use a call light shows neglect, disregard for safety standards, and poor critical thinking. As a minimum, medical staff should have used bed and chair alarms to ensure that staff would be aware when Mr. Wallach attempted to stand or ambulate on his own.

11. I understand from reviewing Mr. Wallach's medical records that he suffered another fall in BOP custody on February 5, 2023, just two days after his discharge from a 25-day ICU hospitalization. Mr. Wallach has informed me that in June 2023, he fell again. This more recent fall was not documented in Mr. Wallach's medical records. It is possible that Mr. Wallach has fallen multiple times without the event being documented.

12. I believe that Mr. Wallach's falls in February 2023 and June 2023 were the direct result of the BOP's negligence in failing to institute basic fall precautions for someone with Mr. Wallach's mental deficits. These precautions are still not in place. Until they are, Mr. Wallach remains at risk for future falls and fall-related head injuries and fractures. For someone whose health is as fragile as Mr. Wallach's, a fall-related injury could result in serious complications, even death.

13. Mr. Wallach has informed me that he continues to struggle with swallowing and that choking while eating or drinking is a regular occurrence. Impaired swallowing puts Mr. Wallach at risk of silent aspiration, which occurs when one inadvertently inhales foods or liquids. Aspiration can lead to pneumonia, which is very dangerous for someone with fragile health. Increased saliva output, such as that currently being experienced by Mr. Wallach, increases the risk of aspiration.

14. Impaired memory, inability to focus, difficulties with communication, and mental health challenges such as depression, anger, and mood swings are known complications with traumatic brain injuries. I understand from my communications with Mr. Wallach and from my review of his medical records that he is currently experiencing these symptoms. These symptoms can make it difficult for Mr. Wallach to comprehend and follow the instructions of officers and staff, increasing the risk of injury to Mr. Wallach and the burden to BOP staff in caring for him. These symptoms also impede Mr. Wallach's ability to absorb and retain information, which in turn prevents him from participating in the BOP's rehabilitative programs.

15. It is crucial for individuals with traumatic brain injuries to receive ongoing comprehensive care, including physical therapy, occupational therapy, and mental health services. Mr. Wallach's medical records reflect a pattern where the complexities of Mr. Wallach's traumatic brain injury have not been fully integrated into his care. In my professional opinion, BOP staff have failed to recognize the extensive and interconnected effects of Mr. Wallach's injury, leading to an oversimplified approach to Mr. Wallach's multifaceted

symptoms and problems. Proper management of Mr. Wallach's care requires an interdisciplinary approach that addresses physical, cognitive, emotional, and behavioral health. The records reveal a siloed approach amongst BOP staff and medical providers, as well as a lack of knowledge and experience, understaffing, and at times a blatant disregard for the safety of those within its care.

16. In reviewing Mr. Wallach's medical records, I have identified concerning inconsistencies in the BOP's documentation of Mr. Wallach's condition. For example, a monthly nursing assessment from March 2023 indicated that Mr. Wallach received thickened liquids, which is a means of protecting against aspiration and choking, but the report also indicated that Mr. Wallach had no difficulties chewing and swallowing. That same assessment states that Mr. Wallach's memory is impaired yet contains a contrary indication that he has no barriers to education. As another example, an interdisciplinary team assessment in September 2023 reported that Mr. Wallach had an "appropriate" affect, yet multiple providers had recently documented that Mr. Wallach was experiencing increased emotional outbursts. More generally, Mr. Wallach's self-care deficit and mobility issues are recognized but not consistently addressed or documented.

17. Mr. Wallach's medical records also indicate alarming gaps in his care. For example, in April 2023, a speech therapist recommended that Mr. Wallach be given thin liquids with certain parameters to prevent aspiration. But to be safely implemented, this recommendation requires daily monitoring to ensure compliance with the imposed parameters. I do not believe this monitoring occurred both because it was not documented and because it is unlikely that the BOP staff can provide sufficient monitoring in light of ongoing staffing shortages. As another example, in October 2023 Mr. Wallach complained of congestion, persistent cough, and nasal drainage for two weeks. He was prescribed Flonase. The provider noted that Mr. Wallach had no symptoms of systemic illness but failed to assess breath sounds. Listening to lungs would be expected as part of an assessment of a patient with a history of

respiratory failure, a high aspiration risk, and a history of influenza, COVID, and pneumonia. One week later, Mr. Wallach returned to medical with worsening symptoms. Mr. Wallach was not tested for coronavirus or influenza, despite his symptoms and the onset of flu season. The provider diagnosed a sinus infection and prescribed antibiotics but did not discontinue the Flonase. A report dated November 15, 2023, listed Flonase as active until December 31, 2023, with no documented reason for continued use. There is also a pattern of delayed adjustments to medication and a disconnect between various healthcare providers' assessments and the actual interventions provided.

18. I believe that these problems with Mr. Wallach's medical records and care are symptomatic of MCFP Springfield's poor care management practices and the BOP's system-wide failures as documented in published reports and investigations. The pattern of inconsistent documentation, overlooked symptoms, and delayed interventions suggest systemic issues in care coordination and quality. As a medical professional, I do not believe that the BOP is currently capable of providing Mr. Wallach with appropriate care. Mr. Wallach will suffer if he remains in a custodial setting.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 1st day of December 2023, at Orange County, California.

DocuSigned by:

*Carole Santos*
A9BF2498484A4D9...
Carole Santos, MSN, RN, PHN, CNL, CMSRN